UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
J.K. INTERNATIONAL PTY. LTD.,           :

                                      Plaintiff,           :       07 Civ. 7328 (SHS)

      - against -                                       :       ECF CASE

OLDENDORFF CARRIERS GMBH & CO.,     :

                                    Defendant.          :
-------------------------------------------------------------------X

## DECLARATION OF TIMOTHY NICHOLAS YOUNG Q.C.

I, TIMOTHY NICHOLAS YOUNG, of 20 Essex Street, London WC2R 3AL hereby declare as follows.

1.     I have been asked by counsel in New York acting for the defendant for my opinion on a point of English law, to which I refer below, and I am told that certain information is required as a matter of the procedural rules of the Federal Courts of the United States governing expert reports. I will therefore begin by setting out that information as briefly as I can. I am a Queen's Counsel practising from my chambers at the above address (previously 3 Essex Court, Temple) in the field of international trade and shipping law in particular, before arbitral and all levels of the courts in England. I have been thus in practice as a barrister since 1978, having been called to the Bar of England and Wales in 1977; I was appointed Queen's Counsel in 1996 and I was elected a Master of the Bench of the Honourable Society of Gray's Inn in January 2004. Prior to my call to the Bar, I took a first class honours degree in Jurisprudence at the University of Oxford (Magdalen College, where I was an exhibitioner) in 1975 and, in the following year, I took a first class honours degree in the Bachelor of Civil Law (still at Magdalen College, where I was an honorary Senior Mackinnon Scholar); thereafter, I read for my Bar Finals, which I took in 1977, coming eighth in the year and receiving the Birkenhead Scholarship of Gray's Inn. While I was

studying for my Bar finals and in my early years of practice, namely from 1976 to 1980, I was a visiting lecturer-in-law in St. Edmund Hall, Oxford, where I taught both undergraduates and graduates.

2. As to my work outside practice at the Bar, my principal academic writing is as one of a team of authors of "Voyage Charters" published by Informa (now in its 3nd Edition, 2007), which work endeavours to set out the law on the subject of the title under English and United States law. I am a member of the London Maritime Arbitrators Association and also of the panel of arbitrators of the Financial Services Authority (recently replaced by the Financial Ombudsman Service); I publish on average about 10 awards per annum on a variety of topics.

3. I act as an advocate before English tribunals (judicial and arbitral) rather than as an expert witness, but I would reckon that I produce on average two or three opinions per annum on matters of English law which opinions are placed before overseas tribunals where English law is relevant; my oral testimony has never yet been called upon.

4. I understand that my prime duty is to assist the court on such matters as are within my expertise and that this duty overrides my duty to those by whom I am to be paid. Accordingly this Declaration is my own true and unbiased opinion based on my knowledge of English law and my own researched and independent consideration of the materials provided to me.

5. The documents I have seen are:

   (i) the Verified Complaint in Admiralty of Plaintiff, J.K. International Pty. Ltd. ("JK"), together with the Verification and Declaration each of Michael O. Hardison;

   (ii) the time charterparty ("the charterparty") for the handymax bulkcarrier mv FREDERIKE OLDENDORFF ("the vessel") dated 12th April 2007 between JK and defendant Oldendorff Carriers GmbH & Co.

("Oldendorff"), as disponent owners, for a time charter trip via safe ports and/or anchorages Vancouver and India and/or Bangladesh with a cargo of agrarian products in bulk, including peas; the vessel was described as having a summer saltwater draft of 11.74 metres on a deadweight of 48,226 and a winter saltwater draft of 11.405 metres on a deadweight of 46,961 mts;

(iii) copies of seven Original "to Order" Bills of Lading signed by agents of the master dated respectively 28th April 2007 (one) and 30th April 2007 for the remainder evidencing the shipment of 46,920.298 mts of yellow peas in bulk in Vancouver by JK, who were also the notify party, for carriage to "India", which bills of lading incorporated the terms of a "charter party dated 12.04.2007";

(iv) correspondence about the precise formulation of JK's claim; and

(iv) a Declaration of Adam Russ, a representative of Oldendorff.

