UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
J.K. INTERNATIONAL PTY. LTD.,                  :
                                               :
                        Plaintiff,             :        07 Civ. 7328 (SHS)
                                               :
        - against -                            :        ECF CASE
                                               :
OLDENDORFF CARRIERS GMBH & CO.,                :
                                               :
                        Defendant.             :
-------------------------------------------------------X

## DECLARATION OF ADAM RUSS

Adam Russ declares as follows:

     1.    I am an English solicitor employed by the Defendant, Oldendorff Carriers GmbH & Co., working in its Legal Department. I can confirm that I am duly authorised to make this Declaration on behalf of the Defendant, Oldendorff Carriers GmbH & Co. ("Oldendorff"), based upon my own personal knowledge of this matter and upon information received from my Operations Department. I will also refer to documents as attached to this Declaration as Exhibits 1-6.

     2.    I have carefully read the Plaintiff's Complaint in this matter dated 16 August 2007. I acknowledge that on or about 12 April 2007 Oldendorff entered into a charterparty with the Plaintiff in which it agreed to charter the vessel "FREDERIKE OLDENDORFF" to the Plaintiff for one time charter trip of duration of about 65-70 days (Exhibit 1). At all times, Oldendorff was the disponent Owner of the vessel and Plaintiff was the charterer of the vessel.

     3.    On or about 16 April 2007 the Plaintiff's agents, Transworld Marine Express, issued voyage instructions to the Master of the vessel confirming to the Master that his vessel had been fixed for one time charter trip of about 65-70 days with intention to discharge West Coast India, Mumbai, or in Charterers' option East Coast India, Bangladesh after loading a full cargo of peas from Vancouver, Canada for Messrs JKI of Brisbane (Exhibit 2).

266537

4.      On or about 30 April 2007, the vessel loaded about 47,000 tons of Canadian Yellow Peas in bulk for carriage from Vancouver, Canada to India. I attach Bills of Lading numbered 1-7 dated Vancouver 28 and 30 April 2007 for discharge India (Exhibit 3).

5.      The vessel sailed from Vancouver, Canada on or about 1 May 2007 bound for West Coast of India via Singapore for bunkers and fumigation of the cargo. At Exhibit 3 I set out correspondence between the Master of the vessel and the Plaintiff's agents. On 21 May 2007 (message (i) of Exhibit 4) the Master of the vessel sent a message to Transworld Marine Express stating that he still had no information about the intended port of destination. He requested Plaintiff to nominate the discharge port. On 23 May 2007 (message (iii) of Exhibit 4) he repeated his request and asked for clear voyage instructions as soon as possible and information about the port of destination. On or about 28 May 2007 the vessel arrived at Singapore to take on fuel ("bunkers") and to fumigate the cargo. On or about 29 May 2007 the vessel sailed from Singapore still bound for West Coast of India.

6.      On 30 May 2007 (message 1 of Exhibit 4) Messrs Sahi Oretrans Mumbai, the Plaintiff's agent, sent a message to the Master requesting how much cargo was to be discharged in order to arrive at Mumbai with a draft (*i.e.*, the extent of the vessel's structure below the water line) of 10.5 metres or 10.0 metres. Shortly afterwards (message 2 of Exhibit 4) Transworld Marine Express sent a further message to the Master requesting his arrival draft and trim and to advise if he could discharge part of the cargo from Hold 4 at Mangalore to achieve even keel and then proceed to Mumbai. Sahi Oretrans then repeated their message (message 3 of Exhibit 4) requesting the quantity to be discharged to arrive at Mumbai with a draft of 10.0m or 10.5m and details of the holds from which the cargo was to be discharged to arrive at those drafts.

7.      Later on 30 May 2007 (message 3a of Exhibit 4) the Master responded to advise that in order to arrive with even keel draft 10.5 metres he would need to discharge 7,200 metric tonnes in total from Holds 2 and 4. In response Sahi Oretrans (message 4 of Exhibit 4) asked the Master if he could reduce the draft by reducing the vessel's ballast and pumping out fresh water so that she could arrive on even keel. They also asked the Master what even keel draft would be after following those options. The Master

266537

responded (message 4a of Exhibit 4) on 31 May 2007 advising that in order to arrive at even keel he would have to pump 700 tons of ballast into the forepeak and would arrive with a maximum draft of 11.95 metres. Later that day, 31 May 2007, Sahi Oretrans acknowledged (message 5 of Exhibit 4) the Master's response and said that they were discussing this with the Plaintiff.

8.      The Plaintiff's Complaint states that the vessel experienced engine problems on or about 2-4 June 2007. *See Plaintiff's Verified Complaint at paragraph 6.* I understand that to be correct although there was little reduction in her daily speed as compared to her average voyage speed until about 6 June 2007. The vessel was then maintaining around 5 to 6 knots until she broke down on 12 June 2007.

9.      On 4 June 2007, Sahi Oretrans advised the Master (message 6 of Exhibit 4) that due to concerns about falling tides and worsening weather that they may divert the vessel to Kandla and requested the Master to advise how much cargo needed to be discharged to achieve a draft of 10.5 metres at Mumbai. However, on the same day, the Master advised Sahi Oretrans that there was a draft restriction at Kandla (message 6a of Exhibit 4).

10.     On 7 June 2007, the Master advised Sahi Oretrans of the engine problems and he gave them a revised ETA at Mumbai of 10 June 2007 and further advised that he was still awaiting firm voyage instructions as to the first discharge port (message 7b of Exhibit 4). The following day, 8 June 2007, Sahi Oretrans confirmed to the Master that as advised by Charterers the first discharge port would be Mundra (message 8 of Exhibit 4). This was the first time that the port of Mundra was mentioned, and it is clear from these communications that the instructions came from the Plaintiff Charterers and not from the Master, as alleged at paragraphs 8-12 of the Plaintiff's Verified Complaint.

11.     It was this point in time that, in my view, the Plaintiff recognized that the vessel could never have been able to lighten to achieve a permissible draft and enter the port of Mumbai. It had nothing to do with any demands from the Master and nothing to do with any engine problems. It should also be noted that at no time during the period of these communications did the Plaintiff protest to the Master about the necessity to proceed to Mundra or put Oldendorff on notice of any claims that may arise therefrom. There then followed some communications regarding the amounts to be discharged at

Mundra in order that the vessel would not have any stability problems and arrive at Mundra with a 10.5 metres draft. The master required part of the cargo to be bagged in order to keep the vessel's stability within acceptable limits. The bagged cargo was placed atop the bulk cargo to prevent shifting and movement of the cargo. However, that requirement was necessary solely because of the Plaintiff's decision to send the vessel to Mundra, and not due to any decisions unilaterally made by the Master as alleged at paragraph 11 of the Plaintiff's Verified Complaint.

12.    In addition, contrary to the allegations at paragraphs 8 and 9 of the Plaintiff's Verified Complaint, it is evident from the documents that the vessel was never going to arrive outside of the monsoon season that affects India and Bangladesh. Plaintiff's Complaint states that the monsoon season commenced in India on 18 June 2007. However, from evidence that I have gathered from my Operations Department, it is clear that the vessel would not have been able to lighten cargo at the outer anchorage in Mumbai after 25 May 2007. The Mumbai Port Trust Circular dated 26 June 2006 (Exhibit 4) states that vessels cannot access the inner anchorage with a draft greater than 10.5 metres. If a vessel has a greater draft than 10.5 metres then she is required to lighten at the outer anchorage but during the monsoon season that anchorage is decommissioned.

13.    I attach a copy of a Certificate of Survey for inland vessels (Exhibit 6) issued by the Maharashtra Maritime Board for an inland vessel of the type that would be used to lighten the "FREDERIKE OLDENDORFF". It will be noted that the fair and foul weather limits (i.e., the dates between which vessel operations are restricted due to weather conditions) are set out on the face of the Certificate. For barges this means that they cannot operate at the outer anchorage during the foul season between 26 May and 31 August inclusive. I also attach a letter from Vinayak Multimodal Transport PVT Limited dated 23 August 2007 (Exhibit 7). In their letter they confirm that they provided barges at the inner anchorage to discharge the "FREDERIKE OLDENDORFF". However, the Plaintiff's agents did not approach them for discharging cargo at the outer anchorage during the period from 25 May 2007 to 25 July 2007 but, in any event, and contrary to Plaintiff's allegations at paragraph 14 of its Verified Complaint, Vinayak could not provide barges outside of the foul weather limit for the port during that period.

266537

14.    It follows from the above that the vessel could never have lightened at Mumbai. The vessel's ETA at Mumbai was never earlier than 2 June 2007 and this is acknowledged by the Plaintiff. It is therefore incorrect for the Plaintiff to state that discharge of the cargo could have been carried out prior to the onset of the monsoon or foul weather season that started on 25 May 2007. It is also incorrect for the Plaintiff to state that it had arranged to discharge cargo into barges at an anchorage but due to the monsoon season it was required to direct the vessel to a berth in order to discharge the cargo. *See Plaintiff's Verified Complaint at paragraphs 13-15.* It is clear from the letter from Vinayak that discharge did take place at the inner anchorage from 19 July to 25 July 2007. However, initial lightening of the vessel to admit her to the inner anchorage could not take place due to the monsoon season.

15.    I am aware that the vessel experienced engine problems from about 4 June 2007 and I understand that the vessel broke down on or about 12 June 2007. However, it is not correct for the Plaintiff to state in at paragraph 7 of its Verified Complaint that the Defendant entered into a contract to salvage the vessel and declared general average. This was carried out by the registered owners. At all times the defendant was the disponent owner and it took no such actions,

16.    The vessel broke down after the Plaintiff's order for the vessel to proceed to Mundra. Further, the vessel had passed Mumbai by the time of the break down. No significant delay was caused to the vessel's ETA at Mumbai by the engine problems, which, in any case, was caused by the off-specification fuel bunkers provided to the vessel by the Plaintiff.

I declare under penalty of perjury and the laws of the United States of America that the foregoing is true and correct.

Executed at Willy-Brandt-Allee 6 Lübeck, October 1st 2007.
Germany

Adam Prüse

260637

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
J.K. INTERNATIONAL PTY. LTD.,                          :
                                                       :
                              Plaintiff,               :        07 Civ. 7328 (SHS)
                                                       :
        - against -                                    :        ECF CASE
                                                       :
OLDENDORFF CARRIERS GMBH & CO.,                         :
                                                       :
                              Defendant.               :
-------------------------------------------------------------X

## DECLARATION OF ADAM RUSS

# EXHIBIT 1

# Time Charter

## GOVERNMENT FORM

*Approved by the New York Produce Exchange*

November 6th, 1913 – Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1 This Charter Party, made and concluded in *Lubeck* on the 17th day of _____ *April* _____ 19 *2007*

2 Between *Oldendorff Carriers GmbH & Co. Lubeck* _____

3 Owners of the good ~~Steamship~~/Motorship *"Frederike Oldendorff"* (*description see Clause 29*) of *Monrovia*

4 of *26586* tons gross register, and *16450* tons net register, having engines of _____ indicated horse power

5 and with full, machinery and equipment in a thoroughly efficient state, and classed _____ *18224* tons of 2240 lbs.

6 at _____ of about _____ *60856 cbm grain* ~~cubic feet bale capacity and about~~ _____ *tons of 2240 lbs.*

7 deadweight capacity (cargo and bunkers, including fresh water and stores ~~not exceeding one and one-half percent of ship's deadweight capacity,~~

8 ~~allowing a minimum of fifty tons) on a draft of~~ _____ feet _____ inches on _____ Summer freeboard, inclusive of permanent bunkers,

9 ~~which are of the capacity of about~~ _____ tons of fuel, and capable of steaming, *throughout the entire period of*

10 this Charter Party fully-laden, under good weather conditions about *14.5* knots on a consumption of about _____ *28* tons ~~of best Welsh coal - best grade fuel oil - best grade Diesel oil,~~

11 now _____ *discharging at Long Beach* _____ as Charterers of the City of _____ *Brisbane, Australia*

12 and _____ *I.E. International Pty. Ltd.* _____ as Charterers of the City of _____

13 Witnesseth, that the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14 ~~about as per Clause 30~~ *a duration of about 65-70 days without guarantee via safe port(s), safe anchorage(s), safe*

15 *berth(s) always afloat, always within Institute Warranty Limits, one time charter trip, Charterer's only allowed to load any grains wheat, peas, legumes, pulses, beans or any other agrarian products in bulk; via Vancouver, to*

16 *FULL India and / or Bangladesh in Charterer's option* ~~within below mentioned trading limits.~~ Charterers to have liability to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining

17 responsible for

18 the fulfilment of this Charter Party.

19 Vessel to be placed at the disposal of the Charterers, at *dropping last outward sea pilot Long Beach, United States West*

20 *Coast any time day or night, Sundays and holidays included.* ~~always afloat, at all times of tide, except as otherwise provided in~~

21 ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as~~ ~~the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 6.~~ *Vessel on* her delivery to be

22 ready *and clean in every way to receive and carry any permissible cargo and to be maintained in such condition during the entire period of this Charter.* ~~to receive cargo with clean-swept holds and tight.~~ *The vessel is to be staunch, strong and in every way* ~~fit~~*fitted for the service as immediately required by Charterers.* Vessel to have ~~having~~ water ballast, winches and

23 donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the ~~cranes~~ winches at one and the same

24 time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-

25 dise, ~~including petroleum or its products, in proper containers,~~ excluding *(See Clause 37).*

26 (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,

27 all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports ~~in British North~~

28 ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of~~ _____ and/or Europe,

29 ~~Mexico, and/or~~ ~~Mexico, and/or South America~~ _____

30 ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St.~~ ~~Lawrence between~~

31 ~~October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea; and the Baltic;~~

32 *worldwide trade within Institute Warranty Limits excluding (see Clause 20) but the Charterers have the option to*

33 *break I.W.L as per Clause 54.*

34

35 as the Charterers or their Agents shall direct, on the following conditions:

36 1.  That the Owners shall provide and pay for all provisions, wages, and consular discharging fees *including agency fees pertaining to owner matters* of the Crew; shall pay for the

37 insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep

38 the vessel in a thoroughly efficient state in hull *cargo spaces*, machinery and equipment for and during the service.

39 2.  That *whilst on hire* the Owners shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *including compulsory garbage removal* Pilotages, Agencies, Commissions,

40 Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into

41  a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

42  illness of the crew *or cargoes carried prior to delivery* to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this

43  charter to be for Charterers account. ~~All other fumigations to be for Charterers account after vessel has been on charter for a~~ ~~continuous period~~

44  ~~of six months or more.~~

45  Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but

46  Owners to allow them the use of any dunnage and shifting boards *and lashing equipment* already aboard the vessel. Charterers to have the privilege of using shifting boards

47  for dunnage, they making good any damage thereto.

48  3.   That the Charterers, ~~at the port of~~ *upon* delivery, and the Owners, ~~at the port of~~ *upon* re-delivery, shall take over and pay for all fuel remaining on

49  board the vessel ~~at the current prices in the respective ports, the vessel to be delivered with not less than~~        tons and not more than        tons *(See Clause 38)*

50  ~~        tons and to be re-delivered with not less than~~        tons and not more than        tons. *(See Confidential Side Letter)*

51  4.   That the Charterers shall pay for the use and hire of the said vessel at the rate of        ____

52  ____ United States Currency ~~per ton of vessel's total deadweight carrying capacity, including bunkers and~~

53  ~~stores, on ... summer freeboard, per Calendar Month,~~ commencing on and from the day of her delivery, as aforesaid, and at

54  and after the same rate for any part of a *day* month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary

55  wear and tear excepted, to the Owners (unless lost) at *dropping last outward sea pilot one safe port West Coast or East Coast India / Bangladesh range any time day or night Sundays and holidays included* unless otherwise mutually agreed.

56  Charterers are to give Owners not less than *30 days notice of intended redelivery range followed by 25/15/10/5 days approximate and probable port and 2/1 days definite* days

57  notice of vessels expected date of re-delivery, and probable port.

