LENNON, MURPHY & LENNON, LLC
Attorneys for Defendant
OLDENDORFF CARRIERS GMBH & CO.
The Gray Bar Building
420 Lexington Avenue, Suite 300
New York, New York 10170
Telephone:    (212) 490-6050
Facsimile:    (212) 490-6070
Kevin J. Lennon
Patrick F. Lennon

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

J.K. INTERNATIONAL PTY. LTD.,                :        07 Civ. 7328 (SHS)
                                             :
                           Plaintiff,        :        ECF CASE
                                             :
      - against -                            :
                                             :
OLDENDORFF CARRIERS GMBH & CO.,              :
                                             :
                           Defendant.        :
------------------------------------------------------------X


# MEMORANDUM OF LAW IN SUPPORT
# OF MOTION TO VACATE MARITIME ATTACHMENT

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS .........................................................................................3

ARGUMENT......................................................................................................

POINT ONE
IT IS PLAINTIFF'S BURDEN TO SHOW CAUSE WHY
THE ATTACHMENT SHOULD NOT BE VACATED ................................................3

POINT TWO
JKI'S ATTACHMENT SHOULD BE VACATED AS ITS UNDERLYING
CLAIMS ARE SO LACKING IN MERIT AS TO BE FRIVOLOUS
OR ARE OTHERWISE MANIFSTLY INQEQUITABLE ...........................................7

POINT THREE
JKI'S ATTACMENT SHOULD BE VACATED AS IT WAS PREMISED UPON A
COMPULSORY COUNTERCLAIM WHICH JKI WAS REQUIRED TO ASSERT WITHIN
OLDENDORFF'S MARITIME ATTACHMENT AS PER FED. R. CIV. P. 13 .............14

CONCLUSION ....................................................................................................17

## PRELIMINARY STATEMENT

Defendant, OLDENDORFF CARRIERS GMBH & CO. (hereinafter "Oldendorff" or "Defendant"), by its undersigned counsel, Lennon, Murphy & Lennon, LLC, submits the within Memorandum of Law in Support of its Motion to Vacate the August 16, 2007 Ex Parte Order of Attachment ("Order") obtained by Plaintiff, J.K. INTERNATIONAL PTY LTD. (hereinafter "JKI" or "Plaintiff"), pursuant to Rule E(4)(f) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

At JKI's request, on August 16, 2007 the Court issued the Order authorizing the attachment of Oldendorff's property in the sum of $4,723,237.92. Subsequently, and after JKI had fully secured its alleged maritime claim via service of the Order and Process of Maritime Attachment and Garnishment ("PMAG") on New York garnishee banks and financial institutions, Oldendorff provided substitute security to JKI as set out in an Order for Release of Funds and Stay of Action dated September 19, 2007. *See Order for Release of Funds and Stay of Action annexed to Kevin J. Lennon Declaration at ¶ 2 (Ex. 1)*("Lennon Decl. at ___"). This matter thus is currently on the Court's suspense calendar subject to Oldendorff's express right to seek to vacate, modify or otherwise address JKI's maritime attachment.

JKI only obtained the August 16, 2007 Order after Oldendorff had obtained security for its affirmative claim against JKI based on JKI's failure to remit hire due and owing in the sum of $1,486,886, inclusive of costs, fees and interest. That JKI only secured its alleged claims against Oldendorff via the subject maritime attachment in New York *after* Oldendorff had secured its claims in the first instance suggests that JKI's motives may in fact be less about securing its alleged claims, which, as discussed herein are lacking both in fact and under English law, and more about seeking to obtain leverage against Oldendorff within the London arbitration.

2

For these reasons, and for the reasons explained in the accompanying Declarations of Timothy Nicholas Young, Adam Russ, and Kevin J. Lennon, JKI's Order should be vacated because: (1) JKI's alleged claims both ignore and inaccurately portray facts relating to the subject time charter voyage; (2) JKI's alleged claims are unrecoverable under English law; and (3) JKI's claim are so lacking in merit as to be characterized as frivolous.

