Michael O. Hardison
EATON & VAN WINKLE LLP
3 Park Avenue
New York, New York 10016-2078
(212) 779-9910

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

J.K. INTERNATIONAL PTY. LTD.,

                  Plaintiff,

   -against-

OLDENDORFF CARRIERS GMBH &
CO.,

                  Defendant.

--------------------------------------------------------x

07 Civ. 7328 (SHS)
ECF CASE

# PLAINTIFF'S MEMORANDUM OF LAW
# IN OPPOSITION TO DEFENDANT'S
# MOTION TO VACATE MARITIME ATTACHMENT

Michael O. Hardison, Esq.
Edward W. Floyd, Esq. (of counsel)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................... iii

PRELIMINARY STATEMENT ................................................ 1

FACTS ....................................................................... 1

ARGUMENT ................................................................ 2

POINT I ..................................................................... 2

OLDENDORFF'S MOTION TO VACATE SHOULD BE
DENIED BECAUSE JKI'S MARITIME ATTACHMENT
COMPLIES WITH ALL APPLICABLE REQUIREMENTS ..................... 2

POINT II .................................................................... 5

NOT ONLY HAS JKI MET ALL REQUIREMENTS
NECESSARY FOR IT TO OBTAIN A MARITIME
ATTACHMENT, BUT THE AMOUNT OF SECURITY
JKI HAS OBTAINED SHOULD NOT BE REDUCED ............................ 5

POINT III ................................................................... 8

OLDENDORFF'S ATTEMPT TO CHARACTERIZE JKI'S
CLAIMS AS FRIVOLOUS MAKES SELF-SERVING ASSUMPTIONS,
IGNORES UNDENIABLE TRUTHS, AND FAILS TO RECOGNIZE THAT,
ULTIMATELY, THIS MATTER INVOLVES DISPUTED ISSUES OF
FACT AND LAW THAT MUST BE RESOLVED BY ARBITRATION
IN LONDON, PURSUANT TO ENGLISH LAW .................................... 8

    A. Even a limited review of the parties' respective positions demonstrates
       that Oldendorff's argument describing JKI's claims as frivolous is
       unsupportable ................................................................ 10

    B. Oldendorff's argument that JKI's claims are unrecoverable under
       English law is a disputed issue of law that must be resolved by
       arbitration in London ........................................................ 13

i

POINT IV ............................................................................. 15

JKI COULD NOT HAVE SOUGHT COUNTER-SECURITY
WHILE OLDENDORFF'S EARLIER RULE B ATTACHMENT
PROCEEDING WAS PENDING BECAUSE ITS CLAIMS
WERE NOT MATURE AND THUS NEITHER THE COMPULSORY
COUNTERCLAIM RULE NOR ANY OTHER RULE OR
PRINCIPLE COULD HAVE REQUIRED JKI TO DO SO ................................. 15

    A.  JKI'S claims were not mature during the pendency of
        Oldendorff's prior Rule B attachment proceeding ....................... 15

    B.  JKI's claims are not subject to the compulsory
        counterclaim rule as argued by Oldendorff ............................. 15

CONCLUSION .......................................................................... 19

## TABLE OF AUTHORITIES

Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.,
    460 F.3d 434 (2d Cir. 2006) ...................................................... 2, 10

Cargill, Inc. v. Sabine Trading & Shipping Co.,
    756 F.2d 224 (2d Cir. 1985) ...........................................….....17

Chiquita International Ltd. v. MV Bosse,
    No. 07 Civ. 6786,
    2007 WL 2979632 (S.D.N.Y. Oct. 11, 2007) (Leisure, J.) ................. 2, 3, 8

Dongbu Express Co. v. Navios Corp.,
    944 F. Supp. 235 (S.D.N.Y 1996) (Scheindlin, J.) ................…............. 5

Finecom Shipping Ltd. v. Multi Trade Enterprises AG,
    No. 05 Civ. 6695,
    2005 WL 2838611 (S.D.N.Y Oct. 25, 2005) (Lynch, J.) ........................ 8

Mutual Fire, Marine and Inland Insurance Company v. Seymour Adler,
    726 F. Supp. 478 (S.D.N.Y. 1989) (Patterson, J.) ............................... 17

Old Hickory Barge and Fleeting, Inc. v. Barge M-553,
    107 F.R.D 689, 1986 AMC 1215 (M.D.La. 1985) .............................. 17

SPL Shipping Ltd. v. Gujarat Cheminex Ltd.,
    No. 06 Civ. 15375,
    2007 WL 831810 (S.D.N.Y. Mar. 15, 2007) (Karas, J.) ...........…........... 3

The Rice Company v. Express Sea Transport Corporation,
    No. 07 Civ. 7077 (S.D.N.Y. Nov. 15, 2007) (Pauley, J.) ...................6, 9, 10

Tide Line, Inc. v. Eastrade Commodities, Inc.,
    No. 06 Civ. 1979,
    2006 U.S. Dist. LEXIS 95870 (S.D.N.Y. Aug. 15, 2006) (Wood, J.) ........... 3

Tommy Hilfiger Licensing, Inc. v. Bradlees, Inc.,
    99 Civ. 4677,
    2002 U.S. Dist. LEXIS 377 (S.D.N.Y. Jan 11, 2002) ............................ 18

Transportes Navieros y Terrestes, S.A. de D.V. v.
Fairmount Heavy Transport N.V.,
    No. 07 Civ. 3076,
    2007 WL 1989309 (S.D.N.Y. July 6, 2007) (Preska, J.) .................. 2, 3, 5, 9

United States v. Snider,

779 F.2d 1151 (6th Cir. 1985) ..................................................... 17

**<u>Statutes</u>**

Fed. R. Civ. P. 13 ............................................................................... 16-18

**<u>Treatises</u>**

3 <u>Moore's Federal Practice</u>, § 13.15 (Matthew Bender 3d ed. 1997) .................. 18

29 <u>Moore's Federal Practice</u>, § 707.05 [2] (Matthew Bender 3d ed. 1997) ............ 4

## PRELIMINARY STATEMENT

Plaintiff J.K. International Pty. Ltd. ("JKI") submits this Memorandum of Law in Opposition to Defendant Oldendorff Carriers GmbH & Co.'s ("Oldendorff") Motion to Vacate Maritime Attachment in the above-captioned matter.

