UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
J.K. INTERNATIONAL PTY.LTD                                  :
                                                            :
                                Plaintiff,                  :   07 Civ.7328(SHS)
                                                            :
        - against -                                         :
                                                            :
                                                            :
OLDENDORFF CARRIERS GMBH & CO,                              :
                                                            :
                                Defendant                   :
------------------------------------------------------------X

## DECLARATION OF JOHN RICHARD BLACKER

I, JOHN RICHARD BLACKER, of 1, New Square London WC2A 3SA hereby declare, pursuant to the provisions of 28 U.S.C. §1746, as follows:

1. I am a solicitor of the Supreme Court of England & Wales and I make this Declaration to deal with some of the points contained in the Declaration of Timothy Young Q.C dated the 2nd October 2007.

2. By way of background, I was admitted as a solicitor on the 15th January 1979 and throughout my professional life, I have specialised in advising clients in relation to international trade and shipping disputes with particular reference to disputes involving the charter of ships. I was a partner with the international law firm of Clyde & Co for 20 years and for the last six years I have been a partner with Ross& Co again specialising primarily in charter disputes. I have extensive

1

knowledge of London arbitration proceedings having been involved in well over 100 during my working life and I have detailed knowledge of the procedure of maritime arbitrations in London, the assessment of costs and fees in relation to them and of the level of interest on awards made by London arbitrators. I also have extensive knowledge of disputes involving the charters of ships where the Owners allege that the fuel (bunkers) purchased by the Charterers has caused substantial damage to the main and/or auxiliary engines of the vessel. Currently, I have at least 10 cases which are subject to London arbitration proceedings and where the disputes are very similar to that involving the vessel "Frederike Oldendorff" (which is the subject of the current action) in that they all concern allegations in relation to the fuel used on board. I have also written articles and conducted seminars on bunker disputes.

3. For the purposes of this Declaration I have reviewed the Declarations of Mr Young and Mr Russ, and I have seen the affidavit of Mr Sandeep Mohan with the exhibits to it and the analysis results of various samples of oil undertaken in Singapore.

4. Like Mr Young, although I am instructed on behalf of JKI, I fully understand that my prime duty is to assist the court on such matters as are within my expertise and that this duty overrides my duty to those by whom I am instructed and paid. Accordingly this Declaration is my own true opinion on the points dealt with in it and I believe all such points are true. Further, although the points dealt with in this Declaration cover some of the points raised by Mr Young, they by no means deal with all of them. Where particular points raised by Mr Young are not dealt with, that does not necessarily mean that I agree with them.

5. Mr Young is quite right to say in paragraph 6 of his Declaration that many of the facts in this case are contested. However, it is not disputed that the vessel suffered a serious breakdown during her voyage from Vancouver to India; that part of her cargo was discharged in Mundra with the balance being discharged in Mumbai

and that there was substantial delay in the discharge and delivery of the cargo to the receivers of it. What is in dispute is the cause of the engine breakdown; whether the cargo would, but for the breakdown have all been delivered in Mumbai without the vessel having to discharge part of her cargo in Mundra; and what the consequences of those disputes are in terms of the financial loss suffered by each party and the liability for that financial loss under the terms of the charter.

6. All of these areas of dispute will involve both sides in collecting detailed factual evidence in the form of documentary evidence and written statements from their own employees and from third parties particularly in India to present to maritime arbitrators in London in due course. The evidence will concern the operation of both discharge ports and the precise facts concerning the physical movements of the vessel at all relevant times from the commencement of the voyage until the ultimate completion of discharge of the cargo. In relation to the cause of the engine breakdown itself, both sides have already appointed chemical experts who have been present at the detailed laboratory analysis of some 10 samples of the bunkers in specialist laboratories in Singapore. Both sides have also appointed expert marine engineers in London who specialise in analysing casualties of this type and in giving their expert opinion in relation to the cause. There will have to be very detailed disclosure by the Owners of the vessel in relation to the operation of the main and auxiliary engines for a substantial period of time prior to, during and after the use of the bunkers purchased by JKI as well as an analysis of the damaged parts of the engine, their age and wear; the detailed symptoms within the engine immediately leading up to the main breakdown and probably a further physical examination of the parts of the main engine (possibly also by expert metallurgists appointed by each party) that were damaged or destroyed. There will be an investigation concerning the operation by those on board of the fuel purification system and of the fuel handling in general and of the operation (or lack of it) of the engine alarm system designed to prevent major damage of this type.

