# Blacker Declaration
# Exhibit 4

were addressed to me. .clusion, however, on e better for me not to ı the extent of *The* ›e the force of Mr. d on the passages in ‹ties and the other *deman v. Scurr*, (1866) he drew my attention. ıay be other, contrary, require a detailed ›r occasion. In these ›ropose to express any

ıst fore reject the ıe n...ıon.

## QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

June 4, 5 and 12, 1980

---

SATEF-HUTTENES ALBERTUS S.p.A.
v.
PALOMA TERCERA SHIPPING CO. S.A.

(THE "PEGASE")

Before Mr. Justice ROBERT GOFF

**Carriage by sea — Deviation — Shipowners delayed in delivering goods to port of discharge — Receivers alleged they suffered loss of profits by reason of delay — Whether owners liable to receivers for damages for loss of profits.**

The claimant receivers carried on business at Vicenza, Italy, importing from Southern Africa, chromite sand for resale mainly to foundries in Italy. On June 24, 1974, they entered into a contract for the purchase of 3100 tonnes of chromite sand at U.S. $44 per tonne f.o.b. Lourenço Marques.

Although the sale was on f.o.b. terms it was agreed that the sellers would charter the vessel and in due course a fixture was concluded under which the sellers chartered *Pegase* from the respondent owners. The charter-party was dated Aug. 19, 1974, and was in the C. Ore 7 form.

The charter was negotiated through Italian brokers (D.) on behalf of the sellers and German brokers (T.) for the owners. Both brokers were aware at the time of the negotiations that *Pegase* had a capacity of 9923 tons deadweight and that the chromite sand would only be a part cargo. Although T. informed D. that another part cargo of 3000 tonnes of sunflower seed would be loaded neither the loading port nor the discharging port were mentioned. D. informed T. of the identity of the sellers as charterers of the vessel and that the cargo had been bought by the receivers who were identified and described as of Vicenza, Italy, and as being "proprietors and receivers"; but neither T. nor the owners were given any information as to the receivers or the nature of their business.

The vessel arrived at Lourenço Marques on Aug. 21, 1974, but had to wait until Aug. 28 for a berth. On Aug. 29 and 30 about 3103.730 tonnes of chromite sand were loaded. A bill of lading was issued incorporating the terms, conditions and exceptions of the charter-party and was subject to The Hague Rules, and it was common ground that the receivers were entitled to sue on the bill of lading.

Although the vessel completed loading on Aug. 30, 1974, she did not deliver her cargo at the discharge port of Porto Marghera until Jan. 17/20, 1975. It was agreed between the receivers and the owners that there had been an admitted deviation of the vessel involving an agreed period of delay of 65 days.

The receivers claimed inter alia: (1) loss of profits; (2) loss brought about by the fact that due to the delay the receivers had to purchase 206 tonnes from their competitors at a high price; and (3) loss of good will.

The owners contended that the cause of the loss of profits was due to the fact that the receivers had failed to keep an adequate stock of chromite sand to cover the anticipated period of carriage from Lourenço Marques to Porto Marghera and to constitute a reserve in the event of some contingency delaying the vessel. They further argued that damages based on a loss of resale profits were not recoverable under a contract of carriage unless at the time of making the contract the shipowners had been given notice that in the event of delay a loss of resale profits was likely to ensue.

The dispute was referred to arbitration and the arbitrator found in favour of the owners but stated his award in the form of a special case, the question of law for decision of the Court being: Whether on the facts found the owners were liable to the receivers for damage for loss of profits other than by way of interest.

——*Held*, by Q.B. (Com. Ct.) (ROBERT GOFF, J.), that (1) on the findings of fact in the special case, it was plain that the receivers did in fact suffer a loss of resale profits by reason of the owners' breach of contract and there was no rule of policy which excluded or restricted recovery of damages from a carrier assessed with reference to a loss of resale profits if on the ordinary principles of law such damages should be awarded (*see* p. 185, col. 2);

(2) the findings by the arbitrator indicated that although the owners had no detailed knowledge concerning the receivers' business they were aware of the possibility of resale and the possibility that there would be no available market for buying in substitute goods (*see* p. 185, col. 2); there was however, no finding in the award that the owners had any knowledge of the extent of the receivers' storage space or of the extent of their stocks and on these findings it was difficult to see how a Court or an arbitrator could conclude that it was sufficiently within the contemplation of the owners that the receivers would have an immediate need of these particular goods for resale to justify a conclusion that the owners were responsible for loss of profits which might have been earned on sales of goods covering the whole period of delay (*see* p. 186, col. 1);

(3) before assessing the damages on the basis of the resale profits actually lost by the receivers the arbitrator ought (a) to have considered whether the actual loss by the receivers was out of the ordinary since the actual resale contracts were not known to the owners; and (b) to have taken into account the fact that the owners had no knowledge of the limited storage space

available to the receivers or of their having run down their stocks or that the receivers had an immediate need of these goods for processing and resale (*see* p. 186, col. 1); and it was necessary for the arbitrator to make some allowance for a period during which stocks might have been used for the purpose of meeting commitments in order to assess the loss of resale profits only by reference to the period during which the owners ought reasonably to have contemplated that it was not unlikely that the receivers would lose resale profits for want of these goods (*see* p. 186, cols. 1 and 2);

(4) as to the receivers' claim for loss of goodwill, it was difficult to see how, on the findings of fact in the award this claim was recoverable in that there were no findings to found a conclusion that the owners ought reasonably to have contemplated any loss of goodwill as not unlikely to result from this breach of contract and without any knowledge of the receivers' business such loss must have been so speculative that it was difficult to see how it could be concluded that this head of claim was not too remote (*see* p. 186, col. 2);

(5) the award would be remitted to the arbitrator for him to make an appropriate award in the light of the principles stated in the judgment (*see* p. 186, col. 2).

---

The following cases were referred to in the judgment:

*Arpad*, The, (C.A.) (1934) 49 Ll.L.Rep. 313; [1934] P. 189;

British Columbia Saw-Mill Co. v. Nettleship, (1868) L.R. 3 C.P. 499;

Gee v. The Lancashire and Yorkshire Railway Co., (1860) 6 H. & N. 211;

Great Western Railway Co. v. Redmayne, (1866) L.R. 1 C.P. 329;

Hadley v. Baxendale, (1854) 9 Ex. 341;

Hall (R. & H.) Ltd. v. W. H. Pim (Junior) & Co. Ltd., (H.L.) (1928) 30 Ll.L.Rep. 159; (1928) 33 Com. Cas. 324;

Heskell v. Continental Express Ltd., (1950) 83 Ll.L.Rep. 438;

Horne v. Midland Railway Co., (1873) L.R. 8 C.P. 131;

Jameson v. The Midland Railway Co., (1884) 50 L.T. 426;

Koufos v. C. Czarnikow Ltd. (The *Heron II*), (H.L.) [1967] 2 Lloyd's Rep. 457; [1969] 1 A.C. 350;

Montevideo Gas and Drydock Co. Ltd. v. Clan Line Steamers Ltd., (1921) 6 Ll.L.Rep. 539; (1921) 37 T.L.R. 544;

O'Hanlan v. The Great Western Railway, (1865) 12 L.T. 490;

Patrick v. Russo-British Grain Export Co., (1927) 28 Ll.L.Rep. 358; [1927] 2 K.B. 535;

Simpson v. The London and North Western Railway Co., (1876) 1 Q.B.D. 274;

Victoria Laundry (Windsor) Ltd. v. Newman Industries Ltd., (C.A.) [1949] 2 K.B. 528;

William Brothers v. Ed. Agius Ltd., (H.L.) [1914] A.C. 510;

Wilson v. The Lancashire and Yorkshire Railway Co., (1861) 9 C.B.(N.S.) 632.

