# Blacker Declaration Exhibit 5

Neutral Citation Number: [2007] EWCA Civ 901

Case No: A3/2006/2651

IN THE SUPREME COURT OF JUDICATURE
COURT OF APPEAL (CIVIL DIVISION)
ON APPEAL FROM QUEEN'S BENCH DIVISION (COMMERCIAL COURT)
MR JUSTICE CHRISTOPHER CLARKE
[2006] EWHC 3030 (Comm)

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 06/09/2007

Before :

**LORD JUSTICE WARD**
**LORD JUSTICE TUCKEY**
and
**LORD JUSTICE RIX**
- - - - - - - - - - - - - - - - - - - - -
Between :

**Transfield Shipping Inc of Panama**

**Appellant/ Charterers**

- and -

**Mercator Shipping Inc of Monrovia**
(*The "Achilleas"*)

**Respondent / Owners**

(Transcript of the Handed Down Judgment of
Smith Bernal Wordwave Limited, 190 Fleet Street
London EC4A 2AG
Tel No: 020 7404 1400, Fax No: 020 7831 8838
Official Shorthand Writers to the Court)

Mr Dominic Kendrick QC (instructed by Swinnerton Moore) for the Appellant
**Mr Simon Croall** (instructed by **Bentleys, Stokes & Lowless**) for the Respondent

Hearing date : 22 May 2007
- - - - - - - - - - - - - - - - - - - - -
Judgement
As Approved by the Court

Crown copyright©

**Lord Justice Rix:**

*The issue*

1.    This appeal raises a novel point concerning damages for late redelivery of a time-chartered vessel. The issue is this: if a charterer is liable to pay damages to an owner for late redelivery of the chartered vessel, are those damages limited by the principles of remoteness to the difference between the charter rate and the market rate at the time of redelivery (if the latter is higher than the charter rate) over the length of the overrun period, that is to say from the due redelivery date until actual redelivery, or can the owner claim damages based on the loss of his next fixture?

2.    On the facts of this case, this question means the difference, as the parties are agreed, between damages in the sum of only US $158,301.17 (the damages in relation to the overrun period) and the much larger sum of $1,364,584.37 (the damages in relation to the loss of fixture).

3.    It is common ground that there is no binding decision of the courts specifically on this issue. The appellant charterers, however, submit that the rule for damages for late redelivery has been so often stated in terms of the overrun period that this court should now confirm that, save only in special circumstances (not to be found in this case) falling within the second limb of the principle in *Hadley v. Baxendale* (1854) 9 Exch 341, that rule is, and should be, the law. As such, the rule would have the necessary virtues of clarity, certainty, ease of calculation, and fairness. The respondent owners submit, on the other hand, that it is common ground that they have in fact suffered the loss of fixture damages which they claim as a result of the charterers' breach, and that that loss was caused by that breach, and that the arbitrators, and the commercial judge, were right to find that those damages fell within the first rule of *Hadley v. Baxendale*. Any rule of damages which in these circumstances failed to award them their actual loss would conflict with the compensatory principle, and would be arbitrary and unfair.

*The facts*

4.    The owners are Mercator Shipping Inc of Monrovia. They were claimants in the arbitration, respondents to an appeal from the arbitrators' award to the commercial court, and respondents again in this court. The charterers are Transfield Shipping Inc of Panama. They were respondents in arbitration and appellants in the commercial court and again here. I shall refer to the parties as the owners and the charterers respectively.

5.    The arbitration award dated 17 May 2006, awarding $1,364,584.17 to the owners, is that of Messrs David Farrington, Christopher Moss and Bruce Buchan. Mr Moss, while participating in the award, delivered separate, dissenting reasons.

6.    The facts stated by the majority of Messrs Farrington and Buchan, as supplemented

with the parties' consent in the judgment of Mr Justice Christopher Clarke, were as follows.

7.    By a time charter dated 22 January 2003 the owners let their vessel, the *Achilleas*, to the charterers for a period of about 5 to 7 months, at a daily hire rate of $13,500. By an addendum to the charter dated 12 September 2003 the vessel was fixed in direct continuation for a further period of minimum 5 months maximum 7 months, exact period in charterers' option, at a new daily hire rate of $16,750. The extended period under the addendum began on 2 October 2003 and the latest redelivery date therefore became 2 May 2004 (at midnight). The vessel was in fact redelivered, over 8 days late, at 0815 local time on 11 May 2004.

8.    The *Achilleas* is a single decker self trimming bulk carrier built in 1994 of some 69,000 dwt. The facts found by the arbitrators are so focussed that we are not even told on what time charter form the parties contracted: but from the judgment of Christopher Clarke J we learn that it was on an amended NYPE 1946 form. The charter provided for "20/15 days approximate notice of redelivery date and port, 10/5/3 days definite notice of redelivery date and port".

9.    On 8 April 2004 the charterers gave 20 days approximate date of redelivery between 30 April and 2 May. On 15 April they gave 15 days approximate date of redelivery between the same dates. On 20 April they gave 10 days definite notice of redelivery again between the same dates.

10.    On 21 April 2004, and therefore, I comment, in reaction to these notices, the owners fixed the vessel for a new 4 to 6 month period charter to Cargill International SA ("Cargill") at a daily hire rate of $39,500. It will be observed that the new hire rate was very greatly in excess of the old charter (addendum) rate of $16,750 per day. The market had soared within six months. It is common ground, however, that the Cargill charter rate was a market rate.

11.    Under their new fixture with Cargill the owners agreed a laycan period (ie the dates before which the vessel could not be delivered and after which Cargill could cancel the fixture) of 28 April to 8 May. There is no finding as to whether the charterers were informed of the Cargill fixture: I therefore assume that they were not.

12.    It is at this point that things began to go wrong. The arbitrators, having also mentioned charterers' 7 day definite notice of redelivery given on 23 April, again for 28 April to 2 May, state —

> "Although the Charterers had given notice of redelivery, they nevertheless fixed the vessel under a subcharter to load a cargo of 66,799 tonnes of coal at Quingdao for discharge at Tobata and Oita. Loading at Quingdao was completed on 24th April."

13.     It would seem that this was a last minute spot charter, but we are told nothing otherwise about its date or rate. Presumably, it must have been very tempting for the charterers to fit in one further charter at the then current market rates.

14.     Within days of the loading of the vessel, on 26 April, the charterers indicated to owners that they were now expecting redelivery at Oita to fall back to 6 or 7 May, albeit on 27 April they gave a revised notice of redelivery for 4 or 5 May. That would have been late but would still have enabled delivery to Cargill under the new fixture within its cancellation date of 8 May.

15.     The vessel arrived at Oita on 30 April, following discharge at Tobata, but was delayed at Oita so that she was not redelivered to her owners until early on 11 May.

16.     By 28 April the owners had been concerned about redelivery as a result of information which they had received from agents at Oita. By 5 May they had to face up to the fact that the vessel would not be redelivered in time to meet the cancellation date of 8 May under the Cargill fixture. So on 5 May the owners agreed with Cargill that the cancellation date would be extended to 11 May and in return owners had to reduce the hire rate from $39,500 to $31,500, a drop of $8,000 per day. It is again common ground that the new rate reflected the market rate at that time.

17.     In the event, the vessel was delivered to Cargill contemporaneously with her redelivery by the charterers, at 0815 local time on 11 May. Cargill redelivered the vessel at 1015 GMT on 18 November 2004, so that the Cargill fixture lasted 191 days 11 hours.

18.     The owners claimed damages for the loss of the original Cargill hire rate, at $8,000 per day, over the period of the Cargill fixture, in the agreed sum of $1,364,584.37. We are not told by the arbitrators how that figure is derived. I calculate 191 days 11 hours at $8,000 per day as approximately $1,532,000: so the difference is about $167,000. The judge said that owners "gave credit for the additional sums earned under the Charterparty by reason of the late redelivery": that might be a reference to the additional 8 days at the addendum charter rate of $16,750 per day (about $140,000), or to the total sum due for the overrun period, which I calculate would have been something over $250,000. Neither figure matches precisely, but the former is the better fit, and the final sum may be due to minor adjustments in account at the end of the charter.   That inference matches the way in which the owners' claim has been advanced, for the award states that they claimed either $1,364,584.37 ("the principal claim") or alternatively $158,301.17 ("the alternative claim"). On this appeal, the claims have been argued as true alternatives.

19.     The judge records (at para 11 of his judgment):

            "It was agreed that the rates negotiated under the Cargill charter
            and the variation thereto were market rates. It was not suggested
            by the Charterers that the Cargill charter was in any way unusual
            or peculiar in its terms or length. Nor was it suggested that the
            Owners had allowed an unusually short gap between the date for

redelivery under the Charterparty and the cancelling date under the Cargill charter."

20. To that I would add that it was not suggested by the Charterers, so far as would appear from the arbitrators' reasons and the judge's judgment, that there was anything inappropriate or unusual in the owners refixing the vessel on 21 April, having received charterers' 10 day definite notice of redelivery by 2 May.

*The law of redelivery*

21. It is necessary to say something about the jurisprudence of the subject of late redelivery of a vessel under a time charter. It will be recalled that "redelivery", although the term of art in this context, is something of a metaphor since, under a time (as distinct from a demise) charter, the vessel remains in the possession of her owner, albeit at the disposal of her charterer within the limits agreed in their contract.

22. This symbiotic relationship, so conducive to trade, nevertheless presents problems at the end of a charter, when the interests of the parties may diverge. Lord Mustill has referred to these problems in *The Gregos* [1995] 1 Lloyd's Rep 1 at 4:

> "A cargo ship is expensive to finance and expensive to run. The shipowner must keep it earning with the minimum of gaps between employments. Time is also important for the charterer, because arrangements have to be made for the shipment and receipt of the cargo, or for the performance of obligations under sub-contracts. These demands encourage the planning and performance of voyages to the tightest of margins. Yet even today ships do not run precisely to time. The most prudent schedule may be disrupted by regular hazards such as adverse weather or delays in port happening in an unexpected manner or degree, or by the intervention of wholly adventitious events...
>
> As the time for redelivery approaches things become more complicated...If the market is rising, the charterer wants to have the use of the vessel at the chartered rate for as long as possible. Conversely, the shipowner must think ahead to the next employment, and if as is common he has made a forward fixture he will be in difficulties if the vessel is retained by the charterer longer than had been foreseen. This conflict of interest becomes particularly acute when there is time left for only one more voyage before the expiry of the charter, and disputes may arise if the charterer orders the ship to perform a service which the shipowner believes will extend beyond the date fixed for redelivery."

23.   In earlier days, when the exigencies of the sea rendered shipping adventures more uncertain, there was concern in favour of charterers that it would be unfair to expect too great an exactitude about the date of redelivery. In *Gray & Co v. Christie & Co* (1889) 5 TLR 577, possibly the earliest case of record, and described by Lord Reid in *The London Explorer* [1972] 1 AC 1 at 14 as one that "has come to be regarded as the leading case" but in general criticised by him ("It does not look like a leading case"), Matthew J held that a three months charter did not prevent the vessel there being sent on a voyage which was expected to overrun the three months by four days (but ultimately overran it by 17 days). Lord Reid accepted that the case was good authority for the proposition that "there is a presumption that a definite date for the termination of a time charter should be regarded as an approximate date only" (*ibid*). Thus a vessel redelivered within "a reasonable time" of the redelivery date was redelivered in time.