6. I understand that the facts of this case are contested. I will seek to give my opinion as to English law on the basis of the two sets of facts as apparent from the documents. I will set out my understanding of the factual positions in order to lay the foundation for the opinions expressed.

7. Some points are common between the parties. It is common ground that the vessel was chartered for one time charter trip on the charterparty terms and the voyage carried out under it was from Vancouver to India. It is likewise common ground that Bills of lading were issued in respect of the cargoes of peas designating the port of discharge as "India". That meant that, as at the time of issue of the bills of lading, the cargo owners (JK) had not determined where precisely discharge was to take place. As time charterers JK retained the right to give orders to the Master of the vessel as to her employment and so they could choose to which port or ports they required the vessel to go. This is not at all unusual. The bills of lading were signed by the agents of the master and were therefore, as a matter of English law, "Owners' Bills", that is to say Bills of

Lading which contained or evidenced a contract of carriage between the registered owners of the vessel (not, I understand, Oldendorff) and the shippers and lawful holders of the Bills of Lading. Oldendorff were not parties to those contracts. They were "to Order" bills, by which the shippers retained the right of disposal so that they could endorse the bills of lading to third parties who would then become lawful holders. The designation of JK as "notify party" indicates that JK had no on-sale contract or sub-charter in existence at that time. I am not aware one way or another whether there any endorsements.. I note that the bills of Lading expressly incorporated the terms of a "charter party dated 12.04.2007", which would seem to be the charterparty mentioned above, although it is of course possible that there were two or more pertinent charterparties of that date. Since I have seen no such charterparties, I will assume that this was a reference to the charterparty. Since the charterparty was expressly governed by English law, the Bills of Lading would be presumed to be governed similarly by English law. I will so assume.

8. The Verified Complaint stipulates at paragraph 5 that the vessel loaded a cargo of Canadian Yellow peas in bulk for carriage from Vancouver to Mumbai, India. The Bills of Lading described the cargoes as whole and split yellow peas but, as I have noted, defined the port of discharge as "India" and I have not seen any order from JK to the master of the vessel to discharge the whole cargo in Mumbai. It appears from the Declaration of Mr. Russ that the orders of JK as to the discharge port were never given for the discharge of the entire cargo at Mumbai. Mumbai is well-known as having a draft limitation and Mr. Russ says that JK sought the master's advice as to how much cargo needed to be discharged to put the vessel's draft on arrival at Mumbai at no more than 10.50 metres. That would accord with my own general experience of cases involving vessels discharging such cargoes in the inner anchorage in Mumbai.

9. While on the laden passage, on about $2^{nd} - 4^{th}$ June the vessel developed problems with her main engines in the form of high exhaust gas temperatures, which is normally symptomatic of combustion problems. The cause is not yet known, but

these problems occurred soon after the vessel took on bunkers in Singapore and it is in my experience not unknown for contaminated bunkers to cause this sort of problem. The provision of bunkers is the responsibility of charterers under time charterparties such as the instant charterparty, and hence the responsibility of JK here. JK say that the cause of the problem was a breach of charter by Oldendorff. Whatever the cause of the problem, however, the vessel slowed and finally stopped on 12th June 2007 whereafter she was salvaged and towed into Mundra for repairs, arriving there on 17th June 2007.

10. It is said by JK that the monsoon season started on the following day. I can offer no evidence on that date, but in my experience it is usually some considerable time earlier and I understand from Mr. Russ' Declaration that there is evidence to that effect and that the onset of the monsoon season was 26th May 2007. Whatever may be the relevant start of the monsoon season, it is impossible to discharge at the outer anchorage of Mumbai once it has begun.