58  5.   Payment of said hire to be made in ~~New York~~ cash in United States currency, ~~semi-monthly~~ *every 15 days* in advance *as per main terms,* and for the last half month or (See side letter)

59  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

60  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

61  hire, or bank guarantee, or on any *fundamental* breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-

62  terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 a.m. on the~~ ~~working day~~

63  ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by~~ ~~Charterers, they~~

64  ~~to have the privilege of using vessel at once, such time used to count as hire.~~

65  Cash for the vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject

66  to 2 ½ % commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

67  of such advances.

68  6.   That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place *in port or elsewhere* that Charterers or their Agents may

69  direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessel to safely

70  lie aground.   *As per Clause 55* ____

71  7.   That the whole reach of the Vessel's Holds, Decks and usual places of loading (not more than she can reasonably stow and carry), also

72  accommodations for Supercargo, if carried, shall be at the Charterers disposal, reserving only proper and sufficient space for Ship's officers, crew

73  tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodation allow;~~ ~~Charterers~~

74  ~~paying Owners ... per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra~~ ~~expenses are~~

75  ~~incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense.~~

76  8.   That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

77  boats. The Captain (although appointed by the Owners), shall be under the order and directions of the Charterers as regards employment and

78  agency; and Charterers are to load, stow, and trim, *tally, secure and discharge* the cargo at their expense under the supervision and responsibility of the Captain, who, is to sign the Bills of Lading for

79  cargo as presented, in conformity with Mate's or Tally Clerk's receipts.

80  9.  That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments *but this provision does not effect Charterers right to advance any claim or require arbitration of any dispute regarding the conduct of the Master in the prosecution of his voyages and in carrying out the orders and directions of the Charterers.*

82  10.  That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted

83  with the utmost despatch.  He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the

84  rate of $1.00 *10.00* per day.  Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers at their Agents, in victual Tally

85  Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal, for all such victualling. *USD $ 1,600.00*

*USD1,500.00 lumpsum per month/pro rata for cables/ victualling, entertainment and representation.*

86  11.  That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the

87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-

88  terers, their Agents or Supercargo, when required, with a true copy of daily *deck and engine logs in English Logs*, showing the course of the vessel and distance run and the con-

89  sumption of fuel

90  12.  That the Captain shall use diligence in caring for the ventilation of the cargo.

91  13.  ~~That the Charterers shall have the option of continuing this charter for a further period of~~ .....................................

92  ~~or giving written notice thereof to the Owners or their Agents.~~ .......days before previous to the expiration of the first named term,

93  ~~or any declared option.~~

94  14.  That if required by Charterers, time not to commence before ___ *16ᵗʰ April 2007* ___ and should vessel not have

95  given written notice of readiness on or before ___ *26ᵗʰ April 2007* ___ but not later than 4 p.m.  *Delivery/redelivery time to be based on G.M.T.* Charterers or

96  their Agents to have the option of cancelling this Charter at any time not later than the day of the vessel's readiness.

97  15.  That in the event of the loss of time from deficiency of men or *deficiency of* stores, fire, breakdown or damages to hull, machinery or equipment,

98  grounding, detention by average accidents to ship cargo, drydocking for the purpose of examination or painting bottom, or by any other cause *unless such causes are due to Charterers and/or their agents and/or their servants*

99  preventing the full working of the vessel, the payment of hire shall cease for the *actual* time thereby lost and if upon the voyage the speed be reduced by

100  defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost or any extra fuel consumed in consequence

101  thereof, and all extra expenses *directly incurred by the vessel* shall be deducted from the hire.

102  16.  That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

103  returned to the Charterers at once.  The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,

104  Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105  The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

106  purpose of saving life and property.

107  17.  That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to *arbitration as per Clause 48* ~~three persons at New York,~~

108  ~~one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be~~

109  ~~final, and for~~ ~~the purpose of enforcing any award, this agreement may be made a rule of the Court.  The Arbitrators shall be commercial men.~~

110  18.  That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-

111  age contributions, and the Charterers to have alien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess

112  deposit to be returned at once.  Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their Agents, which

113  might have priority over the title and interest of the Owners in the vessel.

114  19.  That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and

115  Crew's proportion.  General Average to be adjusted, stated and settled *In London* according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive,~~ ~~and Rule F of~~

116  York-Antwerp Rules *1994 and any subsequent amendments, hire not to contribute to General Average* ~~1924, at such port or place~~ ~~in the United States as may be selected by the carrier, and as to matters not provided for by these~~

117  ~~Rules, according to the laws and usages of the port of New York.  In such adjustment~~ disbursements in foreign currencies shall be exchanged into

118 United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be

119 converted at the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or

120 bond and such additional security, as may be required by the carrier, must be furnished before delivery of goods. Such cash deposit as

121 the carrier or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall if

122 required be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery. Such deposit shall, at the option of the

123 carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the

124 place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in

125 United States money.

126     *See New Jason Clause as attached.* In the event of accident, danger, damage, or disaster, before or after commencement of the

127 voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the

128 goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,

129 losses or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the

130 goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or

131 ships belonged to strangers.

132 Provisions as to General Average in accordance with the above are to be included in all Bills of Lading issued hereunder. *English law*

133 *to apply.*     20.  Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the

134 cost of replacing same, to be allowed by Owners.

135     21.  That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a

136 convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from

137 time of last painting *at Charterers expense and their time,* and payment of the hire to be suspended until she is again in proper state for the service.

138

139 - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

140 - - - - - - - - - - - - - - - - - - - -  22.  Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks *cranes*) capable of handling lifts up

141 to *maximum in accordance with clause 29* three tons, also providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for

142 same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel sufficient light lanterns and oil for

143 night work *in holds, on deck and hatches,* and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The

144 Charterers have the use of any gear on board the vessel.

145     23.  Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;

146 steamer to provide one winchman *craneman or if required by Charterers,* watchman or tallyman per hatch to work winches *cranes* day and night, as required. Charterers agreeing to pay officers, engineers, winchmen,

147 deck hands and donkeymen for overtime work done in accordance with the working hours and rules stated in the ship's articles. If the rules of the

148 port, or labour unions, prevent crew from driving winches *cranes,* shore Winchmen to be paid by Charterers. In the event of a disabled crane winch or winches, or

149 insufficient power to operate crane or cranes winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time, occasioned

150 thereby. *In the event of loss of time due to a breakdown of derrick(s), crane(s), or winch(es) for any period by reason of disablement or insufficient power, the hire shall be reduced for the actual time lost thereby during loading/discharging unless the lost time is caused by negligence of the Charterers or their servants. If the Charterers continue working by using shore crane(s) the Owners shall pay the cost of shore crane, in which case vessel not going Off-hire.*

151     24.  It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained

152 in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,

153 etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both

154 of which are to be included in all bills of lading issued hereunder.

155                         U.S.A. Clause Paramount

156 ~~This bills of lading shall have effect subject to the provision of the Carriage of Goods by Sea Act of the United States, approved April~~

157 ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~

158 ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~

159 ~~be repugnant to said Act to extent, such term shall be void to that extent, but no further.~~

Both To Blame Collision Clause

160
161 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of this ship, the owners of the goods carried~~

163 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~

164 ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~

165 ~~carrying ship or her owners to the owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her~~

166 ~~owners as part of their claim against the carrying ship or carrier. See also Clause 37.~~
167 25. ~~The vessel shall not be required to enter any ice-bound port, or any port where lights or light ships have been or are about to be with-drawn by~~ ice-bound

168 ~~reason of ice, or when there is risk in that the ordinary course of things the vessel will not be able on account of ice in safely draw by reason of ice, or where there is risk in that the ordinary course of things the vessel will not be able on account of ice in safely enter the~~

169 ~~port or to get out after having completed loading or discharging. The vessel not to be ordered to nor bound to enter any ice-bound place or any place where lights, light ships, marks and buoys are or are likely to be withdrawn by reason of ice on the vessel's arrival or where there is risk of ordinarily the vessel will not be able on account of ice reach the place or to get out after having completed loading or discharging. The vessel not to be obliged neither to force ice nor to follow ice-breakers when inward bound. If on account of ice the Master considers it dangerous to remain at loading or discharging place for fear of the vessel being frozen in and/or damaged, he has liberty to sail to a convenient open place and await Charterers' fresh instructions. Detention through any of above clauses to be for the Charterers' account.~~

170 26. ~~Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The Owners to remain responsible for the navigation of the~~
171 ~~vessel~~ acts of pilots and tug boats, insurance, crew, and all other matters, same as when trading for their own account.
172 27. A commission of 1.25 2 ¼ per cent is payable by the Vessel and Owners to Transworld Marine Express Pty Ltd., Brisbane,
173 Australia,
174 on hire earned and paid under this Charter, and also upon any continuation or extension of the Charter.
175 28. An address commission of 2 ½ per cent is payable to see Clause 30 Charterers, J.K. International Pty Ltd., Brisbane,

Australia, on the hire earned and paid under this Charter.

*Irrespective of anything controversy in the T/C it is agreed, whenever Owners have to warrant any conditions or provide any equipment within this Charter this will only be applicable if Bareboat Charters have redelivered vessel accordingly:*

*Additional Clause 29 through 63, Convartime 1993, The Bimco I.S.P.S. Clause US Customs Advance Notification / AMS Clause, New Jason Clause, U.S.A., Clause Paramount and New Both-to-Blame Collision Clause, Hamburg Rules, US Anti Drug Abuse Act 1986, US Tax Reform 1986, Stowaways Clause, all as attached, is to be considered fully incorporated in this Charter Party;*

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by striking out of original Charters, or the insertion of new Charters, such Charters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

Owners:

Oldendorff Carriers GmbH & Co. KG
Lubeck, Germany

Charterers:

J.K. International Pty. Ltd.
Brisbane, Australia

Rider Clauses for M. V. Frederike Oldendorff / J.K. International Pty Ltd
Charter Party Dated 12th May 2007

**Clause 29: Vessel's Description**
Frederike Oldendorff
Type: Geared Handymax Bulkcarrier
Built: Year 1997
Yard: Oshima
Current name: Frederike Oldendorff
Owners: Commercially handled by: Oldendorff Carriers, Luebeck
Disponent or T/C owner  Oldendorff Carriers, Luebeck
Flag: Liberia
Homeport: Monrovia
Class: NKK
Bulk Carrier
Register number: 972555
Total cubic capacity

|  | cbm (abt.) | cuft (abt.) |
|---|---|---|
| Grain | 60956 | |
| Bale | 59778 | |

Tonnage

| | GRT | NRT |
|---|---|---|
| International | 26586 | 16450 |
| Panama | | 22103 |
| Suez | 27791 | 25232 |

Dimensions/Capacities
Deadweight / TPC

| Condition | Deadweight mt(abt.)  lt(abt.) | Draft m(abt.) ft (abt.) | Immersion tpc(abt.) |
|---|---|---|---|
| Summer SW | 48224 | 11.74 | |
| Winter SW | 46961 | 11.405 | |
| Tropical FW | 49466 | 12.250 | |
| Panama | 48226 | 12.006 | |

Length / Breadth / Height

| | m (abt.) | ft (abt.) |
|---|---|---|
| Loa | 189.33 | |
| Lpp | 180.60 | |
| Breadth | 30.95 | |
| Depth Moulded | 16.40 | |

Cubic capacity

| Hold | Deck | Grain cbm (abt.) cuft (abt.) | Bale cbm (abt.) cuft (abt.) |
|---|---|---|---|
| 1 | | 11156 | 10938 |
| 2 | | 13383 | 13124 |
| 3 | | 11948 | 11718 |
| 4 | | 13370 | 13112 |
| 5 | | 11099 | 10886 |

Hold no 3 is not floodable

Hold dimensions

| Hold | Deck | Length (m) | Breadth (m) fwd (abt.)  aft (abt.) | Height(m) fwd (abt.)  aft(abt.) |
|---|---|---|---|---|
| 1 | | 28.4 | 5.2    20.8 | |
| 2 | | 28.8 | 20.8   22.0 | |
| 3 | | 27.0 | 22.0   22.0 | |
| 4 | | 28.8 | 22.0   22.0 | |
| 5 | | 28.4 | 22.0   6.8 | |

Corrugated bulkheads lower and upper hopper

1 of 17

Rider Clauses for M. V. Frederike Oldendorff / J.K. International Pty Ltd
Charter Party Dated 12th May 2007

Strength
Location          Uniform
                  t/m2 (abt.)
Tank top hold 1   20.5mt/m³
Tank top hold 2   16.0mt/m³
Tank top hold 3   26.5mt/m³
Tank top hold 4   16.0mt/m³
Tank top hold 5   21.3mt/m³

Hatch dimensions

| Hold | Deck | Length (m) | Breadth (m) fwd (abt.) aft (abt.) |
|------|------|-----------|------------------------------------|
| 1 | | 17.1 | 15.6 |
| 2 | | 21.6 | 15.6 |
| 3 | | 19.8 | 15.6 |
| 4 | | 21.6 | 15.6 |
| 5 | | 19.8 | 15.6 |

Capacities / Constants

| | t (abt.) | cbm (abt.) | |
|--|----------|-----------|--|
| HFO | 1543 | 90% | |
| MDO | 109 | 90 % | |
| Luboil | 85 | 97.2 | 100% |
| Freshwater | 302 | 301 | |
| Ballast Water | 26768 | 26115.2 | |
| Constants/Sludge | 250 | | |

Distances

| From | To | Dist (m (abt.)) |
|------|-----|------------------|
| Waterline | Highest point (laden) | 32.32 |
| Waterline | Highest point (ballast) | 36.74 |
| Keel | Top of mast | 44.03 |
| Keel | Top of hatchcoaming | 18.30 |
| Waterline | Top of hatchcoaming (laden) | 6.69 |
| Waterline | Top of hatchcoaming (ballast) | 11.11 |
| Hatch coaming | Weatherdeck | 2.00 |
| Tanktop | Underside of hatchcover | 18.40 |

Cargo gear
Number of cranes          4 x 24 m x 25 MT
Electro Hydraulic deck crane KH-2524 N-type
Crane capacity  rated Load & Speed: 25 T x 12m/min
                speed: 53 sec (from max to min radius)
                radius max: 24.0 m(25° angle)
                radius min: 4.5 m (80°08/angle)
                slewing speed: 0.7 rpm
number of grabs 4 grabs electro hydraulic, type hook-on/radio controlled, opening single rope
                model: rshc-70/100x
                specific gravity: 0.95-1.6 t/m³
                volume capacity: /7/10m³
                headed capacity: max 11.2 t
                empty weight: 8.5 t
                wire rope: closing wire rope dia 28mm-2x3line

Rider Clauses for M. V. Frederike Oldendorff / J.K. International Pty Ltd
Charter Party Dated 12th May 2007

Cargo features
Open hatch       no
Box shaped       no
Tweendecks       no
Cells    no
RoRo  no
Ice class       no
Gear/derricks    yes
Grain fitted    yes
Suitable for grab discharge       yes
Grabs fitted     yes
Strength     yes
Logs fitted     no
CO2 fitted in engine     yes
Dangerous goods      no
Ventilation     yes    natural vent flaps on hatch covers no 1/2/3/5
2 x electric driven fans hold no 4
Australia fitted  yes
Panama Canal fitted    yes
Suez Canal fitted    yes


Speed
Speed in knt (abt.)       14.5
Main engine    Mitsubishi 6UEC 50LS II 9,900 PS (7,282 kW), 110 rpm
Speed/Consumption: Ballast    about 14.5 /about 28 t IFO
                   Laden    about 13.7/about 26.5 t IFO
                            always plus about 0,1 mts MDO
Port consumption            about 2,5 mts IFO plus about 0,1 mts MDO idle,
                            about 4,0 mts IFO plus about 0,1 mts MDO cranes working

Bunker quality   ISO 8217:2005
IFO RMG 380
MDO DMB
BIMCO standard Fuel Sulphur Content Clause to apply
Auxiliaries     Daihatsu
                6DLB 20/600ps x 720 rpm
Shaft generator  Nishishiba
3set, AC450V. x 60 hZ
Cruising range  16,900 sea miles

Miscellaneous
Accommodation 23
Lightweight     7229 MT/7115 LT
P&I Club        Gard
Call sign       A 8 D F 2
Telephone
3637 014 52     Standard B
Telefax
3637 014 53     Standard B
Telex
4636 948 97     Standard C
3637 014 55     Standard B

Repeat speed and consumption abouts. Bunker specs as above.
All details are approximate and without guarantee.