In Rolls Royce Industrial Power, (INDIA) v. M.V. FRATZIS, 119 AMC 393, 397, 95 CV 2630 (CSH)(S.D.N.Y.) Judge Haight opined that a three-part analysis should be undertaken by the Court in such situations. That test is as follows:

> [T]here are three questions which arise out of the authorities cited [including Admiralty Rule E(4)(f), Admiralty Rule E(6) and former Local Admiralty Rule 12] and others, to which I will come...
>
> The first: Is the plaintiffs' claim so lacking in merit as to be characterized as frivolous?
>
> If that question is answered in the negative, then one comes to the second question which is: In obtaining the attachment at issue, have the plaintiffs engaged in improper practices to such a degree, or do the circumstances reveal a want of equity so manifest, as to require that the attachment be vacated in its entirety?
>
> And the third question, if that be answered in the negative, is this: Is the amount attached excessive or is it reasonably necessary to secure the plaintiffs' claims?

Rolls Royce, 119 AMC at 397.

Oldendorff respectfully submits that this Court should vacate JKI's attachment pursuant to Rule E(4)(f) because JKI's claim is frivolous. Vacateur would also be appropriate because JKI's action is nothing more than reflexive retaliation to Oldendorff's earlier attachment of JKI's property due to JKI's failure to comply with its charter party obligation pay hire due and owing for the use of the vessel. Finally, vacatuer is appropriate because JKI's claim is actually a compulsory counterclaim that it was required to interpose within the action filed by Oldendorff as per Federal

Rule of Civil Procedure 13 as it arose from the very same transaction as that which gave rose to

Oldendorff's claim against JKI.

## STATEMENT OF FACTS

On or about April 12, 2007, Oldendorff as disponent[1] vessel owner, and JKI as charterer,

entered into a time charter party for the charter of the M/V FREDERIKE OLDENDORFF

("Vessel") for one time charter trip for a duration of about 65 – 70 days for the intended carriage of

"any grains, wheat, peas, legumes, pulses, beans or any other agrarian products in bulk" from

Vancouver, Canada to India and/or Bangladesh in JKI's option. See *Adam Russ Declaration at ¶1*

*(Ex. 1)* ("Russ Decl. at __").

During the subject time charter there were vessel delays incurred due to: (a) the breakdown

of the Vessel's main engines for which the vessel's head owners, non-party Jurgen Schulte

Schiffahrts, are holding Oldendorff liable as allegedly having been caused by substandard fuel oil

bunkers furnished to the vessel by JKI; (b) JKI's failure to provide discharge port instructions to the

vessel Master; (c) JKI's decision to load cargo aboard the vessel to such an extent that cargo needed

to be lightened[2] at the port of Mundra in order to reduce the vessel's draft[3] and thereafter safely

come alongside a berth at the Port of Mumbai; and (d) the onset of the monsoon season in Southeast

Asia (see http://en.wikipedia.org/wiki/Climate_of_India) which, based upon restrictions concerning

cargo operations issued by the Mumbai Port Trust, required that the vessel's draft be no greater than

10.50 meters. *See Russ Decl. at ¶12 (Ex. 5)*. This Circular is also available for review on the

Mumbai Port Trust website maintained at http://mumbaiport.gov.in/newsite/otherinfo/circulars.htm.

---

[1] A 'disponent owner' is the entity that controls the commercial operations of a vessel having taken the vessel on charter from the registered owner of the vessel. The disponent owner usually time charters the vessel from the registered owner and then sub-charters the vessel to charterers for further voyage or time charters.
[2] Cargo lightening is a process whereby an overly laden vessel will discharge part of its cargo at anchor into a lighter (i.e., barge) to reduce the vessel's draft so it can then safely come alongside a pier.
[3] Draft refers to the ship's hull beneath the water line.                4

Due to the extensive vessel delay, there arose disputes between Oldendorff and JKI resulting in the ongoing London arbitration where the parties are currently engaged to resolve their respective claims.

JKI initiated the subject maritime attachment in the Southern District of New York on August 16, 2007[4] by filing a Verified Complaint seeking relief pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims. *See copy of JKI Verified Complaint annexed to Lennon Decl. at ¶ 3 (Ex. 2).* JKI's Verified Complaint alleged damages, inclusive of attorneys' fees and costs, in the amount of $4,723,237.92. However, the Verified Complaint fails to breakdown into discrete elements the sums which allegedly contribute to the principal sum claimed of $3,230,009.89.