The Court should deny Oldendorff's Motion to Vacate Maritime Attachment (the "Motion" or "Motion to Vacate") not only because the attachment complies with all applicable requirements, but also because Oldendorff's arguments in favor of vacating are merely invalid attempts to distract the Court from the reality that a myriad of legitimate disputes regarding fact and law divide the parties and such disputes must be resolved in London arbitration under English law. Specifically, Oldendorff's flawed argument that JKI's claims are frivolous is based upon the self-serving assumption that all of Oldendorff's factual and legal contentions are accurate. However, even the most peripheral review of the facts and English law demonstrates that this is not the case. Likewise, Oldendorff's argument that JKI's attachment is barred by the compulsory counterclaim rule ignores the express provisions of that rule.

## FACTS

The pertinent facts are fully set forth in the Declaration of Michael O. Hardison dated November 19, 2007 ("Hardison Decl."), together with the Declaration of Sandeep Mohan dated November 12, 2007 ("Mohan Decl."), and the Declaration of John Blacker dated November 14, 2007 ("Blacker Decl."), together with all exhibits to the aforesaid declarations, and in the interests of brevity, will not be repeated here.

**ARGUMENT**

**POINT I**

**OLDENDORFF'S MOTION TO VACATE SHOULD BE DENIED BECAUSE JKI'S MARITIME ATTACHMENT COMPLIES WITH ALL APPLICABLE REQUIREMENTS**

In order to withstand a motion to vacate a maritime attachment, the plaintiff having obtained the attachment need only demonstrate that it has complied with the technical requirements set forth in Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims. See Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434, 447 (2d Cir. 2006) (stating "Rule B specifies the sum total of what must be shown for a valid maritime attachment"); see also Chiquita International Ltd. v. MV Bosse, No. 07 Civ. 6786, 2007 WL 2979632, at *7 (S.D.N.Y. Oct. 11, 2007) (Leisure, J.) (citing Aqua Stoli for the proposition that a plaintiff need only "make a prima facie showing and demonstrate that all technical requirements for effective attachment have been met"); Transportes Navieros y Terrestes, S.A. de D.V. v. Fairmount Heavy Transport N.V., No. 07 Civ. 3076, 2007 WL 1989309, at *4 (S.D.N.Y. July 6, 2007) (Preska, J.) (noting that the Aqua Stoli Court stated that "a fact-intensive inquiry is 'improper'" because Rule B provides the sum total of requirements for a maritime attachment).

Pursuant to Rule B, which sets forth the process "by which a party may attach another party's assets," the plaintiff files a verified complaint along with "an affidavit stating that, to the best of the plaintiff's knowledge, the defendant cannot be found within the judicial district." Aqua Stoli Shipping Ltd., 460 F.3d at 438. However, Rule E(4)(F) provides the defendant an opportunity "to argue that the requirements of Rule B were not

2

in fact met." <u>Id.</u> The plaintiff's burden is carried once the plaintiff shows the following: "1) it has a valid prima facie admiralty claim against defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment." <u>Id.</u> at 445 (footnote omitted); <u>see also</u> <u>Chiquita International Ltd.</u>, 2007 WL 2979632, at *2 (setting forth the four factors and noting that "[p]laintiff, however, is not required to prove its case"); <u>Tide Line, Inc. v. Eastrade Commodities, Inc.</u>, No. 06 Civ. 1979, 2006 U.S. Dist. LEXIS 95870, at *25-29 (S.D.N.Y. Aug. 15, 2006) (Wood, J.) (applying the same four factors). Additionally, "lower courts in this District have taken [<u>Aqua Stoli</u>] to mean that a plaintiff's burden at a Rule E(4)(f) hearing is to show only that it has a valid *prima facie* maritime claim against the defendant." <u>SPL Shipping Ltd. v. Gujarat Cheminex Ltd.</u>, No. 06 Civ. 15375, 2007 WL 831810, at *3 (S.D.N.Y. Mar. 15, 2007) (Karas, J.); <u>see also</u> <u>Transportes Navieros y Terrestes, S.A.</u>, 2007 WL 1989309, at *4 ("maritime plaintiffs are not required to prove their cases at this stage of a Rule E(4) hearing").

Further, the inquiry at a Rule E(4)(f) hearing is an extremely limited one in which the plaintiff's verified complaint and affidavit will demonstrate whether the requirements for maritime attachment have been met. <u>See</u> <u>Tide Line, Inc.</u>, 2006 U.S. Dist. LEXIS 95870, at *15-16. A limited review of the verified complaint and affidavit is made in order to determine whether the plaintiff has a valid *prima facie* admiralty claim against the defendant and whether the defendant is absent from the district. <u>Id.</u> Likewise, successful attachment within the district demonstrates that a defendant's property was located in the district. <u>Id.</u> at 26. Finally, the defendant appears obligated to, at least, identify some issue relating to a potential statutory or maritime bar. <u>Id.</u> at 29 (indicating

3

that a court will only consider possible statutory or maritime bars raised by defendants in their arguments).

In the instant matter, JKI has alleged that Oldendorff "breached the charter party entered into between [the parties] by failing to provide a vessel in a thoroughly efficient state in cargo spaces, hull, machinery and equipment for and during the service covered by the charter party and by failing to prosecute the voyage with the utmost" speed. (Hardison Decl. Exhibit 1 at ¶ 20). Breach of a charter party is an established admiralty claim. See 29 Moore's Federal Practice, § 707.05 [2] (Matthew Bender 3d ed. 1997) (stating that "[a] claim for breach of a charter party is an admiralty or maritime claim [and therefore] the plaintiff can attempt to obtain prejudgment security for its claim by commencing an action under" Rule B). Thus, JKI has met its burden of showing a valid *prima facie* admiralty claim against Oldendorff and its entitlement to a maritime attachment. Likewise, JKI thoroughly attempted to determine whether Oldendorff could be found within this district and that research determined that Oldendorff could not be found within the district. (Hardison Decl. at ¶ 5). Oldendorff's property also was successfully located in this district. (Hardison Decl. at ¶ 6). Finally, Oldendorff has not pointed to any statutory or maritime bars affecting the concerned attachment, and it is JKI's position that there are no such bars that would be applicable here. (Hardison Decl. at ¶ 7).