7. As is apparent from the Declaration of Mr Adam Russ and the affidavit of Mr Sandeep Mohan, there will be considerable evidence which will eventually have to be put to the arbitrators in London to enable them to reach a decision on both liability and the amount of loss. My current estimate in line with other London arbitrations I have been involved in concerning this type of casualty is that the eventual oral hearing before London arbitrators could well last for two full weeks with a number of factual witnesses giving oral evidence and either four or six experts in total from the two parties also giving oral evidence. Given that Oldendorff themselves chartered the vessel from the headowners, it is possible that the evidence might also be heard in conjunction with or at the same time as the evidence in an arbitration under the head charter. While therefore the underlying allegation concerning whether the bunkers caused the main engine damage is not uncommon, this is certainly not a "run of the mill" dispute in the sense that all of the issues will be easily resolved with minimal evidence. It is not a case in which either Mr Young or I can at this stage give assistance to the court on the likely outcome of the London arbitration or indeed on many of the disputed facts put forward by both sides and I am surprised by some of Mr Young's comments in relation both to factual and expert evidence.

8. For example, he refers in Paragraph 8 of his Declaration to his own experience of vessels discharging cargoes at the inner anchorage at Mumbai which (with all due respect to him) must be very substantially less than the experience of JKI who are experienced traders of such cargo into India and of the local agents (Sahi) who explain in some detail in the exhibit to Mr Sandeep Mohan's affidavit how the port of Mumbai operates particularly around the period of the monsoon.

9. Mr Young also says in paragraph 10 of his Declaration that in his experience the monsoon season usually starts considerably earlier than the 18th June. Yet the Government of India meteorological Department office of the Deputy Director has confirmed that the monsoon over Mumbai commenced on the 18th June 2007 and that apart from 2006 when it commenced on the 31st May, during the five

years including 2007, it had never commenced before the 10th June – see the letter from the Deputy Director at exhibit 20 to the affidavit of Mr Sandeep Mohan. It is difficult to see how Mr Young's personal experience as a UK lawyer can be better than that of the Government of India meteorological Department.

10. My point is that Mr Young bases his opinion at least in part on an incorrect assumption of the facts and that all of the facts and expert evidence will be put to the London arbitrators in due course for proper determination and decision. What can be said at this stage based on Mr Sandeep Mohan's affidavit is that JKI's <u>case</u> is that their intention was always to discharge the entire cargo at Mumbai and that but for the major problems with the main engine of the vessel, discharge of that cargo would and could have taken place at Mumbai before the onset of the monsoon. It can also be said on the basis of the affidavit of Mr Sandeep Mohan and the exhibits to it that JKI have <u>substantial evidence</u> to support their case on these issues even at this stage.

11. In relation to the cause of the engine problems, Mr Young comments in paragraph 9 that in his experience it is not uncommon for high exhaust temperatures from a vessel's main engine to have been caused by contaminated bunkers. My only response to that rather prejudicial comment is that whether it is or is not common that high exhaust temperatures result from contaminated bunkers should in my respectful view be left to an expert marine engineer and not to an English barrister.

12. What I can say by way of just one example, is that the report of the analysis of a fuel sample in this current case dated the 1st June 2007 carried out by the Visva Laboratory on behalf of the Owners of the "Frederike Oldendorff" concludes by saying "...the quality of this fuel is above average" (see exhibit 1 to this Declaration). That and all the other recent analysis results from samples of these bunkers in my opinion give a far better indication of whether this particular fuel was contaminated than does Mr Young's expressed experience.

5

13. Mr Young also says in paragraph 13 of his Declaration that it is a matter of implicit agreement between the verified complaint and the Declaration of Mr Russ that the vessel had sailed past Mumbai by the time of the breakdown and that no significant delay was caused to her ETA at Mumbai by the breakdown. As can be seen from the exhibits to Mr Sandeep Mohan's Affidavit, the original ETA was the 1st June and on the 6th June the Master reported, after delays on the 5th June, that the vessel was proceeding at half speed and had an ETA at <u>Mumbai</u> at that time, of the 10th June. The Sahi email, at exhibit 1 to Mr Sandeep Mohan's affidavit shows the exact ETA's given and there is clearly substantial evidence from the Master of the vessel himself that there was indeed significant delay caused to the vessel's ETA at Mumbai particularly in the context of the approaching monsoon period. Once again all evidence from the ship including an analysis of the ships' speed throughout the voyage and her geographical location at various times would have to be given to arbitrators in London if this point continues to be made by Oldendorff. It is not a point that will simply be decided in Oldendorff's favour on the basis of assertion.