---

This was an arbitration award stated in the form of a special case by the sole arbitrator, Mr. Anthony Diamond, Q.C., in a dispute between the claimant receivers, Satef-Huttenes Albertus S.p.A. and the respondent owners, Paloma Tercera Shipping Co. S.A. concerning the receivers' loss of profits caused by the delay in delivery of receivers' cargo.

Mr. David Johnson, Q.C., and Miss E. Birch (instructed by Messrs. Middleton Potts & Co.) for the receivers; Mr. Bernard A. Rix (instructed by Messrs. Ingledew, Brown, Bennison & Garrett) for the owners.

The further facts are stated in the judgment of Mr. Justice Robert Goff.

Judgment was reserved.

Wednesday, Oct. 22, 1980

---

## JUDGMENT

**Mr. Justice ROBERT GOFF:** There is before the Court an award in the form of a special case stated by a single arbitrator, Mr. Anthony Diamond, Q.C. The award raises for decision the question whether, on the facts found in the award, shipowners whose ship has, in breach of contract, been substantially delayed on her voyage, are liable to receivers for damages in respect of profits lost by the receivers by reason of the delay in delivery of their goods at the port of discharge.

The matter arises as follows. The claimants, Satef-Huttenes Albertus S.p.A. (whom I shall refer to as "the receivers") carry on business at Vicenza in Italy. They import into Italy from Southern Africa chromite sand for resale mainly to foundries in Italy. The respondents, Paloma Tercera Shipping Co. S.A. (whom I shall refer to as "the owners") were at the material time the owners of a ship called *Pegase*. Now the receivers by a sale contract dated June 26, 1974, purchased from another company (which

I shall refer to as "the
about 3100 tonnes of chr
U.S. $44.00 per ton f.o.l
but it was later agreed t
was on f.o.b. terms, the sl
in by the sellers. In due
concluded on Aug. 19, 1
sellers chartered *Pegase* fi
charter-party in the C. Or
and executed. The cha
through Italian brokers (I
the sellers, and German
acted for the owners. It
brokers at the time of
*Pegase* had a capacity
deadweight exclusive of b
appreciated that the chro
part cargo. The only infor
to Delfino about other
owners would load anothe
3000 tons of sunfl[illegible]
loading port nor d[illegible] rgi
cargo was mentioned. De
of the identity of the seller
ship for the part cargo of
also informed them that
bought by the receivers, wh
described as of Vicenza,
"proprietors and receive
found that, apart from thi
the owners were given any i
receivers or the nature of tl
also found that it would h
Thim and to the owners t
commodity merchants wh
contracts for the purchase
chromite sand.

I now come to the voyag
at Lourenço Marques on
then waited until Aug. 28 for
about 3103.730 tonnes of cl
on Aug. 29 and 30. This
subject matter of a bill
incorporated the terms,
exceptions of the char[illegible]-pa
to The Hague Rules. [illegible] as
the arbitration that the receiv
sue on the bill.

Findings of fact about
voyage are set out in pars. 1
case. Although the ship com
cargo of chromite sand on
did not deliver that cargo at
Porto Marghera in Italy, unti
It was agreed between the
receivers that during this pe
admitted deviation of the
agreed period of delay of 6
this agreement, it is unneces
out in detail the events of

h Grain Export Co., 58; [1927] 2 K.B. 535;
n and North Western Q.B.D. 274;
dsor) Ltd. v. Newman ) [1949] 2 K.B. 528;
d. Agius Ltd., (H.L.)
ashire and Yorkshire 9 C.B.(N.S.) 632.

:io ard stated in the ; by the sole arbitrator, nd, Q.C., in a dispute receivers, Satef-Huttenes the respondent owners, ing Co. S.A. concerning rofits caused by the delay ' cargo.

, Q.C., and Miss E. Birch . Middleton Potts & Co.) Bernard A. Rix (instructed v, Brown, Bennison & rs.

e stated in the judgment of ioff.

rved.

y, Oct. 22, 1980 .

DGMENT

R' FF: There is before in the form of a special case arbitrator, Mr. Anthony award raises for decision r, on the facts found in the whose ship has, in breach of stantially delayed on her to receivers for damages in st by the receivers by reason ivery of their goods at the

s as follows. The claimants, ertus S.p.A. (whom I shall eivers") carry on business at They import into Italy from chromite sand for resale s in Italy. The respondents, ipping Co. S.A. (whom I shall wners") were at the material f a ship called *Pegase*. Now sale contract dated June 26, rom another company (which



I shall refer to as "the sellers") a quantity of about 3100 tonnes of chromites and at a price of U.S. $44.00 per ton f.o.b. Lourenço Marques; but it was later agreed that, although the sale was on f.o.b. terms, the ship would be chartered in by the sellers. In due course, a fixture was concluded on Aug. 19, 1974, under which the sellers chartered *Pegase* from the owners; and a charter-party in the C. Ore 7 form was drawn up and executed. The charter was negotiated through Italian brokers (Delfino) who acted for the sellers, and German brokers (Thim) who acted for the owners. It was known to both brokers at the time of the negotiations that *Pegase* had a capacity of about 9923 tons deadweight exclusive of bunkers, and so it was appreciated that the chromite sand would be a part cargo. The only information given by Thim to Delfino about other cargo was that the owners would load another part cargo of about 3000 tons of sunflower seed, though neither loading port nor discharging port for this part cargo was mentioned. Delfino informed Thim of the identity of the sellers as charterers of the ship for the part cargo of chromite sand, and also informed them that this cargo had been bought by the receivers, who were identified and described as of Vicenza, Italy, and as being "proprietors and receivers". The arbitrator found that, apart from this, neither Thim nor the owners were given any information as to the receivers or the nature of their business; but he also found that it would have been obvious to Thim and to the owners that the sellers were commodity merchants who had entered into contracts for the purchase and resale of the chromite sand.

I now come to the voyage. The ship arrived at Lourenço Marques on Aug. 21, 1974. She then waited until Aug. 28 for a berth, and loaded about 3103.730 tonnes of chrome sand in bulk on Aug. 29 and 30. This shipment was the subject matter of a bill of lading, which incorporated the terms, conditions and exceptions of the charter-party, and was subject to The Hague Rules. It was common ground at the arbitration that the receivers were entitled to sue on the bill.