24.   *Gray v. Christie* led to attempts by owners to define (and by their legal representatives in successive disputes to construe) terms for the length of a charter as excluding any such presumption of approximation.

25.   In *Watson Steamship Co v. Merryweather & Co* (1913) 18 Com Cas 294, Atkin J held that redelivery of a vessel on 20 November 1912, when her charterer had sent her on a last voyage knowing that it could not be performed in time for redelivery "between 15th and 31st October, 1912", was a breach of contract. The arbitration award had awarded the owner "damages for 20 days' detention…calculated at the difference between the chartered rate and the current rate for the said period" (at 297). Atkin J upheld the award, distinguishing *Gray v. Christie* solely on the ground that the reference to redelivery between 15 and 31 October excluded the presumption which would otherwise have allowed redelivery within a reasonable time of the end of the charter period. The sole issue was whether or not the so-called presumption of approximation applied.

26.   An additional point had been raised in arbitration which was no longer disputed in the special case before the court. The award (set out at 296) recorded:

> "6. A claim was made by the owners for damages for dislocation of business and other special damage, but there was no evidence before the umpire that such damages were within the contemplation of the parties at the time the said charterparty was entered into, and he therefore found that such damages were too remote."

27.   The charterers in our case sought to build on this paragraph a foundation for their submission that the owners' loss of their fixture on the *Achilleas* was similarly too remote as special damage. However, the judge was not impressed, and neither am I. We have no insight as to what "the dislocation of business", or the analysis, was. In any event, there was no decision by the court.

28.   A few years later, in another case decided by Atkin J, *Meyer v. Sanderson & Co* (1916) 32 TLR 428, the charter defined the term expressly as "about six months". On the last

day of those six months, 18 June, the charterer sent the vessel on a final voyage, which ended on 30 June. The arbitrators found that that was an unreasonable thing to do. A sum was deposited in a bank in escrow to meet the owners' claim that the charterers should pay "for the use of the steamer on that last voyage at the rate current at the time". Atkin J upheld the award in favour of the owners. There was no analysis: the decision was wholly bound up in the finding of the umpire, and the damages were those in escrow.

29.     One issue which therefore came to be debated in the cases was whether the charter period was completely defined in the contractual language, or allowed of an extension for a reasonable time. Another, closely related issue, was whether the last voyage was "legitimate" or "illegitimate". A legitimate voyage was one which was reasonably expected to be completed within the redelivery date (as might be extended by the presumption in favour of approximation). An illegitimate last voyage was one which could not reasonably be expected to be completed within such a date. An illegitimate last voyage order was itself a breach of contract and could be refused by the owner. Even if not refused, the breach could be reflected in damages, provided the breach was not itself waived.

30.     It is only in comparatively recent times that these issues have been more carefully analysed. In *The London Explorer* the vessel was sent on a legitimate last voyage, but was delayed so long by strikes at her last two discharging ports that she was some three months late. The redelivery clause was arguably of the *Watson v. Merryweather* type, viz "12 months 15 days more or less in charterers' option", see Lord Reid at 15/16, but Lord Morris of Borth-y-Gest at 20 thought otherwise: the presumption of approximation had not been excluded. The current market rate was on this occasion lower than the charter rate. The charterers therefore argued that they were liable to the owners *only* in damages (at the current market rate) and *not* in hire under the charter. That was in truth an impossible contention, for the charter expressly stated (as such charters in general provide) "hire to continue until the hour of the day of her redelivery" (clause 4). The House of Lords so held. However, the situation gave rise to some Humpty-Dumpty type arguments, with the charterers submitting that unexpectedly late redelivery on a legitimate voyage amounted to a breach (in order to found their "only in damages" argument), and the owners saying that there was no breach in such circumstances. On those wider issues their Lordships did not speak with one voice. It is unnecessary to go further into these battles of yesteryear, save to point out, which is important, that even in this relatively modern authority, judges of the utmost distinction, such as Lord Reid and Lord Cross of Chelsea were suggesting that there was an additional presumption that a charter was intended to continue until the end of a legitimate last voyage, so that (in the absence of delay caused by the charterers) even an unexpectedly late redelivery well past the final redelivery date gave rise to no breach, and that was so even if the unexpected delay took redelivery past a fixed *Watson v. Merryweather* type redelivery date (at 15/16, 23); whereas Lord Morris, with whom Lord Guest and Lord Donovan agreed, considered that even on a legitimate last voyage with no firm fixed time for redelivery the day might come when the redelivery date had been exceeded by a reasonable time, so that the charterers thereafter came into breach (at 20, 22). However, all were agreed that, whether there was there a breach or not, the charterers had to pay hire until redelivery.

31.     It was in this context that Lord Morris said (at 20):

> "Even though the time set out in a charterparty is not made of the essence so that the continued use of the vessel after the stated time will not at once have the result that such continued use will be in breach of contract it will be necessary that redelivery should be within a reasonable time. It might well be, therefore, that with a clause similar to clause 4 a charterer would be liable to pay hire at the contractual rate to the time of actual redelivery and in addition (if the current rate exceeded the contractual rate) to pay damages in respect of his failure to redeliver within a reasonable time."

32. However, not only was there no claim for damages arising out of an increased market rate, but the whole discussion was obiter. The charterers were liable to pay the charter rate, whether or not there was a breach.

33. In *The Dione* [1975] 1 Lloyd's Rep 115 (CA) the analysis was further developed, especially by Lord Denning MR, but again not without a division of opinion. The period clause was of the type seen in *The London Explorer*, viz "6 (six) months time charter 20 days more or less in Charterers' option". 20 days more ended on 28 September 1970. The vessel was redelivered some 8 days late, on 7 October. The arbitrators teasingly found both that (a) the last voyage could not reasonably have been anticipated to have been concluded so as to permit redelivery by 28 September; but (b) the delay of some 8 days was "within the reasonable elasticity which it was proper to allow". They therefore rejected the owners' claim. In other words, they adopted the Lord Morris approach to the period term: a reasonable time from 28 September had not been exceeded; the last voyage was a legitimate one; and there was no breach. This court, by a majority (Orr LJ dissenting) disagreed. Lord Denning MR and Browne LJ preferred the view (assumed by Lord Reid) that a term "20 days more or less" defined the limits of elasticity or approximation built into the charter period. Therefore the vessel had to be redelivered by 28 September, the arbitrators' finding as to the margin of elasticity was irrelevant, and the charterers were in breach. That was enough to decide the case. But Lord Denning went on to apply the logic of the arbitrators' finding as to the reasonable expectations as to the final voyage: he observed that once 28 September had become a fixed and final redelivery date, it followed that the last voyage had been an illegitimate one. Browne LJ, however, disagreed: on the grounds that the arbitrators had made no such express finding, and that the order had been accepted in any event.

34. Lord Denning said that, whether the voyage was legitimate or illegitimate, once the final redelivery date had been overshot, the charterer –

> "will be bound to pay the extra. That is to say, he will be bound to pay the charter rate up to the end of the expressly permitted margin or allowance, and the market rate for any overlap thereafter" (at 117, under the heading *"(c) Express margin or allowance"*)..." If the shipowner accepts the direction and goes on the illegitimate last voyage, he is entitled to be paid – for the excess period – at the current market rate, and not at the charter

> rate, see *Meyer v. Sanderson* (1916) 32 T.L.R. 428" (at 118, under the heading (e), dealing with an illegitimate last voyage).

35.    The charterers in this appeal again rely on this expression as to the measure of damages in a late redelivery case. However, again, there was no question of any claim for loss of a fixture. The claim was for an extra £6,050 (on top of the hire which had been paid) for the period from 28 September until redelivery. That was the limit of the issue which went forward to the courts from the arbitrators on a special case.

36.    In *The Johnny* [1977] 2 Lloyd's Rep 1 (CA) a charter period for "minimum 11/maximum 13 calendar months" was exceeded by 29 days on a final voyage from Rotterdam to Karachi. The voyage was assumed to be a legitimate one. The sole issue between the parties was as to the market by which to calculate the damages admittedly due to the owners. It was common ground (despite Lord Denning's doubts, see at 2) that the Baltime's clause 7 controlled the situation. This provided that –

> "Should the vessel be ordered on a voyage by which the Charter period will be exceeded, the Charterers to have the use of the vessel to enable them to complete the voyage,...but for any time exceeding the termination date of the Charter the charterers to pay the market rate if higher than the rate stipulated herein."

37.    The sole issue was whether the relevant "market rate" was for a time trip charter to Karachi (to parallel the final voyage itself) or for an 11/13 month period time charter (to parallel the charter itself). The majority of this court (Orr LJ and Sir David Cairns), in agreement with the commercial judge (Donaldson J), held that it was the latter. Lord Denning dissented, preferring the former solution, on the ground that it was more commercial, and also because it was the umpire's preference too.

38.    Orr LJ explained the decision thus –

> "In his judgment Mr Justice Donaldson pointed out that at any time during the charter period it would be possible to pose and receive an answer to the question "Is the vessel chartered at, above, or below the market rate?" but that whether the answer was addressed to the owner or the charterer, it would not be based on the particular trip or voyage on which the vessel was employed but on market rates for time charters then being fixed or capable of being fixed, and in his judgment the market rate to be adopted for the purposes of cl. 7 was the daily rate for a time charter similar to that granted to the charterers, providing for redelivery worldwide subject to the same exceptions as were contained in the original charter" (at 3)...

> "...it is essential that, so far as possible, like should be compared

with like; and that this object is, among the various candidates, most closely achieved by the rate adopted by the Judge. I also accept that to adopt the rate contended for by the owners would involve an obvious injustice to the charterers in that they would , in respect of part of a legitimate and contractual voyage, be made to pay twice over for the disadvantage to the owners of the ship being redelivered at Karachi rather than in Europe, since that disadvantage must be taken, in my judgment, to have been covered by the original charter-party rates" (at 4).

39.    Lord Denning, in dissenting, sought to analogise the position on a legitimate last voyage to that on an illegitimate one, saying (at 2):

"In testing the position, I propose to take a case where the last voyage was not covered by cl. 7 at all. Assume that, at the time when the vessel was ordered on her last voyage, it was plain that she would be 30 days late after the 13 months had ended. Suppose that, at the time of this last order, the market rates had risen, and the charterer sought to take advantage of them so as to profit from those rates. That would be an illegitimate last voyage. The owners could have refused to take the vessel on it. If they did not refuse, but allowed the vessel to perform that illegitimate last voyage, it is plain the owners could recover either damages or a quantum meruit – see *The Dione* [1975] 1 Lloyd's Rep 115 at p. 118. In either case the amount would be assessed at the market rate then ruling for a time charter trip for that voyage at that time. That is for a time charter for the period of time occupied by such a voyage based on spot rates for the voyage charter but adjusted to a time charter basis. That would obviously be fair and just. The charterer, by sending her on that illegitimate last voyage, would have received the high market rate then ruling and should pay damages based on that rate for that voyage, that is, for the remainder of it after the 13 months had expired."

40.    The charterers here again rely on the latter part of that passage as expressing the standard measure of damages for late redelivery, as relating solely to the overrun period. However, I would again observe how narrow was the issue before the court, once more on a special case from the arbitrators. Again, there was no claim for loss of a subsequent fixture. Moreover, for reasons which I will return to below, I am unsure whether the circumstances governing the case of an illegitimate last voyage are necessarily the same as in the case of a legitimate last voyage.