11. It is said that the master of the vessel demanded that part of the cargo be discharged because of concerns he had about the vessel's draft and that some of the cargo should be bagged to improve stability. It is my experience that if there are too many holds with less than full cargoes of bulk products with a significant angle of repose[1], there is a risk of cargo movement and thus of a loss of stability. There is an issue about whether it was the master who demanded discharge or JK who ordered it. In my experience, there is no reason in the case of repairs to a main engine breakdown to require cargo to be discharged; it is not like hull damage repairs, for example, where some cargo may need to be discharged. If it be the case that it was JK who ordered the vessel to make partial discharge, that would of course be another matter. In that event, I can well see that there might be stability problems resulting which the master would need to address in order to

---

[1] This is the angle to which different bulk cargoes settle at the top of a stow after loading. According to their granular structure and inherent friction characteristics, they will give the appearance of peaks down to nearly flat surfaces with only small undulations. The angle of repose is the angle of the slope of the cargo. This is why some bulk cargoes require to be trimmed, that is flattened by bulldozers or the like, and even secured to prevent lateral movement. This is often done by placing bagged cargo on the surface, as I infer in this case..

maintain the vessel's seaworthiness. This seems to be the case advanced by Mr. Russ for Oldendorff.

12. Lightening took some time at Mundra (from where the lightened cargo was taken by rail to Mumbai and I assume delivered to the lawful holders of the relevant Bill of Lading) and thereafter the vessel went to discharge the balance of the cargo(es) at Mumbai, arriving there on 7th July 2007. It was said that there original estimated time of arrival ("ETA") was 2nd June 2007, which would have permitted discharge before the onset of the monsoon season. Since the vessel could not, because of the seasonal weather, the vessel had to discharge, not at the inner anchorage at Mumbai but at berth. It is said that there is a claim by a barge owner who had been contracted to take discharge and it is also said that there was a claim by cargo receivers against JK for late delivery of the cargoes.

13. I note that the Verified Complaint puts the rise of the main engine exhaust gas temperatures as from on or about $2^{nd} - 4^{th}$ June 2007 and that the vessel's original ETA at Mumbai was 2nd June 2007. Thus it would seem that the main engine problems did not manifest themselves until on or after the original ETA at Mumbai. There is no pleaded suggestion of a prior delay. Mr. Russ says that the vessel had sailed past Mumbai by the time of her breakdown and that no significant delay was caused to her ETA at Mumbai by the breakdown. I think it is therefore a matter of implicit agreement between the Verified Complaint and Mr. Russ. The vessel, it seems, had sailed past Mumbai headed for somewhere else before the engine problems developed and finally brought the vessel to a standstill. This would be consistent only with the vessel going somewhere else first for lightening, and given that the vessel was more deeply drafted than 10.50 metres, this would seem most probable, but the Verified Complaint does not develop this point and so the extent of the common ground is unclear.

14. JK have sought and obtained a Supplemental Admiralty Rule B Attachment of Oldendorff's moneys in the sum of US$4,723,237.92, which seems to be made up as follows:

6

      (1)      Principal claim in the amount of $3,230,009.89;

      (2)      Interest at the rate of 10.25% per annum for 3 years; and

      (3)      Legal costs and disbursements in relation to a London arbitration, $500,000.

15.    The principal claim is made up in the following manner, so I understand.

| Item | Amount |
|---|---|
| Deviation to Mundra (1.4 days plus bunkers) | $58,695.00 |
| Mundra to Mumbai (1.4 days plus bunkers) | $58,695.00 |
| Time Taken to Discharge at Mundra (7 days) | $239,715.00 |
| Time Taken to Discharge at Mumbai up until 10/08/07 (23 days) | $787,635.00 |
| Less Time allowed for same tonnage in Barges (minus 7 days) | ($239,715.00) |
| Bagging at Mundra Anchorage due to Masters change in instructions (4 days) | $135,060.00 |
| Waiting time at Mumbai due to Masters refusal to come to anchorage (1 day) | $33,765.00 |
| Port Costs at Mundra (INR 6,123,106 / Exchange @40.75) | $150,260.27 |
| Bagging costs at Mundra (There was no need if the vessel had gone to Mumbai directly as per original itinerary) | $8,547.63 |
| Receivers Claim for Late Delivery of Cargo (Usd30.00 per mton) | $1,350,000.00 |
| Barge operator Claim for Vessels cancelled call at Mumbai due to delay in arrival as earlier planned (INR 11,880,000.0 / Exchange @ 40.75) | $291,533.74 |
| Transport charges to take stock from Mundra to Mumbai by rail (INR 9,360,000.00 / Exchange @ 40.75) | $229,693.25 |
| Port Costs at Mumbai since the vessel had to discharge at berth | $126,125.00 |

16.    I will begin by giving my opinion as to the English law assuming that the main engine problems were the result of a breach of charterparty by Oldendorff.