3 of 17

Rider Clauses for M. V. Frederike Oldendorff / J.K. International Pty Ltd
Charter Party Dated 12th May 2007

Clause 30 - deleted

Clause 31. - Certificates / Vaccinations:

Owners are obliged to deliver and keep the vessel, her crew and anything pertaining hereto supplied with up-to-date and complete certificates and approvals and equipment and fittings, enabling the vessel and her crew to load, carry and discharge all cargoes permitted under this Charter Party, and to receive bunkers within the trading limits of this Charter Party, even where such certificates, approvals, equipment and fittings, become necessary before or after the commencement of this Charter Party.
It is the responsibility of the Master and the Owners to arrange for vaccination required at ports of call and to keep onboard corresponding valid certificates.

If Owners fail to comply herewith, any time lost and all extra expenses to be for Owners' account and Charterers may deduct same from the hire.

Clause 32 - International Tonnage Certificate:

Upon delivery the vessel shall have onboard an International Tonnage Certificate valid for the duration of this Charter Party.

Clause 33 – delete

Clause 34 – Oil Pollution:

1) Owners warrant that throughout the currency of this charter they will provide the vessel with the following certificates:
Certificates issued pursuant to Section 1016 (a) of the Oil Pollution Act 1990, and Section 108 (a) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended, in accordance with Part 138 of Coast Guard Regulations 33 CFR, from (indicate the earliest date upon which the owners may be required to deliver the vessel into the charter), so long as these can be obtained by the owners from or by (identify the applicable scheme or schemes).
2) Notwithstanding anything whether printed or typed herein to the contrary,
(a) save as required for compliance with paragraph (1) hereof, owners shall not be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this charter.
(b) Charterers shall indemnify owners and hold them harmless in respect of any loss, damage, liability or expense (including but not limited to the costs of any delay incurred by the vessel as a result of any failure by the Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which owners may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.
(c) Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which Charterers and/or the holders of any bill of lading issued pursuant to this charter may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.
(3) Charterers warrant that the terms of this clause will be incorporated effectively into any bill of lading issued pursuant to this charter.

Clause 35 - P & I Club/Cargo Claims:

Owners guarantee that the vessel is entered and shall remain entered in a Protection and Indemnity Association for the duration of this Charter Party.
Charterers warrant that they are covered by TCL for the duration of this Charter Party.
Entry shall include but not be limited to full cover for cargo claims of any nature.

Rider Clauses for M. V. Frederike Oldendorff / J.K. International Pty Ltd
Charter Party Dated 12th May 2007

Vessel is presently entered with the (to be advised) P and I.
Any liability to third parties for cargo claims shall be apportioned between Owners and Time Charterers in accordance
with the Inter-Club New York Produce Exchange Agreement 1996.
Any cargo claims to be handled by Charterers and Owners.
Charterers shall submit any claims to Owners with supporting documents as soon as possible but before agreeing any
settlement. Neither party shall between themselves refer to the 2 (two) years time limit as a defence.
Should any cargo be damaged for which the Owners remain wholly responsible, any actual time lost and extra
expenses incurred directly by the vessel in that respect shall be deducted from the hire.

## Clause 36 - Liability insurance: - :

The Charterers shall not be responsible for loss of life nor personal injury nor arrest or seizure or loss or damage to the
vessel, and/or other objects arising from perils insured against by customary policies of insurance.

## Clause 37 - Trading exclusions/war risk insurance/ice trading:

Vessel to be employed in lawful trades for the carriage of lawful merchandise only between safe port(s) or place(s) and
safe anchorages where vessel can safely lie always afloat within I.W.L. (with exceptions as stated in Clause 55)
specifically excluding following areas: North of straight line between Stockholm End Tallin (including Stockholm and
Tallin) of Baltic Sea during the period from 15th November to 5th of May, (however, extra insurance for all breach of
I.W.L. to be for the Charterers' account as per Clause 55), Iraq, Lebanon, Sri Lanka, Great Lakes, Somalia, war and
warlike zones, and other countries having hostilities with the country of the vessel's flag and places which may be
excluded by the country of the vessel's flag.

Vessel is not ITF-fitted and delays, if any, arising due to ITF-recommendations to be for Charterers risk and account.
If Charterers trading north of straight line between Stockholm and Tallin (including Stockholm and Tallin) of the
Baltic Sea during the period from 15th November to 5th of May, Charterers to give Owners prior notice hereof and to
pay extra insurance for breach of I.W.L. as per Clause 55.

Charterers have the option of calling Ivory Coast buy any cargo claim for shortage to be for the Charterers' account
otherwise cargo claims to be dealt with in accordance with the Inter-Club Agreement.
Charterers are allowed to call Cuba, but not 200 days before vessel is being redelivered to Owners, unless the present
180 days USA-ban against Cuba trading is being lifted/declared null and void. If the USA-ban against Cuba trading
vessel is more than 180 days, then the days of not trading Cuba to be changed accordingly.

CIS-Pacific is excluded from trading. However once the present US/Canadian and/or other countries' restrictions
against tonnage trading to CIS-Pacific port have been totally lifted, Charterers will be allowed to trade to CIS-Pacific.
Charterers and Owners are to mutually agree to the point of time when vessel may resume trading to CIS-Pacific ports.
Charterers are allowed to call at Israeli ports only when all Arabian countries have lifted their ban against Israel trading
vessels.

Notwithstanding the contents of Clause 25, the Charterers are at liberty to send the vessel to port(s) and/or places
where vessels of similar class, size and type navigate.

## Clause 38 - Cargo exclusions:-

The following cargos to be excluded:
All dangerous, inflammable, injurious, hazardous and corrosive goods/commodities as listed in latest IMO D.G. code
and/or any subsequent modification/amendments thereto, explosives of any kind including blasting caps and
detonators, black powder, arms, ammunition and war materials of any kind, nuclear and radioactive
waste/materials/goods and its products/by-products petroleum or its products, motor spirits, asphalt, pitch tar,
ammonium nitrate, ammonium sulphate (however, harmless fertilizers, grades of ammonium nitrate and ammonium
sulphate are allowed), calcium carbide, calcium hypochloride, petcoke, charcoal, creosoted goods, livestock, raw copra,
hides, asbestos, caustic soda, logs (however, vessel may carry bundled pulpwood under and on deck/hatches, with all

## Rider Clauses for M. V. Frederike Oldendorff / J.K. International Pty Ltd
### Charter Party Dated 12th May 2007

lashing equipment to. be for the Charterers' account but only three voyage allowed every 12 months. The loading/ stowing/ lashing/ carrying/discharging to be strictly according to international/local/IMO regulations and to the Master's satisfaction. Bundles of pulpwood logs are weighing about 4.5/5.0 mt per bundle — length about 2.5/3.0 m and height about 2.5/3.0 m), direct reduced Iron ore pellets, sludge ore, ferro silicon, pyrites, quick lime (but limestones are allowed), chloride of lime, sunflowerseed expellers, motor blocks, turnings, scrap of any kind (see below), cotton, salt, bones, resin, shavings, tobacco, charcoal in gunny bags, quebracho extracts, sulphur and naphtha and any further cargos for which vessel not fitted.

Vessel no fitted with Appendix "B", resp. Dangerous Cargo Certificate.
The Charterers warrant that the concentrates shipped under this charter party are non hazardous and non dangerous for carriage according to applicable safety regulations incl. IMO Code(s), but coal and petcoke always to be allowed. The cargo is to be loaded, stowed, trimmed, and discharged strictly in accordance with IMO and local regulations / department of trade regulations at port of call of place of transit. Moisture content of cargo to be within safe limit for sea transport. Certificate(s) relating to moisture content of the concentrates to be handed to Master prior loading. Charterers are allowed to carry fishmeal, however, Charterers clearly understand that the vessel is not CO2 fitted. Any CO2 fittings in holds and time used/material needed to be for Charterers' account The CO2 fitting must meet the international and local IMO's regulations and the Master's satisfaction. Charterers to make holds odourless after discharge to the Master's satisfaction.

(A) Charterers have the option to load sulphur under the following conditions:
1) Prior to loading sulphur, Charterers to arrange and pay for shore labour to apply suitable lime coating to holds at Charterers' time/cost/expenses to the satisfaction of the Master.
2) After discharge of sulphur, Charterers to wash/clean holds at their time/cost/expenses for being suitable to load next cargo.
3) If sulphur carried as last cargo, Charterers to pay US$ 6,000.00 in lieu of hold cleaning including any lime washing removal on redelivery.
4) Cargo to be loaded, stowed and discharged in accordance with international and local regulations and IMO rules.

(B) Charterers have the option to load salt under the following conditions:
1) Prior to loading salt, Charterers to arrange and pay for shore labour to apply suitable lime coating to holds at Charterers' time/cost/expenses to the satisfaction of the Master.
2) After discharge of salt, Charterers to wash/clean holds at their time/cost/expenses for being suitable to load next cargo.
3) If salt carried as last cargo, Charterers to pay US$ 6,000.00 in lieu of hold cleaning including any lime removal on redelivery.
4) Cargo to be loaded stowed and discharged in accordance with international and local regulations and IMO rules.

C) Charterers have the option to load non-oily scrap under the following conditions:
1) When scrap cargo, always excluding turnings, to be loaded, the first load/layer of scrap in each hold to be lowered as low/close as possible to bottom of the hold so as to provide a proper flooring and cushion for loading balance cargo to Master's satisfaction.
2) Prior to loading scrap a hold condition survey to be conducted by an independent surveyor at Charterers' expenses/ in their time and same to be done immediately after completion of discharge.
3) In case of any damage to the vessel's holds and Australian hold ladders caused by loading such scrap cargo, Charterers to be responsible for upgrading/repair to bring hold and Australian hold ladders into same condition as prior to loading scrap before commencement of next voyage.
4) If scrap carried as last cargo, Charterers to pay US$ 6,000.00 in lieu of hold cleaning including any dunnage removal on redelivery.
5) If motorblocks or heavy melting scrap is loaded then such cargo to be loaded by first placing a layer of scrap on the tanktop of each hold so as to provide a proper protection after which the remainder of cargo to be loaded.
6) If motorblocks carried as last cargo then maximum quantity 3.000 m/tons.

D) Charterers have the option to load petcoke under the following conditions:
1) The petcoke mentioned here is limited to petcoke of non-hazardous/non-dangerous type.
2) If Charterers exercise such option, it shall be subject to vessel's stability, trim and stress and to Master's satisfaction.

Rider Clauses for M. V. Frederike Oldendorff / J.K. International Pty Ltd
Charter Party Dated 12th May 2007

3) Such cargo to be loaded/stowed/trimmed/discharged strictly according to latest IMO regulations applicable to such cargo.

4) After discharge of petcoke, Charterers to wash/clean holds at their time/cost/expenses for being suitable to load next cargo.

5) If petcoke carried as last cargo, Charterers to pay US$ 5,500.00 in lieu of hold cleaning on redelivery.

6) Any extra expenses resulting therefrom/incurred thereby and any detention through any of the above causes to be for Charterers' account.

E) Charterers have the option to load cement/cement clinker under the following conditions:

1) After discharge of cement, Charterers to wash/clean holds at their time/cost/expenses for being suitable to load next cargo.

2) If cement carried as last cargo, Charterers wash/clean holds at their time/cost/expenses for Master full satisfaction.

3) Cargo to be loaded, stowed and discharged in accordance with international and local regulations and IMO rules. Charterers have the option to instruct Master/crew to do the lime-washing, lime-removal and/or intermediate hold cleaning for salt/sulphur/petcoke/scrap at Charterers' time/risk/expenses inclusive lime-washing and lime-removal. Intermediate hold cleaning fee to be negotiated and settled directly between Master and Charterers. Owners/Master/crew are not responsible for such cleaning.

Charterers are allowed to load harmless fertilizer grades of ammonium nitrate, respectively ammonium sulphate, however the cargo to be loaded, stowed, carried and discharged strictly according to international and/or local and/or IMO regulations.

## Clause 39 – Bunkers:

The vessel shall be delivered with bunkers as on board at no costs to Charterers. Owners to take over all bunkers MDO/IFO onboard on date of redelivery at actual paid net prices, to be documented by Charterers' last invoices. Charterers are entitled to deduct from last sufficient hire payments, value of estimated quantities for bunkers on redelivery.

Bunkers on delivery about 600 / 700 MT IFO and about 40 / 60 MT MDO at prices USD 320 / 650 IFO / MDO. Bunkers on redelivery about same as on delivery.

A joint on-hire survey to be conducted at delivery port or at first loading port in Owners' time and expense to ascertain hold cleanliness and general condition of vessel at time of delivery.

A joint off-hire survey to be conducted at last discharging port in Charterers' time and expense. Vessel to be redelivered to Owners in the same condition as on delivery, fair wear and tear accepted. The Charterers will be represented by the Such bunker figures shall be final and binding on both parties. supercargo(es) or appointed surveyor(s) and the Owners by the Master and/or Chief Engineer.

The Master and crew to take drip samples at the vessel's manifold of all bunkers supplied by Charterers during the period of this Charter Party. Such samples to be sealed and verified as true samples by bunkers suppliers' representative and the samples shall be delivered to the Charterers at their request. Any claim by Owners in relation to bunkers supplied by Charterers shall be made as soon as possible but in any event within 60 days of the date supply. The fuel shall be blends of hydrocarbons derived from petroleum refining. This shall not prelude the incorporation of small amounts of additives intended to improve some aspects of performance. The fuels shall be free from inorganic acid. The fuel should not include any added substance or chemical waste which jeopardizes the safety of ships or adversely affects the performance of the machinery or is harmful to personnel or contributes overall to additional air pollution. Vessel is registered with Lintec Testing Services, fuel testing and analysing program. Owners to be provided with full copy of test results when available. Costs of which, to be shared 50/50 between Owners and Charterers.

Rider Clauses for M. V. Frederike Oldendorff / J.K. International Pty Ltd
Charter Party Dated 12th May 2007

## Clause 40 - Weather Routing:

The Charterers may supply an independent weather routing company's advice to the Master during voyages specified by the Charterers. The Master shall comply with the reporting procedure of the routing service selected by the Charterers. Evidence of weather conditions shall be taken from the vessel's deck logs and the weather routing company's reports. Should there be a major discrepancy between the vessel's deck log and Weather Routing Company, both parties shall discuss in good faith to access of nature of such discrepancy and for seek for the way of rectification. In case Owners and Charterers cannot find acceptable solution for both parties, a third party to be appointed for final decision.

## Clause 41 - Master's/Crew's assistance:-

With reference to Clause 8 of this Charter Party "customary assistance" shall mean all types of work which the Master and the crew would normally do when the ship is trading for the Owners' account such as, but not limited to:
a) All opening and closing of hatches, when and where required if permitted by local regulations.
b) Warping alongside berths whenever required.
c) Raising/lowering of cranes and/or gangways in preparation for cargo operations, give necessary assistance in the vessel's bunker operations and maintaining sufficient electric power on all cranes during cargo operations.

The Master shall be responsible for all gear, equipment and/or stores supplied to the vessel by or for Charterers' account and the Master shall keep a record of all such gear, equipment and/or stores so supplied. Master to remain same in good condition.

Such gear, equipment and/or stores to be redelivered to the Charterers prior to redelivery of the vessel to the Owners, or if required by the Charterers, at any time during the Charter in like good order and condition as supplied, fair wear and tear excepted.

The Owners shall make good any shortage and/or damage unaccounted for.