For additional facts, reference is made to the supporting Declaration of Adam Russ and the exhibits attached thereto. Further, where indicated, reference is made to the supporting Declaration of Timothy Nicholas Young regarding why JKI's claims are insufficient as a matter of English law.

## ARGUMENT

### POINT I

### IT IS PLAINTIFF'S BURDEN TO SHOW CAUSE
### WHY THE ATTACHMENT SHOULD NOT BE VACATED

As Plaintiff in this maritime attachment action, JKI has the burden at the post-attachment hearing to prove *inter alia* that "it has a valid prima facie admiralty claim against the defendant." *See* Aqua Stoli Shipping Ltd. v. Gardner Smith Pty. Ltd., 460 F.3d 434, 445 (2d Cir. 2006). Supplemental Admiralty Rule E(4)(f) of the Federal Rules of Civil Procedure provides:

> Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why

---

[4] Oldendorff's maritime attachment against JKI assigned civil case number 07 Civ. 64767 (KMK) was concluded on August 6, 2007.

the arrest or attachment should not be vacated or other relief granted consistent with these rules.

Aqua Stoli, 460 F.3d at 445.

It is the plaintiff's burden to prove that the attachment is proper. The Second Circuit Court

of Appeals commented on Rule E(4)(f) in Aqua Stoli and explained the following standard:

> [A] district court must vacate an attachment if the plaintiff fails to sustain his burden of showing that he has satisfied the requirements of Rules B and E. We also believe vacatur is appropriate in other limited circumstances. While, as we have noted, the exact scope of a district court's vacatur power is not before us, we believe that a district court may vacate the attachment if the defendant shows at the Rule E hearing that 1) the defendant is subject to suit in a convenient adjacent jurisdiction; 2) the plaintiff could obtain in personam jurisdiction over the defendant in the district where the plaintiff is located; or 3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise. n5.
>
> n.5 Rule E(4)(f) clearly places the burden on the plaintiff to show that an attachment was properly ordered and complied with the requirements of Rule B and E. Although Rule E does not explicitly mention a district court's equitable power to vacate an attachment or who bears such a burden, former Local Rule 12 required the defendant to establish any equitable grounds for vacatur, and we believe that defendants still bear that burden under the Supplemental Rules.

Id.

Former Local Rule 12, provides as follows:

> Where property is arrested or attached, any person claiming an interest in the property arrested or attached may, upon showing of any improper practice or a manifest want of equity on the part of the plaintiff, be entitled to an order requiring that plaintiff to show cause why the arrest or attachment should not be vacated or other relief granted, consistent with theses rules or the supplemental rules.

Id.

Here, JKI must demonstrate that the Order was properly issued and to rebut, if it is so able,

Oldendorff's showing that JKI's attachment is so frivolous, or manifestly inequitable, so as to

warrant vacateur.

## POINT II

### JKI'S ATTACHMENT SHOULD BE VACATED
### AS ITS UNDERLYING CLAIMS ARE SO LACKING IN MERIT
### AS TO BE FRIVOLOUS OR ARE OTHERWISE MANIFSTLY INQEQUITABLE

JKI's claims are based on alleged damages sustained due to vessel delays incurred in delivering a cargo of yellow peas in bulk from Vancouver, Canada to Mumbai, India. However, as explained below, these alleged damages either ignore or inaccurately portray the facts of the subject voyage. Further, when the underlying facts are taken into account, JKI's alleged claims are unrecoverable under English law.