**POINT II**

**NOT ONLY HAS JKI MET ALL REQUIREMENTS NECESSARY FOR IT TO OBTAIN A MARITIME ATTACHMENT, BUT THE AMOUNT OF SECURITY JKI HAS OBTAINED SHOULD NOT BE REDUCED**

Oldendorff's Motion to Vacate does not expressly request that the Court consider a reduction of security pursuant to Rule E(6). However, Oldendorff does contend that "the Verified Complaint fails to breakdown into discrete elements the sums which allegedly contribute to the principal sum claimed of $3,230,009.89." (Oldendorff's Memorandum of Law in Support of Motion to Vacate Maritime Attachment ("Oldendorff Memo.") at p. 5). Additionally, the Declaration of Mr. Young, upon which Oldendorff relies, contends that JKI's calculation of attorneys fees and costs, as well as its interest calculations, are flawed. (Declaration of Timothy Nicholas Young Q.C. ("Young Decl.") at ¶ 22).

"Rule E(6) provides that '[w]henever security is taken the court may, on motion and hearing, for good cause shown, reduce the amount of security given." Transportes Navieros y Terrestes, S.A. de D.V., 2007 WL 1989309, at *4. In Transportes, the court considered whether to reduce the amount of security "on the basis that [the plaintiff's] damages [were] 'either non-existent or grossly exaggerated.'" Id. The court noted that security might be reduced where there was insufficient evidence to justify the total amount or where the "plaintiff's failure to mitigate its damages [might] be considered good cause to reduce." Id. at *5. Most importantly though, the Transportes Court explained "that 'in an attachment proceeding, the plaintiff need not prove its damages with exactitude' [however] 'the court must be satisfied that plaintiff's claims are not frivolous.'" Id. (quoting Dongbu Express Co. v. Navios Corp., 944 F.Supp. 235, 237

(S.D.N.Y 1996)) (Scheindlin, J.).  Mere factual disagreement between opposing parties regarding amounts at issue in underlying claims though is an insufficient basis to support a reduction of security.  See The Rice Company v. Express Sea Transport Corporation, No. 07 Civ. 7077, slip op. at 6 (S.D.N.Y. Nov. 15, 2007) (Pauley, J.) (stating "the existence of such a factual dispute [concerning underlying damages] precludes reduction of the attachment.") (copy attached).

In the instant matter, none of the potential grounds for a reduction of security exist.  First, JKI's claims are most certainly not frivolous.  Oldendorff's argument that JKI's claims are frivolous is discussed extensively in Point III of this Memorandum. Briefly stated though, Oldendorff's contentions have a total lack of merit since JKI's claims are based upon evidence clearly demonstrating Oldendorff's breach.  Second, security should not be reduced in the instant matter based upon any failure to mitigate because JKI took appropriate business measures.  Once it became apparent, from the Master's communications, that the vessel's continuously later ETA would prevent discharge of the cargo at the outer anchorage prior to the arrival of monsoon weather, JKI prudently redirected the vessel to Mundra in order to enable eventual discharge at Mumbai's inner harbor.  (Mohan Decl. at ¶¶ 27-30).  Thus, JKI endeavored to mitigate damages.

Finally, all of the claims for which JKI seeks security are well documented by the Mohan Declaration and the exhibits thereto.  These claims are either based upon other claims and invoices that JKI has already received, or reasonably expects to receive, based upon the occurrences caused by Oldendorff's breach.  These claims are summarized as follows:

| | | |
|---|---|---|
| Cost for rail transport from Mundra to Mumbai | $182,401.94 | (Mohan Decl. at ¶ 36 and Exhibit 14) |
| Cost for bagging cargo | $8,547.63 | (Mohan Decl. at ¶ 37 and Exhibit 15) |
| Mundra Port and Special Economic Zone charges | $205,514.48 | (Mohan Decl. at ¶ 38 and Exhibit 16) |
| Estimated increased costs for discharge at Mumbai's inner harbor | $126,125.00 | (Mohan Decl. at ¶ 40 and Exhibit 17) |
| Costs due to lost time | $1,073,850.00 | (Mohan Decl. at ¶ 42) |
| Claim by barge operators against JKI | $291,533.74 | (Mohan Decl. at ¶ 43 and Exhibit 18) |
| Claims for delayed delivery | $1,761,034.34 | (Mohan Decl. at ¶ 45 and Exhibit 19) |

As a result of the items identified above, JKI has been exposed to damages in the total amount of $3,649,007.13. (Mohan Decl. at ¶ 47). JKI's Verified Complaint also sought security for interest, which is recoverable in arbitration in London, at a rate of 10.25% over three years, totaling $993,228.03. Additionally, JKI's Verified Complaint sought security for estimated attorneys fees and disbursements, including the costs of arbitration and arbitrators fees, also recoverable in London arbitration, in the amount of $500,000.00. Together, the total amount of security sought by JKI amounted to $4,723,237.92. Finally, it should be noted that the reasonableness of the estimated costs and fees of London arbitration is well supported by the Declaration of John Blacker. (Blacker Decl. at ¶¶ 29-31). Mr. Blacker, whose declaration also sets forth his extensive experience and familiarity with London arbitration and disputes of this precise nature, explains that these estimates, including the calculation of interest, are all quite reasonable. (Id.).

**POINT III**

**OLDENDORFF'S ATTEMPT TO CHARACTERIZE JKI'S CLAIMS AS
FRIVOLOUS MAKES SELF-SERVING ASSUMPTIONS, IGNORES
UNDENIABLE TRUTHS, AND FAILS TO RECOGNIZE THAT, ULTIMATELY,
THIS MATTER INVOLVES DISPUTED ISSUES OF FACT AND LAW THAT
MUST BE RESOLVED BY ARBITRATION IN LONDON,
PURSUANT TO ENGLISH LAW**

There are disputed issues of fact in the instant matter that must be resolved by arbitration in London and pursuant to English law. Oldendorff's baseless and inaccurate argument that JKI's claims are frivolous actually serves to highlight the conclusion that such disputed facts should be resolved by the arbitrators. Recent case law in this district strongly supports such a determination.

In Chiquita International Ltd., the court considered a motion to vacate a Rule B attachment and explained that it "need not, and should not, reach the merits of the [underlying dispute since] that is properly left to the London arbitrators to decide." Chiquita International Ltd., 2007 WL 2979632, at *7 (citing Finecom Shipping Ltd. v. Multi Trade Enterprises AG, No. 05 Civ. 6695, 2005 WL 2838611 (S.D.N.Y Oct. 25, 2005) (Lynch, J.). In Finecom Shipping Ltd., the Court explained that the "ability to understand the merits of a dispute at an early stage is limited, and courts should [therefore] be reluctant to prejudge the merits of claims based essentially on the pleadings . . . [t]his is particularly so when the ultimate merits will be decided not by [the] Court, but by an arbitration panel in another country." Finecom Shipping Ltd., 2005 WL 2838611, at *1-2.