14. I turn now to consider Mr Young's analysis of the individual claim items which starts from paragraph 15 of his Declaration. In paragraph 17 he states that it is plain that many of the heads of claim would normally be recoverable in principle. I agree with that. Starting from the basis that the bunkers caused no damage to the engine and that there was a breach of charter by the Oldendorff in relation to the condition, maintenance and operation of the engine I also agree with him that the first point the arbitrators will consider in assessing the damages due to JKI is the actual losses JKI have suffered or will suffer. So far as I understand Mr Young's Declaration, apart from the interest and costs calculations, he attacks only three items of claim by JKI (see paragraph 18) which I will deal with below. He makes some comments about whether JKI have given credit for the usual time and cost of discharging in Mumbai but says he is unsure how the 7 days credit in fact given by JKI has been calculated. Once again the amount of credit to be given

by JKI will have to be decided by evidence in front of the arbitrators but as Mr Mohan says in paragraph 12 his affidavit, the figure of 7 days is based on the time taken to discharge previous cargoes by JKI at Mumbai. As such it is difficult to see how there can be any genuine criticism of the calculation at this stage. Mr Young quite rightly does not state that any part of the claim should be set aside on the basis of his comments on this point and I therefore turn to the only three heads of claim (apart from interest and costs) that he attacks in paragraph 18 of his Declaration.

15. The first is one day's delay or waiting time at Mumbai due to the Master's refusal to come to the anchorage. Mr Young says that the reason for this refusal is unspecified and he then refers to three English court decisions dealing with their own particular facts to suggest that this head of claim may be unrecoverable or more correctly that Oldendorff may have a defence to it. Whether this head of claim is or is not recoverable will depend on exactly why the Master refused to come to the anchorage, because unless the Master (and Oldendorff) can justify his actions, then his refusal to comply with a lawful order by JKI renders Oldendorff in breach of charter (see for example line 68 of the charter and clause 55 as attached to Mr Russ' affidavit). An analysis of the terms of the charter in relation to the reason given and the contemporary written evidence will have to be considered by the arbitrators in due course but what can be said at the moment is that there seems to be agreement that the Master did indeed refuse to come to the anchorage and that JKI did indeed suffer one day's delay. It is noticeable that Oldendorff have not put forward any factual evidence (for example a statement by the Master) which proves that they have a complete defence to this head of claim. Until the full facts are determined (and most of them on this issue will be in the headowners' possession), there is no reason so far as I can see why it should be said that this loss should not be fully recoverable in line with the principle of damages set out in paragraph 14 above.

16. Mr Young then deals with the claim against JKI by the barge operators and the claim against them by the cargo receivers. He attacks both on the grounds that they are unforeseeable and would not have been in the reasonable contemplation of Oldendorff at the time that they entered into the charter contract.

17. In relation to the barge contract, Mr Mohan says in paragraph 21 of his affidavit that JKI entered into a barge contract for the discharge of the entire cargo at Mumbai on the 2nd June 2007 with United Shippers Limited. However, because of the late arrival of the vessel at Mumbai, the onset of the monsoon and the consequent inability to discharge the cargo into barges at the BFL outer anchorage at Mumbai, United Shippers Limited have asserted a claim against JKI for breach of contract ( see paragraphs 43 of his affidavit). He also exhibits the claim letter. This is of course a claim which (not surprisingly) is not subject to English law but to arbitration in Delhi and to Indian law (see paragraph 11 of the contract exhibited to his affidavit). It is therefore a matter of speculation at this stage whether that claim will or will not succeed against JKI. What is certain, however, is that it is a claim that has in fact been made by United Shippers and accordingly, JKI potentially have a liability to United Shippers for the full amount claimed. The sole issue is whether JKI are entitled in principle to recover from Oldendorff any sum they must pay to United Shippers and I deal with the principles below.

18. The second area of claim criticised by Mr Young concerns the claim by the cargo receivers. Again, letters of claim by the buyers of the cargo against JKI are exhibited (exhibit 19) to Mr Mohan's statement as evidence of those claims which are based on delayed delivery and the resulting loss of market. Mr Young says that these claims are unusual heads of loss which would not be recoverable under English law.

19. The correct analysis in my view in line with paragraph 14 above, is that to the extent that JKI suffer loss as a result of these claims caused by Oldendorff's breach of the charter, then they are recoverable in principle. This is because the

basis of an award of damages is to put the innocent party in the same financial position as he would have been had there been no breach. However, losses are not recoverable if they are considered to be too remote a consequence of the breach or unforeseeable. (the "remoteness" rule). So the court here held in one of the most well known and probably oldest decisions on damages in this country (Hadley v Baxendale 1854 9 Exch 341) (see exhibit 2 to this Declaration).