Findings of fact about the details of the voyage are set out in pars. 18-40 of the special case. Although the ship completed loading her cargo of chromite sand on Aug. 30, 1974, she did not deliver that cargo at the discharge port, Porto Marghera in Italy, until Jan. 17/20, 1975. It was agreed between the owners and the receivers that during this period there was an admitted deviation of the ship involving an agreed period of delay of 65 days. In view of this agreement, it is unnecessary for me to set out in detail the events of the voyage. The arbitrator found that the receivers ought reasonably to have expected that the ship would arrive at Porto Marghera at some time between Oct. 5 and 22, 1974, whereas she arrived there on Jan. 16, 1975. The circumstances which led to the prolonged period of the voyage were as follows. (1) Between Aug. 30 and Sept. 19, the ship was waiting for berth, and engaged in loading a further part cargo of about 2000 tonnes of bagged sugar at Lourenço Marques for carriage to Lisbon. (2) Between Sept. 20 and Oct. 3, she was at Durban, carrying out engine repairs and loading the part cargo of sunflower seed, also for carriage to Lisbon. (3) Between Oct. 3 and Oct. 25 she was on her voyage from Durban to Lisbon, but meanwhile on Oct. 30 the owners (without informing the sellers or the receivers) fixed the vessel to load a further part cargo of urea at Antwerp for carriage to Alexandria. (4) Between Oct. 25 and Nov. 9, the vessel discharged the part cargoes of sugar and sunflower seed at Lisbon, and underwent further repairs. (5) Between Nov. 9 and 13 the vessel proceeded to Antwerp. (6) Between Nov. 13 and 21 the vessel loaded her part cargo of urea at Antwerp. (7) Between Nov. 21 and Dec. 1 the vessel proceeded to Alexandria. (8) Between Dec. 1, 1974 and Jan. 12, 1975, the vessel was waiting for a berth (for over a month) at Alexandria, and discharging her cargo of urea there. (9) Between Jan. 12 and 16, 1975, the vessel was proceeding from Alexandria to Porto Marghera.

During this period there were some communications between the parties. On Aug. 30, 1974, Delfino learned from Thim for the first time of the fixture (on Aug. 23) of the ship to carry the part cargo of sugar from Lourenço Marques to Portugal. On Sept. 16, Thim informed Delfino that the ship was expected to sail from Lourenço Marques on Sept. 17/18 for Durban to load her part cargo of sunflower seed for Portugal, but that it was too soon to give the vessel's e.t.a. at Porto Marghera; however on Oct. 4, in response to an urgent request, Thim gave Delfino an approximate e.t.a. at Porto Marghera of Oct. 5-10, 1974. It was after that date, on Oct. 23, that the owners fixed the ship for the part cargo of urea Antwerp/Alexandria. The arbitrator found that at that time it was common knowledge in shipping circles that Alexandria was affected by serious congestion, and that it was or ought reasonably to have been anticipated by the owners that, as a result of the urea fixture, the vessel's arrival at Porto Marghera would be delayed by anything between 50 and 80 days or even longer. On Nov. 8, Thim, again at Delfino's request, gave a revised e.t.a. of Dec. 4 at Porto Marghera. No reason was given for the delay; later on Nov. 18 the receivers learned through other sources that

the vessel was at Antwerp. On Nov. 29 Thim informed Delfino that the ship was bound for Alexandria. There followed further requests for information by Delfino; on Dec. 30 Thim informed them that the ship would berth on Jan. 7 to 8, and on Jan. 6 Thim informed them that she was expected to sail for Porto Marghera on Jan. 11.

Such were the events concerning the voyage. No issue of liability arises in respect of these events, because it was agreed before the arbitrator:

(a) that the passage from Lisbon to Antwerp and Alexandria constituted a deviation which could not be justified by any liberty clause contained in the charter-party or bill of lading;

(b) that accordingly the owners admitted that they were liable for any delay in delivery caused by the deviation; and

(c) that the relevant delay for which the owners were liable was agreed as 65 days.

Furthermore I should record that, despite a passage in the arbitrator's reasons annexed to the award which prompted a notice of motion on behalf of the owners to remit the award to the arbitrator, it has been made plain by the arbitrator in subsequent correspondence that he at no stage tried to suggest that the owners acted otherwise than in good faith; indeed he assumed that the owners bona fide believed that they were entitled to order the deviation to Antwerp and Alexandria.

In the result, the sole issue before the arbitrator was the issue of damages. Before the arbitrator, the receivers advanced the following claim to damages:

(1) Loss of profit on average sales of 800 tonnes of chromite sand per month for 65 days at Italian lire 32.79 per kilo (being the difference between the cost of the chromite sand to the receivers (including carriage to Vicenza, drying and selecting, general and sales expenses) viz. Italian lire 87.21 per kilo, and the price at which the chromite sand would have been sold to customers, viz. Italian lire 120 per kilo). In this connection I should record a finding of fact by the arbitrator that, by reason of the delay of 65 days, the receivers lost sales at the rate of 800 tonnes per month for the duration of that period (save for two parcels of about 206 and 21 tonnes which were respectively purchased and borrowed from the receivers' competitors, Industria Chimica Carlo Laviosa S.p.A. ("Laviosa") of Livorno, which sales could not be and were not made up subsequently.

(2) Loss brought about by the fact that, due to the delay, the receivers had to purchase the quantity of 206 tonnes from Laviosa at a higher price.

(3) Loss of goodwill. The receivers claimed that as a result of the incident some of their customers failed to place repeat orders with them and transferred their custom to the other importer, Laviosa. Under this head, the receivers claimed Italian lire 25,000,000. In this connection I refer to the arbitrator's finding that, by reason of the delay of 65 days, a number of unsatisfied customers of the receivers transferred their custom to Laviosa and were apparently lost to the receivers.

In addition to their main claim as above, the receivers also advanced the following claims:

(4) Loss of interest for 65 days on the f.o.b. price of the chromite sand, freight and insurance premium at the rate of 18.375 per cent. per annum. This claim was alternative to the claim in respect of loss of resale profits.

(5) Exchange loss caused by the delay and due to the necessity to surrender foreign currency under Italian law. This claim amounting to Italian lire 778,542, was admitted by the owners.

(6) An additional insurance premium of Italian lire 2,422,725 on the chromite sand payable by reason of the deviation. This claim was also admitted by the owners.

(7) Deposit under Italian exchange control regulations. The receivers claimed a declaration that, should they be compelled to deposit sums with the Italian exchange control authorities by reason of the delay, then they would be entitled to an indemnity in respect of interest on such deposits.

Of these items, the owners admitted (4) in principle and, as I have recorded, (5) and (6). But they contested items (1), (2) and (3). Apart from matters of detail, and allegations that the receivers had failed to mitigate their damages (which were rejected by the arbitrator), they submitted in particular that the cause of the receivers' loss of profits, need to purchase in and loss of goodwill, were that the receivers had failed to keep an adequate stock of chromite sand to cover the anticipated period of carriage from Lourenço Marques to Porto Marghera and to constitute a reserve in the event of some contingency delaying the arrival of the vessel. But the owners' main contention was as follows (I quote from par. 44 of the special case):

> . . . as a matter of principle, damages based on a loss of resale profits were not recoverable under a contract of carriage unless at the time of making the contract the shipowner had been given notice that, in the event of delay, a loss of resale profits was likely to ensue. The

(Com. Ct.)]
...GOFF, J.]

...Owners contended th... making the contract n... were they put on no... render a loss of resal... law. The Owners cont... price of chrome sand l... the Receivers would... recover damages bas... market price during... since the market price... up during the period... damages recoverabl... consisted of interest o... chrome sand (and on... insurance premium) fo... certain other expenses

viz. the exchar... 'oss... insurance premiu... The... to market was suppor... findings of the arbitrator

56. I find that there... a market for either c... selected and dried chro... sense that chrome san... quantities was not r... purchase and sale a... regularly bought and... Italy.

57. I find that the cu... Italy at which selected... could be sold (if avail... and Laviosa remaine... period October 1974 to... not rise or fall to any a...