41.    In *The Black Falcon* [1991] 1 Lloyd's Rep 77, the charter period was defined as "6 or 8 months 15 days more or less". The final date for redelivery was therefore 31 March 1988 plus 15 days, ie 14 April: it might have been 14 June, but for the fact that the charterers missed the date provided for in the charter for exercising their option in

favour of the 8 month period. At a time when the effect of the option exercise clause was still in dispute, the charterers ordered the vessel in March 1988 on a voyage which could not be performed by 14 April. The owners protested, but allowed the voyage to take place. In fact, the vessel was not delivered until 23 May. At the ensuing arbitration, the charterers lost on the 8 months option exercise point: it followed that the last voyage was an illegitimate one. A further point was when the period of damages in respect of the increased market rate should run from. The arbitrators said that it should be from 16 March, because that was when they considered that the vessel would have been redelivered if the last illegitimate voyage had not been performed. Steyn J, however, held that damages should commence at 14 April, for until then the redelivery date had not been exceeded (at 80/81). He said:

> "In my judgment the arbitrators' approach conflicts with the principle governing the calculation of damages which was enunciated in *The Dione*…this case is authority for the proposition that in circumstances where the owners undertook the illegitimate last voyage without waiving their rights to claim damages, the charterers' obligation is to pay the charter rate until the last permissible date for redelivery, and thereafter pay the market rate until actual redelivery."

42. It was a nice point. However, once again, there was no claim for loss of a subsequent fixture. The issue, already defined in arbitration, was the narrow issue defined above.

43. In *The Peonia* [1991] 1 Lloyd's Rep 100 (CA) the jurisprudence to date was carefully considered by this court, especially in the judgment of Bingham LJ. The charter terms and the facts found at arbitration set up the need for such analysis. The charter period was defined as follows:

> "about minimum 10 months maximum 12 months time charter. Exact duration in charterers' option. Charterers have further option to complete last voyage…"

44. The 12 months expired on 11 June 1988. In early May the charterers ordered the vessel on a final voyage which was not expected to be completed until 19 July at the earliest. The arbitrators were prepared to assume that this even exceeded any allowance built into the charter period by the expression "about". It was therefore regarded by the owners as an illegitimate voyage, and they pressed the charterers for a revised order or alternatively for payment of hire at an advanced rate for the duration of the proposed voyage outside the charter period. When the charterers refused either alternative, the owners terminated the charter. In theory, they might have been entitled to do so, on the basis that the ordered voyage was an illegitimate one, persisted in, in repudiatory breach of the charter. This early termination of the charter led to a dispute as to the parties' rights. There was of course no question of the loss of a subsequent fixture by the owners (although there might have been the loss of a sub-fixture by the charterers); and it is not even clear that the owners (who after all had the benefit of an increased market rate), as distinct from the charterers, had any claim. The arbitrators resolved the issue in

favour of the charterers, on the ground that the charterers' "further option to complete last voyage" meant that the charterers were contractually entitled to order the vessel to undertake any last voyage that started before the latest time for redelivery, even if it was expected to last beyond that date. In the commercial court, Saville J disagreed, and this court dismissed the charterers' appeal.

45.   The question of construction of the "further option" was resolved by saying that it only related to a legitimate last voyage. Such a voyage could be completed, even if it extended unexpectedly (provided no delay was caused by charterers' breach), at the charter rate and without any uplift to reflect an increased market rate. Therefore, the owners had been entitled to refuse to perform the voyage, whether or not the charterers' insistence on it amounted to a repudiation of the charter.

46.   In order to reach that position, however, this court had to analyse the underlying position at common law, and thus the existing jurisprudence. In particular this court had to resolve the question which had divided the opinions of the House of Lords in *The London Explorer*, namely whether, where a vessel was sent on a *legitimate* last voyage but was unexpectedly delayed even beyond what might be regarded as the charter's final redelivery date, there was any breach of contract. This court observed that, on the authorities both before and after *The Dione*, it had generally been considered, as reflected in leading text-books such as *Scrutton on Charterparties* (19th ed, at 359) and *Wilford, Coghlin and Kimball, Time Charters* ( 3rd ed, at 88/89) that the law was as stated by Lord Reid (see *per* Bingham LJ at 115), namely that there was an additional presumption in favour of a charterer which extended the charter period to the end of the last legitimate voyage (see above at para 30). However, this court also concluded that, nevertheless, Lord Morris's opinion was to be preferred, which was consistent with what, on the better view, turned out to be the effect of the majority of this court in *The Dione* (at 116). As Bingham LJ had anticipated, even before considering the authorities, "every time charter must have a final terminal date...by which...the charterer is contractually obliged to redeliver the vessel", and that remained so even where the law implied a margin of tolerance beyond an expiry date stipulated in a charter (at 107).

47.   The existence of and the reason for the error is explained in the current edition of *Time Charters* (5th ed, 2003) at para 4.6 at 130):

> "Until the decision in *The Peonia*, the generally held perception of the effect of the authorities was that there was no breach in redelivering after the end of the charter period if the last voyage orders were valid or "legitimate" (see the view to this effect expressed by Lord Denning MR in *The Dione*...at page 117)."

48.   The reference there to Lord Denning's judgment in *The Dione* is to a passage immediately *after* the citation contained in para 34 of this judgment above, where, despite that citation, Lord Denning, reflecting Lord Reid's view, had gone on to say:

> "(d) If the charterer sends the vessel on a legitimate last voyage – that is, a voyage which it is reasonably expected will be completed by the end of the charter period, the shipowner must

> obey the directions. If the vessel is afterwards delayed by
> matters for which neither party is responsible, the charter is
> presumed to continue in operation until the end of that voyage,
> even though it extends beyond the charter period. The hire is
> payable at the charter rate until redelivery, even though the
> market may have gone up or down: see [*The London Explorer*]."

49.    Moreover, it will be recalled that *The Dione* was ultimately a decision on the express
       provisions of the Baltime's clause 7.

50.    I draw attention to this now merely historical aspect of the jurisprudence in order to
       emphasise that it was only finally in 1991 that it became clear that an overrunning
       *legitimate* last voyage could result in a breach of contract. Up to then, it had been
       assumed that only an *illegitimate* last voyage could amount to a breach of contract. An
       illegitimate last voyage could be refused, in which case the charter would end
       prematurely and the breach would not arise because of late redelivery. And where the
       illegitimate last voyage was nevertheless accepted by the owners, it was unlikely to be
       in circumstances where those owners had first contracted for a new fixture and then
       allowed it to be imperilled by permitting the illegitimate voyage to proceed.

51.    This then is the context in which in *The Peonia* Bingham LJ said in relation to an
       illegitimate voyage (at 108):

> "It is accordingly an order which the charterer is not entitled to
> give (just as an order to visit a prohibited port would be) and in
> giving it the charterer commits a breach of contract (perhaps a
> repudiatory breach but that we need not decide). The owner need
> not comply with such an order, because he has never agreed to
> do so. Alternatively, he may comply with the order although not
> bound to do so: if he does comply, he is entitled to payment of
> the hire at the charterparty rate until redelivery of the vessel and
> (provided he does not waive the charterer's breach) to damages
> (being the difference between the charter rate and the market rate
> if the market rate is higher than the charter rate) for the period
> between the final terminal date and redelivery."

52.    Again, the charterers here rely on the latter part of this citation (and Slade LJ at 118 to
       similar effect) as setting out the limits of the measure of damages for late redelivery
       under a time charter. However, not only was no claim for loss of a subsequent fixture in
       issue in *The Peonia*, but it was very unlikely that it could have been: the charter was
       terminated early.

53.    The final authority in this series which it is necessary to refer to is an important one, not
       least because it comes from the House of Lords. Its facts are complex. In *The Gregos*,
       to which I have already referred above, the charter period was for a maximum of 70
       days, until 18 March 1987. On 9 February the charterers indicated their orders for a

final voyage, then anticipated to be completed before 18 March. However, by the time the vessel had finished discharging on her previous voyage and was ready to proceed, namely 25 February, a grounding of another vessel obstructed the river channel and made the proposed voyage unworkable in the time available. The owners refused to undertake it, contending that an insistence on the charterers' part would amount to a repudiation of the charter. In the meantime, the owners had negotiated, but not fixed, a new charter at an increased hire rate coupled with a bonus to reflect the fact that the vessel was perfectly placed and did not have to perform a ballast voyage at the new charterer's expense. A without prejudice agreement was then entered into between the parties to the original charter, whereby the owners consented to perform the voyage, but it was agreed that, if in subsequent proceedings it was held that they were justified in terminating the contract, then they should receive as compensation a sum to reflect the more advantageous terms of the proposed substitute fixture. In the event, the arbitrators found in favour of the owners and awarded them $300,000. The vessel was redelivered on 26 March, some 8 days late. It appears that, but for the special terms of the without prejudice agreement, the damages which would have been awarded would have been a mere $35,000 (see at 10).

54.    The essential issue therefore was whether there was a repudiation of the charter, and that in turn depended on whether the date for assessing the legitimacy of the charterers' order was 9 February, when it would have been legitimate, or 25 February, when it would not have been. The House of Lords, in disagreement with this court (whose judgment is reported at [1993] 2 Lloyd's Rep 335) held that the latter was the correct date for that assessment. The original order had become ineffectual, and needed to be replaced, which the charterers showed they had no intention of doing. By their persistence in their original order they had therefore committed an anticipatory repudiatory breach of the charter.

55.    Thus: (i) the case was concerned with an illegitimate last voyage; (ii) nevertheless, it was not concerned with the awarding of damages for late redelivery at common law, as distinct from compensation under the without prejudice agreement; (iii) although there was in fact no subsequent fixture, the without prejudice agreement sought to mimic the position as though there had been such a fixture but it had been lost by the performance of the illegitimate last voyage, if it was illegitimate; (iv) by agreement, the compensation payable, if there had been a repudiation, was designed to indemnify the owners for the especially favourable substitute charter that they would have been able to fix, but for their concession to their charterers.