17.    The purpose of an award of damages is to put the plaintiff into the same position financially as if the contract had not been broken (Robinson v. Harman (1848) 1 Ex. 850 at page 855). The recoverable damages would therefore be the losses

caused to JK as caused by that breach, rather than for example losses which would have been incurred in any event (The Golden Victory [2007] 2 W.L.R. 691) or losses caused by JK's own unreasonable conduct in failing to mitigate their loss (Banco de Portugal v Waterlow [1932] A.C. 452). Losses of the type would have to be contemplated by the parties as a not unlikely consequence of the breach in the normal course of business as at the date when the charterparty was concluded (The Heron II [1969] 1 A.C.350 and see also a very recent decision of the Court of Appeal in The Achilleas [2007] 1 Lloyd's Rep. 19 at first instance and [2007] EWCA Civ. 901 in the Court of Appeal, dismissing the appeal). It is plain that many of the above heads of damage would normally be recoverable in principle, although one would have to give credit for the usual time and costs of discharge at Mumbai, which would inevitably have required some significant lightening given the draft limits at Mumbai and the weight of cargo loaded on the charterparty warranted draft of about 11.4 metres on that deadweight; and so one has also to factor in the time and cost of such lightening. I am unsure as to the extent to which JK have done this since the lightening, bagging and on-carriage costs would seem to have been inevitable for discharge in Mumbai. I cannot determine how the allowance of 7 days has been assessed. It appears not to include the time and cost of going to the lightening port, whichever it was.

18. However, there are three heads of damage which surprise me in this connection:

 (i) The waiting time at Mumbai due to the Master's refusal to come to the anchorage (1 day) seems not to be related to the engine problems and seems to relate to an entirely unspecified refusal of the master to obey a sailing order. The background of this is unexplained in the Verified Complaint, but a charterer cannot place a vessel off-hire (or recover damages for hire wasted) if the master acts in reasonable response to navigation risks he encounters (The Hill Harmony [2001] 1 Lloyd's Rep. 147). He is in particular not necessarily obliged to obey an order instantly (The Houda [1994] 2 Lloyd's Rep. 541); he is entitled to some time to inform himself and consider the risks inherent in obeying

an order which is in effect as to an element of navigation as to which he bears the ultimate responsibility (Larrinaga v The Crown (1944) 78 Ll. L. Rep. 167).

(ii) The barge operator's claim for the vessel's cancelled call at Mumbai would seem to be a most unusual head of loss and not one which a reasonable shipowner would contemplate as resulting from his breach, since barges in Mumbai are feverishly occupied in unloading vessels before the onset of the monsoon and thus fully occupied so that such a loss would seem most improbable and unforeseeable. I note that it has not been said that the claim has been paid by JK.

(iii) The most extraordinary of the lot is the large claim for delay as made by the receivers. I am surprised because "cargo receivers" would be highly unlikely to make a claim on JK for such a loss unless there was a specific term in their sale contract, guaranteeing an arrival date, which would not be in the reasonable contemplation of Oldendorff at the time of the making of the charterparty. Such terms are highly unusual and would require JK specifically to inform Oldendorff before contracting so that it can be said that Oldendorff ought to have contemplated such a loss as resulting form their breach of charter. What I would expect in the normal course of things would be that the cargo receivers, who would be lawful holders of the relevant bill of lading would make a claim under that bill of lading against the registered owners of the carrying the vessel and not against JK. Since the Verified Complaint and other documents offer no explanation of the claim by cargo receivers other, perhaps, than to indicate that it is a claim which JK have not paid, I am unable to see how such a claim would be not unlikely to arise. It might be different if the "cargo receivers" were JK themselves (see The Heron II, above), but then the claim would not be formulated as one for an indemnity for a claim against JK by "cargo receivers". The type of alleged loss is quite different in that case.