## Clause 42 - Bills of Lading:

With reference to Clause 8, it is understood that the Charterers and/or their agents may sign Bill(s) of Lading on Master's behalf provided same are in conformity with Mate's and/or Tally Clerk's receipts.
Only clean bills of lading to be issued. Charterers to be allowed to split bills of lading as per L/C with Owner's prior approval which not to be withheld unreasonably.
Master to have right to reject all cargo requiring clausing on Charterers time and account.

## Clause 43 - Supercargoes/Port Captains:-

The Charterers or their Supercargo(es) are entitled to call for speed trails, in ballast or loaded condition, indemnifying the Owners for any extra expenses in this connection. The Charterers and/or their Supercargo(es) may install and remove, at their expense, time and risk such instruments as may be required to check the vessel's speed and revolutions of the main engine.

Under the condition that the normal vessel's operation not be effected, the Charterers and/or their Supercargo(es) shall have free and unlimited access to the whole vessel, including the bridge, holds and engine room and also to all vessel's tanks including but not limited to bunker, lubricating oil, sludge, ballast and freshwater tanks.

Whenever required, the Master must bring the vessel into even trim (but only under consideration of the safety for ship, crew and cargo and in accordance with vessel's class approved trim and stability calculations) to ensure correct bunker soundings. The Charterers and/or their Supercargo(es) and/or Surveyors to have free and unlimited access to the vessel's deck and engine log books, tank plans, calibration scales and/or other plans as requested and are allowed to make copies of the original log books on board or ashore.

Rider Clauses for M. V. Frederike Oldendorff / J.K. International Pty Ltd
Charter Party Dated 12th May 2007

**Clause 44 - Performance:**

If the Charterers have reason to be dissatisfied with the performance of the vessel, the Owners upon receiving complaints shall immediately investigate and take appropriate steps to correct the situation.

**Clause 45 - Stevedore damage:**

Charterers to be responsible for stevedore damages. However, where possible at loading and discharging ports, stevedore damage, if any, to be settled directly between Owners and Stevedores. Should Stevedores not settle damages on first demand, Charterers to pay same. Charterers only to be responsible when Master notifies in writing at the time of occurrence of damage within 24 hours or as soon as possible, but latest upon sailing from the port of occurrence, (except in case of hidden damage, which to be reported on discovery but latest on completion of discharge on the voyage in question, to Charterers or their agents in respective ports). For all stevedore damage, Master shall endeavour to, if possible, obtain from responsible party written acknowledgement of responsibility and specifying the extent of the damage. (Should damage affect vessel's seaworthiness, or working capacity, repairs are to be effected immediately and vessel to remain on hire). All damages which are to be repaired by Charterers and which do not refer to fair wear and tear and do not affect vessel's seaworthiness or working capacity are to remain for occasional repair when vessel is to dock for Owners' account so that Charterers pay for the actual cost of repairs, but not for time used, unless it exceeds the time used for the vessel's own repairs. Owners to advise Charterers when stevedore damage has been settled between Owners and third parties.

**Clause 46 - Off-hire:**

After suspension of hire, from any cause, the vessel shall be placed again at Charterers' disposal at the same port or place where hire was suspended, or other place not less favourable to Charterers. The Charterers may, however, in their option accept the vessel on hire again in such position and at such time as the vessel may again in all respects be ready to comply with the orders and directions of the Charterers.

The Charterers may in their option, declarable within 14 days after each occurrence, add to the time charter period, partly or wholly, any off-hire period(s). The rate of hire for any such added period(s) shall be paid at the same rate as that applicable during the off-hire period(s). During any off-hire period estimated to exceed 8 days, the Owners to give the Charterers not less than 5 (five) days definite notice of resumption of the service.

If the vessel has been off-hire for a total period of 30 (thirty) consecutive days during this Charter Party, the Charterers are at liberty to cancel the balance of period of this Charter Party and redelivery shall take place upon vessel being free of cargo.

Hold condition on arrival at first loading port, the holds to be swept clean, dried and free from rust scale and in every respect ready to receive Charterers intended cargo. If vessel fails any Shippers and or Authorities surveys then vessel to be off-hired from the time of failure of any survey until all holds have passed all inspections and / or surveys.

**Clause 47 - Punctual Payment:**

With reference to Clause 5 (five) it is agreed that the hire is to be considered correctly paid upon Charterers' bankers having irrevocably remitted the hire to Owners' bankers as stated in Clause 53.

Before exercising the option of withdrawing the vessel from the Charter the Owners will give the Charterers 72 (seventy two) hours, (Saturdays, Sundays and holidays excluded) official notice in writing and will not withdraw the vessel if the hire is paid with the 72 (seventy two) hours.

The Charterers have the liberty to retain sufficient funds from any hire to cover actual and estimated amounts including estimated off-hire and value of estimated bunkers on redelivery for Owners' account.

Rider Clauses for M. V. Frederike Oldendorff / J.K. International Pty Ltd
Charter Party Dated 12th May 2007

## Clause 48 - Arbitration:

All disputes arising out of this contract which cannot be amicably resolved shall be referred to arbitration in London. Unless the parties agree upon a sole arbitrator the reference shall be to 2 (two) arbitrators. One to be appointed by each of the parties. The Arbitrators shall be commercial men, and the umpire, if appointed, shall be a legal man, and shall be Members of the London Maritime Arbitrator's Association or otherwise qualified by experience to deal with commercial shipping disputes.

The contract is governed by English Law and there shall apply to arbitration proceedings under this clause the terms of the London Maritime Arbitrators' Association current at the time when the arbitration proceedings are commenced. It is further agreed that the 7 (seven) days limit for appointment of the Arbitrators, either originally or by substitution, shall be changed to 14 (fourteen) days.
In the event the amount of claim and counterclaim does not exceed US$ 50,000.00 the parties agree to refer any dispute to a sole Arbitrator in accordance with the "LMAA Small Claims Procedure 1989".

## Clause 49 - Speed:

The Charterers may instruct the vessel to steam at any speed within the capabilities of vessel's main engine subject to Master's and Chief Engineer's approval.

With reference to lines 9 and 10 of this Charter Party, good weather conditions is understood to mean all weather conditions not exceeding wind force Beaufort four.

## Clause 50 - Lieu of Cleaning On Redelivery:

With reference to line 54, the Charterers have the liberty to redeliver the vessel with unclean holds, against paying the Owners a lumpsum of US$ 5,000,00 (five thousand) in lieu of cleaning including dunnage removal and in case salt, sulphur, petcoke, scrap or cement/cement clinker is carried as last cargo, as per Clause 38.

## Clause 51 - Captions:

The captions of clauses herein are inserted for convenience only and shall not be construed to have any restrictive effect on the text herein.

## Clause 52 - Additional Equipment, Fittings:

The Charterers, subject to Owners approval which not to be unreasonably withheld, shall be at liberty to fit, weld any additional equipment and fittings for loading, discharging and/or securing cargo always at class/Masters satisfaction and approval. Such work shall be done at the Charterers expenses and time and the Charterers shall remove such equipment and fitting at their expense and time prior to redelivery, if Owners so request. The meaning of this clause shall include the cuttings/ rewelding of cement loading holes as required by Shippers at Charterer's time and expenses.

## Clause 53 - delete

## Clause 54 - Delivery of cargo without production of Bills of Lading:

If the original Bills of Lading should not be available at the port(s) of discharge at the time when the vessel is ready to commence discharge, the Master and Owners shall allow Charterers/Receivers to discharge the cargo against production of a Letter of Indemnity on Owners P and I Club wording signed by Charterers. It is agreed that the signed Letter of Indemnity may be presented to Owners by Telefax.
Charterers are obliged to provide to Owners the original Bs/L latest within 6 months after discharging.

Rider Clauses for M. V. Frederike Oldendorff / J.K. International Pty Ltd
Charter Party Dated 12th May 2007

## Clause 55 - NAABSA/Breaking I.W.L.:

Trading to be only between good and safe ports/berths/anchorages or places where vessel can safely lie always afloat. Charterers have option of breaching I.W.L. against paying net extra insurance involved as per original receipted invoice from Underwriters. Such extra insurance on hull and machinery is not to exceed the amount charged as if vessel was entered with Lloyds of London Underwriters.

(a) The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the Vessel to lie aground at a safe berth for loading or discharging of cargo and/or bunkering.

(b) The Charterers shall give the Owners such advance notice as they reasonably can of the details of the berth where the vessel is ordered to lie aground.

(c) Without prejudice to the generality of the Charterers' rights under (a), it is expressly agreed that the Master shall have the right to refuse to comply with the order to proceed to a berth where the vessel may lie aground if in his reasonable opinion it is not safe to do so.

(d) The Owners shall be entitled to insure any deductible under the Vessel's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the Vessel's Underwriters and/or the cost of insuring any deductible under the Vessel's hull policy in which event Charterers will be co-insured under owners vessel's hull police for all damages exceeding the deductible.

(e) If Master has reason to believe that a damage (direct or indirect) occurred during a port stay where vessel touched bottom or lay aground, a diver and/or class survey to check the condition of vessel's bottom and bilge keel area as well as rudder and propeller, shall be carried out immediately or latest in next convenient port. Time and expenses to be shared 50/50 between Owners and Charterers in case no (direct or indirect) damage is found. If it is determined that there is actual damage to hull, Charterers to reimburse Owners for the cost of survey.

(f) The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from the vessel's lying aground including any liability for salvage or towage in the event that the vessel is unable to depart from the berth unaided and shall provide any security which may be required by a salver. The Vessel shall remain on hire for any time lost including periods for repairs as a result of the vessel's laying aground.

## Clause 56 - deleted:

## Clause 57 - Deck Cargo:

Charterers have the option of loading cargo on deck and/or hatches always within the strength as per description Clause at their own risk and expense and responsibility for loss or damage howsoever caused. The relevant Bills of Lading to be claused "carried on deck at Shippers'/cargo Owners, Charterers, Receivers risk, expense and responsibility without liability on the part of the vessel or her Owners for loss, damage, expense or delay howsoever caused". In case vessel to load cargo on deck (excluding cargo as per Clause 38), vessel to carry a full deck load and to load on hatches, in accordance with normal practice and such cargo on deck/hatches to be limited only by the deck and hatch strength and the vessel's stability and without deterioration of the sight beam and such cargo to be loaded to the Master's satisfaction.

## Clause 58 - Grabs:

Charterers have the option of placing their own grabs onboard the vessel and attach same to the vessel's cranes/hooks. All necessary fittings to be arranged and paid for by the Charterers. Charterers may store such grabs onboard on deck at their risk and expense and Charterers to make their own arrangements with Master/Crew as to maintenance. Owners will on delivery instruct the Master to co-operate with Charterers and/or their port Captain in this respect. Vessel to provide power for such electro-hydraulic grabs, 440 volt/6OHz, from vessel's generators.

Rider Clauses for M. V. Frederike Oldendorff / J.K. International Pty Ltd
Charter Party Dated 12th May 2007

### Clause 59 - MDO Usage:

Vessel uses diesel oil entering/leaving port in rivers/canals and manoeuvring in shallow/ narrow waters as well as for load/unsteady running conditions and stopping and starting as per description Clause 53.

### Clause 60 - Freshwater for hold-cleaning:

Fresh water for washing/cleaning holds to be for Charterers' account which to be paid to Owners, against vouchers at actual price, if bought from shore. If produced onboard by freshwater evaporator or taken from the river, then same to be free of charge.

### Clause 61 - Steel Products/Surveys:

If finished steel products are carried, Charterers should arrange both, loading and discharging surveys, cost of which to be shared 50/50 between Owners and Charterers and Charterers shall send copies of the survey reports to Owners for their records.

### Clause 62 - Bunkering prior redelivery quality of fuel:

Fuel Quality to be advised
Owners' liberty to bunker vessel for their own account prior to redelivery provided not interfering with Charterers' operations of the vessel. Charterers option to bunker RMF 25 where RMG 35 or respectively RMF 25 is not available.

### Clause 63 - Intermediate hold cleaning:

Intermediate hold cleaning for each and every voyage to be performed by crew if required by Charterers and permitted by local regulations. Charterers to pay according to scale directly to the Owner. Owners to give their best co-operation in this respect, but not responsible for such cleaning.
US$ 400.00 per hold for intermediate hold cleaning.
Vessel on her delivery and the duration of this Charter Party to be equipped with basic tools for ordinary hold cleaning between voyages. Such equipment to include shovels, brooms, long broom handles, scrapers and ladders. Also small containers/empty drums shall be onboard for temporary storage of cargo residues. However, additional materials/chemical required to be supplied and paid for by Charterers.

### Clause 64 - Drydocking Clause:

Owners shall have the option to place the vessel in dry-dock during the currency of this Charter at a convenient time and place to be mutually agreed upon between the Owners and the Charterers. The vessel will be off-hire from the time Charterers to release vessel on dropping last outward in empty condition. The vessel will be off-hire from the time Charterers released the vessel, at any time day or night Sundays and Holidays included until the time at which the vessel is returned to Charterers service at the place where she was released or equidistant any time day or night Sundays and Holidays included.
Any bunker consumed during off-hire to be for Owners account and reimbursed to Charterers as per last paid prices, duly supported with relevant vouchers.
Owners to give 45 days approximate notice of possible place and date of dry-docking.

### Clause 65 - Charterers' House Flag:

The Charterers or their Sub-Charterers shall have the liberty of flying their own house flag and funnel marking. Owners do not have the right to change the name of the vessel without Charterers prior written consent.

Rider Clauses for M. V. Frederike Oldendorff / J.K. International Pty Ltd
Charter Party Dated 12th May 2007

## Clause 66 - War Cancellation:

In the event of outbreak of war (whether it is a declaration of war or not) between any two or more of the following countries: U.S.A., United Kingdom, C.I.S., Russia, Australia, Germany, The People's Republic of China, either the Owners or the Charterers may cancel the Charter.

## Clause 67 - - deleted

## Clause 68 — Surveyors:

Owners are allowed to appoint any P and I Club approved Surveyor worldwide.

## Clause 69 - ISM Code:

From the date of coming into force of the International Safety Management (ISM) code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both, the vessel and "the company" (as defined by the ISM code) shall comply with the requirements of the ISM code.
Upon request,  the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers. Should Owners be unable to provide same ISM Certificate within 5 (five) days of request then Charterers have the option of cancelling the Charter unless the vessel already has cargo on board.
Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners or "the company" to comply with the ISM code shall be for the Owners' account.

## Clause 70 - deleted

## Clause 71 – Vessel sale

Vessel not to be sold during the currency of this Charter.

## NEW CLAUSES:

### HAMBURG RULES

Neither the Charterers nor their Agents shall permit the issue of any bill of lading, waybill or other document evidencing a contract of carriage (whether or not signed on behalf of the Owner or on the Charterers' behalf or on behalf of any Sub- Charterers) incorporating, where not compulsorily applicable, the Hamburg Rules or any other legislation giving effect to the Hamburg Rules or any other legislation imposing liabilities in excess of Hague or Hague/Visby Rules. Charterers shall indemnify the Owners against any liability, loss or damage which may result from any breach of the foregoing provisions of this clause.

### U.S. ANTI DRUG ABUSE ACT 1986 CLAUSE

a) In pursuance of the provisions of the U.S. Anti Drug Abuse, Act 1986, or any reenactment thereof, the Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested narcotic drugs and marijuana to be loaded or concealed on board of the vessel. Non-compliance with the provisions of this clause will amount to breach of warranty for the consequences of which the Charterers will be liable and will hold the Owners, the Master and the crew of the vessel harmless and will keep them indemnified against all claims whatsoever which may arise and be made against them individually or jointly. Furthermore, all time lost and all expenses incurred, including fines, as a result of the Charterers' breach of the provisions of this clause will be for the Charterers' account and the vessel will remain on hire. Should the vessel be arrested as a result of the Charterers non-compliance with the provisions of this clause, the Charterers will at their expense take all reasonable time the vessel is released and at their expense put up bail to secure release of the vessel. The Owners will remain responsible for all time lost and all expenses incurred,

Rider Clauses for M. V. Frederike Oldendorff / J.K. International Pty Ltd
Charter Party Dated 12th May 2007

including fines, in the event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the vessel's personnel.

b) In pursuance of the provisions of sub clause a) above, the Owners and Charterers confirm that they have signed the U.S. Sea Carriers Initiative Agreement and will comply with same during the currency of the charter.