The subject charter party allowed for JKI to elect at its option to deliver cargo to West Coast India or East Coast Bangladesh. JKI issued voyage instructions to the Master of the vessel confirming this time chartered voyage. *See Russ Decl. at ¶ 3 (Ex. 2)*. Thereafter, the vessel loaded about 47,000 tons of yellow peas as reflected by Bills of Lading dated April 28, 2007 and April 30, 2007 which provided for discharge in "India." *See Russ Decl. at ¶ 4 (Ex. 3)*. As explained within the annexed Declaration of Timothy Nicholas Young, these Bills of Lading were "to Order" and referred only to the discharge port as "India" reflecting that as of the time of issuance JKI did not know where discharge would take place and that it likely had no contract in place for the on sale of the cargo to Indian and/or Bangladeshi receivers. *See Young Decl. at ¶¶ 5, 7.*

Importantly, and contrary to JKI's statement of the facts, the Bills of Lading did not identify a specific discharge port and certainly did not identify Mumbai as the sole discharge port for this cargo. From the time the vessel departed Vancouver through her arrival at, and ensuing departure from, Singapore (where fuel bunkers were stemmed, or provided, to the vessel and the cargo was fumigated) the vessel Master had requested JKI to inform him regarding the intended discharge port but JKI failed to nominate the discharge port. *See Russ Decl. at ¶ 5 (Ex. 4).*

7

Thus, at a minimum, where JKI in its Verified Complaint at paragraph 5 states that "the vessel loaded a cargo .... from Vancouver, Canada to Mumbai, India" (*See JKI Complaint annexed to Lennon Decl. at ¶3  (Ex. 2)*) this failed to take into account that the Bills of Lading issued contemporaneously with cargo loading *did not* indicate that Mumbai was the intended discharge port and also ignores that for over one month following the issuance of those Bills of Lading that JKI failed to advise the vessel Master, or Oldendorff, of the intended actual discharge port. *See Russ Decl. at ¶ 5 (Ex. 4).*

It is critically important that JKI's inaccuracy in respect of the discharge port be taken into account since the damages claimed by JKI cannot in any way be blamed on Oldendorff since the vessel had no realistic ability to discharge her full cargo at Mumbai due to her excessive draft, which was caused solely due to the volume of cargo laden on board the vessel by JKI.  According to Mr. Young, the Port of Mumbai is well noted as having a draft limitation (*see Young Decl. at ¶ 8*). That this was known to JKI is amply demonstrated by the flurry of messages exchanged between JKI and the vessel Master concerning the amount of cargo that would need to be lightened in order to safely arrive at a berth in Mumbai. *See Russ Decl. at ¶¶ 6, 7 (Ex. 4).*  In fact, because these messages show that JKI was fully aware of the need to arrive at Mumbai with a draft of no greater than 10.5 meters, this shows that JKI was aware of the restrictions at Mumbai and thus cannot plausibly blame Oldendorff for its own failure to either load the vessel to achieve a draft within the Mumbai port limits, of which it as aware, or to arrange for cargo lightening outside of Mumbai in advance of the onset of the monsoon season.

Further when the vessel might have arrived at Mumbai, which save for her main engine breakdown, would have been in any event no earlier than June 2, 2007, JKI could not have discharged cargo without previously lightening because of the Mumbai Port Trust restrictions on

vessels arriving with a draft greater than 10.5 meters. Yet further, the onset of the monsoon season for the entirety of India was actually on or about May 11, 2007 (*see Lennon Decl. at ¶ 4) (Ex. 3*) and well before June 18, 2007 (as alleged at paragraph 9 of JKI's Verified Complaint) and for Mumbai was approximately June 1, 2007 (*see Lennon Decl. at ¶ 4) (Ex. 3*). Accordingly, due to the "foul weather season" restriction imposed by the Mumbai Port Trust, it would have been impossible to lighten the Vessel at Mumbai at any time after May 25, 2007. *See Russ Decl. at ¶¶ 12 – 14 (Ex. 5, 6)* and *Young Decl.* at ¶ 10.

Notwithstanding the foregoing, which shows that the vessel was never going to be able to discharge her full cargo at Mumbai without first lightening cargo at a port other than Mumbai (*see Russ Decl. at ¶¶ 11, 12, 14*), JKI alleged to this Court that the damages it allegedly incurred were caused as a result of main engine problems that culminated in the vessel breakdown on June 12, 2007[5] whereupon she was towed to Mundra, India for repairs, arriving there on or about June 17, 2007.