Similarly, the principle that at this stage of the dispute, "a fact-intensive inquiry is 'improper,'" Transportes Navieros y Terrestes, S.A. de D.V., 2007 WL 1989309, at *4, underscores the conclusion that follow-on proceedings, be they in the form of litigation or

arbitration, rather than Rule B proceedings, ought to determine the merits of the dispute. Succinctly stated, "[c]ourts in a maritime attachment action are not permitted to make substantive determinations on the plaintiff's underlying claim, since 'Rule B specifies the sum total of what must be shown for a valid maritime attachment.'" The Rice Company, No. 07 Civ. 7077, slip op. at 4-5 (quoting Aqua Stoli, 460 F.3d at 447). In The Rice Company, the court denied the defendant's motion to vacate or, alternatively, to reduce a maritime attachment. Id. at 1. The defendant's motion to vacate was based on equitable grounds. Id. at 2. The court held that it could not consider such equitable arguments "without probing the merits of the underlying claim." Id. at 5. However, "[d]etermining the merits of [the] underlying issues would undermine the standard that 'a proper Verified Complaint is all that is required.'" Id. (quoting Transportes, 2007 WL 1989309, at *4).

In the instant matter, since a fact-intensive inquiry is not appropriate, the disputed issues of fact must be resolved by the arbitrators. Thus this Court ought to deny Oldendorff's request to conduct a detailed review of disputed factual issues. JKI has already shown that its attachment complied with the requirements set forth in Rule B. Oldendorff bears the burden to demonstrate whether there are other grounds to support its Motion to Vacate. See Aqua Stoli, 460 F.3d at 445, n. 5. Oldendorff cannot do so and its motion should be denied.

In reaching its holding, the Aqua Stoli Court expressly rejected use of "a [broad] equitable inquiry" during consideration of motions to vacate maritime attachments. Aqua Stoli, 460 F.3d at 446. Likewise, making such an equitable inquiry appears to be precisely what the Rice Company Court refused to do. See The Rice Company, No. 07

Civ. 7077.  However, that is precisely the type of inquiry for which Oldendorff's Motion

calls.  Oldendorff cannot point to any actual basis to support its Motion and thus it makes

a vague argument that asks this Court to consider factual disputes that are to be

determined by the arbitrators in London.   Moreover, JKI's positions regarding such

disputed facts are certainly not frivolous.

> **A.    Even a limited review of the parties' respective positions demonstrates that Oldendorff's argument describing JKI's claims as frivolous is unsupportable**

Oldendorff inaccurately claims that JKI did not identify the intended discharge

port in a timely manner.  (Oldendorff Memo. at pp. 7-8).  In actuality, JKI provided such

advice at a very early stage.  On April 16, 2007, only four days after the charter party was

dated, the agents for JKI issued Voyage Instructions to the Master of the M/V Frederike

Oldendorff (the "Master") that provided "the vessel would load a cargo of peas at

Vancouver, Canada and discharge all cargo at Mumbai and/or one other Indian port."

(Mohan Decl. at ¶ 6).  Subsequently, JKI sold all of the cargo to four different receivers

in Mumbai.  (Mohan Decl. at ¶ 9).  Thereafter, on May 16, 2007, JKI's agents in Mumbai

advised the Master that all cargo aboard the vessel would be discharged at Mumbai.

(Mohan Decl. at ¶ 10 and Exhibit 4).

JKI's agents also made all the necessary arrangements to discharge all of the

cargo at Mumbai.  In fact, preparation to meet customs requirements at Mumbai was one

of the topics expressly covered in the notice provided by the message to the Master on

May 16 and thus the Master was well aware of the designated discharge port.   The

message stated, in pertinent part, "[w]e are your agents at Mumbai . . . [t]o complete Port

and custom's pre-arrival requirements" we need the following documents which were

then enumerated. (Mohan Decl. Exhibit 4). On May 26, 2007, JKI's agents in Mumbai applied for, and promptly received, permission to discharge the entire cargo into barges at the outer anchorage for onward transportation to the Mumbai Port. (Mohan Decl. at ¶ 13-14 and Exhibits 1 and 5). Additionally, on June 2, JKI entered into a contract for the barging of the cargo from the outer anchorage to the dock at Mumbai. (Mohan Decl. at ¶ 21 and Exhibit 10). Finally, on June 4, the agents filed "an Import Manifest with Mumbai Customs for all of the cargo being carried" aboard the vessel. (Mohan Decl. at ¶ 26 and Exhibit 1).

Thus, it is clear that JKI not only intended to deliver the cargo at Mumbai, and made the necessary arrangements to do so, but also that the vessel's Master and owners were well aware of the designated discharge port throughout the period of late May and early June. "On May 22, 2007, VBSK [apparently vessel managers for the actual owners of the vessel] advised [JKI's agents at Mumbai] that the estimated time of arrival ("ETA") of the vessel [was] June 1." (Mohan Decl. at ¶ 11 and Exhibit 1). Likewise, on May 28, 2007, JKI's agents in Singapore even sent a reminder to the vessel's master that Mumbai was the designated discharge port. (Mohan Decl. at ¶ 15 and Exhibit 6). Moreover, on May 30, 2007, the Master of the M/V Frederike Oldendorff sent a communication to JKI's agents in Singapore that acknowledged "Mumbai would be the discharge port and confirmed receipt of the pre-arrival information for the port of Mumbai which had been forwarded to him by [JKI's agents in Mumbai] on May 16, 2007." (Mohan Decl. at ¶ 16 and Exhibit 7). Additionally, "[o]n or about May 31, 2007, with the permission of the actual owners of the M/V Oldendorff" the original bills of lading were cancelled and replaced by bills of lading that expressly stated all cargo would

be discharged at Mumbai. (Mohan Decl. at ¶ 19 and Exhibits 8 and 9). Also, beginning June 1, the Master provided regular ETA updates for arrival at Mumbai. (Mohan Decl. at ¶ 20). These estimated arrival notices reflect an increasingly delayed ETA but, nonetheless, demonstrate that the Master knew where his vessel was supposed to go. Such awareness is also set forth in the vessel logs which clearly indicate that the destination was Mumbai. (Mohan Decl. at ¶ 32 and Exhibit 12). Perhaps the most telling demonstration of Oldendorff's knowledge of the designated discharge port is that Oldendorff sent "the actual owners of the vessel" a letter dated June 4 that referenced Vancouver/Mumbai Bills of Lading Nos. 1-10 which provided for the delivery of all cargo at Mumbai and agreed "to indemnify the actual owners for [doing so] without production of the original bills of lading." (Mohan Decl. at ¶ 22 and Exhibit 11).