> "The damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, i.e. according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of it".

20. In a later case (the Heron II (1969) 1 AC 350) (see exhibit 3 to this Declaration) Lord Reid said:

> "So the question for decision is whether a plaintiff can recover as damages for breach of contract a loss of a kind which the defendant, when he made the contract, ought to have realised was not unlikely to result from a breach of contract causing delay in delivery. I use the words "not unlikely" as denoting a degree of probability considerably less than an even chance but nevertheless not very unusual and easily forseeable". And it was later said in the same judgment, "A great many extremely unlikely results are "reasonably foreseeable"".

21. The Heron II concerned a voyage charter with Czarnikov, who were sugar merchants, as the shipowners knew. A cargo of sugar was delivered late to its destination at Basrah. The shipowners were held liable for the difference between the value of the sugar in the Basrah sugar market at the date when the cargo should have arrived and its lower value at the date of arrival. The court had no

9

difficulty in deciding that the shipowners knew that there was a market for sugar in Basrah and that had they thought about it, they must have known that at least it was not unlikely that the sugar would be sold at market price on arrival. They must also be held to have known that in any ordinary market, prices are liable to fluctuate from day to day. The shipowners were held liable for the charterers loss of profit. The actual or imputed knowledge of the shipowners was therefore important.

22. In another loss of profits case the "Pegase"(1981) I Lloyds Rep 175 (see exhibit 4 to this Declaration), the court said:

> "...I can find in the cases no rule of policy either excluding, or imposing special criteria in respect of the recovery of loss of profits, whether the relevant contract be a contract of sale or carriage, whether the breach be non-delivery or delayed delivery, and whether the profits claimed to have been lost are resale profits or profits from loss of use (which I shall call user profits)".

23. Equally in the very recent Court of Appeal decision in the "Achilleas" given on the 6th September 2007 (see exhibit 5 to this Declaration)., the court said:

> "The fact, however, that the market may have been particularly high... or particularly volatile in the critical period relevant to the circumstances of this caser, is not relevant, when once the type of loss, namely loss of a follow-on fixture, can be identified as "not unlikely".

24. From these cases it is clear that it is the knowledge or intention or imputed knowledge or intention of the parties at the time they entered into the contract which is the relevant knowledge for the purposes of the "remoteness" rule. So far as knowledge of the market is concerned, the courts have had little difficulty based on the facts in each case in finding the defendants liable for market losses actually suffered by the innocent plaintiff. Further, once it is decided that the type

of loss was within the parties' actual or imputed knowledge or intention at the time the contract was entered into, it does not matter that the loss itself was particularly high – for example where there has been a sudden and wholly unexpected drop in the market value – the loss is still recoverable in full.

25. In the present case therefore, London arbitrators would first have to hear what actual or imputed knowledge Oldendorff had at the time the charter was entered into about the use of barge contracts by the charterers and the port operations generally in Mumbai before, during and after the monsoon period. (It is worth noting in this connection that Oldendorff are highly experienced ocean carriers. Their own website states that they currently own around 50 vessels and operate some 300 in total). If it is held that Oldendorff should have known that JKI would enter into a barge discharging contract which if breached by JKI because of the late arrival of the vessel would result in a claim against JKI for damages, then there is no reason in principle (based on the decided cases some of which are referred to above), why the arbitrators should not order Oldendorff to reimburse JKI's loss. Equally if after hearing the evidence, the arbitrators were to conclude that Oldendorff should have known that there was a market for this type of cargo in Mumbai and that markets of this type fluctuate then again there is no reason in principle why they should not order Oldendorff to reimburse JKI for their losses connected with the Receivers' claims based on a loss of market.

26. I should mention, in relation to a loss of market claim, that Mr Young says that he is surprised that the cargo receivers are claiming against JKI under the sale contract unless there is an express term to that effect in the sale contract itself. He says that what he would expect is that the cargo receivers would claim against the shipowners under the terms of the bills of lading. He says it might be different in his view, if JKI themselves owned the cargo throughout and suffered the direct market loss and that since they will not suffer the direct market loss as owners of the cargo but only as defendants to a claim by the cargo owners then JKI's loss is not recoverable from Oldendorff.