58. There was at all... sand available for purc... Marques. I am unable t... to whether the market... F.O.B. Laurenco Marq... the relevant peri... Th... that the price di... ot f... during that period.)

I now come to the... arbitrator, but I must pr... other paragraphs containi... him. First, he made the... fact concerning the busin...

46. The commodity re... sand" in the sale contrac... in the bill of lading is a... chrome ore which is us... process of manufacturi... foundries. I refer to it... sand".

47. At all material ti... two Italian firms eng... import of chrome sand i...

'rom Laviosa at a high

The receivers claimed incident some of their repeat orders with them custom to the other 'nder this head, the ı lire 25,000,000. In this the arbitrator's finding lay of 65 days, a number ıers of the receivers n to Laviosa and were eceivers.

nai im as above, the the .lowing claims:

'or 65 days on the f.o.b. nd, freight and insurance of 18.375 per cent. per ; alternative to the claim ;ale profits.

ısed by the delay and due rrender foreign currency his claim amounting to s admitted by the owners.

insurance premium of on the chromite sand the deviation. This claim the owners.

Italian exchange control /ers claimed a declaration ompelled to deposit sums nge control authorities by ıen they would be entitled ɜspect of interest on such

e ( rs admitted (4) in ave . .orded, (5) and (6). ɜms (1), (2) and (3). Apart il, and allegations that the to mitigate their damages l by the arbitrator), they .lar that the cause of the its, need to purchase in and ɜre that the receivers had lequate stock of chromite ticipated period of carriage ɪues to Porto Marghera and rve in the event of some ʒ the arrival of the vessel. ı contention was as follows 4 of the special case):

principle, damages based on rofits were not recoverable ɪf carriage unless at the time ɔntract the shipowner had that, in the event of delay, a its was likely to ensue. The

Owners contended that neither at the time of making the contract nor at any time thereafter were they put on notice of facts such as to render a loss of resale profits recoverable in law. The Owners contended that if the market price of chrome sand had fallen in the 65 days, the Receivers would have been entitled to recover damages based on the fall of the market price during that period; but that, since the market price had, if anything, gone up during the period of the delay, the only damages recoverable by the Receivers consisted of interest on the FOB price of the chrome sand (and on the prepaid freight and insurance premium) for 65 days, together with certain other expenses . . .

viz. the exchange loss and the additional insurance premium. The owners' submission as to market was supported by the following findings of the arbitrator:

> 56. I find that there was at no material time a market for either crude chrome sand or selected and dried chrome sand in Italy in the sense that chrome sand in large commercial quantities was not regularly available for purchase and sale and was not in fact regularly bought and sold by merchants in Italy.
>
> 57. I find that the current domestic price in Italy at which selected and dried chrome sand could be sold (if available) by the Receivers and Laviosa remained steady during the period October 1974 to January 1975 and did not rise or fall to any appreciable extent.
>
> 58. There was at all material times chrome sand available for purchase F.O.B. Laurenco Marques. I am unable to make any findings as to whether the market price for chrome sand F.O.B. Laurenco Marques rose or fell during the relevant period. (There was some evidence that the price did not fall but may have risen during that period.)

I now come to the conclusions of the arbitrator, but I must preface these by certain other paragraphs containing findings of fact by him. First, he made the following findings of fact concerning the business of the receivers.

> 46. The commodity referred to as "chromite sand" in the sale contract and "chrome sand" in the bill of lading is a fine, granular type of chrome ore which is used, inter alia, in the process of manufacturing metal castings in foundries. I refer to it herein as "chrome sand".
>
> 47. At all material times there were only two Italian firms engaged in the regular import of chrome sand into Italy. These were the receivers who imported it through Porto Marghera and . . . Laviosa . . . who imported it through the port of Livorno.
>
> 48. Both the Receivers and Laviosa imported chrome sand by purchasing it from firms resident outside Italy under contracts of sale which provided for delivery FOB Lourenco Marques or under contracts of sale (such as CIF contracts) on similar terms.
>
> 49. The chrome sand so imported was then sold after arrival by the Receivers and Laviosa respectively in comparatively small quantities to regular customers who were in most instances foundries, that is to say who were the ultimate consumers of the chrome sand.
>
> 50. Apart from purchasing chrome sand FOB Lourenco Marques (which would normally involve the charter of a ship to carry the chrome sand), the only other possible source of supply was that chrome sand imported through the port of Antwerp might be available for sale in Belgium, Holland or Germany. Due to the high cost of transporting such chrome sand by road or rail from the North of Europe to Italy, a purchase of chrome sand from this source was in most cases prohibitively expensive.
>
> 51. The Receivers' business practice with regard to the marketing of chrome sand was at all times as follows:
>
> (a) A small proportion (about 5 per cent) of the chrome sand imported by them was supplied directly to the foundries of their customers in its crude humid state.
>
> (b) The remainder (about 95 per cent) was dried and selected so as to remove impurities at the Receivers' works at Vicenza. It was then supplied either in bulk (as to about 45 per cent) or in bags (as to about 50 per cent) to their customers.
>
> (c) The processes of drying selecting and bagging (the processes carried on at the Receivers' works) were such that the Receivers' capacity to process goods was constant and could not suddenly be increased.
>
> (d) Processing was carried out at an average rate of 800 tons a month.
>
> (e) There was limited storage capacity for chrome sand at the Receivers' works. The storage capacity was normally limited to about 4,000 tons though by compressing the storage to the maximum extent 4500 tons could be accommodated.
>
> (f) The Receivers tried, so far as possible, to ensure that at any one time they had

sufficient chrome sand in store to supply between 2 and 3 months' sales (i.e. 1600 to 2400 tons). Commonly they would have 2,000 to 3,000 tons in store. But if a large shipment of chrome sand was expected, then because of the limitations of storage space, the Receivers would schedule the arrangements for the supply of the new shipment so that, by the time it was expected to arrive, the amount of chrome sand in stock had been run down to the extent necessary to provide storage space for the new shipment.

(g) After processing the selected and dried chrome sand was supplied in relatively small consignments (the great majority ranged from less than one ton to 30 tons) to a limited number of regular long-term customers who normally ordered the whole of their requirements from the Receivers.

(h) The great majority of the Receivers' regular customers had foundries in Italy, though a minority of sales were effected to neighbouring countries such as France, Austria and Jugoslavia.

(i) At the time of the "Pegase" shipment, the Receivers imported and sold about 55 to 60 per cent of the chrome sand imported into Italy, the remainder being imported and sold by Laviosa.

52. The shipment of 3,000 tons of chrome sand on the "Pegase" was one of the largest imported by the Receivers but two consignments of a similar or larger size had been imported by them in 1973. In order to ensure that there was sufficient storage space to accommodate the "Pegase" cargo, the Receivers so arranged matters that by October 1974, when the vessel was expected to arrive at Porto Marghera, their stock of chrome sand had been run down. On 1st October the Receivers had about 1300 tons of chrome sand in stock. On 31st October the Receivers' stock in hand amounted to only about 325 tons. Some ten days thereafter the Receivers ran out of stock.