56.    Since the case was not ultimately about the assessment of damages for late redelivery, Lord Mustill was able to deal with that topic in an aside. He said (at 5):

        "(On damages, see...*The Peonia...*)"

57.    Nevertheless, at the conclusion of his speech he returned to the question of damages and the without prejudice agreement. It is worth setting out the passage in full (at 10):

        "In conclusion I must notice a feature of the award which troubled the arbitrator himself...This was what Lord Justice

Hirst called the "windfall damages" attached to the repudiation, a large multiple of those which would have been awarded simply in respect of a few days' late redelivery. At first sight, this apparently anomalous result is a good reason for questioning whether the claim for repudiation was soundly based. On closer examination, however, the anomaly consists, not so much in the size of the damages, but in the fact that damages were awarded at all. Imagine that the without prejudice agreement had not been made, and that the owners, having treated the charter as wrongly repudiated, had accepted a substitute fixture with Navios. If one then asked what loss had the repudiation caused the owners to suffer, the answer would be – None. On the contrary, the charterers' wrongful act would have enabled the owners to make a profit. Even if they had not accepted the substitute employment they might very well have suffered no loss, since they would have been in the favourable position of having their ship free in the right place at the right time to take a spot fixture on a rising market. In neither case would the owners ordinarily recover any damages for the wrongful repudiation. Yet the arbitrator awarded a large sum. The reason was, I believe, that what the arbitrator did was not to award damages but to enforce the terms of the without prejudice agreement, and to remunerate the owners for performing a voyage from which, in consequence of the charterers' wrongful act, they would otherwise have been free. This purely technical distinction would have been of no interest but for the stress laid on the size of the award of some U.S.$300,000 for the anticipatory repudiation of a contract which, if performance had gone ahead, would have led to a breach yielding a mere U.S.$35,000 in damages. For the reasons just stated, this comparison is inaccurate. The point really to be made is that if the conduct of the charterers was repudiatory the consequence that they were left without a ship to lift their sub-charterers' cargo may seem out of proportion to the comparatively minor breach which their order, if performed, would have entailed. There is force in this, but not enough to overcome the contractual logic. The fact is that in a volatile market, of which merchant shipping is by no means the only example, a contract breaker may find the consequences of a breach are multiplied to a surprising degree by adventitious factors. Here, the charterers chose to stand their ground in circumstances where, if they were mistaken, the owners would have the upper hand. I believe that they were mistaken and must suffer the consequences, harsh as they may seem."[1]

58.    What is Lord Mustill saying here? First, this passage seems to me to confirm my understanding of the facts of the case, set out above. Secondly, where an order for an illegitimate voyage results in the early termination of the charter on a rising market, Lord Mustill observes that there is unlikely to be any recovery of repudiation damages.

---

1 For an explanation of these figures, see the judgment of Hirst LJ in the court of appeal, at [1993] 2 Lloyd's Rep 335 at 341.

Thirdly, he considers the submission that, if instead the illegitimate last voyage is permitted to be performed and results in redelivery only a few days late, then the damages caused are likely to be small: and appears to acknowledge that that submission has some force. To some extent, that comment might seem to assist the charterers here. However, the remark is elliptical, and does not expressly set out why the loss of a valuable substitute fixture should not itself be reflected in the damages available: but the answer may well be that, if the owners had simply permitted the illegitimate voyage to be performed, they could not have complained that the available substitute voyage, which had not been fixed, was lost. Fourthly, he points out that even minor breaches may have surprisingly major consequences.

59.    Be that as it may, the facts of *The Gregos* illustrate, by means of the without prejudice agreement that the parties entered into, what price those parties put on the performance of the disputed voyage. For the charterers, in part perhaps because they had already committed themselves to their own sub-fixture, it was worth taking the risk of being obliged to pay large-scale compensation to the owners. Moreover, the without prejudice agreement demonstrates the recognition by the charterers of how much the owners would themselves lose by being prevented from performing their own substitute fixture. It also demonstrates the price which the owners thought it prudent to demand as the quid pro quo for performing an ex hypothesi illegitimate voyage. In my judgment, these considerations reveal the understanding of the parties as to the value to be placed by each of them on the performance of a voyage which overruns the stipulated redelivery date under their charter.

*The appellant charterers' reliance on this jurisprudence*

60.    I have dealt with this jurisprudence in detail because one of the main strands of Mr Dominic Kendrick QC's submissions on behalf of the appellant charterers is to argue that what he described as the "loss of use" or "market" measure, as applied to the period of the overrun beyond the redelivery date, represented the authoritatively approved, conventional, and binding prima facie measure of loss for the breach of contract consisting in late redelivery of a time chartered vessel. As such, this prima facie measure could only be departed from on the basis of special facts, brought home and known to a charterer as at the time of contracting, as reflected in the second rule in *Hadley v. Baxendale*. There was therefore no justification for the arbitrators' or judge's adoption of an approach to damages in this case which gave the owners a different measure of loss based on the loss of the Cargill fixture, in a figure vastly exceeding the conventional measure of loss. Such loss of fixture damages had never before been awarded to an owner for late redelivery of a vessel. The loss of use measure for the period of the overrun, on the other hand, had again and again been restated as the appropriate measure of loss, by judges of the greatest distinction, starting with Atkin J in 1913 in *Watson v. Merryweather*, and continuing through *The London Explorer* (per Lord Morris), *The Dione*, *The Johnny*, *The Black Falcon*, *The Peonia*, and *The Gregos*. In *The Peonia* this court had recognised that the rule had already become binding as a result of the decision of a majority in this court in *The Dione*; and in *The Gregos*, Lord Mustill, whose speech was approved by Lord Ackner, Lord Slynn of Hadley and Lord Woolf, referred to *The Peonia* as providing the rule on damages for late redelivery. Mr Kendrick submitted that this measure of loss is accepted as correct by *Scrutton* (20th ed,

at 349) and *Wilford* (5th ed, 2003, at para 4.9).

61.  This submission did not convince a majority of the arbitrators, nor Christopher Clarke J, who correctly observed (at para 34 of his judgment) that in none of these cases was the recoverability of damages for loss of a subsequent fixture actually in issue. That is certainly true; but I have sought to show that the matter goes still further than that. Any issue of damages generally arose only in a very narrow form, and had already been defined and confined in the special case stated in arbitration; and not only was compensation for loss of a fixture not in issue, it usually could not have been in issue on the facts. What is more, it was not until *The Peonia* that there was any clear recognition that damages were available for late redelivery upon a legitimate last voyage. As for the consequences of an illegitimate last voyage, the cases demonstrate that they may vary more widely, and also indicate that, for one reason or another, a loss of fixture claim could rarely occur.

62.  In these circumstances, it was ultimately common ground before us that there was no single binding decision confining late redelivery damages to the overrun period. The charterers rather say that the overrun period measure has become authoritative by frequent restatement. It was for this reason that Mr Kendrick also relied on what Hobhouse LJ said in *The Nukila* [1987] 2 Lloyd's Rep 146 at 152:

> "Turning to the authorities it must at the outset be recognized that, whether or not they are strictly binding upon us, they must, insofar as they represent the existing authoritative statements of the law only be departed from if they are clearly wrong. This principle has been stated on a number of occasions in the field of commercial law where it is recognized that the parties enter into contracts on the basis of the law as it has been stated in the applicable authorities. For a Court, in deciding a dispute under a commercial contract, later to depart from those authorities risks a failure to give effect to a contractual intention of those parties as evidenced by their contract entered into on a certain understanding of the law. As Lord Dunedin said in *Atlantic Shipping & Trading Co. v. Louis Dreyfus & Co.* (1922) 10 Ll.L.Rep. 703; [1922] 2 A.C. 250 at p. 257:
>
> > My Lords, in these commercial cases it is of the highest importance that authorities should not be disturbed and if your Lordships find that a certain doctrine has been laid down in former cases and presumably acted upon you will not be disposed to alter that doctrine unless you think it clearly wrong.
>
> (See also Lord Wilberforce in *The Aries*, [1977] 1 Lloyd's Rep. 334 at p. 338, cols 1 and 2; [1977] 1 W.L.R. 185 at pp. 190-191.)"

63.  However, in my judgment those well established considerations do not easily apply to the current case. There, Hobhouse LJ was concerned with authorities touching on the

meaning of a latent defect for the purposes of a standard clause. Here, we are concerned with general principles of damages. The owners' case does not seek to say that the overrun measure of damages is incorrect: merely that it does not deal with or answer a claim for loss of a subsequent fixture caused by late redelivery. Even Mr Kendrick's submission is expressed only in terms of a prima facie rule. I will revert to the interest in favour of certainty when considering the appellants' general submissions in that regard, later in this judgment.

64.    Now that I have put the facts of this case in the context of the relevant jurisprudence, I shall refer to how the majority and minority arbitrators, and the judge, dealt with their decisions.

*The reasons of the majority of the arbitrators*

65.    It is clear from the reasons forming part of the award that the parties approached the damages issue (correctly described by the arbitrators as an "important" issue) on the basis of whether or not the loss of fixture damages alternative was within the first limb of the rule in *Hadley v. Baxendale*.

66.    That famous rule (at 354) is that –

> "the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, i.e. according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it".

67.    The charterers submitted that the overrun damages alternative, described by them as the "normal measure of damages", corresponded to the first rule, and that the loss of fixture measure "could be recovered in principle but only if those damages could be brought within the second rule". The arbitrators went on to refer to Lord Reid's reformulation of the *Hadley v. Baxendale* test in *The Heron II* [1969] 1 AC 350 at 382/3, viz –

> "So the question for decision is whether a plaintiff can recover as damages for breach of contract a loss of a kind which the defendant, when he made the contract, ought to have realised was not unlikely to result from a breach of contract causing delay in delivery. I use the words "not unlikely" as denoting a degree of probability considerably less than an even chance but nevertheless not very unusual and easily foreseeable."

68.    The arbitrators found that "both parties were experienced in the chartering markets"

(para 7) and that charterers' counsel had rightly accepted in exchanges with the tribunal that Lord Reid's "not unlikely" test was met by results which would include "missing dates for (a) a subsequent fixture, (b) a dry docking and (c) a sale of the vessel" (para 8). The award continued (at para 9):

> "in today's market with its ease of communication and much higher emphasis of maintaining a vessel in almost continuous employment those "not unlikely results" are known, recognised and accepted hazards of late redelivery. They were not very unusual. To the contrary, they were the kind of results which the parties would have had in mind. Although the issue in this reference was not concerned with a particular market at a particular port, nevertheless the parties were actively engaged in the shipping market. It was not in dispute that the market rates for tonnage goes up and down, sometimes quite rapidly, and that such variations are market knowledge."

69.    The arbitrators then rejected a submission on behalf of the charterers that the loss of fixture was not one which the parties could be considered to have contemplated because the size of the loss in question (due to the volatility of the market in May 2004) could arise in only a small minority of cases. The arbitrators accepted that the size of the loss might be unusual, "but the type of loss was readily identifiable" (para 11). They added that it was arguable that, given the volatility of the market, the charterers should have used the greatest care to ensure that the redelivery of the vessel was effected by the latest contractual date (para 12).

70.    The arbitrators agreed that if a lawyer had been asked for what damages the owners would be liable if the vessel was redelivered late, he would have referred to the overrun period measure of damages; however, if a broker had been asked the same question, he would have referred to the dangers of loss of fixture acknowledged in the award (para 17).

71.    The charterers submitted that they had not "assumed responsibility" for the loss of any particular fixture. The arbitrators' response was that the length of the follow-on fixture was irrelevant, unless it was an extravagant or unusual bargain. There was no evidence that it was, or that a distinction should be made between a trip or period charter. Nor had it been submitted for the charterers that the Cargill fixture was extravagant or unusual (at para 18).

72.    The arbitrators therefore concluded that the loss of fixture damages claimed by the owners fell within the first rule of *Hadley v. Baxendale*. They added that, if it were otherwise, there was no special knowledge at the date of the addendum which would have brought the claim within the second rule (para 20).