9

19. However, once one factors in the points made by Mr. Russ as to the timing of the requests by JK to advise about lightening to make an arrival draft of 10.50 metres at Mumbai and about an order by JK for the vessel to lighten in Mundra and further about this not being a requirement of the master, then the quantum of the claim is obviously very significantly further reduced. Charterers cannot claim damages for the consequences of a master following their orders as to the employment of the vessel, by which is meant the economic utilization of the vessel (The Hill Harmony, above). Indeed, it is the other way round, since owners (or disponent owners) are entitled in principle to an indemnity from the charterers for the consequences of following an order as to the employment of the vessel; it is charterers who compensate owners in such a case (The Island Archon [1994] 2 Lloyd's Rep. 227). Thus, if for example, a charterer requires cargo to be discharged at a way port such that the remaining cargo on the vessel needs to be secured for stability purposes, then if the shipowner pays the costs of such securing (or bagging) it is he who is entitled to indemnity from the charterer as to those costs and if necessary the time, the port costs and any deviation expenses.

20. Therefore, if as Mr. Russ says (I express no view on this factual point) the vessel was always going to miss the monsoon onset date and was always going to have to lighten before going too Mumbai, then the charterer could never recover as damages the costs associated with those inevitable operations even assuming a breach by the shipowner with regard to the main engine failures. To do so would be to put the charterer into a *better* position than if the contract had been performed and that is contrary to the purpose of an award of damages. It will be seen that, if this assumption be correct, then very little indeed of the claim survives. Of course, to the extent that the period of the charter has been extended by the breach, then JK are entitled to be compensated for that loss, but since that would normally done by putting the vessel "off-hire", there would be no need for such a claim as damages. I infer that the absence of such a claim would indicate that JK did indeed put the vessel off-hire and thus achieved the simple remedy of self-help.

21. If the problems were the result of the contamination of bunkers provided by JK under their bunkering obligations in the charterparty, then not only would all of the above claims be plainly unsustainable, but Oldendorff would be able to recover the value of lost hire and an indemnity in respect of the cost of main engine repairs if charged for them by the headowners.

22. Whichever assumption be correct, the resolution will have to be done by arbitration in London. I might render a few comments about some elements in JK's claim in that regard. They indicate that the costs would be of the order of US$500,000. That is a surprising figure for what is on any view a relatively run-of-the-mill engine breakdown claim. English arbitrators have the power to limit the amount of recoverable costs. Also the claim for interest at 10.25% per annum is, in my view excessive for two main reasons. First, the figure is excessive; London arbitrators usually award 2-2.5% above base or prime, compounded at quarterly or half-yearly rests; in the light of recent interest rate increases, this would currently generate a figure of about 8%. Second the period of 3 years is excessive since this is the sort of claim that should not take three years to bring to an award, being as I have said a run-of-the-mill claim; it should be completed within 18 months and arbitrators have many powers to ensure that delays are avoided. The draftsman of the Verified Complaint has a rather adverse and possibly a rather old-fashioned view of what modern maritime arbitration in London involves in terms of time and money.

23. <u>Conclusion</u>: In summary, therefore, on the basis of the facts as pleaded in the Verified Complaint, very significant elements of the quantum claimed are excessive and not reasonably recoverable as a matter of English law. The facts alleged may be amended or clarified, but as they stand in that document, that is clear in my view. If the facts turn out to be as set out in Mr. Russ' Declaration, namely that the vessel was always going to have to lighten somewhere (in the event Mundra) before proceeding to and unloading at Mumbai, then I do not think that any of the pleaded claims is reasonably recoverable as a matter of English law.

I declare under penalty of perjury and the laws of the United States of America that the foregoing is true and correct.

Executed at _London on the 2nd day of_ October 2007.

_____
Timothy Young Q.C.