## U.S. TAX REFORM 1986 CLAUSE

Any U.S. Gross Transportation Tax as enacted by the United States Public Tax 99-514 (also referred to as the U.S. Tax Reform Act of 1986), including later changes or amendments, levied on income attributable to transportation under this charter party which begins or ends in the United States, and which income under the laws of the United States is treated as U.S. Source Transportation gross income, shall be reimbursed by the Charterers.

## STOWAWAYS CLAUSE

a)    (i) The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining access to the vessel by means of secreting away in the goods shipped by the Charterers.

(ii) If, despite the exercise of due care and diligence by the Charterers, stowaways have gained access to the vessel by means of secreting away in the goods shipped by the Charterers, this shall amount to breach of charter for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them. Furthermore, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account and the vessel shall remain on hire.

(iii) Should the vessel be arrested as a result of the Charterers' breach of charter according to sub-clause a) (ii) above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the vessel is released and at their expense put up bail to secure release of the vessel.

b)    (i) If, despite the exercise of due care and diligence by the Owners, stowaways have gained access to the vessel by means other than secreting away in the goods shipped by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Owners' account and the vessel shall be off hire.

(ii) Should the vessel be arrested as a result of stowaways having gained access to the vessel by means other than secreting away in the goods shipped by the Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable time, the vessel is released and at their expense put up bail to secure release of the vessel.

## I. BOTH – TO – BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following clause shall apply: -

## BOTH - TO – BLAME COLLISION CLAUSE

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servant of the carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact"

Rider Clauses for M. V. Frederike Oldendorff / J.K. International Pty Ltd
Charter Party Dated 12th May 2007

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

## II. GENERAL AVERAGE AND NEW JASON CLAUSE

General Average shall be payable according to the York/Antwerp Rules, 1950, but where the adjustment is made in accordance with the law and practice or the United States of America, the following clause shall apply:

### NEW JASON CLAUSE

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, to be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery."

and the Charterers shall procure the all Bills of Lading issued under this Charter Party shall contain the same clause.

## BIMCO STANDARD WAR RISKS CLAUSE FOR TIME CHARTERS, 1993

### CODE NAME: "CONWARTIME 1993"

1.     For the purpose of this Clause, the words:
a. "Owners" shall include the shipowners, bareboat Charterers, disponent owners, managers or other operators - who are charged with the management of the vessel, and the Master, and
b. "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against all vessels of certain flags or crew or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be, dangerous or are likely to be or to become dangerous to the vessel, her cargo, crew or other persons on board the vessel.

2.     The vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the vessel, her cargo, crew or other persons on board the vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be exposed to War Risks. Should the vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

3.     The vessel shall not be required to load contraband cargo, or to pass through any blockade whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels, of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation.

4.
a. The Owners may effect War Risks insurance in respect of the Hull and Machinery of the vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls thereof shall be for their account.

15 of 17

Rider Clauses for M. V. Frederike Oldendorff / J.K. International Pty Ltd
Charter Party Dated 12th May 2007

b. If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterer's orders, the vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

5.    · If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect or sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

6. The vessel shall have liberty:

a.       to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports or call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

b.       to comply with the order, directions or recommendations of any War Risks underwriters who have the authority to give the same under the terms of the War Risks insurance;

c.       to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with National Laws aimed at enforcing the same to which the Owners are subject and to obey the orders and directions of those who are charged with their enforcement;

d.       to divert and discharge at any other port any cargo or part thereof which may render the vessel liable to confiscation as a contraband carrier;

e.       to divert and call at any other port to change the crew or any part thereof or other persons on board the - vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

7.       If, in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owner's intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

8.       If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfillment of this Charter Party. However the master and owners nevertheless to remain ultimately responsible for the seaworthiness of the vessel at all times.

THE BIMCO I.S.P.S. CLAUSE

(a) (I)       From the date of coming into force of the international code for the security of ships and of port facilities and the relevant amendments to Chapter XI of SOLAS (ISPS code) in relation to the vessel and thereafter during the currency of this charter party, the Owners shall procure that both the vessel and the company (as defined by the ISPS code) shall comply with the requirements of the ISPS code relating to the vessel and the company. Upon request the owners shall provide a copy or the relevant international ship security certificate (or the interim international ship security certificate) to the Charterers. The owners shall provide the Charterers with the full style contact details of the company security officer (CSO).·
(ii) Except as otherwise provided in this charter party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the owners or the company to comply with the requirements of the ISPS code or this clause shall be For the owners' account.

(b) (i)       The Charterers shall provide the CSO and the ship security officer (SSO)/master with their full style contact details and, where sub-letting is permitted under the terms of this charter party, shall ensure that the

16 of 17

Rider Clauses for M. V. Frederike Oldendorff / J.K. International Pty Ltd
Charter Party Dated 12th May 2007

contact details of all sub-Charterers are likewise provided to the CSO and the SSO/master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this charter party contain the following provision:

The Charterers shall provide the owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub- Charterers are likewise provided to the owners

(ii) Except as otherwise provided in this charter party, toss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this clause shall be for the Charterers' account.

(c) Notwithstanding anything else contained in this charter party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the owners' negligence, all measures required by the owners to comply with the ship security plan shall be for the owners' account

(d) If either party makes any payment which is for the other party's account according to this clause, the other party shall indemnify the paying party.

US CUSTOMS ADVANCE NOTIFICATION/AMS CLAUSE FOR TIME CHARTER PARTIES

(a) If the vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

    i)    Have in place a SCAC (Standard Carrier Alpha Code);
    ii)    Have in place an ICB (International Carrier Bond);
    iii)    Provide the Owners with a timely confirmation of i) and ii) above; and
    iv)    Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause. Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

Owners
Oldendorff Carriers GmbH & Co. KG
Luebeck, Germany

Charterers
J.K. International Pty Ltd
Brisbane, Australia

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
J.K. INTERNATIONAL PTY. LTD.,                    :
                                                 :
                              Plaintiff,         :    07 Civ. 7328 (SHS)
                                                 :
         - against -                             :    ECF CASE
                                                 :
OLDENDORFF CARRIERS GMBH & CO.,                   :
                                                      :
                              Defendant.         :
------------------------------------------------------------X

## DECLARATION OF ADAM RUSS

# EXHIBIT 2

# TRANSWORLD MARINE EXPRESS PTY. LTD.

P.O. Box 417
"Northgate Court" 3/116 Crockford Street,
Northgate, Queensland - 4013
Australia

Telephone :   + 61 7 3861 9925
Facsimile   :   + 61 7 3861 9926
Email        :   postfix@tmeship.com

Brisbane
Monday 16 April 2007

To,

The Master M.V. " FREDERIKE OLDENDORFF"

Dear Captain

### _Subject : Voyage Instructions for M.V. "FREDERIKE OLDENDORFF " / JKI - CP Dated 12.04.07_

Welcome to J.K. International's Time Chartered fleet. We look forward to your fullest co-operation in ensuring the success and fastest turn around of the voyage.

Your vessel has been fixed for one time Charter trip of about  65-70 days, without guarantee, delivery dropping last outward sea pilot Long Beach, U S West Coast 16-26 April, 2007 ,ETR 17th AGW, anytime, day or night, Sundays and holidays included, with redelivery on dropping last outward sea pilot 1 safe port full India, intention West coast India, Mumbai, or in Charterers option East Coast India, Bangladesh, anytime day or night Sundays and Holidays included, after loading a full cargo of peas from Vancouver, Canada for our Principals, Messrs J.K. International, Brisbane. We are conducting vessel operations on their behalf. Please fax or E-Mail a copy of your Crew List to our Office.

The full style of our companies is as follows:-

### _Transworld Marine Express Pty. Ltd.     J.K. International Pty. Ltd._

| | | | | |
|---|---|---|---|---|
| Northgate Court, 3/116 Crockford Street | 49 Suscatand Street | | | |
| Northgate, Queensland - 4013 | Rocklea, Queensland - 4106 | | | |
| Australia | Australia | | | |

| | | | | |
|---|---|---|---|---|
| Office Telephone | : | + 61 7 3861 9925 | Office Telephone | : | + 61 7 3722 7111 |
| Office Facsimile | : | + 61 7 3861 9926 | Office Facsimile | : | + 61 7 3274 1367 |
| E-Mail : | postfix@tmeship.com | E-Mail : | jki@jki.com.au | | |
| Home Telephone | : | + 61 7 3863 1299 | Home Telephone | : | + 61 7 3349 5962 |
| Home Facsimile | : | + 61 7 3862 8350 | Home Facsimile | : | + 61 7 3343 3224 |
| Person in Charge | : | Capt Ivan Colaço | Person in Charge | : | Mr. Jiwan Mohan |

### _Voyage + Bunkers_

Vessel will be delivered with about 600/700 Mtons IFO (380CST) and about  40/60 Mtons MDO.
Charterers will arrange to supply bunkers at Vancouver to enable vessel to reach Mumbai with a safety margin. Please advise us of quantity to be supplied at Vancouver. Please also advise bunker quantity to be supplied at Singapore for redelivery 10 days after departure from load port. Please confirm quantity of bunkers received at each port so we can compare with Suppliers figures. As per the Charter Party it is the Master's responsibility to ensure that bunkering takes place without incident, please ensure all precautions are taken to avoid any spillage and/or pollution. Vessel will redeliver with about same quantity as on delivery.

Please do best to maintain maximum Charter Party speed of about 13.7 knots consuming about 26.5 MT IFO (380CST) and 0.1.MDO for auxiliary engine consumption at sea.

1

Weather News Inc. will be instructed to give you sailing directions and will be in contact with you directly, they will monitor your speed and consumption for the full voyage until arrival last discharge port. To avoid any performance claim please ensure vessel performs as per Charter Party. Please extend your best co-operation to them and if at any time you need further information please do not hesitate to contact us.

## Cargo

The vessel is to load a full cargo consisting of Peas estimated to be about 46,500 Mtons on summer marks. Our agents at Vancouver, Messrs Compass Marine will request for a stowage plan from you and advise the intended cargo quantity to be loaded. Please confirm your proposed stow plan with them and departure draft at load port and arrival draft at discharge port for our consideration. Kindly liaise with the loadport Agents regarding the final quantities and number of ports and berths.

The vessel is to endeavour to arrive at the discharge port on even keel and cargo will be loaded accordingly. If required Charterers will arrange lightening or berthing by special arrangement with the Port Authority. However, Charterers would appreciate your best efforts in arriving with minimum trim thus reducing the draft. If requested by the Charterers or Agents or Shippers please try best to load quantities requested by them but maintaining vessel in a safe and stable condition at all times.

Kindly ensure that the necessary cargo calculations have been prepared and are ready to be presented on arrival at load port. Also ensure that all cargo gear is in good working order and have necessary marking and that the vessel complies with all the requirements of the ports that the vessel will visit.

Any cargo that requires clausing of Mate's Receipts/Bills of Lading should be rejected and only clean cargo to be loaded. Only clean Mate's Receipts/Bills of Lading to be issued. Please sign letter authorising Charterers Agents including Transworld Marine Express Pty. Ltd. to sign and release Bills of Lading in accordance with Mate's Receipts.

Please co-operate with the various Authorities at load and discharge ports or any other ports as requested to ensure fastest possible loading/transit/discharging. Please contact us at anytime if you require clarification to any of the above.

## Hold Condition

Please ensure upon arrival first load port all holds to be clean, dry, and free of loose rust, scale, infestation and from residue of any previous cargo ready and in every respect ready to load a cargo of grain. Charterers would strongly suggest that the holds are washed down with fresh water and ensure they are dry prior arrival to ensure that vessel passes shippers and Government surveys on arrival. This is very important and would give the voyage a good and positive start.

The Authorities are very strict with their inspections and mainly concentrate on previous cargo residues and loose rust and scale. It is imperative that vessel passes surveys on arrival otherwise claims for direct expenses could be sent to Owners. To avoid such a situation we strongly suggest that Crew are well instructed on getting the vessel prepared for loading operations on arrival and hold cleanliness. Please carry out soundings of the vessel's tanks and bilges where practical every day during the voyage. The results of the soundings to be reported to the Charterers or their Agent or supercargo in writing upon completion of the voyage.

Kindly ensure hatches are weather tight throughout the voyage and cargo gears are ready for use on arrival at all ports. The Shipper, Charterers and Receivers are very strict about damaged cargo, to ensure that all cargo arrives at the discharge port in the same condition that it was loaded, please take all precautions to avoid any ingress of water. If necessary please seal all hatch covers with Tarpaulins on completion of loading and do not open same until the Stevedores are ready to commence discharge at the discharge port but always keeping in mind your obligation to protect the cargo especially with regard to ventilation of the cargo to avoid sweating. Please note vessel will be off-hired if damaged cargo is found on board at the discharge port so please take all precautions including sealing the hatches to ensure that there is no damaged cargo.

## Surveys

Upon arrival at load ports you will have to complete the usual grain surveys. Please ensure the vessel is ready in all respects upon arrival. Charterers will require a hose test of hatch covers.

2

Charterers and Owners will also arrange a joint On Hire Bunker survey at the delivery port of Vancouver in order to verify quantity of Bunkers on delivery. Please co-operate with the surveyor to ensure accurate results. A redelivery bunker survey will be carried out on completion of the voyage again to ascertain the quantity of bunkers remaining on board.

*Agent's details*

*Canada : Compass Marine Services*                           *Agents at Mumbai :To be Advised.*
Compass Marine Services      Inc.
Suite 2200 - 1050 West Pender Street
Vancouver, B.C. Canada - V6E 3S7
Office Telephone     : +1 604 669 0100
Office Facsimile     : +1 604 681 9283
E-Mail               : compass@compassmarine.ca
Person To Contact    : Dave Hill

### Stevedore Damage

All damage to ships structures caused by stevedores at load or discharge port must be carefully noted and written reports/protests are to be made out accordingly, immediately such damage has occurred or as soon as same has been noticed. Stevedore damage has to be reported to the Stevedores with a copy to the Agents and ourselves within 24 hours of occurrence otherwise any such damage will not be accepted by the Stevedores. If time permits, these damages are to be repaired by stevedores before vessel departure and written reports made out to confirm same. Please send us copies of all letters of protest or other correspondence.

### Notices

Please ensure that arrival notices are given commencing from receipt of these instructions and every other day following initial advice but no less than 5, 3, 2 and 1 day's notice of arrival at first and each subsequent load port to the load port Agents, J.K. International and ourselves. Please also send us a delivery notice when vessel delivers to Charterers including date and time of delivery and bunker quantities.

Notice of Readiness to be tendered by radio/cable/telex/Fax or E-Mail message either by master or agent, off berth wipon, wibon, wiccon or wifpon. Laytime to count 24 hours after tendering Notice of Readiness in office hours, however, please tender Notice of Readiness on arrival and again on berthing. In case Shippers commence discharge before lay time commences, such work to be allowed and all time used to count.

Upon departure from each Port please send us a departure report including quantity loaded, time completed loading, departure draft and arrival draft at next port. Kindly send regular ETA notices to the Agents at discharge port with copy to us. Please advise time and position full away and bunkers remaining on board immediately on departure. When steaming, please send noon positions every two days with following information:

1. Date and time of position (local noon or state if GMT)
2. Latitude in degrees and decimals / Longitude in degrees and decimals
3. Vessel's heading and average speed / Wind direction and speed (Beaufort force)
4. Wave height in metres
5. Estimated time / place of arrival
6. Fuel/Diesel consumed in last 2 days and Fuel/Diesel remaining on board
7. Average rpm

Upon arrival at discharge port please send actual time and position for end of sea passage with bunkers remaining on board. On completion of the voyage please send us by courier copies of deck and engine log extracts.

Kindly give Charterers Agents at Discharge port 21/14/10/7 and 5 days approximate notice of ETA discharge port, and 3/2/1/ day's definite notice of arrival with copy to us. Upon arrival port limits please send NOR to the Receivers, via Agents with copy to Charterers and us.