JKI asserts that because of this main engine breakdown and ensuing vessel repairs, that the vessel could not reach Mumbai, thereby causing her to be diverted to Mundra, which allegedly resulted in JKI's exposure to cargo receiver claims, various port charges, expenses to lighten the vessel, expenses to bag cargo and expenses to transport discharged cargo from Mundra to Mumbai. *See JKI Complaint at ¶ 12 annexed to Lennon Decl. at ¶ 3 (Ex. 2)*. JKI claims also that while at Mundra the vessel Master "demanded that part of the cargo be discharged" and also "insisted that some of the cargo be put in bags in order to improve the stability". *See JKI Complaint at ¶¶ 10, 11 annexed to Lennon Decl. at ¶ 3 (Ex. 2)*.

---

[5] Where JKI asserts that Oldendorff entered into a contract of salvage for the vessel and declared general average this ignores that fact that Oldendorff, as disponent owner, did not have any right of salvage or general average and took no such action. *See Russ Decl. at 15.*

9

However, this is simply not the case and JKI certainly has submitted no proof to the Court to substantiate its claims in this respect. In contrast, Oldendorff's evidence submitted herein demonstrates that the vessel Master had consistently sought a declaration from JKI regarding the intended discharge port and that at various times during the voyage JKI vacillated from Mumbai to Kandla to Mundra. *See Russ Decl. at ¶¶ 6, 7, 9, 10 (Ex. 4, messages 1, 2, 6, 6a, 8 ).* However, at no point in time during the voyage did the Master "demand" that part of the cargo be discharged at Mundra or "insist" that some cargo be bagged or, in fact, that the vessel proceed to Mundra at all since the communications evince that the instruction to proceed to Mundra emanated from JKI rather than the vessel Master or Oldendorff. *See Russ Decl. at ¶ 10, 11 (Ex. 4, message 8)*

Further, the reason why some of the remaining cargo was bagged was in order to ensure that the vessel would not encounter any stability problems when arriving at Mumbai. *See Russ Decl. at ¶ 11.* That the Master required some of the cargo be bagged is not surprising given that JKI ordered cargo to be discharged at Mundra in order to alleviate the vessel draft restriction at Mumbai and the consequential stability issues caused by the partial cargo discharge. *See Young Decl. at ¶ 11.*

However, even more pertinent is the fact that the vessel only experienced her breakdown *after* she had passed Mumbai and was ostensibly bound for Mundra although JKI had not, at that point in time, made any firm declaration as to the intended discharge port. JKI's Verified Complaint alleges that the main engine problems began to manifest "on or about June 2 – 4, 2007" but that the alleged original ETA to Mumbai was June. *See JKI Verified Complaint at ¶¶ 6, 13 annexed to Lennon Decl. at ¶ 3 (Ex. 2).* Therefore, as noted by Mr. Young, the main engine problems did not even arise until on or after the alleged ETA to Mumbai and thus, contrary to JKI's unfounded allegations, there can be no delay attributable to the main engine problems. *See Young Decl. at ¶ 13 and Russ Decl. at ¶¶ 8, 11, 14, 16.*

For the foregoing reasons, there is no basis at all for JKI's assertion that its alleged damages were caused by breach of the charter party committed by Oldendorff. Further, where JKI further in its Verified Complaint that due to the vessel delay in arriving at Mumbai it incurred losses to barge owners and cargo receivers, it is respectfully submitted that JKI should be required to come forward with some documentation and quantification of these alleged losses since the former, if incurred at all, was due to JKI's own negligence in not understanding the reality of shipping cargo to Mumbai in the midst of monsoon season and the latter is dubious since unless JKI obligated itself to deliver cargo within a certain time frame, which, in any event was never communicated to Oldendorff, this would be unusual in the trade and not foreseeable to Oldendorff. *See Young Decl. at ¶ 18(iii)*

In cases such as that presented here, the Court is empowered with the discretion to vacate because "[t]he inherent power to adapt an admiralty rule to the equities of a particular situation is entrusted to the sound discretion of the district judge sitting as an admiralty judge." *See* Greenwich Marine, Inc. v. S.S. Alexandra, 339 F.2d 901, 905 (2d Cir. 1965). By way of further legal authority, notwithstanding that in Aqua Stoli the exact scope of the district court's vacateur power was not squarely before the Second Circuit, the Court held nevertheless that given the exceptional remedy of maritime attachments, a district court has the inherent authority to vacate an abusive or otherwise unfair attachment. *See* Aqua Stoli, 460 F.3d at 442-445.