Oldendorff's arguments regarding the feasibility of discharging all of the cargo at Mumbai are similarly flawed in that they ignore undeniable facts regarding when the monsoon season occurred in Mumbai in 2007. First, Oldendorff makes much ado about certain draft restrictions at Mumbai's inner harbor. (Oldendorff Memo. at p. 9). However, as discussed above, JKI had planned, and made contractual arrangements, to barge the cargo from the outer anchorage to the dock. (Mohan Decl. at ¶ 21). Likewise, Oldendorff's contention that the monsoon season began in Mumbai on approximately June 1, 2007 is clearly inaccurate. (Oldendorff Memo. at p. 9). "[M]onsoon season at Mumbai, as confirmed both by the India Meteorological Department of the Government of India and JKI's agents at Mumbai, did not commence in 2007 until June 18." (Mohan Decl. at ¶ 48 and Exhibits 1 and 20).

Second, Oldendorff argues that "during the voyage JKI vacillated [regarding the discharge port] from Mumbai to Kandla to Mundra." (Oldendorff Memo. at p. 10). As discussed above, following departure from Vancouver, JKI sold the cargo to four different receivers in Mumbai and made all necessary arrangements for delivery at Mumbai via the outer anchorage. However, once the vessel began to report increasingly later ETAs, JKI and its agents in Mumbai took the responsible business step of considering alternative ports and procedures. (Mohan Decl. at ¶ 25). Alternative ports that were considered included both Kandla and Mundra. (Mohan Decl. at ¶¶ 24 and 31). This precaution was taken in case the vessel's failure to maintain pace with its ETAs became so severe as to conflict with the approach of the monsoon. (Mohan Decl. at ¶ 29). Such conflict arose on June 6 when the vessel reported an ETA for Mumbai of June 10 which would have been too late to discharge at the designated outer anchorage. (Mohan Decl. at ¶¶ 28 and 29). Thus, "JKI directed the vessel to proceed to Mundra, India, in order to discharge enough cargo to enable the vessel" to discharge the remainder at Mumbai's inner harbor. (Mohan Decl. at ¶ 31).

**B.      Oldendorff's argument that JKI's claims are unrecoverable under English law is a disputed issue of law that must be resolved by arbitration in London**

Oldendorff argues that "JKI's alleged damages are unrecoverable as a matter of English law." (Oldendorff Memo. at p. 14). Undoubtedly, the appropriate forum for the resolution of this argument, just as for the disagreement regarding factual issues, is arbitration in London pursuant to English law. In support of its argument regarding recoverability under English law, Oldendorff introduces the Declaration of Timothy Nicholas Young, an English barrister. Not surprisingly, Mr. Young seems to assert that

JKI would not be entitled to recovery under English law.  However, JKI relies upon the Declaration of John Richard Blacker, an English solicitor with decades of experience dealing with matters similar to the instant one.  (Blacker Decl. at ¶ 1).  Mr. Blacker thoroughly explains that the legal issues are not nearly as definite – or as one sided – as Mr. Young seems to believe.

Regarding issues of English law that Oldendorff specifically referenced in its Memorandum of Law in Support of its Motion to Vacate, Mr. Blacker addresses the following issues for which very brief summaries are provided below:

> **Claims by cargo receivers**: "[t]o the extent that JKI suffer loss as a result of [such] claims caused by Oldendorff's breach of the charter, then they are recoverable in principle." (Blacker Decl. at ¶ 19).  Mr. Blacker then discusses the long line of English cases considering remoteness and notes that London arbitrators will need to hear "what actual or imputed knowledge Oldendorff had at the time the charter was entered." (Blacker Decl. at ¶ 25).

> **Waiting time at Mumbai**: Mr. Blacker explains that "[a]n analysis of the terms of the charter in relation to the reason given and the contemporary written evidence will have to be considered by the arbitrators in due course but what can be said at the moment is that there seems to be agreement that the Master did indeed refuse to come to the anchorage and that JKI did indeed suffer one day's delay." (Blacker Decl. at ¶ 15).

> **The claim by the barge operators**: Mr Blacker first notes that this claim is subject to "arbitration in Delhi and to Indian law." (Blacker Decl. at ¶ 16).  Therefore, the "sole issue is whether JKI [would be] entitled in principle to recover from Oldendorff any sum they must pay to [the barge operators]." (Id.)  Additionally, when placed before the London arbitrators, recovery for claims asserted by the barge operators would be subject to the same analysis regarding remoteness that would apply to the cargo receivers' claims discussed above.

> **Factual disputes and their effect on claims**:  Mr. Blacker explains that "[u]nless and until all the evidence is put to London arbitrators and the issues in dispute are decided by those arbitrators, none of the listed claims put forward by JKI can, in [his

view] be excluded as a matter of principle under English law and Mr. Young's assumptions on the evidence are, with respect to him, mere speculation at this stage." (Blacker Decl. at ¶ 29). Similarly, Mr. Blacker notes that comments concerning what may have caused main engine failure are "rather prejudicial" and concern a matter to "be left to an expert marine engineer and not to an English barrister." (Blacker Decl. at ¶ 11).

## POINT IV

### JKI COULD NOT HAVE SOUGHT COUNTER-SECURITY WHILE OLDENDORFF'S EARLIER RULE B ATTACHMENT PROCEEDING WAS PENDING BECAUSE ITS CLAIMS WERE NOT MATURE AND THUS NEITHER THE COMPULSORY COUNTERCLAIM RULE NOR ANY OTHER RULE OR PRINCIPLE COULD HAVE REQUIRED JKI TO DO SO

#### A.    JKI'S claims were not mature during the pendency of Oldendorff's prior Rule B attachment proceeding

Prior to JKI becoming aware of the claims for which it sought security through the instant matter, Oldendorff commenced, and sought the voluntary dismissal of, its own Rule B attachment proceeding. However, because of the timing of that earlier action, in particular its voluntary dismissal, JKI never could have sought counter-security from Oldendorff. The summons in that action issued on July 17, 2007. However, Oldendorff's attorneys signed the Notice of Voluntary Dismissal, noting that JKI had not appeared, on July 27, 2007. Only nine days expired between the Summons and the signing of the Notice of Voluntary Dismissal. Soon thereafter, on August 6, 2007, the court ordered the matter dismissed.