27. Once again this is an argument that will have to be decided by the arbitrators in London. For my own part I regret that I unable to see the distinction in principle. If the cargo receivers were the holders of the bills of lading they might indeed have a claim under the bill of lading against the shipowners as well as a claim under their purchase contracts against JKI. They might well decide that the easier claim lies against JKI under the sale contracts. They might claim under both contracts. Equally even if there is no express term in the sale contracts relating to the date of delivery of the cargo, they may well have a claim under Indian law based on an implied term that the cargo will arrive at its destination within a reasonable time of the shipment date. We are not, after all, dealing with a claim by the cargo receivers based on English law and I do not know why Mr Young refers solely to an express contractual provision. If JKI are found liable for the Receivers' claims in India under their sale contract, I am unable to see why they should not in principle be able to recover those losses from Oldendorff – they are, after all, based on loss of market value. It seems to me to make little difference whether JKI as charterers suffer a direct market loss or are successfully sued by their cargo buyers and suffer the loss of market through their sale contract.

28. Secondly, the arbitrators will look at whether Oldendorff should, based on the evidence, have contemplated the type of loss JKI say they will suffer as the not unlikely result of delayed delivery of the cargo. At the risk of being accused of speculation, Oldendorff are highly experienced international carriers of cargoes. I should have thought that it is not beyond the bounds of probability that a carrier with their experience would be familiar with the operation of the port of Mumbai during the monsoon season and have a reasonable knowledge of the cargo market in respect of cargo they carry there. Once again, however, it will be for the arbitrators in London to hear all the evidence on this and render a decision based on that evidence.

29. I therefore disagree with Mr Young that very significant elements of the quantum of the claim can be dismissed at this stage on the basis that they are excessive and not reasonably recoverable as a matter of English law (see paragraph 23 of his affidavit). Unless and until all the evidence is put to London arbitrators and the issues in dispute are decided by those arbitrators, none of the listed claims put forward by JKI can, in my view be excluded as a matter of principle under English law and Mr Young's assumptions on the evidence are, with respect to him, mere speculation at this stage.

30. I turn finally to deal with Mr Young's comments on costs and interest in paragraph 22 of his Declaration. In relation to costs, he says that the figure claimed of US$500,000 is high (although he does not say what would be a reasonable figure). Again with all due respect to Mr Young, I am sure he will be the first to acknowledge that his experience in dealing with costs assessments and estimates is limited. A barrister in this country does not even negotiate his or her own fees. This is done between the barrister's clerk and the solicitor. As a solicitor I deal on a daily basis with clients who request regular costs breakdowns and estimates and barrister's rarely deal direct with a client.

31. In my view the costs figure of US$500,000 in this case (which can of course only be an estimate at this stage) is not a figure that can be seriously criticised. Indeed less than a month ago in another very similar case involving a claim by shipowners that contaminated fuel caused damage to the vessel's main engine, I provided an estimate of slightly higher than US$500,000. In that case (which is well advanced and as a consequence much of the cost had actually been incurred) there has been no serious criticism of the estimate from the lawyers for the plaintiff. While it is certainly true, as Mr Young says, that London arbitrators have the power to limit the amount of recoverable costs, I have not seen that power exercised in arbitrations except where the way in which one party has conducted the arbitration is open to severe criticism, or where the amount in dispute is very small.

32. In relation to interest, Mr Young criticises both the rate of interest claimed (10.25% simple interest) and the period for which it is claimed (3 years). So far as the rate of interest is concerned, I agree with Mr Young that London arbitrators generally award 2 - 2.5% above prime rate in relation to US dollars to reflect the cost of borrowing. Of course prime rate fluctuates and at this stage JKI can only estimate the interest rate that might be awarded. However, arbitrators do not award simple interest. They have the power to award a compound rate and in my experience of London marine arbitrations they invariably do so. The rate is compounded with 3 monthly stops. So simple interest at 10.25% is higher (although not much higher) than the figure of 8% mentioned by Mr Young because the latter will compounded.

33. In relation to the period of three years for the calculation of interest, which Mr Young describes as excessive, I would only make three points. First, while it is certainly possible that an arbitration could be concluded in less than three years I am afraid it is by no means certain. For example, two of the current London arbitrations with which I am involved and which concern bunker claims similar to the present case were commenced in July and August 2005 respectively and neither is yet near a final hearing. Secondly, the Letter of Undertaking provided by Oldendorff to JKI in this case covers not just the arbitration proceedings but also any appeal to the court from an arbitration award. Three years is not therefore unreasonable as an estimate in my view for both arbitration and appeal proceedings. Thirdly, Mr Young does not mention the fact that Oldendorff calculated interest for 3 years in their Rule B1 attachment proceedings against JKI in New York in July this year. So Oldendorff themselves disagree with him on this point, as do I.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at  1, New Square 14th November 2007.

John Blacker