53. When the vessel did not arrive the Receivers made all reasonable endeavours to purchase other chrome sand to meet their customers' requirements. Save for a parcel of about 206 tons purchased from Laviosa (the maximum available) and another parcel of about 21 tons borrowed from Laviosa (and subsequently replaced in kind) the Receivers were unable to obtain any supplies. The main reasons were:

(i) the lack of alternative supplies in Italy;

(ii) the prohibitive cost of chrome sand from the North of Europe;

(iii) the lack of reliable information from the Owners as to the delays affecting the vessel;

(iv) the delay likely to be involved in purchasing more goods FOB Lourenco Marques;

(v) that 2000 tons of goods were due to arrive on the vessel and if other goods were purchased FOB Lourenco Marques, there might be insufficient storage space for both consignments.

Next, the arbitrator made the following findings of fact concerning the effect of the owners' breach of contract, in addition to the matters I have already referred to.

59. The loss suffered by the Receivers, as a result of the delay of 65 days for which liability was admitted, was as follows:

(1) *Loss of Profit*

I find (subject always to the question of law hereinafter set out) that the Receivers suffered a loss of resale profits as a result of the delay in the arrival of the vessel for 65 days, as follows:

| | |
|---|---|
| (a) Loss of profit on sales during 65 days | Lit. 54,795,650 |
| (b) Loss of profit due to loss of repeat orders from regular customers | 25,000,000 |
| | Lit. 79,795,650 |

*Alternatively*

| | |
|---|---|
| If the Receivers' loss should be quantified on the basis of loss of interest on the FOB price of the chrome sand, I find that the loss of interest amounted to | Lit. 5,832,582 |
| (2) *Exchange Loss* | 778,542 |
| (3) *Additional Insurance Premium* | 2,422,725 |

On the basis of these findings of fact, the conclusion of the arbitrator was that the owners were not liable to the receivers for damages for loss of profit, and therefore that the receivers were only able to recover the sum in respect of interest, together with the sums in respect of exchange loss and additional insurance premium. He attached to his award a document setting out his reasons for reaching that conclusion. I shall return to that in a moment. Before leaving his award, I must set out certain paragraphs which contain the arbitrator's findings regarding

iable information from
ie delays affecting the

ely to be involved in
oods FOB Lourenco

of goods were due to
and if other goods were
urenco Marques, there
storage space for both

r made the following
erning the effect of the
tra n addition to the
refe d to.

ed by the Receivers, as a
of 65 days for which
d, was as follows:

always to the question of
t out) that the Receivers
resale profits as a result of
arrival of the vessel for
rs:

fit on
ays Lit. 54,795,650
ofit due to
lers from
s 25,000,000
Lit. 79,795,650

rs' loss
ified on the
nt on
f the
find that
est
Lit. 5,832,582
778,542
irance 2,422,725

these findings of fact, the
bitrator was that the owners
ie receivers for damages for
therefore that the receivers
cover the sum in respect of
with the sums in respect of
lditional insurance premium.
award a document setting
reaching that conclusion. I
in a moment. Before leaving
set out certain paragraphs
rbitrator's findings regarding

the knowledge of the owners at the time of entering into the contract, and how far a loss of resale profits by the receivers might at that time have been contemplated by the owners as resulting from the breach which in fact occurred.

60. Before and at the time of making the charterparty fixture (19th August 1974) and at the time of shipment (29th to 30th August 1974) the following facts were known to the Owners and their brokers, Thim:

(a) that chrome ore and chrome sand are high-grade ores used for special purposes and accordingly carry a higher rate of freight than, for example, iron ore;

(b) that there was about a 50 per cent chance that the cargo would be sold on or shortly after arrival of the vessel at Porto Marghera either by the Receivers or by the ultimate holders of the bill of lading who would present it and take delivery of the goods thereunder;

(c) that different types of chrome ore are used for different specialised industrial purposes;

(d) that there was about a 50 per cent chance that if the chrome ore did not arrive in Italy or only arrived there after a substantial delay, the Receivers or other holders of the bill of lading would be unable to replace it by purchases made for spot delivery in Italy and would only be able to replace it after a considerable delay by purchases made for delivery at source, i.e. for delivery at Lourenco Marques.

61. At no material time did the Owners or their brokers, Thim, have any knowledge of the Receivers' business practices as summarised at paragraph 51.

62. In so far as it is a question of fact I find and in so far as it is a question of law I hold (subject to the opinion of the Court) that if the Owners and their brokers had considered at any time in August 1974 whether a deviation likely to result in a delay in delivery of between 50 and 80 days would cause the Receivers to suffer a loss of resale profits they would have considered that there was serious possibility that such a loss would be so caused, and indeed, that it was not unlikely to be so caused.

The question of law posed by the arbitrator for the decision of the Court was as follows:

> Whether on the facts found the Owners are liable to the Receivers for damages for loss of profit other than by way of interest.

That question the arbitrator answered, subject to the opinion of the Court, in the negative.

So the question which the Court has to consider in the present case is whether, on the facts found in the special case, the owners are liable to the receivers for loss of profit. As I have already indicated, the arbitrator's conclusion was that they were not. His conclusion was founded (as his detailed reasons show) on his understanding that it has long been the policy of the law to reject claims for loss of profit against carriers, unless "special circumstances" were communicated at the date of the contract. With great respect to the learned arbitrator, my own reading of the authorities leads me to conclude that there is no such rule of policy.

When a plaintiff claims damages from a defendant, he has to show that the loss in respect of which he claims damages was caused by the defendant's wrong, and also that the damages are not too remote to be recoverable. The principle of remoteness of damage is a limiting principle of policy, and the principles applicable in contract and tort are not the same (see *Koufos v. Czarnikow Ltd. (The Heron II)*, [1967] 2 Lloyd's Rep. 457; [1969] 1 A.C. 350). In contract, the general principle of remoteness of damage was authoritatively stated by Baron Alderson when he delivered the judgment of the Court of Exchequer in the leading case of *Hadley v. Baxendale*, (1854) 9 Ex. 341 at p. 354; and there are several cases decided in the second half of the 19th century in which the principle so stated was applied, including cases concerning the liability of carriers (as indeed was *Hadley v. Baxendale* itself). It is on cases such as these that the arbitrator particularly relied in reaching his conclusion. But the law has not stood still since that time; and, although the principle stated in *Hadley v. Baxendale* remains the fons et origo of the modern law, the principle itself has been analysed and developed, and its application broadened, in the 20th century.

The crucial passage in Baron Alderson's statement of principle reads as follows:

> . . . Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, i.e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it.

This statement of principle was at one time widely understood to embrace two "rules", the first rule being concerned with the recovery of damages arising naturally, i.e., according to the usual course of things, and the second rule being concerned with recovery of damages within the contemplation of the parties at the time when the contract was made. Furthermore, the application of the second rule was understood to be dependent upon knowledge of special circumstances which had not merely been communicated by the plaintiff to the defendant at or before the time when the contract was made (a requirement which is consistent with one reading of the succeeding passage in Baron Alderson's judgment), but had been so communicated that the defendant, by entering into the contract, assented expressly or impliedly to assuming the risk of loss flowing from such special circumstances. Thus in *British Columbia Saw-Mill Co. v. Nettleship*, (1868) L.R. 3 C.P. 499, a case concerned with the liability of a carrier, Mr. Justice Willes said (at p. 509) that—

> . . . Knowledge on the part of the carrier is only important if it forms part of the contract.