*The views of the minority arbitrator.*

73. Mr Moss, however, accepted the submission that the overrun measure of damages represented the normal *Hadley v. Baxendale* first rule position, so that it would take knowledge of special circumstances to bring the loss of fixture measure into play as an incident of the second rule. He said:

> "3. The situation which faced us in the present case must surely have occurred many times in the past, given the volatility of shipping markets from time to time. Without ever having had the point argued previously, I shared what I regarded at the outset in this arbitration as the well-established view in the industry, namely, that if a vessel is redelivered late, the measure of damages which the charterer must pay to the shipowner (if the market has risen in the meantime) is the difference between the market rate for the period of the overrun and the charter rate. That is the measure of damages which I would regard as being in the contemplation of those involved in the industry (whether they be operators, brokers or lawyers) as applying in such a situation – unless the charterer has been put on notice of the subsequent fixture. Knowledge of special circumstances will clearly enable the shipowner to rely on the 'second limb' of the rule in *Hadley v. Baxendale*."

74. He added that the effect of the majority's view was "to impose on the Charterers a completely unquantifiable risk in what is a relatively common situation (ie late redelivery under a time charter) given the exigencies of the shipping industry" (para 4). He was concerned that the extent of that risk in terms of the length of the lost fixture should be limited only by the concept of an "extravagant or extraordinary bargain" (para 5). It is clear that, as a matter of policy, Mr Moss was concerned about a charterer as distinct from an owner taking the risk of loss of a subsequent fixture – in the absence of special knowledge (para 7). His view was that a charterer could not be said to have assumed the responsibility for loss of a particular follow-on charter, the length and nature of which was entirely within the owner's control. The "fundamental problem" was that it was difficult to see where the line could be drawn in terms of the length of a subsequent fixture. For that reason the law had developed so as "to restrict" the owner's claim in such circumstances to the overrun period measure of damages. Departure from that rule would give rise to a real risk of commercial uncertainty for the shipping industry (para 11).

75. Mr Moss went on to make a distinction ("at least arguable") drawn from the expert evidence (which had been prepared by the parties but was not technically before the arbitrators and to which he therefore should not have referred) between a voyage charter or trip time charter on the one hand and a period time charter (such as the Cargill fixture) on the other. He said that period time charters represented only 15% of the relevant market and therefore said that contemplated losses arising from the loss of a period fixture could only be taken as "a relatively unlikely possibility" (at para 12). This factor combined with the "utterly exceptional rate" featuring in this case led him to

question whether it could fairly be said that a loss of this "type" must have been within the contemplation of the parties (at para 13); the owners' claim therefore had "the feel" of special damages (at para 14). He concluded (at para 15):

> "damages based on the fact that a shipowner had concluded a particularly lucrative period fixture and has done so at a time when the market is at a peak (and shortly before it falls dramatically) would have to be regarded as a type of loss or damage "only likely to occur in a small minority of cases". As such, damages of this type would only be recoverable under the 'second limb' of the rule in *Hadley v. Baxendale*."

*The award, in sum*

76.    In sum, at the arbitration there was no dispute, and/or it was found, that the loss of fixture damages in the agreed sum of $1,364,584.37 had been caused by the breach of contract consisting in the late redelivery of the vessel. There was, however, an issue as to whether that loss, caused by the charterers' breach and actually suffered by the owners, was nevertheless too remote to be recovered. In respect of that single issue of remoteness a majority of the arbitrators were satisfied, on the facts, that it was not too remote. The loss was of a type which the charterers, as experienced participants in the shipping industry, should have contemplated at the time of contracting. There was no case on the part of the charterers that the fixture in question had been entered into, or sustained when amended, other than in the normal course of business, or at other than market rates, or had been fixed for an unusual length of time; nor that it had been entered into too early, or on too short a laycan basis. No objection was to be taken to it on the ground that it was a period charter. The loss fell within the first limb of the rule. It was not a special loss such as could only be recovered in the light of special knowledge.

77.    Mr Moss, in the minority, appears to have differed on the facts, and to have done so despite concessions to the contrary, as subsequently expressly recorded by the judge (see para 19 above). He also appears to have felt that, irrespective of the factual position as interpreted by him, the loss of fixture measure of damages as a whole should be confined to a case of special knowledge under the second limb of the rule. It is not entirely clear, however, whether ultimately his disagreement was premised on that general view, albeit arising in an a fortiori case, or whether it depended on his feeling that the facts of the case were themselves exceptional. These factors go a long way to undermine such force as his views might otherwise possess; and in any event his views are of course those of a minority.

*The judgment of Christopher Clarke J below*

78.    Before the judge, the charterers, appealing the award, appear to have had one main and several subsidiary arguments. The main argument was a return to the submission which had failed before the arbitrators, to the effect that the loss of fixture damages could not

properly fall within the first limb of the rule in *Hadley v. Baxendale*. They supported that primary submission with the following further submissions: (i) that the line of authority concerning damages for late redelivery under a time charter adopted the overrun period measure of damages; (ii) that a comparison of cases concerning damages in the sphere of sale of goods demonstrated that damages measured by loss of profits on particular sub-sales, as distinct from damages measured by a simple comparison between contract and market rates, were generally regarded as legally irrelevant, being *res inter alios acta* ie a matter merely transacted with third parties; and (iii) (reflecting arguments of practicality discussed in the minority reasons of Mr Moss) that certainty, simplicity and pragmatism all required a simple rule limited to damages for the overrun period (in the absence of special knowledge brought home to a charterer at the time of contracting).

79.    The approach of the judge, in his careful and learned judgment, was to begin with a detailed examination of the rule in *Hadley v. Baxendale* in modern times, as a result of which he effectively reached his determining conclusion even before considering the charterers' subsidiary arguments. Thus under the heading "Conclusion", he said:

> "55. In my judgment on the facts found by the majority arbitrators the Owners' primary claim is not too remote. They have determined that, to the knowledge of the Charterers, it was recognised and accepted as a hazard of late redelivery that the vessel would miss her cancellation date for the next fixture; that this was not something that was very unusual but, on the contrary, the kind of result which the parties would have had in mind; that rapid variations in market rates in either direction were market knowledge; and that the kind of loss suffered by the Owners, namely the need, on account of delay in redelivery, to adjust the dates for the subsequent employment of the vessel with a reduction in the previously agreed rate of hire, was within the contemplation of the parties as a not unlikely result of the breach.
>
> 56. Insofar as it is necessary to do so, the Owners' loss of profit can, in the light of the findings of the majority arbitrators, legitimately be treated as *"arising naturally i.e. according to the usual course of things from such breach of contract itself"*. In considering the first limb, the Court is not constrained to look at what people with not even a minimum knowledge of the shipping trade would contemplate. The court is entitled to look at the *"general...facts..., known to both parties"*: per Lord Upjohn in *The Heron II* at page 424; and *"such knowledge and information as (the contract breaker) as reasonable men (sic), experienced in its trade, should have had and should have brought to bear in its contemplation"*: per Davies LJ in *Hill v. Ashington Piggeries* at page 1524D."

80.    As for the subsidiary submissions:

i)The judge had already observed that the line of cases stating damages for late redelivery in terms of the loss of any higher market rate for the period of the overrun was not concerned with any claim to recover damages for loss of fixture. In relation to the charterers' reliance on what Hobhouse LJ had said in *The Nukila*, he observed that in the absence of binding authority, he had to go on to consider whether the solution which, on the facts, appeared to be supplied by the rule in *Hadley v. Baxendale* was consistent with general principle.

ii)As for the sale of goods cases, he considered that on the whole they supported the majority arbitrators' solution. Although the prima facie rule, where a market was available, was that, for instance, expressed by section 51(3) of the Sale of Goods Act 1979 ("the measure of damages is prima facie to be ascertained by the difference between the contract price and the market or current price of the goods at the time or times when they ought to have been delivered"), nevertheless where no market was available, or where the self-same goods had to be passed on down a line of sub-sales, the courts did look to the individual contracts made by claimants for the purposes of measuring their true or actual loss: see *R & H Hall Ltd v. W H Pim Junr & Co Ltd* (1928) 30 Ll L Rep 159, *Bence Graphics International Ltd v. Fasson UK Ltd* [1998] QB 87, *Louis Dreyfus Trading Ltd v. Reliance Trading Ltd* [2004] Lloyd's Rep 243. The loss of a fixture due to late redelivery was analogous to such cases, for there was no right to substitute the vessel made unobtainable by the lateness of her redelivery.

iii)As for the practical considerations: the judge took them into account, but felt that they were not such as to make it right to deprive the owners of their actual loss. Any difficulties could be met on consideration of individual cases.

*The submissions on appeal*

81.    On this appeal, Mr Kendrick on behalf of the charterers appears to have shifted his ground somewhat, perhaps conscious of the prima facie difficulties created by the facts found or conceded. His primary submission now is not so much that the arbitrators or the judge misunderstood or misapplied the rule in *Hadley v. Baxendale*, but rather that for reasons of authority, principle and pragmatism the measure of damages for late redelivery of a time chartered vessel should, absent special knowledge of a subsequent fixture going beyond the facts of this case, be limited to loss of current market value during the overrun period.

82.    In this connection, he places particular emphasis on the doctrine of the irrelevance of

the claimant's third party transactions (*res inter alios acta*), submitting that the owners' charter arrangements with Cargill were a matter for themselves alone and cannot affect the charterers absent special knowledge at the time of contracting (through which it could be said that they had assumed responsibility for the loss). As he put it in his skeleton argument: "A charterer guilty only of a short late redelivery is not to be faced in law with uncapped loss of profit claims based on unknown contracts of unknown length made at unknown times…It should have been held in the light of the decided cases, the understanding of the shipping market, and the existence of a market measure, that the mere foreseeability of a possible loss of profit as 'not unlikely' on unknown contracts of unknown length and type would not be contemplated as being taken into account to displace the ordinary measure."

83.     In developing these submissions, Mr Kendrick made certain analytical distinctions which were fundamental or important to his case. Thus he distinguished between the overrun period and the lost fixture measures of loss as a distinction between a "loss of use" and a "loss of profits" measure. He distinguished between the same measures of loss also on the basis that the former was a "market" measure of loss, whereas the latter was based not on market prices but on special transactions personal to the owners. He sought to elide both these distinctions with a third distinction, that the overrun measure of loss was a prima facie measure (like the market measure in sale of goods cases), whereas the loss of fixture measure was a special measure, which depended therefore on special facts and special knowledge of those facts. He sought to draw an analogy in these respects between the prima facie, market based, measure of loss in sale of goods cases, and special cases of consequential loss of profits which depended on particular circumstances and particular knowledge. Talk of the owners' actual or true loss was misplaced: all loss caused by breach is in one sense an actual or true loss, and that is why the doctrine of remoteness of damage is necessary, to place limits on the recoverability of loss in a way that is fair to both parties.

84.     As for the argument from pragmatism, it proceeded somewhat as follows. The overrun measure was simple, straightforward, easily applied, and well-recognised. Being market based, it was objective; it was also authoritative. Any departure from it would unfairly undermine the certainty of the chartering market. The loss of fixture measure lacked these virtues. It depended on the private arrangements of the owners. It introduced uncertainties, not least as to the length of the follow-on fixture which could be used as the basis for the calculation of loss. What was to stop an owner claiming in respect of the loss of a long-term charter of many years? Since nearly every charter would be followed by a subsequent fixture (barring dry-docking, repairs, or sale), and since late redelivery was a frequent occurrence, and since markets were always in movement and often volatile, nearly every redelivery would be plagued by uncertainty, imposing an unfair risk upon charterers. The arbitrators' reference to extravagant and unusual bargains was no solution: too many cases could lie outside those strictures. Moreover, a late redelivery might be beneficial to an owner, by delaying the refixing of the vessel during a rising market: if so, then the extra profit earned by the vessel would have to be set off against the overrun loss otherwise due to that owner. All such complications were better avoided. The consistent line of jurisprudence to date had expressed the wisdom of the industry, the market and the courts in limiting damages to the overrun period. That wisdom should be maintained, especially as policy entered so much into the concept of remoteness of damage.