### Discharge

The vessel will discharge all cargo at Mumbai and/or one other Indian Port. An average discharge rate of about

3

2,500-3,000 MT per day, 7 days a week will be attained.

#### Draft Surveys

Upon arrival at all load and discharge ports, you are to perform a draft survey. The draft survey is to be conducted prior to loading/discharge and after completion of loading/discharging of cargo. This is to determine that the correct quantity is loaded or discharged without fear of any discrepancies. It is imperative that you send us copies from each port as soon as practical after they have been completed.

#### Quarantine Regulations

Kindly comply with recommended Quarantine controls and guidelines of all ports / waters being visited by the vessel, with special note to measures for the prevention of sediment discharge and ballast water exchange.

#### Off Hire

If any off-hire periods, please immediately E-Mail / Fax us details of same and make sure that we get a report in writing stating period and bunkers consumption.

#### Statement of Facts / Time Sheets

It is most important that all Statement of Facts and time sheet, are signed by you, with any alterations or remarks you may wish to make. At some ports the Agents / Stevedores will try to insert incorrect rain times please ensure that all times correspond to times in the Ship's Log Book. We would also suggest that the Agents are told in writing to bring a copy of the Statement of Facts one day prior completion for checking in advance and so only last days times need to be checked prior departure.

Please confirm receipt and understanding of these voyage instructions.

We trust the above is sufficient for you to carry out voyage and wish you a safe voyage. Please do not hesitate to contact us at any time if you require anything further.

*Yours Faithfully*

*Capt. I. Colaço*
As Agents only

4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
J.K. INTERNATIONAL PTY. LTD.,                            :
                                                        :
                              Plaintiff,                :    07 Civ. 7328 (SHS)
                                                        :
        - against -                                     :    ECF CASE
                                                        :
OLDENDORFF CARRIERS GMBH & CO.,                          :
                                                             :
                              Defendant.                :
------------------------------------------------------------X

## DECLARATION OF ADAM RUSS

# EXHIBIT 3

CODE NAME: "CONGENBILL", EDITION 1994

Shipper

J.K. INTERNATIONAL PTY LTD.

## BILL OF LADING
TO BE USED WITH CHARTER PARTIES

Reference No. B/L No. 01

Consignee

TO THE ORDER

# ORIGINAL

Notify address

J.K. INTERNATIONAL PTY LTD.

| Vessel | Port of loading |
|---|---|
| MV FREDERIKE OLDENDORFF | VANCOUVER, CANADA |

Port of Discharge

INDIA

MARKS AND NOS

A QUANTITY OF CARGO SAID TO BE
5,250.000 MT WHOLE YELLOW PEAS

Gross Weight
SAID TO WEIGH
5,250.000 METRIC TONS

LOADED CLEAN ON BOARD APRIL 30, 2007
STOWAGE: HOLD NOS. 1, 3 & 5
HOLD NO. 2 ON BOTTOM

FREIGHT PAYABLE AS PER CHARTER PARTY DATED 12.04.2007

(of which                    on deck at Shipper's risk; the Carrier not
          being responsible for loss or damage howsoever arising)

| | |
|---|---|
| Freight payable as per CHARTER PARTY DATED 12.04.2007 | SHIPPED at the Port of Loading in apparent good order and condition on board the Vessel for carriage to the Port of Discharge or so near thereto as she may safely get the goods specified above. |
| FREIGHT ADVANCE. Received on account of freight: | Weight, measure, quality, quantity, condition, contents and value unknown. |
| | IN WITNESS whereof the Master or Agent of the said Vessel has signed the number of Bills of Lading indicated below all of this tenor and date, any one of which being accomplished the others shall be void. |
| | FOR CONDITIONS OF CARRIAGE SEE OVERLEAF |
| Time used for loading ...........days ............hours. | |

| | |
|---|---|
| Freight payable at AS PER C/P | Place and date of issue VANCOUVER, CANADA APRIL 30, 2007 |
| Number of original Bs/L 3/THREE | Signature COMPASS MARINE SERVICES AS AGENTS ONLY FOR AND BY AUTHORITY OF THE MASTER, CAPT. ALEKSANDR GRACHYOV |

CODE NAME: "CONGENBILL", EDITION 1994

Shipper

J.K. INTERNATIONAL PTY LTD.

**BILL OF LADING**
TO BE USED WITH CHARTER PARTIES

Reference No. B/L No. 02

Consignee

TO THE ORDER

Notify address

J.K. INTERNATIONAL PTY LTD.

**ORIGINAL**

| Vessel | Port of loading |
| MV FREDERIKE OLDENDORFF | VANCOUVER, CANADA |

Port of discharge

INDIA

MARKS AND NOS

A QUANTITY OF CARGO SAID TO BE
16,750.000 MT WHOLE YELLOW PEAS

Gross Weight
SAID TO WEIGH
16,750.000 METRIC TONS

LOADED CLEAN ON BOARD APRIL 30, 2007
STOWAGE: HOLD NOS. 1, 3 & 5
HOLD NO. 2 ON BOTTOM

FREIGHT PAYABLE AS PER CHARTER PARTY DATED 12.04.2007

(of which           on deck at Shipper's risk; the Carrier not
being responsible for loss or damage howsoever arising)

Freight payable as per
CHARTER PARTY DATED 12.04.2007

FREIGHT ADVANCE.
Received on account of freight:

Time used for loading ............days ..............hours.

SHIPPED  at the Port of Loading in apparent good order and
condition on board the Vessel for carriage to the
Port of Discharge or so near thereto as she may safely get the goods
specified above.

Weight, measure, quality, quantity, condition, contents and value un-
known.

IN WITNESS whereof the Master or Agent of the said Vessel has signed
the number of Bills of Lading indicated below all of this tenor and date,
any one of which being accomplished the others shall be void.

FOR CONDITIONS OF CARRIAGE SEE OVERLEAF

| Freight payable at AS PER C/P | Place and date of issue VANCOUVER, CANADA APRIL 30, 2007 |
| Number of original Bs/L S/THREE | Signature COMPASS MARINE SERVICES AS AGENTS ONLY FOR AND BY AUTHORITY OF THE MASTER, CAPT: ALEKSANDR GRACHYOV |

CODE NAME: "CONGENBILL", EDITION 1994

Shipper

J.K. INTERNATIONAL PTY LTD.

**BILL OF LADING**
TO BE USED WITH CHARTER PARTIES

Reference No. B/L No. 03

Consignee

TO ORDER

**ORIGINAL**

Notify address

J.K. INTERNATIONAL PTY LTD.

| Vessel | Port of loading |
| MV FREDERIKE OLDENDORFF | VANCOUVER, CANADA |

Port of discharge

INDIA

MARKS AND NOS

A QUANTITY OF CARGO SAID TO BE
3,357.662 MT CANADIAN WHOLE YELLOW PEAS IN BULK

Gross Weight
SAID TO WEIGH
3,357.662 METRIC TONS

LOADED CLEAN ON BOARD APRIL 30, 2007

STOWAGE HOLD NO.1, 3 & 5
HOLD NO. 2 ON BOTTOM

FREIGHT PAYABLE AS PER CHARTER PARTY DATED 12.04.2007

(of which          on deck at Shipper's risk; the Carrier not
being responsible for loss or damage howsoever arising)

Freight payable as per
CHARTER PARTY DATED 12.04.2007

FREIGHT ADVANCE.
Received on account of freight

Time used for loading ..........days ............hours.

SHIPPED at the Port of Loading in apparent good order and
condition on board the Vessel for carriage to the
Port of Discharge or so near thereto as she may safely get the goods
specified above.

Weight, measure, quality, quantity, condition, contents and value un-
known.

IN WITNESS whereof the Master or Agent of the said Vessel has signed
the number of Bills of Lading indicated below all of this tenor and date,
any one of which being accomplished the others shall be void.

FOR CONDITIONS OF CARRIAGE SEE OVERLEAF

| Freight payable at | Place and date of issue |
| AS PER C/P | VANCOUVER, CANADA |
|  | APRIL 30, 2007 |
| Number of original Bs/L. | Signature COMPASS MARINE |
|  | SERVICES AS AGENTS ONLY FOR |
| 3/THREE | AND BY AUTHORITY OF THE |
|  | MASTER, CAPT: ALEKSANDR |
|  | GRACHYOV |

CODE NAME: "CONGENBILL", EDITION 1994

Shipper

J.K. INTERNATIONAL PTY LTD.

## BILL OF LADING
TO BE USED WITH CHARTER PARTIES

Reference No. B/L No. 04

Consignee

TO ORDER

Notify address

J.K. INTERNATIONAL PTY LTD.

# ORIGINAL

| Vessel | Port of loading |
|--------|-----------------|
| MV FREDERIKE OLDENDORFF | VANCOUVER, CANADA |

Port of discharge

INDIA

MARKS AND NOS

A QUANTITY OF CARGO SAID TO BE
556.882 MT CANADIAN WHOLE YELLOW PEAS IN BULK

Gross Weight
SAID TO WEIGH
556.882 METRIC TONS

LOADED CLEAN ON BOARD APRIL 30, 2007
STOWAGE: HOLD NO. 1, 3 & 5
            HOLD NO. 2 ON BOTTOM

FREIGHT PAYABLE AS PER CHARTER PARTY DATED 12.04.2007

(of which            on deck at Shipper's risk; the Carrier not

being responsible for loss or damage howsoever arising)

| Freight payable as per CHARTER PARTY DATED 12.04.2007  FREIGHT ADVANCE. Received on account of freight  Time used for loading ............days ....,..........hours. | SHIPPED at the Port of Loading in apparent good order and condition on board the Vessel for carriage to the Port of Discharge or so near thereto as she may safely get the goods specified above.  Weight, measure, quality, quantity, condition, contents and value unknown.  IN WITNESS whereof the Master or Agent of the said Vessel has signed the number of Bills of Lading indicated below all of this tenor and date, any one of which being accomplished the others shall be void.  FOR CONDITIONS OF CARRIAGE SEE OVERLEAF |
|---|---|

| Freight payable at AS PER C/P | Place and date of issue VANCOUVER, CANADA APRIL 30, 2007 |
|---|---|
| Number of original Bs/L 3/THREE | Signature COMPASS MARINE SERVICES AS AGENTS ONLY FOR AND BY AUTHORITY OF THE MASTER, CAPT: ALEKSANDR GRACHYOV |

Page 2

CODE NAME: "CONGENBILL". EDITION 1994

Shipper

J.K. INTERNATIONAL PTY LTD.

**BILL OF LADING**
TO BE USED WITH CHARTER PARTIES

Reference No. B/L No. 05

Consignee

TO ORDER

Notify address

J.K. INTERNATIONAL PTY LTD.

# ORIGINAL

| Vessel | Port of loading |
| MV FREDERIKE OLDENDORFF | VANCOUVER, CANADA |
| Port of discharge | |

INDIA

MARKS AND NOS

A QUANTITY OF CARGO SAID TO BE
6,300.000 MT CANADIAN YELLOW SPLIT PEAS IN BULK

Gross Weight
SAID TO WEIGH
6,300.000 METRIC TONS

LOADED CLEAN ON BOARD APRIL 30, 2007
STOWAGE: HOLD NO. 4

FREIGHT PAYABLE AS PER CHARTER PARTY DATED 12.04.2007

(of which                    on deck at Shipper's risk; the Carrier not
                being responsible for loss or damage howsoever arising)

| Freight payable as per CHARTER PARTY DATED 12.04.2007 | SHIPPED at the Port of Loading in apparent good order and condition on board the Vessel for carriage to the Port of Discharge or so near thereto as she may safely get the goods specified above. |
|---|---|
| ~~FREIGHT ADVANCE~~ ~~Received on account of freight~~ | Weight, measure, quality, quantity, condition, contents and value unknown. |
| | IN WITNESS whereof the Master or Agent of the said Vessel has signed the number of Bills of Lading indicated below all of this tenor and date, any one of which being accomplished the others shall be void. |
| | FOR CONDITIONS OF CARRIAGE SEE OVERLEAF |
| Time used for loading ............days ...............hours. | |

| Freight payable at AS PER C/P | Place and date of issue VANCOUVER, CANADA APRIL 30, 2007 |
|---|---|
| Number of original Bs/L. 3/THREE | Signature COMPASS MARINE SERVICES AS AGENTS ONLY FOR AND BY AUTHORITY OF THE MASTER, CAPT. ALEKSANDR GRACHYOV |

Page 2

CODE NAME: "CONGENBILL". EDITION 1994

| Shipper | | |
|---|---|---|
| J.K. INTERNATIONAL PTY LTD. | | |

**BILL OF LADING**
TO BE USED WITH CHARTER PARTIES

Reference No. B/L No. 06

Consignee

TO ORDER

Notify address

J.K. INTERNATIONAL PTY LTD.

# ORIGINAL

| Vessel | Port of loading |
|---|---|
| MV FREDERIKE OLDENDORFF | VANCOUVER, CANADA |

Port of discharge

INDIA

MARKS AND NOS

Gross Weight
SAID TO WEIGH
5,186.996 METRIC TONS

A QUANTITY OF CARGO SAID TO BE
5,186.996 MT CANADIAN YELLOW  SPLIT PEAS IN BULK

LOADED CLEAN ON BOARD APRIL 30, 2007
STOWAGE: HOLD NO. 4

FREIGHT PAYABLE AS PER CHARTER PARTY DATED 12.04.2007

(of which          on deck at Shipper's risk; the Carrier not
being responsible for loss or damage howsoever arising)

Freight payable as per
CHARTER PARTY DATED 12.04.2007

FREIGHT ADVANCE
Received on account of freight

Time used for loading ............days ................hours.

SHIPPED at the Port of Loading in apparent good order and
condition on board the Vessel for carriage to the
Port of Discharge or so near thereto as she may safely get the goods
specified above.

Weight, measure, quality, quantity, condition, contents and value un-
known.

IN WITNESS whereof the Master or Agent of the said Vessel has signed
the number of Bills of Lading indicated below all of this tenor and date,
any one of which being accomplished the others shall be void.

FOR CONDITIONS OF CARRIAGE SEE OVERLEAF

| Freight payable at AS PER C/P | Place and date of issue VANCOUVER, CANADA APRIL 30, 2007 |
|---|---|
| Number of original Bs/L 3/THREE | Signature COMPASS MARINE SERVICES AS AGENTS ONLY FOR AND BY AUTHORITY OF THE MASTER, CAPT: ALEKSANDR GRACHYOV |

CODE NAME: "CONGENBILL", EDITION 1994

Shipper

J.K. INTERNATIONAL PTY LTD.

# BILL OF LADING
## TO BE USED WITH CHARTER PARTIES

Reference No. B/L No. 07

Consignee

TO ORDER

Notify address

J.K. INTERNATIONAL PTY LTD.

# ORIGINAL

| Vessel | Port of loading |
| MV FREDERIKE OLDENDORFF | VANCOUVER, CANADA |

Port of discharge

INDIA

MARKS AND NOS

A QUANTITY OF CARGO SAID TO BE
10,516.758 MT WHOLE YELLOW PEAS

Gross Weight
SAID TO WEIGH
10,516.758 METRIC TONS

LOADED CLEAN ON BOARD APRIL 28, 2007
STOWAGE: HOLD NOS. 1, 3 & 5
        HOLD NO. 2 ON BOTTOM

FREIGHT PAYABLE AS PER CHARTER PARTY DATED 12.04.2007

(of which                on deck at Shipper's risk; the Carrier not
               being responsible for loss or damage howscever arising)

Freight payable as per
CHARTER PARTY DATED 12.04.2007

FREIGHT ADVANCE.
Received on account of freight

.................................................................

Time used for loading ...........days ............hours.

SHIPPED  at the Port of Loading in apparent good order and condition on board the Vessel for carriage to the Port of Discharge or so near thereto as she may safely get the goods specified above.

Weight, measure, quality, quantity, condition, contents and value unknown.

IN WITNESS whereof the Master or Agent of the said Vessel has signed the number of Bills of Lading indicated below all of this tenor and date, any one of which being accomplished the others shall be void.