The Court so held in the context of praising Judge Leval's holding in Integrated Container Serv. Inc. v. Starlines Container Shipping, Ltd., 476 F. Supp. 119 (S.D.N.Y. 1979). "Then-District Judge Leval astutely noted, however, the possibility of abuse by the attaching party in some circumstances." Aqua Stoli, 460 F.3d at 442. One such case of abuse occurs when a party who can by "found" within the Southern District of New York has its property restrained "across the river" in the Eastern District of New York. In Integrated Container, Judge Leval held that where there is

11

an "abusive use of the maritime attachment remedy…the courts may easily remedy the situation by exercising discretion to set aside an unfair attachment." Integrated Container, 476 F.Supp. at 124. Based on the facts of Integrated Container, an "across the river case," Judge Leval held that the attachment was not unfair because "there can be no doubt that the plaintiffs' need for security is real, [and] that their quest for attachment is not a tactic of harassment." Id.; *see also* Central Hudson Gas and Elec. Corp.v. Empresa Naviera Santa, SA, 845 F.Supp. 150, 153 (S.D.N.Y. 1994)("The Rule was not abused, inasmuch as there was a substantial risk that [plaintiff] would not be able to locate sufficient assets to satisfy its claims, which in turn were not frivolous.")

Furthermore, "a district court has the inherent authority to vacate an attachment "upon a showing of 'any improper practice' or a 'manifest want of equity on the part of plaintiff." *See* Blake Mar., Inc. v. Petrom S.A., 05 Civ. 8033, 2005 U.S. Dist. LEXIS 26310, 2005 WL 2875335, at *2 (S.D.N.Y. Oct. 31, 2005) (quoting Southern District of New York Former Local Civil Rule 12 (1986)). While an attachment may surely be vacated where a plaintiff cannot demonstrate that it has satisfied the technical requirements of Rule B, Judge Pauley also recently held that "[c]ourts may also vacate an attachment in certain limited circumstances *where equity so demands*." Flame Maritime Ltd. v. Hassan Ali Rice Export Co., 07 Civ. 4426 (WHP), 2007 U.S. Dist. LEXIS 64470, *4 (S.D.N.Y. August 31, 2007)(citing Aqua Stoli, 460 F.3d at 444). (emphasis added).

The decisions where courts have vacated attachments obtained to secure frivolous claims are instructive in this case because in both instances the attachments were unfair and initiated for improper or abusive purposes. In addition to the Rolls Royce case discussed above, in Bay Casino, LLC v. M/V ROYAL EMPRESS, 1999 U.S. Dist. LEXIS 22357 (S.D.N.Y. 1999), in the context of a defendant's challenge to a maritime attachment, and where the plaintiff had furnished the court with misleading information regarding projected profits and actual costs, the court held that

12

"plaintiff's lost profits claim is frivolous and, therefore, improperly included as part of the security."

*See* Bay Casino, 1999 U.S. Dist. LEXIS 22357 at *3-4.  The Bay Casino court further held that the

claim was frivolous because the very existence of the damages were uncertain, *i.e.*, where profits

were speculative at best, and that recovery was unwarranted where the plaintiff could not potentially

prove loss to a reasonable certainty standard.  "It is well-settled that in an attachment proceeding,

the plaintiff need not prove its damages with exactitude but the court must be satisfied that the

plaintiff's claims are not frivolous." *Id.* at *3 citing Dongbu Express Co. v. Navios Corp., 944 F.