However, as of August 6, 2007 (let alone July 27), JKI could not have sought counter-security because its claims had not matured. Notably, the bulk of the costs and claims that JKI incurred as a result Oldendorff's breach were unknown until on or after August 6. (Mohan Decl. at ¶ 49 and Exhibits 12, 13, 15, and 17). The invoice for rail

15

transport of cargo from Mundra to Mumbai is dated August 6, and the invoice for bagging cargo is dated August 7. (Mohan Decl. Exhibits 14 and 15). Additionally, the estimate that JKI's agents in Mumbai provided regarding the port expenses incurred due to the vessel's delayed arrival is dated August 9. (Mohan Decl. Exhibit 17). Finally, JKI did not begin to receive claims from some of the cargo receivers until August 20 and 29, 2007. (Mohan Decl. Exhibit 19).

Therefore, it would not have been possible for JKI to have sought counter-security while Oldendorff's Rule B proceeding was pending because JKI lacked the information necessary to assert all its claims.

**B.    JKI's claims are not subject to the compulsory counterclaim rule as argued by Oldendorff**

Even if JKI's claims had been mature during the brief period of time while Oldendorff's earlier suit was pending, JKI's attachment would not be subject to, let alone barred by, the compulsory counterclaim rule. In fact, Oldendorff's argument regarding compulsory counterclaims completely ignores the actual provisions of Fed. R. Civ. P. 13 which states, in pertinent part, as follows:

> A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the [same transaction or occurrence, unless] (1) at the time the action was commenced the claim was the subject of another pending action, or (2) the opposing party brought suit upon the claim by attachment or other process by which the court did not acquire jurisdiction to render a personal judgment on that claim, and the pleader is not stating any counterclaim under this Rule 13.

Fed. R. Civ. P. 13(a). Thus the rule itself provides multiple bases for its complete inapplicability to the instant matter.

JKI never entered a responsive pleading in the earlier matter brought by Oldendorff and which was voluntarily dismissed by Oldendorff. Where "a responsive pleading in a first action was never required, the defendant therein [is] not barred from bringing a second action asserting those claims that would have been compulsory counterclaims in the first action.".  See Mutual Fire, Marine and Inland Insurance Company v. Seymour Adler, 726 F. Supp. 478, 483 (S.D.N.Y. 1989) (Patterson, J.) (adopting the court's holding in United States v. Snider, 779 F.2d 1151 (6th Cir. 1985)); see also 3 Moore's Federal Practice, § 13.15 (Matthew Bender 3d ed. 1997) (stating "[a] claim that should have been pleaded as a compulsory counterclaim in [a] first suit will only be barred in a subsequent action if a responsive pleading, such as an answer, was required to be or was served in the earlier action").

Moreover, even if JKI had answered Oldendorff's complaint in the earlier matter, the instant action would still not violate Fed. R. Civ. P. 13.  Specifically, Fed. R. Civ. P. 13(a)(2) excepts parties in suits initiated by attachments from compulsory counterclaim requirements.  That exception "was intended to allow defendants in a *quasi in rem* action to refrain from asserting" what otherwise might be compulsory counterclaims.  See Cargill, Inc. v. Sabine Trading & Shipping Co., 756 F.2d 224 (2d Cir. 1985).  As one authority has explained it, "where the principal demand is filed *in rem*, a party has the *option* either to assert a counterclaim in the *in rem* proceeding or to assert it in a separate proceeding.  If a party exercises his option to not file a compulsory counterclaim in an *in rem* proceeding, he is not foreclosed by *Rule 13(a)* from asserting it in a separate proceeding." See Old Hickory Barge and Fleeting, Inc. v. Barge M-553, 107 F.R.D 689, 691, 1986 AMC 1215 (M.D.La. 1985).  Simply put, "[a] defendant is not required to

plead a compulsory counterclaim when the opposing party has sued using attachment." See 3 Moore's Federal Practice, § 13.16[3][a].

Here, Oldendorff brought suit in the earlier matter by way of attachment. Because Oldendorff's proceeding was initiated by attachment, all of JKI's claims fell squarely within the letter and spirit of the exception provided by Fed. R. Civ. P. 13(a)(2). Thus JKI was not required to assert any of its claims in the earlier matter and, as stated in Cargill, Inc., it always had the option to assert its claims in a separate, subsequent proceeding.

Further, the compulsory counterclaim rule does not apply to JKI's claims because, as discussed above, JKI's claims had not matured by the time Oldendorff's action was dismissed. When a counterclaim matures after a party has served its answer, such counterclaims are permissive rather than compulsory. See Tommy Hilfiger Licensing, Inc. v. Bradlees, Inc., 99 Civ. 4677, 2002 U.S. Dist. LEXIS 377, at *16 (S.D.N.Y. Jan 11, 2002) (Knapp, J.) (citing 3 J. Wm. Moore et al., Moore's Federal Practice P 13.14[1] (3d ed. 1999) for the proposition that "[a] counterclaim that arose from the same transaction or occurrence as the primary claim, but did not accrue or mature until after service of the responsive pleading . . . is not compulsory").

Finally, if Oldendorff's argument regarding Rule 13 were correct, then a potential defendant could shield itself from future liability by filing its claims against an opponent first and then seeking voluntary dismissal of the matter before the opponent made an appearance. Such an outcome would be inequitable and highly detrimental to the system of orderly justice. Oldendorff's attempt to secure such an inequitable and disorderly

outcome ought to be contemplated in connection with the Court's consideration of

Oldendorff's request for equitable relief in its Motion to Vacate.

## **CONCLUSION**

Wherefore, for all the foregoing reasons, the Court should deny Oldendorff's

Motion to Vacate Maritime Attachment.