Again, in the application of the so-called two rules in *Hadley v Baxendale*, it has been said that in the absence of special circumstances so communicated certain heads of damage are irrecoverable. In particular, it has been held in a number of cases concerned with breach of contract of carriage that a loss of profits on sub-sales was irrecoverable (see, e.g., *Wilson v. The Lancashire and Yorkshire Railway Co.*, (1861) 9 C.B.(N.S.) 632, *O'Hanlan v. The Great Western Railway*, (1865) 12 L.T. 490, *Great Western Railway Co. v. Redmayne*, (1866) L.R. 1 C.P. 329, *Horne v. Midland Railway Co.*, (1873) L.R. 8 C.P. 131, *The Arpad*, (1934) 49 Ll.L.Rep. 313; [1934] P. 189, and *Heskell v. Continental Express Ltd.*, (1950) 83 Ll.L.Rep. 438). In contracts of carriage, damages for loss of user profits have also been held to be irrecoverable in a number of cases (see e.g., *Hadley v. Baxendale*, *Gee v. The Lancashire and Yorkshire Railway Co.*, (1860) 6 H. & N. 211, and *British Columbia Saw-Mill Co. v. Nettleship* — *Gee*'s case being concerned with raw materials for a factory, and the other two cases with machinery for factories).

Now, as I have already said, the law has not stood still since *Hadley v. Baxendale*. First, the principle originally enunciated in that case has been restated, in particular in two cases — by the Court of Appeal in *Victoria Laundry (Windsor) Ltd. v. Newman Industries Ltd.*, [1949] 2 K.B. 528, and by the House of Lords in *The Heron II*. In the *Victoria Laundry* case, Lord Justice Asquith (who delivered the judgment of the Court) restated the principle in terms of foreseeability (see p. 539)—

> the aggrieved party is only entitled to recover such part of the loss actually resulting as was at the time of the contract reasonably foreseeable as liable to result from the breach . . .

and further he stated that what was so foreseeable depends on the knowledge of the party in breach at the time the contract was made — such knowledge being either imputed, i.e., knowledge of the ordinary course of things which everyone is taken to know, or actual knowledge by him at that time of special circumstances outside the ordinary course of things. In *The Heron II*, their Lordships were in general unwilling to accept foreseeability as the criterion of remoteness in contract, considering it to be more appropriate to liability in tort. Lord Reid, for example, preferred as a criterion for contractual liability the test whether the damages claimed were within the contemplation of the defendant at the time of the contract in the sense of being "not unlikely" to result from the breach. Others of their Lordships used different phraseology; but the thread running through the speeches is that the damages must have been within the contemplation of the defendant, not in the sense that they were probable (which would be too strict a test) but rather in the sense that there was a serious possibility of their occurrence or that they were not unlikely to occur. The general result of the two cases is that the principle in *Hadley v. Baxendale* is now no longer stated in terms of two rules, but rather in terms of a single principle — thought it is recognized that the application of the principle may depend on the degree of relevant knowledge held by the defendant at the time of the contract in the particular case. This approach accords very much to what actually happens in practice; the Courts have not been over-ready to pigeon-hole the cases under one or other of the so-called rules in *Hadley v. Baxendale*, but rather to decide each case on the basis of the relevant knowledge of the defendant.

The second development has been a loosening of the rule, stated in earlier cases (of which *British Columbia Saw-Mill Co. v. Nettleship* is a typical example) that knowledge by the defendant of special circumstances is only relevant if so communicated to him that he, by entering into the contract, assented expressly or impliedly to assuming the risk of loss flowing from such special circumstances. Indeed, in *The Heron II*, Lord Upjohn (at pp. 484-485 and 421-422) expressly dissented from the proposition that liability for damages resulting from special circumstances must be made a term of the contract. The decided cases appear to support the opinion so expressed by Lord

Upjohn. In some cases, the Courts appear to be prepared to take into account knowledge of special circumstances (i.e., circumstances outside the ordinary course of things) although such knowledge was not communicated by the plaintiff to the defendant — such as knowledge of the nature of the plaintiff's business (see, e.g., *Simpson v. The London and North Western Railway Co.*, (1876) 1 Q.B.D. 274, and the *Victoria Laundry* case) or knowledge of the existence of a market (e.g., knowledge of the defendants in *The Heron II* that there was a market in sugar at the discharging port, Basra). In other cases, however, the Courts appear to have considered that the special circumstances should have been specifically drawn to the attention of the defendant by the plaintiff — as in *Hadley v. Baxendale* and *British Columbia Saw-Mill Co. v. Nettleship*, both cases being concerned with a claim to damages by reason of the plaintiff's factory being prevented from working on account of late delivery of a part of machinery by the defendant carrier. In the light of the decided cases, the test appears to be: have the facts in question come to the defendant's knowledge in such circumstances that a reasonable person in the shoes of the defendant would, if he had considered the matter at the time of making the contract, have contemplated that, in the event of a breach by him, such facts were to be taken into account when considering his responsibility for loss suffered by the plaintiff as a result of such breach. The answer to that question may vary from case to case, taking into consideration such matters as, for example, the nature of the facts in question and how far they are unusual, and the extent to which such facts are likely to make fulfilment of the contract by the due date more critical, or to render the plaintiff's loss heavier in the event of non-fulfilment.

The two governing principles — the principle of causation and the limiting principle of remoteness of damage — provide, in their developed form, the solution to most problems of damages. Furthermore, I can find in the cases no rule of policy either excluding, or imposing special criteria in respect of, the recovery of damages for loss of profits, whether the relevant contract be a contract of sale or a contract of carriage, whether the breach be non-delivery or delayed delivery, and whether the profits claimed to have been lost are resale profits or profits from loss of use (which I shall call user profits). It is true that, in point of fact, lost profits are seldom recovered as damages; but that appears to follow simply from the application of the ordinary principles of causation and remoteness. This experience is reflected in the prima facie or normal measures of damages that are applied, almost as a matter of course, in so many cases. These prima facie measures of recovery are simply practical rules of thumb, of great usefulness, which are applicable in a large number of cases. Thus in contracts of sale of goods, where there is an available market for the goods the prima facie measure of damages for non-delivery is the difference between the contract price of the goods and their market price at the time when they ought to have been delivered (see s. 51 (3) of the Sale of Goods Act, 1893). A similar prima facie measure of damages applies in cases of delayed delivery; and the contrast between contract and market price may similarly provide the prima facie measure of damages for breach of other contracts, e.g., the repudiation of a time-charter. But it is to be observed that, in each of these cases, the prima facie measure of damages presupposes the existence of an available market for the goods at the date of breach. This is because the existence of an available market will generally mean that the innocent party can, at the date of breach, acquire a substitute from the market — for example, in cases of sale, the buyer can buy in substitute goods. That being so, he cannot usually say that the breach has *caused* the loss of any particular profits: the principle of causation normally excludes, in such cases, a recovery of damages in respect of lost profits.

Where there is no available market, the situation is somewhat different. The normal measure, typified by s. 51 (3) of the Sale of Goods Act, cannot apply. In such a case, however, it is usual to apply a measure assessed with reference to the value of the goods to the innocent party at the date when, and the place where, the contract ought to have been performed; and furthermore that value commonly includes, in a commercial contract at least, a sum to allow for a reasonable profit. In cases concerned with contracts of carriage, at least, such an approach has a respectable ancestry: see, e.g., *O'Hanlan v. The Great Western Railway*, (1865) 12 L.T. 490, in which Mr. Justice Blackburn said—

> . . . Where there is no market, we have no such means of settling the market value, and it must be ascertained by taking into consideration various matters, including, in addition to cost price and expenses of transit, reasonable importer's profits.