85.    On behalf of the owners, Mr Simon Croall in essence said that the majority arbitrators'
       findings of fact were conclusive; and that the judge's reasons for upholding their award
       and rejecting the charterers' arguments were correct. He emphasised that all issues of
       causation had been decided in the owners' favour, and the sole issue was that of
       remoteness. Many of the charterers' submissions were nevertheless, upon analysis, an
       attempt to raise a non-existent dispute about causation. The best example was their
       submission which stressed that a departure from a market based loss was irrelevant as
       *res inter alios acta*. That, however, was a doctrine of causation, not remoteness.
       Similarly, the distinction based on a loss of profits measure of damages was misplaced:
       such a measure was often to be applied as *Hadley v. Baxendale* first limb damages. The
       argument from pragmatism was similarly misplaced: the point had simply not arisen
       before; now that it had, it needed to be dealt with as a matter of principle; the
       difficulties were exaggerated; there was nothing in the slightest out of the way about the
       Cargill fixture; future arguments on different facts could be faced on their own merits.

*Hadley v. Baxendale and the doctrine of remoteness*

86.    There is something odd about the argument about whether the arbitrators were right to
       decide on the facts that the owners' loss of fixture claim fell within the first limb of the
       *Hadley v. Baxendale* rule. The charterers could not change the majority arbitrators'
       findings of fact (and did not seek to argue that they were perverse). If this appeal had
       come from a trial, they might in theory have been able to interest this court in looking
       again at aspects of the facts, but that approach was not open to them. Moreover, they
       were unable, save in respect of some marginal submissions, even to suggest that the
       majority arbitrators had directly erred in law in their discussion or application of the
       *Hadley v. Baxendale* principles. In effect, therefore, their argument had to be that,
       whatever conclusion the arbitrators came to on the facts, in respect of Lord Reid's "not
       unlikely" formulation of the *Hadley v. Baxendale* test, did not matter. It was simply
       wrong to conclude that, even on these facts, loss of fixture damages could fail to be too
       remote to be recoverable, without further specific information brought home to the
       charterers at the time of contracting. Thus the arguments that the matter was effectively,
       even if not as a matter of strict precedent, decided by authority; that the fixture was
       irrelevant as *res inter alios acta*; that it was a matter of principle or policy; that any
       other rule would lead to uncertainty and chaos.

87.    Be that as it may, it is in my judgment, worth looking briefly at some of the leading
       cases in application of the *Hadley v. Baxendale* rule, to see whether there is any
       cogency in the charterers' complaint that it has here been misapplied, even on the facts
       found. After all, the rule is not all that easy to understand in the abstract, free of all
       practical application.

88.    *Hadley v. Baxendale* itself is of course a case about a contract of carriage, between a
       carrier and a mill-owner. They were not in the same business. The carrier was carrying
       the mill-owner's broken mill-shaft, so that it could be copied and replaced, and the
       carrier was told as much. But he was not told that the mill could not work without a
       new shaft, because it had no spare. The broken shaft was delayed, and the mill-owner
       suffered loss of profits as a result. But those losses were held to be too remote. In the
       ordinary way a carrier would not have known that a mill would not have a spare mill-

shaft, and the "special circumstances" were not communicated to the carrier. The case demonstrates, in my judgment, as has come to be generally recognised, that there are not so much two rules, as two means by which a defendant may possess the knowledge necessary to make his liability a fair one. That knowledge may either arise from the "usual course of things", or from the communication of special circumstances, a point clearly made in the next case I cite.

89.    *Victoria Laundry (Windsor) Ld v. Newman Industries Ld* [1949] 2 KB 528 concerned a contract of sale, of a boiler needed by a firm of launderers and dyers who were expanding their business. It was made known to the seller that the boiler was urgently required. The boiler was delayed in its supply. As a result the launderers suffered loss of profits, both in general and also of some especially lucrative new dyeing contracts. The critical part of the actual decision is contained in the following passage in the judgment of this court given by Asquith LJ (at 542/3):

> "Secondly, that while it is not wholly clear what were the "special circumstances" on the non-communication of which the learned judge relied, it would seem that they were, or included the following:- *(a)* the "circumstance" that delay in delivering the boiler was going to lead "necessarily" to loss of profits. But the true criterion is surely not what was bound "necessarily" to result, but what was likely or liable to do so, and we think that it was amply conveyed to the defendants by what was communicated to them (plus what was patent without express communication) that delay in delivery was likely to lead to "loss of business"; *(b)* the "circumstance" that the plaintiff needed the boiler "to extend their business." It was surely not necessary for the defendants to be specifically informed of this, as a precondition for being liable for loss of business. Reasonable persons in the shoes of the defendants must be taken to foresee without any express intimation, that a laundry which, at a time when there was a famine of laundry facilities, was paying 2,000l. odd for plant and intended at such a time to put such plant "into use" immediately, would be likely to suffer in pocket from five months' delay in delivery of the plant in question, whether they intended by means of it to extend their business, or merely to maintain it, or to reduce a loss; *(c)* the "circumstance" that the plaintiff had the assured expectation of special contracts, which they could only fulfil by securing punctual delivery of the boiler. Here, no doubt, the learned judge had in mind the particularly lucrative dyeing contracts to which the plaintiffs looked forward... We agree that in order that the plaintiffs should recover specifically and as such the profits expected on these contracts, the defendants would have had to know, at the time of their agreement with the plaintiffs, of the prospect and terms of such contracts. We also agree that they did not in fact know these things. It does not, however, follow that the plaintiffs are precluded from recovering some general (and perhaps conjectural) sum for loss of business in respect of dyeing contracts to be reasonably expected, any more than in respect of laundering contracts to be reasonably expected."

90.   The distinction made here was between the normal expectation of the profits of persons in the business of launderers and dyers, and the unusually high profits obtainable on particular contracts. But there was no difficulty in the proposition that in the ordinary course of business, the wrongful delay in delivery of goods may cause a loss of profits for which the defendant will be held liable.

91.   The principles restated by Asquith LJ at 539/540 have been influential, subject to the observations by Lord Reid in *The Heron II* (at 389E/G) that the test formulated as "reasonably foreseeable as liable to result" was acceptable only so long as it was intended to be understood as "foreseeable as a likely result": for "A great many extremely unlikely results are reasonably foreseeable". Of particular interest is principle (4) –

> "(4.) For this purpose, knowledge "possessed" is of two kinds; one imputed, the other actual. Everyone, as a reasonable person, is taken to know the "ordinary course of things" and consequently what loss is liable to result from a breach of contract in that ordinary course. This is the subject matter of the "first rule" in *Hadley v. Baxendale*. But to this knowledge, which a contract-breaker is assumed to possess whether he actually possesses it or not there may have to be added in a particular case knowledge which he actually possesses, of special circumstances outside the "ordinary course of things," of such a kind that a breach in those special circumstances would be liable to cause more loss. Such a case attracts the operation of the "second rule" so as to make additional loss also recoverable" (at 539).

92.   *The Heron II* also concerned, like *Hadley v. Baxendale*, a contract of carriage, in fact a voyage charter with charterers, Czarnikow, who were sugar merchants, as the shipowners knew. A cargo of sugar was delivered late to its destination at Basrah. The shipowners were held liable for the difference between the value of the sugar in the Basrah sugar market at the date when the cargo should have arrived and its lower value at the date of arrival. Lord Reid's "not unlikely" test has been set out above. The other members of the House expressed themselves in similar, if not identical terms: see the headnote at 351E/F, eg Lord Pearce and Lord Upjohn spoke of a "serious possibility" or "real danger" (at 414F/415D, and 425C). However, the effect of the test cannot properly be appreciated without matching it with the facts as to the shipowners' knowledge, for instance as stated by Lord Reid at 382D/F:

> "It may be well first to set out the knowledge and intention of the parties at the time of making the contract so far as relevant or argued to be relevant. The charterers intended to sell the sugar in the market at Basrah on arrival of the vessel. They could have changed their mind and exercised their option to have the sugar delivered at Jeddah but they did not do so. There is no finding that they had in mind any particular date as the likely date of

arrival at Basrah or that they had any knowledge or expectation that in late November or December there would be a rising or a falling market. The shipowner was given no information about these matters by the charterers. He did not know what the charterers intended to do with the sugar. But he knew that there was a market in sugar at Basrah, and it appears to me that, if he had thought about the matter, he must have realised that at least it was not unlikely that the sugar would be sold in the market at market price on arrival. And he must be held to have known that in any ordinary market prices are apt to fluctuate from day to day: but he had no reason to suppose it more probable that during the relevant period such fluctuation would be downwards rather than upwards – it was an even chance that the fluctuation would be downwards."

93. Those facts are not materially different from our facts: save in two respects in both of which our facts are stronger in favour of liability. The first is that in this appeal the parties are in the same business, whereas there they were not: that may affect the matters which in the ordinary way ought to be within the contemplation of a defendant as not unlikely to occur: even if, as Lord Reid pointed out, it ought to be no longer possible to state the rule of remoteness in the context of carriage by sea (between parties not in the same business) "in a way inconsistent with the general law as it exists today" (at 392G). The second is that a charterer of time chartered tonnage knows that a new fixture is very likely to be entered into by the owner of his chartered vessel so as to follow as closely as possible to the redelivery of the vessel, for the reasons which Lord Mustill had pointed out in *The Gregos* (see above at para 22): that knowledge goes well beyond any particular expectation that the owners of *The Heron II* could have had about the intentions of Czarnikow with respect to the cargo of sugar carried by them.

94. Moreover, it is to be observed that in *The Heron II* the House  of Lords declined to follow a previous decision of this court in *The Parana* (1877) 2 PD 118: as to which Lord Reid pointed out that at that earlier time the rule in *Hadley v. Baxendale* was applied more strictly, citing the "reasonably certain" language of this court's judgment in *The Parana* (at 123). He then continued (at 392C/E):

"If that was the right test then the decision was right, and I think that that test was in line with a number of cases decided before or about that time (1877). But, as I have already said, so strict a test has long been obsolete. And, if one substitutes for "reasonably certain" the words "not unlikely" or some similar words denoting a much smaller degree of probability, then the whole argument in the judgment collapses."