FOR CONDITIONS OF CARRIAGE SEE OVERLEAF

| Freight payable at AS PER C/P | Place and date of issue VANCOUVER, CANADA APRIL 28, 2007 |
| Number of original Bs/L 3/THREE | Signature COMPASS MARINE SERVICES AS AGENTS ONLY FOR AND BY AUTHORITY OF THE MASTER, CAPT: ALEKSANDR GRACHYOV |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
J.K. INTERNATIONAL PTY. LTD.,                    :
                                                 :
                              Plaintiff,          :      07 Civ. 7328 (SHS)
                                                 :
        - against -                               :      ECF CASE
                                                 :
OLDENDORFF CARRIERS GMBH & CO.,                  :
                                                 :
                              Defendant.          :
------------------------------------------------------------X

### DECLARATION OF ADAM RUSS

# EXHIBIT 4

266528

*Via Globe Wireless*_____ Page 1

Message Accepted by Globe Wireless at 21/05/2007 01:39:57    3.50 Kbits

Date: 21/05/2007 01:38:35                                                    (i)
From: A8FY8
To:   TRANSWORLD MARINE EXPRESS PTY.LTD - JKI <postfix@tmsship.com>
cc:   Oldendorff Vancouver <operations@oldendorff-northamerica.com>
bcc:  BS Chartering <chartering@schultegroup.com>
Priority: Normal

Subject: Port of Destination

   Dear Sirs,

I still have not information abt port of Destination.
It may well be that the vessel hasn't necessary sea Charts.
Pls nominate Port of discharging with purpose to order necessary Charts.
ETA Singapore 27/05 early morning WP.

BRGDS            Master


*Via Globe Wireless*_____ Page 1

Message Accepted by Globe Wireless at 23/05/2007 05:32:42    3.50 Kbits

Date: 23/05/2007 05:18:46                                                    (ii)
From: A8FY8
To:   Robin B B Chng - Singapore <robin@maldiveshipping.com.mv>
cc:   Bos Agencies PTE LTD-Singapore(V-4/7) <phwleong@gmail.com>
cc:   BS Chartering <chartering@schultegroup.com>
bcc:  Maldives National Shipping Agencies-Sing. Agent <maldives@cyberway.com.sg>
Priority: Normal

Subject: ETA S'pore

   Dear Sirs,

1. I havn't instruction of Charterers/shipper re cargo fumigation!
2. Pls explain what is abrevation "PEBGA"
3 ETA Singapore bunkering place - 27.05.07 abt at 20.00 lt (from15.00 to 24.00 lt
as
   weather and current permit).

BRGDS            Master

Via Globe Wireless_____     Page 1

Message Accepted by Globe Wireless at 23/05/2007 05:54:07     6.75 Kbits     (iii)

Date: 23/05/2007 05:36:16
From: ABFYS
To:     Oldendorff  Vancouver <operations@oldendorff-northamerica.com>
To:     TRANSWORLD MARINE EXPRESS PTY.LTD - JKI <postfix@tmeship.com>
cc:     Oldendorff-PIC-Susanne Nawrozki <susanne.nawrozki@oldendorff.com>
bcc:    BS Chartering <chartering@schultegroup.com>
Priority: Normal

Subject: Request of voyage instruction

    Dear Sirs,

1. in 4 days vsl will be in Singapore, but I still have not information abt port
   of destination.
2. I received request of pre-Arr.Info from Mumbay agent, What I must reply him?!
3. I received information from Singapore Agent that vsl have to be fumigated, but
   all halds
   are sealed, what I must Do?!
4. I received question from Shipper abt quantity of bunker to be supplied, all
   necessary information and calculation was given month ago, what I must answer if
   I don't know port of
   distination?!
   Please supply me with clear voyage instruction ASAP and confirm this msg.

BRGDS            Master

*Via Globe Wireless*_____ *Page 1*

Message Accepted by Globe Wireless at 30/05/2007 10:11:14    5.00 Kbits

Date: 30/05/2007 10:10:16                                      *1a*
From: A8TY8
To:    Sahi Oretrans Pvt Ltd - MUMBAI <aot@vsnl.com>
cc:    TRANSWORLD MARINE EXPRESS PTY.LTD - JNI <postfix@tmeship.com>
Priority: Normal

Subject: Draft

Dear Sirs,
Please be informed the ship's draft on arrival to Mumbai  on 06 June as flws:

1.On arrival Mumbai: F-11.31 m, A-12.28 m. Trim-0.97 m, Air draft-31.86 m.
2.TPC-51.8 tn/cm
3.To arrange even keel with draft 10.5 m we need to discharge: Hold N.2 - 1400
mt,                                                   Hold N.4 - 5800 mt
                                                      ----------------------
                                                        Total:   7200 mt

Brgds, master.

---

*Via Globe Wireless*_____ *Page 1*

Message Accepted by Globe Wireless at 31/05/2007 01:45:31    2.75 Kbits

Date: 31/05/2007 01:35:26                                      *3a*
From: A8TY8
To:    Sahi Oretrans Pvt Ltd - MUMBAI <aot@vsnl.com>
Priority: Normal

Subject: Vessel's draught on arrival to Mumbai

Dear mr.Narayan!
To arrange vessel on even keel on arrival to Mumbai we can pump in into Forepeak
of 700 mt ballast. In this case we'll have draught as flws: F-11.94 m, A-11.95 m,
Trim-0.01 m. Awaiting yr reply.

Brgds, master.

Page 1

Via Globe Wireless_____

Message Accepted by Globe Wireless at 06/06/2007 07:46:06    3.75 Kbits

Date: 06/06/2007 07:45:04
From: ABFY8
To:   Sahi Oretrans Pvt Ltd - MUMBAI <sot@vsnl.com>
Priority: Normal

7a

Subject: ETA report

Dear Sirs,
I regret to inform you that on 05 June we stopped ME due to high temperatures of
exhaus gas of the ME for 4hsr and 20 min. Now we'r proceeding with Half speed
ahead and have speed 6 knt.
ETA Mumbai on 10 June at 02.40 UTC/08.10 LT WP.
Kindly request to inform us about port of pre-discharging becaus port of Kandla
is not safe port for our vessel.

Brgds, master.

Page 1

Via Globe Wireless_____

Message Accepted by Globe Wireless at 04/06/2007 10:41:27    8.75 Kbits

Date: 04/06/2007 10:38:29
From: ABFY8
To:   Sahi Oretrans Pvt Ltd - MUMBAI <sot@vsnl.com>
cc:   TRANSWORLD MARINE EXPRESS PTY.LTD - JKI <postfix@tmeship.com>
cc:   Oldendorff-PIC-Susanne Nawrozki <susanne.nawrozki@oldendorff.com>
cc:   Oldendorff Vancouver <operations@oldendorff-northamerica.com>
bcc:  FleetB <fleetb@vhsk.de>
Priority: Normal

6a

Subject: New discharging port KANDLA

Dear Sirs,
Please be informed, that mv "Frederike Oldendorff" on arrival to KANDLA Pilot
station will have drafts as flws: F-11.31 m, A-12.28 m. and could not safety
reach KANDLA's inner port water due to small depth. According to the Guide to
Port Entry the max daft into port KANDLA is 11.2 m !!!
Kindly to draw yr attantion that we can arrange even keal max draft 11.99 m.
only.
Please note that we have not BA chart No.3466 - "Approching to port Kandla".
The plan of pre-discharging as flws:Hold No.2 - 1,400 mt
                                     Hold No.4 - 5,800 mt.
                                     -------------------
                                     Total: 7,200 mt

After pre-discharging vessel will have drafts as flws:
        - F-10.38 m
        - A-10.43 m
        - Air draft -23.63 m
        - TPC-51.8 tn/cm.

Brgds, master.

Page 1

*Via Globe Wireless*_____

Message Accepted by Globe Wireless at 07/06/2007 07:20:32    2.25 Kbits

Date: 07/06/2007 07:19:12
From: ABFYS                                                    7b
To:   Sahi Oretrans Pvt Ltd – MUMBAI <sot@vsnl.com>
Priority: Normal

Subject: ETA MUMBAI

Dear Sirs,
mv Frederike Oldendorff continue to sail with speed 6 knt due to ME problem. ETA
Mumbai on 10 June at 03 UTC. Awaiting istruction of safe port for discharging.

Brgds, master.

---

Page 1

*Via Globe Wireless*_____

Message Accepted by Globe Wireless at 08/06/2007 07:19:58    4.75 Kbits

Date: 08/06/2007 07:19:03
From: ABFYS
To:   Sahi Oretrans Pvt Ltd – MUMBAI <sot@vsnl.com>
cc:   Oldendorff-PIC-Susanne Nawrozki <susanne.nawrozki@oldendorff.com>    7c
cc:   FleetB <fleetb@vbsk.de>
bcc:  BS Chartering <chartering@schultegroup.com>
Priority: Normal

Subject: ETA Report

Dear Sirs,
Please be advised that mv Frederike Oldendorff ETA Mumbai for discharging of
46,918 mtn of Yellow peas on 10 June 2007 at 02.00 UTC.
Awaiting your instructions regarding Safe port of discharging.
Kindly inform you that if we'll have not clear instruction about Safe port of
discharging, we'll
drop anchor at Mumbai road anchorage on 10 June at 02.00 UTC.
Please confirm the receipt of my ETA Report.

Brgds, master.

*Page 1*

*Via Globe Wireless*_____

Message Accepted by Globe Wireless at 11/06/2007 10:17:37    6.50 Kbits

Date: 11/06/2007 10:16:40
From: ASFYB
To:   Sahi Oretrans Pvt Ltd - MUMBAI <sot@vsnl.com>
To:   OLDENDORFF-CONTRACTS <contracts@oldendorff.com>
To:   Oldendorff  Vancouver <operations@oldendorff-northamerica.com>
To:   JKI <jki@jki.com.au>
cc:   Oldendorff-PIC-Susanne Nawrozki <susanne.nawrozki@oldendorff.com>    *8a*
cc:   Oldendorff - Carriers <bulk@oldendorff.com>
bcc:  FleetB <fleetb@vbsk.de>
bcc:  BS Chartering <chartering@schultegroup.com>
Priority: Normal

Subject: ATA MUNDRA

Dear Mr. NARAYAN!
MV Frederike Oldendorff ETA MUNDRA on 13 June at 00.20 UTC.
To arrange proper ship's stability we have fully discharge Hold N.2-6,371 mt and
hold N.4-11,487 mt, total-17,858 mt. We'll have draft 9.42 m.
Kindly draw your attention that vessel can not Safetly approach and enter to
MUNDRA port without
BA chart No.670 (BA chart No.670 " Ports in Gulf of Kachchh, Mundra port &
approaches". Kindly request to arrange abv chart with Pilot.
Please be advised that Hull&Machinery P&I Society is GARD, Sweden.

brgds, master.

---

*Page 1*

*Via Globe Wireless*_____

Message Accepted by Globe Wireless at 11/06/2007 14:54:28    5.25 Kbits

Date: 11/06/2007 14:53:11
From: ASFYB
To:   JKI <jki@jki.com.au>
To:   Oldendorff  Vancouver <operations@oldendorff-northamerica.com>
To:   TRANSWORLD MARINE EXPRESS PTY.LTD - JKI <postfix@tmaship.com>
cc:   Oldendorff - Carriers <bulk@oldendorff.com>
cc:   Oldendorff-PIC-Susanne Nawrozki <susanne.nawrozki@oldendorff.com>    *9a*
bcc:  BS Chartering <chartering@schultegroup.com>
bcc:  Sahi Oretrans Pvt Ltd - MUMBAI <sot@vsnl.com>
Priority: Normal

Subject: MUNDRA  discharging Plan

Dear Capt.Ivan Cola+ADc-o
This is to inform you that in accordance with owner's information our vessel in
MUNDRA will get a  bunker of IFO-400 mt, MDO-80 mt. In this case we'll have not
problem with ship's stability (free surface of the fuel tanks), but to adjust for
MUMBAI max. draft 10.5 m, we'd discharge 7,200 + 480 =7,680 mt.
Kindly request to approve.

Brgds, master.

*N 1*

```
***
MSG: 328505 2007/05/30 06:05:26 ROUTINE
***

NL BURUM LES 204400501 30-MAY-2007 06:01:28 328505



MV FREDERIKE OLDENDORFF
TO:  MASTER FREDERIKE OLDENDORFF
FM :  SAHI ORETRANS MUMBAI

PLS ADVSE TPC FOR YR VSL AND ALSO ADVSE HOW MUCH CGO IS TO BE DISCHA
RGED TO ARRIVE AT DRAFT OF 10.5 M OR 10 M DRAFT.

BEST REGARDS
NARAYAN
```

*N 2*

```
***
MSG: 334433 2007/05/30 06:31:05 ROUTINE
***
Subject: Draft
From: "T.M.E. Brisbane - Post Fixture" <postfix@tmeship.com>

Capt/Capt Colaco

Pls adv arr draft n trim. Pls adv if u can disch part cgo fm h4 at Mangalore to
achieve even keel then proceed to Mumbai.

TksnBrgds
Capt Ivan Colaco
As Agents only
```

*N 3*

```
***
MSG: 337983 2007/05/30 06:51:32 ROUTINE
***

NL BURUM LES 204400501 30-MAY-2007 06:50:01 337983



MV FREDERIKE OLDENDORFF
TO:  MASTER, FREDERIKE OLDENDORFF
FM :  SAHI ORETRANS MUMBAI

PLS ADVSE FLWG:
1) TPC
2) QTY TO B DISCHARGED TO ARRIVE AT DRAFT OF 10 M OR 10.5 M
3) DTLS OF HOLDS FRM WHICH CGO IS TO B DISCHARGED TO ARRIVE AT 10.5 M
 OR 10 M DRAFT

BEST REGARDS
NARAYAN
```

$N$ 4

```
***
MSG: 392864 2007/05/30 12:57:38 ROUTINE
***

NL BURUM LES 204400501 30-MAY-2007 12:56:27 392864



MV FREDERIKE OLDENDORFF
TO:  MASTER, FREDERIKE OLDENDORFF
FM  :   SAHI ORETRANS MUMBAI

TKS FOR YR LAST MSG N NOTED VSL'S TRIM OF 0.97M ON ARVL AT MUMBAI. PL
S ADVSE IF U CAN REDUCE DRAFT BY TAKING BALLAST AND PUMPING OUT F/W S
O THAT SHE CAN BE ON EVEN KEEL. PLS ADVSE WHAT WL BE EVEN KEEL DRAFT
AFTER DOING THE ABV OPTIONS.

PLS ADVSE

BEST REGARDS
NARAYAN
```

NL BURUM LES 204400501 31-MAY-2007 08:25:25 545619         $N$ 5

```
MV FREDERIKE OLDENDORFF
TO:  MASTER, FREDERIKE OLDENDORFF
FM:  SAHI ORETRANS MUMBAI

TKS FOR YR LAST TWO MSGS.

RE YR MSG ON PUMPING IN BALLAST INTO FOREPEAK MT BALLAST TO ACHIEVE E
VEN KEEL DRAFT, WE ARE DISCUSSING IT WITH CHTRS AND SHALL REVERT.

MNTIME WE RQST U TO SEND ALL PRE-ARRIVAL INFORMATION/DOCS AS THEY ARE
REQUIRED HERE URGNTLY TO REGISTER THE VSL WITH PORT AND CUSTOMS WELL
IN TIME.

BEST REGARDS
NA  YAN
```

```
***
MSG: 256496 2007/06/04 08:42:25 ROUTINE      $N$ 6
***

NL BURUM LES 204400501  4-JUN-2007 08:41:18 256496



TO:  MASTER, FREDERIKE OLDENDORFF
FM  :   SAHI ORETRANS MUMBAI

YR ETA MSG NOTED. WITH THE FALLING TIDES AND WEATHER CONDITION WORSEN
ING, VESSEL MAY NOT BE ABLE TO DISCHARGE AT MUMBAI WITH HER PRESENT A
RVL DRAFT. HENCE CHTRS MAY DIVERT THE VSL TO KANDLA PORT FOR DISCHARG
ING PART CGO (MAX SPLIT YELLOW PEAS + YELLOW PE
AS) AND RETURN TO MUMBAI WITH ARVAL DRAFT OF MAX 10.5M SSW.

PLS THERE4 ADVSE THE QTY TO BE DISCHARGED AT KANDLA AND OTHER REQUIRE
MENTS IF ANY IN ORDER FOR THE VSL TO ARRIVE SAFELY AT MUMBAI WITH 10.
5M DRAFT.

PLS ADVSE
```