Supp. 235 (S.D.N.Y. 1996).  Addressing New York law, the court rejected the plaintiff's lost profits

claim and partially vacated the attachment because allowing security for a frivolous claim would

have put the plaintiff in a better position than it otherwise would have been without the defendant's

involvement.  The Bay Casino court held as follows:

> Several grounds for such a finding (that the claim was frivolous) were apparent in
> both the parties' pleadings and in their representations to the Court in the hearing on
> this matter.
>
>         \*\*\*
>
> While the plaintiff has a much lighter burden of proof in this [Rule E(4)(f)]
> proceeding than at trial, the Court can find no basis in law or in fact to find plaintiff's
> claim non-frivolous  .  .  .
>
> Additionally, neither in their pleadings, nor in their representations to this Court has
> plaintiff provided the Court with an evidentiary basis for historical profits that would
> indicate plaintiff's claims for lost profits constitutes anything more than bald
> speculation.  Absent this, especially in consideration of the fact that plaintiffs are
> marketing  .  .  .  a consumer driven, highly volatile venture [,] plaintiff cannot
> potentially prove loss to a reasonable certainty.
>
>         \*\*\*
>
> Defendants cite Rolls Royce v. Fratzis M., 1996 AMC 393, 396 (S.D.N.Y. 1995) in
> heralding the Court's responsibility to address the question of:
>
>> In obtaining the attachment…have the plaintiffs engaged in improper
>> practices to such a degree or do the circumstances reveal a want of

13

> equity so manifest, as to require the attachment to be vacated in its entirety.
>
> In reducing security, this Court is mindful of its discretion under both law and equity. Since plaintiffs will not be able to prove a claim for lost profits based solely on questionable projections, unsupported by historical profits, the Court declines to secure the claim…Considering the facts at bar, this Court considers that clear guidance in determining plaintiff's lost profits claim is frivolous. Thus, plaintiff's claim for lost profits will not be considered in calculating an appropriate security.

Bay Casino, 1999 U.S. Dist. LEXIS 22357 at *4-7.

The above cited decisions provide that district courts are empowered with the authority to vacate frivolous and/or abusive maritime attachments. Applying these principles to this case, because JKI's claim is frivolous vacateur is appropriate. The Order should be vacated since JKI has amply and repeatedly alleged relevant inaccuracies in its Verified Complaint and is seeking to secure an alleged claim that arose due to its own negligence in failing to properly execute a shipment of bulk cargo from the U.S. to India on the cusp of the monsoon season. None of this is in any way a fault attributable to Oldendorff, which amply explains the vague, obtuse and misleading allegations in JKI's Verified Complaint.

Further, as explained in Mr. Young's Declaration, based on the foregoing facts, JKI's alleged damages are unrecoverable as a matter of English law. To summarize, Mr. Young notes the following:

- Even assuming that the vessel breakdown was caused due to Oldendorff's breach of charter party JKI's recoverable damages under English law are those caused by that very breach and not those which would have been incurred in any event or those caused by JKI's own failure to mitigate (see Young Decl. at ¶ 17). Such losses would need to be contemplated as a "not unlikely consequence" of the breach as of time of the charter party formation. Because the alleged cargo receiver's claim ($1,350,000) for late delivery would not be such a contemplated loss it is unrecoverable ((see Young Decl. at ¶17, 18 (iii).Further, Oldendorff fails to provide credit to Oldendorff for costs that would have been incurred in any event (i.e., cargo lightening, port costs, transshipment costs, etc. - (see Young Decl. at ¶ 15);
- Waiting time at Mumbai ($33,765) is unrecoverable given the Master's discretion in carrying out orders furnished by JKI as Vessel charterer (see Young Decl. at ¶ 18(i));

14

- Barge operator's claim ($291,533.74) for cancelled calls would be highly unusual given the normal state of operations at Mumbai fully occupying barges and there is no submitted documentation of this alleged damage (*see Young Decl. at ¶ 18(ii)*.

- Even where one assumes that JKI's claims might normally be considered as recoverable these same damages are barred after the facts are considered since JKI as Vessel Charterer may not claim for damages those consequences which flow from the very instructions that they have provided to the Vessel Master. As all of the asserted damages are consequences from the instructions, and perhaps failure to provide timely instructions, committed by JKI, the alleged damages are not properly to be born by Oldendorff but rather JKI. *See Young Decl. at ¶ 19, 20.* If this were otherwise then JKI would be placed into a *better* position than had the contract been performed which is obviously anathema to the purpose of damages.

- Finally, as the main engine breakdown was caused by the insufficient bunkers supplied to the Vessel by JKI all claims are "plainly unsustainable." *See Young Decl. at ¶ 21.*

Given all of the foregoing, it is respectfully submitted that JKI is not entitled to the

exceptional maritime attachment remedy afforded by Supplemental Rule B and the Order should be

vacated as JKI's claims are frivolous and/or are manifestly inequitable.