Dated: New York, New York
      November 19, 2007

                                   EATON & VAN WINKLE LLP

                          By:     /s/ Michael O. Hardison_____
                                  Michael O. Hardison

                                  3 Park Avenue
                                  New York, New York 10016-2078
                                  (212) 779-9910

                                  Attorneys for Plaintiff

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/19/07

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
THE RICE COMPANY,                           :

             Plaintiff,          :          07 Civ. 7077 (WHP)

       -against-                     :          MEMORANDUM AND ORDER

                          :

EXPRESS SEA TRANSPORT
CORPORATION,                                :

             Defendant.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, District Judge:

        Plaintiff The Rice Company ("Rice") brings this action to attach assets of

Defendant Export Sea Transport Corporation ("ESTC") as security for its pending arbitration

claim against ESTC.  ESTC moves pursuant to Fed. R. Civ. P. Supp. Rule E to vacate this

Court's ex parte order of attachment dated August 9, 2007 (the "Attachment Order"), or to

reduce the amount attached.  In the alternative, ESTC seeks counter-security for its counterclaim

in arbitration against Rice.  For the following reasons, ESTC's motion to vacate or reduce the

amount of the attachment is denied and its motion for counter-security is granted.

## BACKGROUND

        Rice, a California-based commodities trader, chartered the M/V APOSTOLOS II

(the "Vessel") from ESTC, a Panamanian company, on April 4, 2007 for a period of

approximately thirteen months at a rate of $24,500 per day.  (Declaration of Diego Garat dated

Sept. 25, 2007 ("Garat Decl.") ¶¶ 2-3; Verified Complaint dated Aug. 9, 2007 ("Compl.") ¶¶ 2-3,

Ex. 1: Charter Contract (the "Charter Contract") at 1, 2.)  The Vessel passed through several

Singapore sub-chartered the Vessel to an Australian company that transported aluminum from Australia to Iran. (Garat Decl. ¶ 4.) The aluminum was to be unloaded in Iran between July 19, 2007 and August 3, 2007. (Garat Decl. ¶ 4.)

On July 3, 2007, ESTC canceled the Charter Contract, claiming that Rice had not rendered timely payment. (Garat Decl. ¶ 5.) Rice contends that because the Vessel was en route to Iran when it received notice of the cancellation, Rice was forced to accept an interim contract with ESTC at a higher rate of $28,500 per day. (Garat Decl. ¶ 5.)

ESTC then offered Rice a new charter for the remainder of the original Charter Contract at a rate of $28,500 per day, with stricter payment conditions than contained in the Charter Contract. (Declaration of Hugh Maxwell Townson dated Sept. 10, 2007 ("Townson Decl.") ¶ 20, Ex. 6: Email from Hugh Maxwell Townson to The Rice Company USA.) Rice declined and filed for arbitration in London, claiming $4,946,170.13 in damages from ESTC's withdrawal of the Vessel. (Garat Decl. ¶¶ 16-18, Ex. 6: Letter dated July 17, 2007 from James King to Charles Weller; Compl. ¶¶ 10-11.) The damages estimate was based on the rate of $36,409 per day that Rice determined would be required to charter a similar Vessel. (Garat Decl. ¶¶ 6-7, Ex. 1: Report published by Clarkson's Group dated July 23, 2007.)

ESTC counterclaims in the arbitration that Rice failed to pay for the interim service that allowed the Vessel to complete its Iran trip. (Townson Decl. ¶¶ 26-30.) ESTC seeks $1,171,585.80 in damages for its counterclaim, and is currently holding $697,565.13 of Rice's assets as security until the counterclaim is decided. (Townson Decl. ¶¶ 33-34.)

On July 24, 2007, ESTC offered "to provide [Rice] with security in the form of an ESTC letter of undertaking, subject to agreement between the parties as to the terms of that [letter] and on quantum." (Townson Decl. ¶ 6, Ex. 1: Email dated July 24, 2007 from Charles

Weller to James King.) Rice did not respond, instead filing this action. (Compl. ¶ 1.) On

August 9, 2007, this Court ordered attachment of ESTC's assets up to $4,946,170.13.

(Attachment Order at 2.)

On August 28, 2007, ESTC's counsel asked Rice to abandon the Attachment

Order in exchange for a bank guarantee, with "Rice undertaking to answer for the costs of the

[guarantee]." (Townson Decl ¶ 10, Ex. 3: Letter dated August 28, 2007 from Charles Weller to

James King.) Rice again refused ESTC's offer. (Townson Decl ¶ 11.)


## DISCUSSION

I. Motion to Vacate

    A. Legal Standard

ESTC moves to vacate the attachment on equitable grounds. "[Fed. R. Civ. P.

Supp.] Rule B specifies the sum total of what must be shown for a valid maritime attachment."

Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434, 447 (2d Cir. 2006). As long

as the procedural requirements of Rule B are met, courts must sustain the attachment, unless the

defendant can show that an equally convenient alternative exists for the plaintiff. Aqua Stoli,

460 F.3d at 444. Specifically, "a district court may vacate [an] attachment [on equitable

grounds] if...1) the defendant is subject to suit in a convenient adjacent jurisdiction; 2) the

plaintiff could obtain in personam jurisdiction over the defendant in the district where the

plaintiff is located; or 3) the plaintiff has already obtained sufficient security for the potential

judgment, by attachment or otherwise." Aqua Stoli, 460 F.3d at 445. The burden is on the

defendant to demonstrate the equitable grounds for vacatur. Aqua Stoli, 460 F.3d at 445 n. 5.

3

ESTC does not contest that the procedural requirements of Rule B have been satisfied. Rather, it argues vacatur is warranted because (1) Rice rejected its prior offers of security, and (2) Rice has unclean hands, having engaged in business transactions with Iran in violation of Executive Order No. 12959 § 1(d) and 50 U.S.C. §§ 1702, 1705.

## B. ESTC's Offer of Alternative Security

While a court may vacate an attachment if the plaintiff has already obtained security, Aqua Stoli, 460 F.3d at 445, ESTC has merely offered to provide security. In fact, the availability of other security does not preclude attachment. See Aqua Stoli, 460 F.3d at 444 ("Federal admiralty law allows a plaintiff to seize assets and bring suit wherever such assets may be found precisely because, while other assets may be available, plaintiffs may encounter difficulty tracking them down."). Moreover, ESTC's initial offer of a letter of undertaking was subject to further negotiation, and the subsequent offer of a bank guarantee was conditioned on Rice paying unspecified costs. (Townson Decl. Exs. 1, 3.) In light of these uncertainties, ESTC has not shown the alternative security would even be equivalent to that afforded by a Rule B attachment. See Aqua Stoli, 460 F.3d at 445 n. 5 (placing burden on party seeking vacatur to show alternative security existed). ESTC's offer to provide security therefore cannot be grounds for vacatur.