In my own experience such a measure is habitually adopted in cases of short delivery by carriers under contracts of carriage by sea, where there is no evidence of an available market at the place of discharge. In such cases, the effect is that loss of profits is reflected in the measure of damages, though only a loss of reasonable profit. It is true that, in cases of

non-delivery under contracts of sale or carriage, for the purpose of assessment of damages the valuation of the goods at the time when they should have been delivered will not generally be based upon any resale price for which they have been sold by the buyer or goods-owner under any advance or intermediate contract of sale (though a resale price may, in an appropriate case, provide evidence of their value): see, e.g., *Williams Brothers v. Ed. T. Agius Ltd.*, [1914] A.C. 510, and *The Arpad*, (1934) 49 Ll.L.Rep. 313; [1934] P. 189. But even in such cases, damages based upon the resale price may be recoverable. Thus, in a contract of sale, if at the time of making the contract it was sufficiently within the contemplation of the seller that the buyer would resell the goods and there was no available market to buy in substitute goods, or that the buyer would resell the goods on such terms as to exclude the possibility of buying in on the market, the damages may be assessed with reference to the resale price, provided of course that the resale price does not arise from "extravagant and unusual bargains" — see, e.g., *Patrick v. Russo-British Grain Export Co.*, (1927) 28 Ll.L.Rep. 358; [1927] 2 K.B. 535, and in particular *R. and H. Hall Ltd. v. W. H. Pim (Junior) & Co. Ltd.*, (1928) 30 Ll.L.Rep. 159; (1928) 33 Com. Cas. 324 (especially at pp. 162 and 330, per Viscount Dunedin), a decision referred to with approval in *The Heron II* (see pp. 465-466 and 386-388, per Lord Reid). Recovery in respect of lost resale profits has also been allowed in cases of late delivery under contracts of carriage, at least where the carrier has sufficient knowledge of the market conditions to render such damages not too remote in law (see *Simpson v. The London and North Western Railway Co.*, and *Jameson v. The Midland Railway Co.*, (1884) 50 L.T. 426). In any event however, lost resale profits at unusually high prices can never be recovered unless the defendant has sufficient knowledge of the resale price at or before the time when the contract was made, so that it was within the reasonable contemplation of the defendant that he was assuming responsibility for the risk of such loss in the event of late delivery; indeed, to achieve this result, it may well be necessary for the plaintiff to have specifically drawn to the attention of the defendant the reason why due performance was of such critical importance to him. A leading case in which such damages were held to be irrecoverable from a carrier is *Horne v. Midland Railway Co.*, (1873) L.R. 8 C.P. 131.

Claims for damages for loss of user profits appear from the cases to rest upon similar principles. Once again, there appears to be no rule of policy excluding, or restricting, the recovery of such damages: everything depends on the circumstances of the particular case. The cases are often cases of delayed delivery rather than non-delivery, though this should make no difference in principle. Since in many cases, in particular in many cases concerned with contracts of carriage, the carrier may have no knowledge or means of knowledge of whether the goods will be put to any particular use, it is sometimes said that the normal measure of damages for delayed delivery simply reflects a rate of interest upon the value of the goods over the period of delay. But it may require only a modest degree of knowledge to entitle the plaintiff to recover damages based on a reasonable profit which might have been earned during the period of loss of use, as for example in the *Victoria Laundry* case itself (though that case was of course concerned with a contract of sale); but more will be required before a defendant carrier can be held liable for particularly high profits which have been lost or for particularly catastrophic results if the goods are delivered late — for example, the stoppage of a whole factory for want of machinery or raw materials, as in *Hadley v. Baxendale*, *Gee*'s case and *British Columbia Saw-Mill Co. v. Nettleship*. In such cases, it may well be necessary for the plaintiff to have brought home to the defendant, at or before the time when the contract was made, the critical need for delivery on the due date, because it can be said that without such notice no defendant could reasonably have contemplated that he was assuming responsibility for the relevant loss in the event of breach. The *Victoria Laundry* case was, as I have said, a case of sale of goods; and no doubt there is a greater likelihood, in cases of sale as opposed to cases of carriage, of the defendant having sufficient knowledge of the goods or of the nature of the plaintiff's business to appreciate the effect of, for example, late delivery. But it is not difficult to envisage a carrier being held responsible for damages for loss of user profits in a case where, for example, a railway locomotive consigned by sea to a railway company was delivered late, even though nothing specific was communicated at or before the time of making the contract concerning the use to which the goods were to be put. Indeed, in comparable circumstances damages for loss of user profits were held to be recoverable against a carrier in *Montevideo Gas and Drydock Co. Ltd. v. Clan Line Steamers Ltd.*, (1921) 6 Ll.L.Rep. 539; (1921) 37 T.L.R. 544, a case in which the defendant owners mistakenly delivered to a gas company steam coal instead of gas coal. Mr. Justice Roche (as he then was) said (at pp. 541 and 545):

> . . . Mr. Stuart Bevan contends that the rule as to the contemplation of the parties is more rigidly applied or has a greater effect in limiting damages in cases of breaches of

' delayed delivery rather
gh this should make no
Since in many cases, in
cases concerned with
he carrier may have no
f knowledge of whether
any particular use, it is
he normal measure of
elivery simply reflects a
value of the goods over
it it may require only a
owledge to entitle the
damages based on a
might have been earned
ss e, as for example
ca... itself (though that
erned with a contract of
be required before a
n be held liable for
which have been lost or
phic results if the goods
r example, the stoppage
vant of machinery or raw
v. Baxendale, Gee's case
w-Mill Co. v. Nettleship.
well be necessary for the
it home to the defendant,
when the contract was
for delivery on the due
be said that without
dant could reasonably
hat he was assuming
elevant loss in the event
a Laundry case was, as I
of goods; and no doubt
hood, in cases of sale as
rriage, of the defendant
vledge of the goods or
plaintiff's business to
o or example, late
t c ult to envisage a
onsible for damages for
case where, for example,
consigned by sea to a
elivered late, even though
mmunicated at or before
contract concerning the
s were to be put. Indeed,
stances damages for loss
held to be recoverable
ntevideo Gas and Drydock
Steamers Ltd., (1921) 6
37 T.L.R. 544, a case in
ners mistakenly delivered
n coal instead of gas coal.
s he then was) said (at

an contends that the rule
ion of the parties is more
has a greater effect in
n cases of breaches of