95. *The Pegase* [1981] 1 Lloyd's Rep 175 was another case of delayed delivery of a cargo, this time of chromite sand to be delivered under a bill of lading to receivers who required the sand for their business as resellers of such material to foundries. Arbitrators rejected the loss of profits claim made by the receivers against the

shipowners, and the receivers appealed by way of a special case. Robert Goff J remitted the award to the arbitrators for them to make an appropriate award in the light of the principles stated in his judgment, in which he succinctly stated his conclusions regarding a wide-ranging review of the jurisprudence (see at 181/183). For instance:

> "Now, as I have already said, the law has not stood still since *Hadley v. Baxendale*. First, the principle originally enunciated in that case has been restated, in particular in two cases...*Victoria Laundry*...and...*The Heron II*...The general result of the two cases is that the principle in *Hadley v. Baxendale* is now no longer stated in terms of two rules, but rather in terms of a single principle – though it is recognized that the application of the principle may depend on the degree of the relevant knowledge held by the defendant at the time of contract in a particular case. The approach accords very much to what actually happens in practice; the Courts have not been over-ready to pigeon-hole the cases under one or other of the so-called rules in *Hadley v. Baxendale*, but rather to decide each case on the basis of the relevant knowledge of the defendant...
>
> In some cases, the Courts have been prepared to take into account knowledge of special circumstances (i.e., circumstances outside the ordinary course of things) although such knowledge was not communicated by the plaintiff to the defendant – such as knowledge of the nature of the plaintiff's business...In other cases, however, the Courts appear to have considered that the special circumstances should have been specifically drawn to the attention of the defendant by the plaintiff...In the light of the decided cases, the test appears to be: have the facts in question come to the defendant's knowledge in such circumstances that a reasonable person in the shoes of the defendant would, if he had considered the matter at the time of making the contract, have contemplated that, in the event of a breach by him, such facts were to ·be taken into account when considering his responsibility for loss suffered by the plaintiff as a result of such breach. The answer to that question may vary from case to case, taking into consideration such matters as, for example, the nature of the facts in question and how far they are unusual, and the extent to which such facts are likely to make fulfilment of the contract by the due date more critical, or to render the plaintiff's loss heavier in the event of non-fulfilment.
>
> The two governing principles – the principle of causation and the limiting principle of remoteness of damage – provide, in their developed form, the solution to most problems of damages. Furthermore, I can find in the cases no rule of policy either excluding, or imposing special criteria in respect of, the recovery of loss of profits, whether the relevant contract be a contract of sale or carriage, whether the breach be non-delivery or delayed delivery, and whether the profits claimed to have been lost are resale profits or profits from loss of use (which I shall call user profits)."

96.    I can find in none of these cases any statement of a relevant test, or any principle, or any decision on the facts, which is inconsistent with the majority arbitrators' conclusion. No distinction is made between what the charterers here have described as loss of use damages (damages in respect of the overrun period) and loss of profits to be earned by a subsequent transaction to which the claimant seeks to devote his property (damages in respect of the loss of fixture). The refixing of the vessel at the end of the charterers' charter was not merely "not unlikely", it was in truth highly probable (barring other possibilities). The nature of the chartering market was at all times an open book to the charterers: it was their own business, in which they were experienced. It was of course a market which went up and down and could be volatile. Against that background of knowledge, which the charterers had always possessed, and in truth arose out of the ordinary nature of things, the charterers should have been cautious about the danger of late redelivery. There is no finding that their last voyage was an illegitimate one, and therefore I assume that it was legitimate. However, in taking the risk of a delay on a last legitimate voyage, the charterers were of course seeking to squeeze the last drop of profit from what, in the light of the huge increase in rates since the time of their addendum, was a particularly strong market. If by misfortune a delay on the last voyage put them into breach, they knew, or ought to have known, what the risks were for themselves and their owners. They may or may not have calculated that, if the delay which they had put in motion, caused their owners to lose their next fixture, this would happen just at a time when there was a sudden crack in market rates. But if they had considered that possibility, they ought to have appreciated that, barring any unusual features of the subsequent fixture, the risk of that loss should fairly fall on themselves rather than the owners. Why should it fall on the owners?

97.    Mr Kendrick submitted that the arbitrators had applied the wrong test, that of mere foreseeability, which Lord Reid had criticised in *The Heron II*. The sole basis of this submission was the arbitrators' acceptance of the charterers' own concession that drydockings and sales of a vessel were also "not unlikely" events, as well as subsequent fixtures. However, there is not the slightest sign that arbitrators directed themselves by other than Lord Reid's test.

98.    In theory, one possibility, of course, is that a loss of fixture may not be caused by the delay in redelivery. Such might perhaps have been the case, for instance, if, unusually, the fixture had been made with a laycan limited to the day of redelivery itself. Alternatively, it might be said that that is something which a charterer could not reasonably have anticipated, and so is too remote. That, however, is not this case.

99.    Another possibility is that a new fixture's rate is in excess of market rates. That again is something that could not reasonably have been anticipated. That again, however, is not this case.

100.   However, we are now moving into the area of the charterers' further submissions.

*Res inter alios acta*

101.    Mr Kendrick submitted that the owners' third party transactions are irrelevant, and that only a "market" rate of damages can enter into their liability. He further submits that that "market" rate is to be found in the overrun period measure of damages (the difference between charter and current market rates at the date of redelivery) as distinct from the loss of fixture measure of damages which was here premised on the precise transactions in relation to the Cargill fixture.

102.    In my judgment, however, these distinctions and submissions are erroneous. It is perfectly true that where a breach of contract has caused the claimant to lose a transaction, his loss is generally prima facie to be measured against the price set by the relevant market at the relevant date. Thus in *The Heron II* the damages for late delivery of the sugar were dictated by the difference between its value in the Basrah market at the proper time for delivery and its lower value at the time of delayed delivery. For the same reason, the loss caused by the breach of non-delivery or delayed delivery of goods sold is prima facie to be measured, as against a seller, by the difference between contract price and any higher price set by the market at the due date for delivery. That, however, is because, where there is an available market, the claimant is assumed to have mitigated his loss by buying in substitute goods at the market price. It does not matter that he chooses not to buy in, or delays his purchase. That is his own speculative decision or, where the subsequent transaction involves third parties, (in the Latin phrase) *res inter alios acta*.

103.    This reliance on the market as the arbiter of what a claimant has lost by his defendant's breach of contract in the ordinary course of events is well ingrained in English law. Many examples abound, and, as the judge observed, the rule has been enshrined in statute, for instance in sections 51(3) or 53(3) of what is now the Sale of Goods Act 1979. A good example, in the case of a time charter, is to be found in *The Elena d'Amico* [1980] 1 Lloyd's Rep 75. The shipowners there had wrongfully repudiated their time charter by failing to repair their vessel, only 14 months through a 3 year charter. The charterers, however, did not replace the vessel by hiring in a substitute. Subsequently, nearly a year after the termination of the charter, the market rose substantially. The charterers sought to recover damages based on that subsequent rise, but failed, both in arbitration and in the commercial court. Robert Goff J explained the reasons why at 87/90: using sale of goods cases as an analogy, he demonstrated that the independent decision of a claimant, albeit acting reasonably in his own interests, to defer, either for a time or completely, buying in from the market what the defendant has deprived him of, is an example where the resulting loss is incurred independently of the breach of contract. Thus, after referring to three aspects of the rules relating to mitigation of loss, he stated (at 88) –

> "Now, in my judgment, these aspects of mitigation are all really aspects of a wider principle which is that, subject to the rules of remoteness, the plaintiff can recover, but can only recover, in respect of damage suffered by him which has been caused by the defendant's legal wrong. In other words, they are aspects of the principle of causation."

104.   Robert Goff J continued (at 89/90):

> "If, at the date of the breach, there is an available market, the normal measure of damages will be the difference between the contract rate and the market rate for chartering in a substitute ship for the balance of the charter period. If however the time charterer decides not to take advantage of that market then, generally speaking, that will be his own business decision independent of the wrong; and the consequences of that decision are his. If he judges the market correctly, he reaps the benefit; if he judges it incorrectly, then the extra cost falls on him.
>
> It does not matter (and this is important in regard to the findings of the arbitrator in the present case) that his decision was a reasonable one, or was a sensible business decision, taken with a view to reducing the impact upon him of the legal wrong committed by the shipowners. The point is that his decision so to act is independent of the wrong."

105.   He therefore found that the charterers' independent decision meant that there was no causative link between the owners' repudiation and the damages claimed.

106.   In the present case, however, there is no issue of causation, and the sole question before us is one of remoteness. Moreover, if the charterers fail on that question of remoteness, there is no issue as to the amount of damages to be awarded: namely $1,364,584.37. If that had not been common ground, it is possible – I am intending to make no decision on the matter – that, having proved the loss of the Cargill fixture, the owners' claim was really to be measured by the difference between (a) the market rate for a new fixture as of the due redelivery date and (b) the market rate for that fixture as of the actual redelivery date: provided that was no higher than the damages actually suffered. The argument for that result would be that it represents the conventional measure favoured by English law.

107.   As it is, that particular argument has not been debated, and does not need to be. However, even though the damages have been agreed, subject to the issue of remoteness, and even though it is common ground that the Cargill fixture was made at an appropriate time in relation to the expected redelivery of the vessel, and at the then market rate, and that the amendment to the laycan dates and the rate were similarly made in an appropriate manner and at a market rate, Mr Kendrick has sought to argue that this was the typical case discussed in *The Pegase* of an independent decision, or *res inter alios acta*. On the findings of the majority arbitrators, however, it was not. The fixture was made in accordance with the due redelivery date, and in the immediate run-up to it, and it was entered into in response to the charterers' formal redelivery notice in accordance with their contractual redelivery obligations.

108.   This was not of course a reaction caused by the breach of late redelivery, but in normal anticipation of due redelivery, as the charterers might themselves have contemplated would occur. Subject to the possibility that the market rate as at the due date for

redelivery is to be taken as the marker instead, rather as in *Victoria Laundry* the claimant was to be compensated for lost contracts at an ordinary rate rather than at the special rates which had been negotiated, it seems to me that no complaint can be made about the owners' transaction thus far. (In the present case, what might possibly be said to be special in at any rate the sense of individual is the particular date of the new fixture, here 28 April 2004, albeit a mere four days before the due redelivery date of 2 May. Once that date is chosen, the rate is dictated by the market. So, the rate is only special in as much as it depends on the date of fixture.) What happened next did happen in direct reaction to the charterers' breach, for on 2 May (at midnight) the vessel's redelivery was late. By 5 May the owners accurately predicted that the vessel would not be redelivered in time for the cancelling date under the Cargill fixture of 8 May. They therefore acted in reasonable mitigation of the charterers' breach by negotiating with Cargill an extension of the cancellation date to 11 May, on pain of dropping the new fixture rate by $8,000: a reduction dictated by the swift drop of the market and agreed by reference to the new market price. Again, no complaint can be made about that reaction, unless possibly it might have been argued that the date for calculating the new market price should be taken as the actual date of redelivery.

109.    It follows, in my judgment, that it does not matter whether or not this case comes, as the judge thought it did, within those exceptional cases where there is no available market and therefore it is the actual loss suffered, rather than the conventional next market loss, which can be claimed: as in *Hall v. Pim* and the other cases discussed by the judge. However, I can see great force in the judge's conclusions in this respect. A follow-on fixture made by a shipowner is rather like the resale of goods by a merchant buyer. As Devlin J said in *Kwei Tek Chao v. British Traders and Shippers Ltd* [1954] 2 QB 459 at 489/490:

> "It is perfectly true that the defendants knew that the plaintiffs were merchants who had bought for re-sale, but everybody who sells to a merchant knows that he has bought it for re-sale, and it does not, as I understand it, make any difference to the ordinary measure of damage where there is a market. What is contemplated is that the merchant buys for re-sale, but if the goods are not delivered to him he will go out into the market and buy similar goods and honour his contract in that way. If the market has fallen he has suffered no damage; if the market has risen the measure of damage is the difference in the market price. There are, of course, cases where that prima facie measure of damage is not applicable because something different is contemplated. If, for example, a man sells goods of special manufacture and it is known that they are to be re-sold, it must also be known that they cannot be bought in the market, being specially manufactured by the seller. In such a case the loss of profit becomes the appropriate measure of damage. Similarly, it may very well be that in the case of string contracts, if the seller knows that the merchant is not buying merely for re-sale generally, but upon a string contract where he will re-sell those specific goods and where he could only honour his contract by delivering those goods and no others, the measure of loss of profit on re-sale is the right measure."