N 7

```
***
MSG: 299511 2007/06/06 10:20:20 ROUTINE
***

STRATOS CSAT 2042041594989  6-JUN-2007 10:19:01 299511

FROM: SUSANNE.NAWROZKI@OLDENDORFF.COM (NAWROZKI, SUSANNE)
SUBJECT: FW: NOON REPORT

DEAR CAPT..

KINDLY URGENTLY ADVISE IF YOUR GOOD VESSEL WILL SAIL DIRECTLY TO MUMBAI OR IF
CARGO WILL BE PRE-DISCHARGED AT MANGALORE OR KANDLA.

THANKS AND BRGDS
OLDENDORFF, LUEBECK
SUSANNE NAWROZKI

+49 451 150 0232 (DIRECT LINE)
+49 172 413 8954 (CELL)


PLS REPLY TO BULK@OLDENDORFF.COM AND SUSANNE.NAWROZKI@OLDENDORFF.COM
```

N 8

```
***
MSG:   75944 2007/06/08 11:41:10 ROUTINE
***

NL BURUM LES 204400501  8-JUN-2007 11:40:04 075944



FREDERIKE OLDENDORFF - MUNDRA
TO : MASTER, FREDERIKE OLDENDORFF
FM : SAHI ORETRANS MBI

NORED YR LAST ETA REPORT, AS ADVSD BY CHTRS, YR 1ST PORT OF DISCH WL
BE 'MUNDRA'. PLS THERE4 ADVISE YR ETA MUNDRA ACCORDINGLY.

FOR MUNDRA CUSTOMS / PORT, FLWG DOCS ARE REQRD.

  \ P. LIST
  CREW LIST
  BOND STORE LIST
 SHIPS CURRENCY
 NIL LIST
 ENGINE/DECK STORE LIST
 .PROVISIONSLIST
 MARITIME DECLARATION
. VOYGE MEMO

V ALSO ATTACH HEREWITH ISPS DECLARATION FORMAT WHCH PLS FILL UP, SIGN
. N SEND TO US ALONGWITH ABV DOCS.

PLS NOTE THAT ON ARVL AT MUMBAI AFTER MUNDRA, VSLS' ARVL DRAFT SHUD N
OT EXCEED 10.5 M.

 BRGDS
 NARAYAN
```

*N 9*

```
***
MSG: 637331 2007/06/11 13:00:45 ROUTINE
***
Subject:  Cargo
From:  "T.M.E. Brisbane - Post Fixture" <postfix@tmeship.com>
```

Capt/Capt Cola+ADc-o

Pls note Agts hv advsd tht u now req abt 17858 MT to be disch at Mundra however
as per earlier msg only 7,200 MT to be disch at Mundra, pls ensure that only 7,2
00 MT is to be disch as all docs prepared accdly.

TksnBrgds
Capt Ivan Cola+ADc-o
As Agents only

*N 10*

```
***
MSG: 809515 2007/06/12 07:16:12 ROUTINE
***
Subject:  Stow
From:  "T.M.E. Brisbane - Post Fixture" <postfix@tmeship.com>
```

Capt/Capt Cola+ADc-o

TYt. Pls note Cnrts hv advsd tht they hv changed qty with customs many times and
now customs unwilling to accept any further changes, so pls do your best to dis
ch max 7286.796 MT at Mundra to arrive Mumbai with 10.5 m draft.

TksnBrgds
Capt Ivan Cola+ADc-o
As Agents only

*Via Globe Wireless*_____ *Page 1*

Message Received on Board 6/12/2007 8:12:49 AM     14.50 Kbits     *N11*

Date: 6/12/2007 8:05:00 AM
From: sot@vsnl.com
To:    ABFY8@globeemail.com <ABFY8@globeemail.com>
cc:    postfix@tmaship.com <postfix@tmaship.com>
cc:    sandeep@jki.com.au <sandeep@jki.com.au>
cc:    jki@jki.com.au <jki@jki.com.au>
Priority: Urgent

Subject: MUNDRA  discharging Plan


TO   :   Master, Frederick Oldendorff
FM   :   Sahi Oretrans - Mumbai

Good day.

When charterers decided on Mundra as 1st discharge port, we had requested you to
advise the quantity to be discharged at Mundra so as to arrive at Mumbai with max
draft of 10.5 M. On receipt of your advice on Mundra quantity, manifest was filed
at Mundra customs for 7,286,996 MT and the balance quantity has already been
filed with Mumbai customs. Now to amend the already-manifested quantity at both
the ports will create lot of problems with the customs. Hence under the
circumstances, nothing  can be done as far as customs is concerned.


Best regards
Narayan
Sahi Oretrans
As Agents

----- Original Message -----
From: "FREDERIKE OLDENDORFF" <ABFY8@globeemail.com>;
To: <jki@jki.com.au>; <operations@oldendorff-northamerica.com>;
<postfix@tmaship.com>
Cc: <bulk@oldendorff.com>; <susanne.nawrozki@oldendorff.com>
Sent: Monday, June 11, 2007 8:23 PM
Subject: MUNDRA discharging Plan


> Dear Capt.Ivan Colu+AOc-o
> This is to inform you that in accordance with owner's information our vessel in
> MUNDRA will get a bunker of IFO-400 mt, MDO-80 mt. In this case we'll have not
> problem with ship's stability (free surface of the fuel tanks), but to adjust for
MUMBAI
> max. draft 10.5 m, we'd discharge 7,200 + 480 =7,680 mt.
> Kindly request to approve.
>
> Brgds, master.
>
> Received: from GCC at Globe Wireless;
> Mon, 11 Jun 2007 14:56 UTC
> Message-id: 208549201
>
> _____ NOD32 2322 (20070611) Information _____
>
> This message was checked by NOD32 antivirus system.
> http://www.eset.com
>
>
Received: from INT at Globe Wireless;
Tue, 12 Jun 2007 08:05 UTC
Message-id: 208569496

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
J.K. INTERNATIONAL PTY. LTD.,                          :
                                                       :
                              Plaintiff,               :        07 Civ. 7328 (SHS)
                                                       :
       - against -                                     :        ECF CASE
                                                       :
OLDENDORFF CARRIERS GMBH & CO.,                         :
                                                       :
                              Defendant.               :
--------------------------------------------------------------X

## DECLARATION OF ADAM RUSS

# EXHIBIT 5

266528



**Panamax size vessels at inner anchorage during monsoon season.**
**(Circular no. DC/C-SH/2908 dated 26.06.2006)**



125
OF ACHIEVEMENT

पोन /Phone   : 2261 4345, 5656 4021
फॅक्स / Fax   : 91-22-2261 2404
टेलेक्स/Telex  : 81-11 81047 MBPT IN
ई-मेल /E-mail : mbpt@vsnl.com


**मुंबई पोर्ट ट्रस्ट**
**MUMBAI PORT TRUST**





उपसंक्षक का कार्लाय
पोर्ट हाउस
शिशो बाल्लपगाव मार्ग
मुंबई – 400 001.
Deputy Conservator's
'Port House'
Shoarji Vallabhdas M
Mumbui – 400 001.

---

## CIRCULAR

No   DC/C-SH/ ? ९९ ४                          **2 6 JUN 2006**

To.

All Vessel Owners/Agents carrying out
stream discharge in Mumbai Harbour.

Sub :  Panamax size vessels at inner anchorage
during monsoon season.
_____

As you are well aware during the foul weather season, all anchorages
South of the "A" line fall outside the inland water limits and are therefore
decommissioned resulting in a reduction of 50% in the number of anchorage
available in Mumbai Harbour  Also due to weather conditions prevalent during
the monsoons, it is impossible to carry out stream discharge at those
decommissioned anchorages.

There are only 3 anchorages of 10.00m  draft available in the inner a
These 3 anchorages are of 1000ft (305m) radius each and are suitable for ships
of about 180m length  When ships substantially longer than this are brought
they encroach into the adjacent anchorages thus resulting in a loss of the
adjacent anchorage for use by another ship. Also since the vessel has a larger
swinging circle  she swings during every change of tide through an area of the
anchorage Eastward which has a lesser draft.

In view of what is stated above, we have to request you to take up this
matter with your Principals and :

1      Refrain from bringing panamax size vessels for stream discharge
during monsoon season.

2      In case you are constrained to bring panamax size vessels, then the
draft should not exceed 10.00m in view of the larger swinging circle.

3.     Handymax size vessels with a draft of 10.50m can be accepted (tide
permitting) since they swing within the radius of the berth.

4      You are requested to advice your Principals not to exceed the above
mentioned drafts as during the foul weather season (monsoon time), it
is not possible to discharge cargo at BFL area for the purpose of
lightening the ship.

*(signature)*

(CAPT. M M RODRIGUES)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
J.K. INTERNATIONAL PTY. LTD.,                        :
                                                     :
                          Plaintiff,                 :     07 Civ. 7328 (SHS)
                                                     :
          - against -                                :     ECF CASE
                                                     :
OLDENDORFF CARRIERS GMBH & CO.,                      :
                                                     :
                          Defendant.                 :
-------------------------------------------------------------X

## DECLARATION OF ADAM RUSS

# EXHIBIT 6

266528

granted at Mumbai and be conveyed
up to the Chief Surveyor, Maharashtra
Maritime Board, Mumbai



No. 196-061555



# MAHARASHTRA MARITIME BOARD
## CERTIFICATE OF SURVEY
ISSUED UNDER ACT I OF 1917 BY THE GOVERNMENT OF MAHARASHTRA
### For an Inland Vessel

To remain in force only until the 28th day of September, 2006

Inland Vessel (Motor Vessel) :- **M.V. GAJ LAXMI**       **MOR/IV/00005**

Owner, Managing Owner or Agent :- SHRI. MICHAEL R. FERNANDES, DIRECTOR ,
M/S. VINAYAK MULTIMODAL TRANSPORT PVT. LTD., D4, KALPATARU,SECTOR
98,CBD,BELAPUR, NAVIMUMBAI - 400613

| Port of Registry and Official Number Year of Built & Yard | Registered Tonnage | | Name of Master & Engine Driver and Number and grade of his Certificate |
|---|---|---|---|
| | Gross | Net | |
| Mumbai - Mors MOR/IV/00005 (Ghodbunder-Thane-1997) | 1394.00 | 584.00 | Shri.Dawood Khan Salakhan Sakharkar, 1st Class Master, Cert No. 0695 Shri. Goutam Parameniya, 1st Class Engine Driver, Cert No. 003/2004 |

**Limits beyond which this vessel is not to ply**

TO PLY WITHIN INLAND WATER LIMITS ONLY
To ply within Fair and Foul Weather limits only
Fair Season :(1st Sept. to 25th May) to Ply within Fair weather limits only
Foul Season :(26th May to 31st August) to ply within Foul Weather limits only

**NUMBER OF PASSENGERS AND L.S.A**

This Ship is according to the declaration of the Surveyor, fit to carry, when there is no encumbrance of passenger accommodation :-

| Passengers / crew capacity | Fair | Foul | Life Jackets and Life Buoys / Boats | Fire Fighting Appliances |
|---|---|---|---|---|
| Tween Deck / FWD | --- | --- | 02Buoyant Appl. for 24 Persons ( 02 x 12 Persons ) Life Buoys --- 04 nos. Life Jackets --- 11 nos. Engine : Kirloskar Cummins .400 BHP x 2 nos. KT 1150 M = 2 nos. Built in 1997 | W/Co2 - 04 Mech. Foam Type 9 Litre - 04 Mechanical Foam 50 ltr. - 01 DCP - 01 Fire Hydrant - 04 Fire Hoses - 02 Sand Box with Scoop - 01 Fire Buckets - 10 Fire Axe - 01 Dust Bin - 01 |
| Main Deck / Engine | --- | --- | | |
| Upper Deck /AFT | --- | --- | | |
| Crew | 11 | 11 | | |
| Total | 11 | 11 | | |

Vessel examined in Dry Deck / Slip Way on 29/09/2004

If the space measured for Passenger Accommodation is occupied by Cattle or by Cargo, or other articles :-
Then for every 4 1/2 superficial feet of such space so occupied on the upper deck , and
for every 9 superficial feet of such space so occupied on the lower deck or in the cabins   } ONE PASSENGER is to be deducted from the numbers above

THIS IS TO CERTIFY that the provisions of the Law with respect to the Survey of the above mentioned Motor vessel and the transmission of Declarations in respect thereof have been complied with.

**This Certificate, unless cancelled or revoked , to be in force until the 28th day of September, 2006**

Signed by order of the Government of Maharashtra, this 06th October, 2005

Marine Engineer & Surveyor In Charge
Maharashtra Maritime Board
Mumbai

Either this certificate or the original / duplicate thereof, furnished by the Government of Maharashtra, is to be put up in a conspicuous part of the vessel, where it will be visible to all persons on board.

If the number of passengers carried exceeds the number stated in this Certificate, The Master of Owner shall, for every passenger over and above that number, be each liable to a Fine which may levied at the rate of Five Hundred Rupees.

In case of any ACCIDENT occasioning loss of life, or any material damage affecting the sea worthiness or efficiency of the vessel,either in the hull or in any part of the machinery or equipment, a report BY LETTER, SIGNED BY THE OWNER OR MASTER is to be forwarded to the Chief Surveyor, Maharashtra Maritime Board, Mumbai, within 24 hours after the happening of the accident, or as soon thereafter as possible.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
J.K. INTERNATIONAL PTY. LTD.,                    :
                                                 :
                              Plaintiff,         :       07 Civ. 7328 (SHS)
                                                 :
         - against -                             :       ECF CASE
                                                 :
OLDENDORFF CARRIERS GMBH & CO.,                  :
                                                         :
                              Defendant.         :
---------------------------------------------------------------X

## DECLARATION OF ADAM RUSS

# EXHIBIT 7

766528



# VINAYAK MULTIMODAL TRANSPORT PVT. LTD.

1st Floor, Bharati Bhavan, Opp. St. George Hospital, 211/219, P. D'Mello Road, Fort,
Mumbai-400 001.
Tel: 22641921 / 22 / 23 / 24 • Fax: 022 2264 1925 • Email: vinayakmultimodal@yahoo.co.in

23rd August 2007

M/s Forbes Gokak Ltd,
S. P. Centre,
41/44, Minoo Desai Marg,
Mumbai – 400 005

Dear Sirs,

### Ref : M. V. Fredrike Oldendorff

We have for reference your letter dated 23rd August 2007 regarding discharge of
Chickpeas from above referred vessel. In this connection we would like to give following
information as required by you.

1   We have provided our 2 no. barges of capacity 2200 Mt. at inner anchorage from
    19/07/2007 to 25/07/2007 to M/s Sahi Oretrans Pvt. Ltd. for discharging
    chickpeas from the above vessel.

2.  M/s Sahi Oretrans did not approach us for discharging cargo at outer anchorage
    during the said period i.e. from 25th May 2007 to 25th July 2007

3.  We also would like to inform you that we do not provide barges outside foul
    area limit in the referred period i.e. 25th May to 31st August as it is against
    prevailing MMD rules.

Thanking you,

Yours faithfully,

For Vinayak Multimodal Transport Pvt. Ltd.

S. B. Shenvi - Director



Registered. Office: Kalpataru, Sector-8B, C.B.D. Belapur, Navi Mumbai-400 618. • Tel: 5610 1918

Branch Office: 265. Bazargate Street, 106, Birya House. Fort, Mumbai-400 001. • Tel: 5634 6181 / 56332651 / 22672630