## POINT III

### JKI'S ATTACMENT SHOULD BE VACATED AS IT WAS PREMISED UPON A COMPULSORY COUNTERCLAIM WHICH JKI WAS REQUIRED TO ASSERT WITHIN OLDENDORFF'S MARITIME ATTACHMENT ACTION AS PER FED. R. CIV. P. 13

As set out above, Oldendorff obtained a maritime attachment against JKI for claims arising

out of the subject charter party. *See Oldendorff Verified Complaint annexed to Lennon Decl. at ¶ 5*

*(Ex. 4).* In that attachment action Oldendorff successfully restrained JKI's property in New York

and in order to dismiss its attachment required JKI to post acceptable substitute security to secure

Oldendorff's claims at London arbitration.

The claims that Oldendorff alleged in its maritime attachment clearly arose from the very

same transaction or occurrence as that which JKI now cites to in support of its maritime attachment

in this action. As a result, JKI was obligated under Federal Rule of Civil Procedure 13 to assert

within Oldendorff's action its counterclaim as it is a compulsory counterclaim under Supplemental

Rule E(7) which tracks the language of Rule 13. *See* <u>Sea Terminals, Inc. v. Independent Container Lines, Ltd.</u>, 1990 U.S. Dist LEXIS 11561, *5 (S.D.N.Y.1990) and <u>Goudy & Stevens, Inc. v. Cable Marine, Inc.</u>, 665 F. Supp. 67, 71( D. Me. 1987).

JKI clearly made an affirmative choice to forego asserting its compulsory counterclaim within Oldendorff's attachment action, which would have served to limit the scope of security for its counterclaim to the level of security obtained by Oldendorff in the first instance as per Supplemental Rule E(7) and the caselaw decided thereunder. Rather, JKI waited until approximately one week after Oldendorff's attachment had been dismissed to then file its own attachment, based on the frivolous grounds outline at Point II, supra. JKI thus managed to tactically obtain an attachment nearly 300% greater than that obtained by Oldendorff for its straight forward breach of charter party claim against JKI based on JKI's overarching and undisputable responsibility to pay charter party hire due and owing.

The Second Circuit clearly stated in <u>Aqua Stoli</u> that given the exceptional remedy of maritime attachments a district court has the inherent authority to vacate an abusive or otherwise unfair attachment. *See* <u>Aqua Stoli</u>, 460 F.3d at 442-445. Here, JKI's attachment has been obtained on frivolous grounds and implemented on patently strategic grounds designed to maximize leverage over Oldendorff in the London arbitration all of which in any event violated Fed. R. Civ. P. 13.

JKI's claim is a compulsory counterclaim and the normal consequence for failure to raise a compulsory counterclaim is that the party is barred from raising such a claim in a later filed action, *see* <u>Puffin Co. v. Pivitka</u>, 2007 U.S. Dist. LEXIS 29382, *8-10 (E.D.N.Y. 2007); <u>Critical-Vac Filtration Corp. v. Minuteman Int'l Inc.</u>, 233 F.3d 697, 399 (2d Cir. 2000). Accordingly, JKI's subject attachment should be dismissed.

16

## CONCLUSION

For the foregoing reasons, the Court should vacate the Ex Parte Attachment Order and

dismiss JKI's action.

Dated: October 17, 2007
       New York, NY

                                    Respectfully submitted,

                                    The Defendant,
                                    OLDENDORFF CARRIERS GMBH & CO.

                                    By: _____
                                        Kevin J. Lennon
                                        Patrick F. Lennon
                                        LENNON MURPHY & LENNON, LLC
                                        420 Lexington Avenue, Suite 300
                                        New York, NY 10170
                                        (212) 490-6050 – phone
                                        (212) 490-6070 – fax
                                        kjl@lenmur.com
                                        pfl@lenmur.com

17

**AFFIRMATION OF SERVICE**

I hereby certify that on October $\underline{17}$, 2007, a copy of the foregoing Memorandum of Law was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

By: _____
Kevin J. Lennon

18