## C. Unclean Hands

ESTC's argument for vacatur on the ground that Rice violated the laws of the United States by conducting business with Iran is also unavailing. Courts in a maritime attachment action are not permitted to make substantive determinations on the plaintiff's

4

underlying claim, since "Rule B specifies the sum total of what must be shown for a valid
maritime attachment." Aqua Stoli, 460 F.3d at 447. "[A] proper Verified Complaint is all that is
required to satisfy Rule B and to prevail against a Rule E(4) motion to vacate." Transportes
Navieros y Terrestres, S.A. de D.V. v. Fairmount Heavy Transport N.V., No. 07 Civ. 3076
(LAP), 2007 WL 1989309, at *4 (S.D.N.Y. June 6, 2007). ESTC argues that cases prior to the
enactment of Rule E(4) imply courts may generally exercise broad discretion to prevent abuse by
the plaintiff. However, "[i]n none of these cases . . . was the determinative question anything
other than whether the defendant could be 'found' within the district—in other words, whether
the textual requirements of the attachment rule were met." Aqua Stoli, 460 F.3d at 442.

      This Court cannot consider the Plaintiff's unclean hands without probing the
merits of the underlying claim. The Charter Contract itself makes no mention of Iran; the Court
would have to make a factual inquiry into Rice's involvement, as the voyage to Iran was
undertaken through a sub-charter (Garat Decl. ¶ 4). Moreover, even if Rice's voyage to Iran did
violate United States law, the Charter Contract could still be enforceable. "The violation of a
statute that is merely malum prohibitum will not necessarily render a contract illegal and
unenforceable." Benjamin v. Koeppel, 85 N.Y.2d 549, 553 (N.Y. 1995). Determining the merits
of these underlying issues would undermine the standard that "a proper Verified Complaint is all
that is required," Transportes, 2007 WL 1989309, at *4.

      ESTC's motion to vacate is therefore denied. While upholding the attachment
enforces a contract that may be illegal, this Court reads Aqua Stoli to require such a result.
However, this Court will forward a copy of this Memorandum and Order to the United States
Attorney for the Southern District of New York for such action as he deems appropriate. "Under
our Constitution no court, state or federal, may serve as an accomplice in the willful

transgression of 'the Laws of the United States.'" Lee v. State of Fla., 392 U.S. 378, 386 (1968) (quoting U.S. Const. art VI).

II. Motion to Reduce Attachment

ESTC moves in the alternative for a reduction in the attachment. "Whenever security is taken the court may, on motion and hearing, for good cause shown, reduce the amount of security given." Fed. R. Civ. P. Supp. Rule E(6). While "the plaintiff need not prove its damages with exactitude," the court must find that the plaintiff's damages estimate is "not frivolous." Dongbu Express Co. Ltd. v. Navois Corp., 944 F. Supp. 235, 237 (S.D.N.Y. 1996). Courts have reduced the damages where the plaintiff has offered no evidence to support its claim, see Daeshin Shipping Co. Ltd. v. Meridian Bulk Carriers, Ltd., No. 05 Civ. 7173 (NRB), 2005 WL 2446236, at *2 (S.D.N.Y. Oct. 3, 2005) (reducing attachment to amount of attachment for which plaintiff offered substantiating evidence), or where it is an "undisputed fact" that the plaintiff failed to mitigate damages, see Transportes, 2007 WL 1989309, at *7 (reducing the attachment because plaintiff admitted to waiting six months before trying to mitigate damages).

Because Rice provides evidence supporting its claim that $36,409 was the prevailing market rate for chartering a Vessel of equivalent size and utility (Garat Decl. ¶¶ 6-10, Ex 1), Rice's damages estimate is non-frivolous, see Dongbu, 944 F. Supp. at 237. Although ESTC offers evidence that $28,500 was closer to the market rate (Townson Decl. ¶ 20, Ex. 6), the existence of such a factual dispute precludes reduction of the attachment. See Transportes, 2007 WL 1989309, at *7 (requiring indisputable evidence to reduce attachment). ESTC's motion to reduce the amount of the attachment is therefore denied.

III. Motion for Counter-Security

    ESTC seeks counter-security from Rice for ESTC's counterclaim that Rice failed to make payments for the completed voyage to Iran. "When a person who has given security for damages in the original action asserts a counterclaim that arises from the transaction or occurrence that is the subject of the original action, a plaintiff for whose benefit the security has been given must give security for damages demanded in the counterclaim unless the court for cause shown, directs otherwise." Fed R. Civ. P. Supp. Rule E(7)(a). Once satisfied that the counterclaim is "non-frivolous," a court need not probe more deeply into the strength of the counterclaim to grant counter-security. Result Shipping Co., Ltd. v. Ferruzzi Trading USA Inc., 56 F.3d 394, 399-400 (2d Cir. 1995). Where the plaintiff does not offer any evidence that it would be "financially unable to post counter-security or that posting the counter-security would impair its ability to pursue its claim in arbitration," courts typically grant counter-security. Daeshin Shipping, 2005 WL 2446236, at *3.

    ESTC seeks to attach $474,020.67, the difference between the amount it claims in London and the amount it has already secured from Rice. (Townson Decl. ¶¶ 33-34.) ESTC's counterclaim arises from the same occurrence that is the subject of Rice's claim. ESTC has also alleged facts indicating that Rice has not paid for its use of the ship en route to Iran, allegations that render the counterclaim non-frivolous. (See Townson Decl. ¶¶ 26-30.) Moreover, Rice does not argue that counter-security would be a financial burden great enough to jeopardize Rice's ability to bring its own claim. ESTC's motion for counter-security in the amount of $474,020.67 is therefore granted.

CONCLUSION

For the foregoing reasons, Defendant ESTC's motion to vacate and its motion to reduce the attachment are denied. ESTC's motion for counter-security in the amount of $474,020.67 is granted.

Dated: November 15, 2007
       New York, New York

                                          SO ORDERED:

                                          WILLIAM H. PAULEY III
                                          U.S.D.J.

*Counsel of Record*

Keith B. Dalen, Esq.
Hill Rivkins & Hayden LLP
45 Broadway, Suite 1500
New York, NY 10006-3739
*Counsel for Plaintiff*

Patrick Lennon, Esq.
Lennon, Murphy & Lennon, LLC
420 Lexington Avenue, Suite 300
New York, NY 10170
*Counsel for Defendant*

*Copy forwarded to:*

Hon. Michael J. Garcia
United States Attorney
Southern District of New York
1 St. Andrews Plaza
New York, NY 10007