contract of carriage than it has in cases of breaches of contract of sale. In a sense I think this is true and is a natural result of the fact that a carrier is supposed to know less about the commodity he carries and to undertake less responsibility in connexion with it than a seller of the same commodity would be supposed to do. The case strongly relied upon by the defendants in this regard is *British Columbia Saw-Mill Co. v. Nettleship*, (L.R. 3 C.P. 499). In the present case certain facts and certain consequences, now made the basis of a claim, did, I think, fall outside the contemplation of the parties, as, for example, the extremity of the plaintiffs' necessity, which drove them to cereals as a substitute for coals. For this and other reasons I exclude as irrecoverable certain items of the plaintiffs' claim. On the other hand, I hold that the defendants did know that the coal was required, and urgently required, for the making of gas and knew that gas coal in substitution for this coal was or might well be unobtainable within any reasonable time. I do not accept the evidence given by the defendants' witness as to the slender extent of their knowledge. It must, in my opinion, be taken to have been within the knowledge and contemplation of the defendants that steam coal would make less gas and by-products than gas coal, and that if they delivered steam coal instead of gas coal they must make good the deficiency in money. These matters are not matters peculiar to the plaintiffs' business but to all gas makers, as the plaintiffs were known to be. In the case of *Cory v. Thames Ironworks* (L.R. 3 Q.B. 181), the plaintiffs claimed certain damages peculiar to their special object in buying a hulk. This they failed to recover, but they recovered a smaller sum of £420 as loss which would have arisen in any event by the non-supply of a hulk if it had been intended for use for ordinary business purposes. That case was a case of sale of goods, but in my view on facts such as I find here the same measure of responsibility is to be applied to the carrier. On appropriate facts, the responsibility of a carrier may extend to loss of a very special character. (See *Simpson v. London and North Western Railway Company*, 1 Q.B.D. 274; and *Schulze v. Great Eastern Railway Company*, 3 The Times L.R. 635; 19 Q.B.D. 30.) On other facts it may be less extensive. (See *Horne v. Midland Railway Company*, L.R. 8 C.P. 131.) In truth distinctions between the liability of a carrier and a seller depend on matters of fact and not of law.

That the difference between recoverable damages in contracts of sale and contracts of carriage depends on questions of fact rather than law, has since been stressed both in the *Victoria Laundry* case (at pp. 536-537, per Lord Justice Asquith) and in *The Heron II* (at pp. 485 and 424, per Lord Upjohn). Such a conclusion is inconsistent with any rule of policy excluding, or limiting, the recovery of damages against a carrier; rather it presupposes that the same principles are applicable in contracts of sale and of carriage, though the application of those principles may lead to different conclusions.

With these principles in mind I turn to the case now before me. On the findings of fact in the special case, it is plain that the receivers did in fact suffer a loss of resale profits by reason of the owners' breach of contract. Next, for the reasons I have given, I know of no rule of policy excluding or restricting recovery of damages from a carrier assessed with reference to a loss of resale profits, if on the ordinary principles of law such damages should be awarded. I turn therefore to the findings of fact relating to the owners' knowledge and contemplation at the time when the contract of carriage was made. From these, it appears that the owners had no detailed knowledge concerning the receivers' business, but the arbitrator found (see par. 60 of the special case) that the owners knew:

> (b) that there was about a 50 per cent chance that the cargo would be sold on or shortly after arrival of the vessel at Porto Marghera either by the Receivers or by the ultimate holders of the bill of lading who would present it and take delivery of the goods thereunder;
>
> . . .
>
> (d) that there was about a 50 per cent chance that if the chrome ore did not arrive in Italy or only arrived there after a substantial delay, the Receivers or other holders of the bill of lading would be unable to replace it by purchases made for spot delivery in Italy and would only be able to replace it after a considerable delay by purchases made for delivery at source, i.e. for delivery at Lourenco Marques.

Now these findings of fact go to the contemplation of the owners regarding the possibility of resale, and the possibility that there would be no available market for buying in substitute goods. But there is a significant gap in these findings of fact. In the case of *Hall v. Pim*, the defendants were held to have contemplated the possibility of resale of the goods as specific goods; there is however no finding of fact to justify any such conclusion in the present case. Indeed, the present case is concerned not with a claim for loss of resale profits on the goods which were delivered late, but rather with a claim for profits lost through want of raw material over a period of time. In these circumstances, the authority which is

perhaps most apposite is *Gee*'s case, in which a carrier of raw materials (cotton) who had no knowledge, either from express notice or from general knowledge of the course of business in the district, that the plaintiff had an urgent need for the prompt delivery of the raw material at his mill (which was a new mill, and held no stock of cotton), was held not responsible for wasted expenses and lost profits when, the goods having been delivered four days late, the mill was at a standstill during that period for want of raw material. In the present case, as we know from the facts found in the special case (see par. 51 (f)), the receivers had, because of limitation of storage space, run down their stocks to provide storage space for the expected shipment; but, not surprisingly, there is no finding that the owners had any knowledge of the extent of the receivers' storage space, or of the extent of their stocks. On these findings, it is difficult to see how a Court or an arbitrator could conclude that it was sufficiently within the contemplation of the owners that the receivers would have an immediate need of these particular goods for resale, to justify a conclusion that the owners were responsible for loss of profits which might have been earned on sales of goods covering the whole period of delay. No doubt the owners could, on their knowledge at the time of making the contract, reasonably have contemplated as not unlikely that (in the event of there being no available market for buying in substitute goods except after a considerable delay) the receivers would, after a delay so great as in the present case, lose some resale profits, as indeed is the arbitrator's conclusion in par. 62 of the award; and a conclusion, on the facts found, that the owners should, on the knowledge available to them, have reasonably understood that they were assuming responsibility for such a loss in the event of a considerable delay appears to me to be unobjectionable in point of principle. But before assessing the damages on the basis of the resale profits actually lost by the receivers, the arbitrator ought, in my judgment, to have considered two questions in particular. First, since the actual resale contracts were not known to the owners, he should have considered whether the actual profits lost by the receivers were out of the ordinary; clearly, they should not be entitled to recover profits for "extravagant or unusual bargains", but only at a reasonable level. Second, and more important, the arbitrator should have taken into account the fact that the owners had no knowledge of the limited storage space available to the receivers or of their having run down their stocks, and (as I understand the position) had no knowledge that the receivers had an immediate need of these goods for processing and resale. That being so, it was necessary for the arbitrator to make some allowance for a period during which stocks might have been used for the purpose of meeting commitments, in order to assess the loss of resale profits only by reference to the period during which, on the knowledge available to them, the owners (had they considered the position) ought reasonably to have contemplated that it was not unlikely that the receivers would lose resale profits for want of these goods. Such an exercise may well be a difficult one, and may call for a somewhat arbitrary conclusion; but it is an exercise which has, in my judgment, to be carried out if the principles of law are to be properly applied to the facts of the present case.

Finally I must refer to the receivers' claim for damages for loss of goodwill. They claimed Italian lire 25,000,000 on the ground that, by reason of the incident, some of their customers failed to place repeat orders with them and transferred their custom to Laviosa; and the arbitrator found that the delay of 65 days did have the effect that a number of unspecified customers of the receivers did transfer their custom to Laviosa and were permanently lost to the receivers, the resulting loss of profit to the receivers being assessed by him at the claimed figure of Italian lire 25,000,000. Even so, I do not see how, on the findings of fact in the award, this head of claim was recoverable by the receivers from the owners; because (quite apart from the fact that, on the findings of fact, it resulted from the whole delay of 65 days) there are no findings of fact in the award to found a conclusion that the owners ought reasonably to have contemplated any loss of goodwill as not unlikely to result from this breach of contract. Indeed, without any knowledge of the receivers' business or of the circumstances in which they traded, any loss of goodwill must have been so speculative that it is difficult to see how it could be concluded that this head of claim was not too remote.

In the light of this judgment, I do not propose simply to answer the question of law in the affirmative. If I were to do so, the effect would be that the arbitrator's award would automatically come into effect, and, as I understand the position, that alternative award may have been made without taking into consideration the question whether the profits actually lost by the receivers were in any way out of the ordinary, and was made without taking into account the owners' lack of knowledge of the receivers' storage facilities or stocks. In all the circumstances, I consider that my proper course is to order that the award be remitted to the arbitrator, for him to make an appropriate award of damages in the light of the principles stated in this judgment.

---