110.   So here, if the analogy with sale of goods is to be pursued, the charterers knew that the owners were likely to re-fix a new charter to follow on their own in close proximity. Vessels being what they are and chartered as specific items (only comparatively rarely does a charter permit a substitute), the charterers would also have known that, if the vessel did not become available to the owners at the due time, there was no market in which she could be bought in, and that the owners would have to be able to deliver into the new charter that vessel and her alone. As the judge said (at para 94 of his judgment below):

> "If late delivery of goods under a sale contract is to be regarded as analogous to late redelivery under a charterparty, it has to be remembered that that which is to be redelivered will in all probability be the very thing that is thereafter to be delivered under a subsequent charter."

111.   That leaves the question of the length of the new fixture by reference to which the loss of fixture damages is to be calculated. Mr Moss, the minority arbitrator, saw this as "The fundamental problem…it was difficult to see where a line was to be drawn". The majority arbitrators, on the other hand, thought the length of the follow-on fixture was irrelevant, unless it amounted to an extravagant or unusual bargain, which in this case it was not.

112.   I can see that such a question might raise a problem on particular facts, but such problems of line-drawing are often inevitable in the law, as the issue in *The Johnny* demonstrates even in relation to the question of the overrun period measure of damages (see paras 36-39 above). The solution there was to take a current market price on a fixture of equivalent length to that of the parties' charter. On our facts, however, I see no difficulty. The previous two periods of charter to the charterers (about 5 to 7 months under the original charter and minimum 5 to maximum 7 months under the addendum) had both been of plus or minus 6 months: and the Cargill fixture was again of around this length, in fact a little shorter at 4 to 6 months. It appears to be within a standard length. Such a fixture was plainly "not unlikely". It may be, but I see no need to decide, that as a rule of thumb a charterer should not, without further knowledge, be held liable in such a situation for the loss of a new fixture of longer length than that which he had himself contracted for. If need be, and the market feels that such a question should be determined by contract, a standard form or even special provision could be agreed. But as a matter of principle, the claimant should not be kept out of any compensation because of an argument about the length of the new fixture: any more than the launderers in *Victoria Laundry* should be prevented from recovering any loss of profits because the particular dyeing contracts which formed one of their heads of loss were too special to form the basis of a calculation. It seems to me that the authoritative phrase "extravagant or unusual" is equal to the situation (see, for instance, *North Sea Energy Holdings v. Petroleum Authority of Thailand* [1997] 2 Lloyd's Rep 418). A contract at other than market prices, where the market price is relevant, is liable to be extravagant, and an unusual contract is likely to be outside the "usual course of things" which is the essential focus of the remoteness rule.

113.    The fact, however, that the market may have been particularly high in April/May 2004, or particularly volatile in the critical period relevant to the circumstances of this case, is not relevant, when once the type of loss, namely loss of a follow-on fixture, can be identified as "not unlikely". See *McGregor on Damages*, 2003, 17th ed, at para 6-162.

*The argument from authority*

114.    I have already largely dealt with this above. Mr Kendrick has sought to build on the fact that the claim for loss of fixture damages has not previously been made, nor therefore needed to be considered, the theory that any loss beyond the overrun period requires special facts to justify an "escape" from the loss of use measure, or a specific "assumption of responsibility" for loss of a subsequent fixture. However, I have observed above that it was not until *The Peonia* in 1991 that it was properly recognised that damages were available for late redelivery on a legitimate last voyage. And as for late redelivery on an illegitimate voyage, that raises special problems: if the voyage is not performed, the damages in question do not arise; and if it is performed, the probability is that a new fixture has not been arranged; and if one has been concluded, the argument might then arise that it was the owners' own choice to perform the illegitimate voyage that caused the loss of fixture: see also para 122 below.

115.    As for the "assumption of responsibility" submission, this is a misunderstanding of the requirement that where special knowledge is required, it is not enough for it to come to a defendant casually from a third party. It must come from the claimant in circumstances which make it proper to hold that the defendant is, or ought to be, alive to the risk. There is certainly no need for liability to be an express or implied term of the contract. The judge dealt with this submission entirely satisfactorily at paras 59/65 of his judgment.

116.    Even though a claim for loss of fixture damages has never been in issue, Mr Kendrick sought nevertheless to place reliance on submissions made to this court in *The Gregos*, eg at 343 and 345, where counsel (myself and Mr Gross QC as he then was) are recorded as submitting that on the proper facts damages for loss of fixture might be available under "the second rule" of *Hadley v. Baxendale*. That, however, takes the matter no further. So such damages might. The question is whether they are available on the facts of this case.

*The argument from practicality*

117.    Finally, therefore, I turn to Mr Kendrick's submissions under this heading, which deserve serious consideration. This is because the doctrine of remoteness is ultimately designed to reflect the public policy of the law. As Asquith LJ stated in his principle (1) in *Victoria Laundry* at 539, the compensatory principle in favour of a complete indemnity, which is the most basic of all rules regarding damages, would be "too harsh a rule" if pursued relentlessly. *McGregor* at para 6-178 recognises that the overall requirements of public policy may require ("although very occasionally") the refusal of

damages even where they may be said to have been in the parties' contemplation.

118.    In my judgment, however, this is not such a case. There is no fixed rule, and certainly no binding authority, that damages for late redelivery of a time chartered vessel is limited to the overrun period measure. There is of course nothing wrong with a rule which provides for such a measure. It would be outrageous if the law did not provide for such a measure. However, even Mr Kendrick accepts that it is only a prima facie measure, and that damages for loss of fixture may be available on proper facts. The jurisprudence would therefore not have to change in order to accommodate the damages awarded by the majority arbitrators in this case: it would merely have to develop, to reflect the claim now made for the first time. But its development would be entirely in accordance with principle. Its refusal to develop would not be in accordance with principle. This, therefore, is not a case where the argument in favour of certainty, or the *Nukila* principle, militates against the claim. On the contrary, principle and the particular facts of the case in my judgment require this solution. It seems to me that in *The Gregos* Lord Mustill went far towards accepting that a relatively short overrun might have very large consequences. Moreover, albeit by express agreement, the parties in that case agreed that if the charterers there were in repudiatory breach, then the owners ought to be compensated on the basis of the value to them of the fixture which they would then have foregone in order to perform the charterers' last voyage. It was done by agreement, not under the common law, but that agreement may still be said to represent the parties' own recognition of the fairness of that situation.

119.    Moreover, it seems to me that the rule for which Mr Kendrick contends, namely that damages for late redelivery should be limited to the overrun period measure *unless* the owners can show that, at the time of contract, they had given their charterers special information of their follow-on fixture, is both undesirable and uncommercial. It is undesirable, because it puts the owners too much at the mercy of their charterers: who can happily drain the lost drop and more of profit at a time of raised market rates, taking the risk of late redelivery, knowing that they will never have to pay their owners more than the current market rate for the overrun period, a rate which will never in truth properly reflect the value to the charterers of being able to fit in another spot voyage at the last moment. It is uncommercial, because, if it is demanded that the charterers need to know more than they already do in the ordinary course of events, when they already know that a new fixture, in all probability fixed at or around the time of redelivery, will follow on their own charter, then the demand is for something that cannot be provided. All that an owner will be able to tell his charterer in most cases is that he plans to fix his vessel anew at the time of redelivery. To which the charterer might well reply: "Well, I know that already! But don't expect that your telling me that is enough to put me on notice for the purpose of claiming loss of fixture damages if I redeliver the vessel late and you turn out to lose your fixture!" Such an answer, however, reflects the uncommerciality and error of the charterers' submission.

120.    As for the submission that the arbitrators' decision in this case will throw the situation in general into confusion, because late redelivery and changing market rates are common occurrences, I am sceptical that that is so. Business-like communication and co-operation between the parties to a charter ought to make a dangerous mishap an unusual event. It has taken the best part of two decades for *The Peonia* to bring forward this claim itself. It requires extremely volatile conditions to create the situation which occurred here. If the shipping industry nevertheless feels that it cannot live with this

result, clauses can be created to regulate the situation: just as clauses have come into being to regulate last voyages, such as Baltime clause 7[2] and Shelltime 4 clause 19[3].

121. As for the submission that where the making of a new fixture is delayed by late redelivery in a rising market, this would mean that a charterer's overrun period liability in damages could be off-set by the owner's recovery of a rate under the new fixture higher than he would otherwise have obtained: I would leave the solution of that question to the occasion when it arises. Mr Kendrick's submission is that the loss of fixture measure is a true alternative. If so, and I am not sure about that, the fact that there is no loss, or even a gain, under one measure, would not necessarily mean that there is no loss under the overrun period measure. Moreover, where one party has used another party's property beyond the time allowed, there is much to be said for the proposition that the minimum that the party in breach should pay is a current market rate.

122. As for illegitimate voyages, it seems to me that special considerations may arise here, but they have not been the subject of any debate before us, and I would be cautious about expressing any opinion. I would merely mention the possibility that an illegitimate voyage, being outside the contract and, if insisted upon, an anticipatory breach in repudiation of it (*The Gregos*), may amount in effect to a form of new offer: so that, if an owner in response says, "No, but I warn you that I have fixed the vessel for a new charter, and if you insist on the voyage and I perform it, not waiving my right to damages, and I lose my new fixture, I will look to you for compensation", it is not impossible that, albeit late in the day, the charterer will be fixed with knowledge of the new charter (see Mr Gross QC *arguendo* in *The Gregos* in the court of appeal at [1993] 2 Lloyd's Rep 335 at 345, albeit *cf Scrutton's* comment at 349 at footnote 11). That is not very different from what the parties agreed in *The Gregos*.

*Conclusion*

123. For these reasons, I would dismiss this appeal. In sum, subject to the issue of remoteness, the damages were agreed. On that issue, I would uphold the majority arbitrators' award.

124. **Lord Justice Tuckey:** I agree.

125. **Lord Justice Ward:** I also agree.

---

2 "Should the Vessel be ordered on a voyage by which the Charter period will be exceeded the Charterers to have the use of the Vessel to enable them to complete the voyage, provided it could be reasonably calculated that the voyage would allow re-delivery about the time fixed for the termination of the Charter, but for any time exceeding the termination date the Charterers to pay the market rate if higher than the rate stipulated herein."
3 "If at the time this charter would otherwise terminate in accordance with Clause 4 the vessel is on a ballast voyage to a port of redelivery or is upon a laden voyage, Charterers shall continue to have the use of the vessel at the same rate and conditions as stand herein for as long as necessary to complete such ballast voyage, or to complete such laden voyage and return to a port of redelivery as provided by this Charter, as the case may be."
Cf, re Shelltime 3's clause 18, *The World Symphony* [1992] 2 Lloyd's Rep 115, and *Wilford* at [591].