UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
J.K. INTERNATIONAL PTY. LTD.,                          :

                Plaintiff,             :            07 Civ. 7328 (SHS)

   - against -                                         :            ECF CASE

OLDENDORFF CARRIERS GMBH & CO.,                        :

                Defendant.             :
-----------------------------------------------------------------X

## SECOND DECLARATION OF TIMOTHY NICHOLAS YOUNG Q.C.

I, TIMOTHY NICHOLAS YOUNG, of 20 Essex Street, London WC2R 3AL hereby declare as follows.

1. I am the same Timothy Young who made the Declaration in this matter on 2nd October 2007. I remain under the duty to do my best to assist this Honorable Court on matters of English law. In this respect I have been shown a number of further documents to supplement those I had seen when I made my earlier Declaration. In particular I have been shown:

    (i)   The Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Vacate Maritime Attachment dated November 15, 2007;

    (ii)  Declaration of Sandeep Mohan dated 12th November 2007 with 20 Exhibits;

    (iii) Declaration of Michael I O. Hardison dated November 19, 2007, with 3 exhibits;

    (iv)  Declaration of John Richard Blacker dated 14th November 2007, with 5 exhibits.

2.  It is principally the Declaration of Mr. Blacker on English law and practice to which I wish to address attention in this, my second, Declaration. I feel obliged to begin by making three preliminary points:

    (i)  I note that the Plaintiff's Memorandum of Law says "*...that the legal issues are not nearly as definite – or as one sided – as Mr. Young seems to believe...*" and Mr. Blacker refers to some comments in my Declaration as "*prejudicial*". I am not familiar with the *mores* and forms of expression used in this Honorable Court, but I hope it is not being suggested that my Declaration was "one-sided" in the sense of biased in favour of the Defendant. If that is being suggested, I should register my strong objection; my Declaration was written on the basis of the facts as I then understood them on the basis of identified documentary materials and I explicitly set out that understanding so that this Honorable Court could see the basis of my opinion; and it was my own, entirely even-handed opinion which resulted, being based on three different possible factual permutations. I note that Mr. Blacker seems to know a considerable amount about the preparation of the case (see paragraph 6 where he speaks of the experts both sides have appointed) and this indicates that he has been involved in that preparation, whereas I, by contrast, have no knowledge of matters other than what I read in the documents before this Honorable Court and I have not been instructed as counsel for the Defendants in the arbitration.

    (ii) Since there appears to be some implicit (and even at times, explicit) questioning of my experience, I should add that I have been continuously in practice in the area of shipping and shipping arbitration for nearly 30 years. Mr. Blacker says he has been involved in over 100 arbitrations in his career; I have done a rough check of my own experience and I have been involved as counsel in well over 600 arbitrations. I have had several cases dealing with discharge in Indian ports and many cases involving main engine failures, and whilst it is obvious that I do not hold myself out as an expert in these areas, I do have the insight that such experience

brings. I have also been an arbitrator in several bunker contamination disputes, of which one very memorable one involved bunkering in Singapore[1]. Also in my capacity of arbitrator, I deal with many issues of costs and case management and, earlier in November this year, I delivered a speech to an International Conference organized by IBC on the subject of "Controlling Costs in Maritime Arbitration".

(iii) Certain incidental points which I made at paragraphs 8 – 10 of my earlier Declaration and which seem to have excited criticism, were made for one purpose and one purpose only, namely that, when I am presented with a set of factual assumptions for the writing of any Opinion, I always seek if possible to consider the probability or improbability of those assumptions being correct. That involves cross-checking against the available evidential material and against my own experience. If I think an assumption is unrealistic or improbable, I will say so and give my reasons. That said, I should point out that Mr. Blacker materially misrepresents what I actually said in the relevant parts of my Declaration and, given the criticism he levels at me, I must set the record straight:

(a) At paragraph 8 of his Declaration, Mr. Blacker says that the experience of JKI and the local agents of discharging in Mumbai is greater than mine. Of course it is. But when one actually looks at what I said, it will be seen that there is no difference between Mr. Blacker's clients/their agents and myself. I draw attention to paragraph 4 of the email dated 8th November 2007 of Narayan Nethrakere in Exhibit 1 to Mr. Sandeep Mohan's Declaration where he says exactly what I said: Mumbai is well known as having a draft limitation (of about 10.5 metres) at the inner anchorage; that is the very reason why there is lightening at the outer anchorage when the weather permits. That is actually the very premise of the Plaintiff's whole case. Mr. Blacker's assertion

---

[1] In passing I note the 4th paragraph of clause 39 of the time charterparty in issue

of "surprise" at my comment is therefore both misplaced and misleading.

(b) At paragraph 9 of his Declaration, Mr. Blacker says that my experience of monsoons is not as good as that of the Government of India meteorological Department. Of course it is not. But he fails to note that, in my Declaration, I was referring to the assertion in paragraph 9 in the Verified Complaint that *"The monsoon season commenced in India on June 18, 2007"* (emphasis added). My comment about that was (and remains) entirely correct, since the monsoon season "...*in India...*" commences much earlier than its arrival *in Mumbai*. I myself refer to the report of the Government of India Meteorological Department of the Southwest Monsoon 2007 in Exhibit 3 to the Declaration of Kevin J. Lennon where at p. 2 of 10 it says "...*The monsoon revived gradually and arrived over Kerala on 28th May, four days prior to the normal date...*" (Kerala being an Indian mainland state) and then advanced at varying speeds over the rest of the subcontinent. The time when the effects of the monsoon are felt at the outer anchorage of Mumbai and when they are such that lightening at the outer anchorage is affected is an entirely different thing. It will be seen, therefore, that the Government of India meteorological Department actually supports my view, however unimportant my view may be. Mr. Blacker's criticism of my comment in paragraph 10 of my Declaration is thus founded upon a misstatement, or at least a misapprehension, of what I actually said.

(c) At paragraph 11, Mr. Blacker says that I said "...*it is not uncommon for high exhaust gas temperatures from a main engine to have been caused by contaminated bunkers*" (emphasis added). I did not say that. What I actually said was that it is "...*not unknown for contaminated bunkers to cause this sort of problem...*". That is a very different thing. All I was doing was

4

testing the likelihood of one of the three assumptions which I was asked to make and which I explicitly set out. Mr. Blacker not only misapprehended what I was saying, therefore, he also expressly misrepresented it to this Honorable Court. I might note, however, since my experience is being questioned, that my comment about high exhaust gas temperatures resulting from "combustion problems" is unquestionably correct; it is *only* combustion problems that can cause such high temperatures; many years of cross-examining marine engineers has taught me that much. The particular *cause* of the combustion problems in any particular case will naturally vary: it may be the fuel used, or it may be the fuel injection equipment, or it may be valve maloperation. This will plainly be for marine engineers to investigate, but I do note that the recent analysis report (Exhibit 1 to Mr. Blacker's Declaration) makes two potentially important comments, in addition to the sentence quoted by Mr. Blacker. The first is there was *"presence of high sodium noted [which] will cause trumpet formation on fuel nozzle and affect combustion efficiency"*; combustion inefficiency is the paradigm of high exhaust gas temperatures. The second is that the CCAI value was 849 with the *"Observation: ignition delay is indicated by CCAI greater than 840 for medium-speed engines"*; delayed ignition is another cause of high exhaust gas temperatures.

3. With those comments made, it will be immediately obvious that the facts as I understood them and as I set them out (specifically for the purpose of assisting this Honorable Court to see the factual basis on which I was giving my opinion) have been considerably enlarged by the Declaration of Sandeep Mohan and the exhibits thereto. I hardly feel it fair for Mr. Blacker to criticise me for not commenting on the contents of a Declaration which did not exist when I made my Declaration. Some elements of Mr. Mohan's evidence take the matter well beyond the material available to me earlier. One example is that the Verified

Complaint alleged the rise in exhaust gas temperatures as being on or about 2nd – 4th June 2007[2] at a time when the vessel's ETA Mumbai was 2nd June, "…which would have permitted discharge prior to the onset of the Monsoon season…" (see paragraphs 6 and 13 thereof). Mr. Mohan has now to be making a materially different, or at least a more elaborate case with more underlying documents and I appreciate that the comment I made which was based on the Verified Complaint's pleading of the ETA at Mumbai is now incorrect. It has no impact upon my conclusions, however.

4. Although I still maintain the analysis on the basis of the threefold possible factual assumptions which I set out in my earlier Declaration, for present purposes I will assume (i) that the cause of the engine problems was a breach of charter by the Defendant; (ii) that at all material times the Plaintiff was intending to discharge the entire cargo at Mumbai[3] by lightening at the outer anchorage before monsoon conditions made it impossible (iii) that the programmed discharge was about 7 days[4] and (iv) that monsoon conditions and pertinent barge regulations would have allowed that discharge. Thus I am here working upon the assumption that the Plaintiff's version of the seminal facts is correct. I hope that I can thereby avoid Mr. Blacker's further criticism.

5. Those assumptions and the critical new factual points which the Plaintiff has raised do not in any way affect my opinion as expressed in my earlier Declaration other than to reinforce it quite markedly.

---

[2] I note that Mr. Mohan exhibits and relies upon the vessel's deck log (his Exhibit 12) which I have carefully read and that very document demonstrates that the first logging of a problem with the vessel's main engine and speed was at 21.55 hours on 4th June 2007 ("*Stop engine by request of Ch[ief] Engineer, High temperature of the M[ain] E[ngine]. Vessel adrift*" and then again, after some progress (see the "distance made good" column) again on 5th Jun at 13.10 "*M[ain] E[ngine] stopped for checking*" and it was restarted at 17.30 hours increasing to half speed by 18.23 hours. Thereafter of course problems were encountered.

[3] Cf paragraph 12(a) below

[4] See the Declaration of Sandeep Mohan paragraph 12, although at the risk of exciting Mr. Blacker's "surprise", I do note that the Voyage Instructions (to which Mr Mohan referred at ibid paragraph 6) spoke of "*An average discharge rate of about 2,500-3,000 MT per day, 7 days a week will be attained*", which, for a cargo of nearly 47,000mts is about 16-19 days, not 7 days.

6

6.  The legal propositions which I made in my earlier Declaration remain entirely sound and it is noteworthy that Mr. Blacker does not challenge a single proposition; in truth all he does is cite cases which I had already cited to the same effect. The legal conclusions which I drew not only remain sound, they are (as I noted) entirely reinforced by what I have seen since.

7.  It will be remembered that, at paragraphs 16-18 of my earlier Declaration, I considered the issue of damages on the assumption of a breach of charter by the Defendant and, at paragraph 18, I isolated three heads of claimed damage which were in my view irrecoverable on the facts as I then believed them to be.

8.  Of those three heads of damage, item (i) has not been touched upon by any of the Plaintiff's evidence other than the sentence in paragraph 42 of Mr. Mohan's Declaration, which adds no more detail. Nor has the Plaintiff sought to elaborate the Verified Complaint to explain the underlying factual allegations upon which it relies. Mr. Blacker has said that the claim is due to the master's refusal to come to the anchorage, although none of the factual evidence produced descends to that allegation. Mr. Blacker is of course not a witness of that fact. He says that unless the master can justify his actions, his refusal to comply with a lawful order is a breach of charter. That is simplistic and, as a piece of legal analysis, inaccurate. It is for the Plaintiff, as Charterers, to prove what its order was and that it was lawful; it is not for the Defendant to disprove lawfulness. Mr. Blacker raises an issue of the burden of proof in English law but reverses it incorrectly. As I noted in my earlier Declaration, the master's duty is not to obey immediately, but to obey within a reasonable time given the issues arising from the order. Issues of safety and navigation are characteristically encountered in this connection. A master is bound to navigate safely and it is a non-delegable discretion vested in him. I refer to the three authorities I have earlier addressed: The Hill Harmony [2001] 1 Lloyd's Rep. 147, The Houda [1994] 2 Lloyd's Rep. 541 and Larrinaga v The Crown (1944) 78 Ll. L. Rep. 167. Mr. Blacker does not address these authorities, nor does he challenge the propositions of law derived

from them.  He appears to say that it is, without more, a breach of charter if the master does not proceed to an anchorage as ordered by charterers.  That is wrong and the burden of proof lies on charterers.  If, as here, the Plaintiff adduces no evidence about its order, then there is simply no arguable breach.  If the master did indeed wrongly refuse a lawful order the vessel would be off-hire (there being no discrete further head of loss and damages resulting) and yet no claim for off-hire has been made in these proceedings, so far as I am aware form the documents I have seen.

9.  As to item (ii) (the barge operator's claim), I had not at that time seen any material underlying the Plaintiff's claim.  Since then I have seen

- at Exhibit 12 to Mr. Mohan's Declaration, the contract which the Plaintiff made with the barge operator, United Shippers Limited ("USL") and

- at Exhibit 18 to the same Declaration, the claim document presented by USL to the Plaintiff for Rs. 1,18,80,000[5].

The USL contract provides as follows (with emphasis added):

> "This contract ...for handling of chick peas coming into MbPt [Mumbai port] on the mother vessel MV Frederick Oldendorff.  USL agrees to perform the following work for JKI:
> 1. SCOPE OF WORK:
>    a. **Port Services:**
>       - **Complete onboard stevedoring**
>       - **Discharging of cargo at the jetty with excavators**
>       - **Inter carting of cargo to storage areas within port premises**
>
> 5. REMUNERATION:
> For services rendered by USL to JKIL as per the scope of work detailed above in clause 1, JKIL will pay USL
>
> For Scope of work detailed under 1 a    **Rs.35 P[er]M[etric] T[on]**
>
> *Any and all lighterage charges to / on the Mother Vessel, cargo charges and all statutories levied by MBPT will be JKIL account.*
>
> 6. PAYMENT TERMS:
>
> *Payment for the handling services rendered by USL shall be as follows:*

---

[5] The commas are in the right place, since this is the customary Indian way of writing sums in Rupees in my experience.

> 1. *For 10,000 MT in advance with first advance to reach USL prior to arrival of the vessel*
>
> 2. *On completion of discharge of 9,000 MT M/s JKIL will release next payment for 10,000MT to USL, which will continue until vessel completion...*
>
> 10. FORCE MAJEURE
>
> **If either party is unable to perform or comply in full or part with any obligations or conditions of the contract due to contingencies beyond the control of either party and without its faults or negligence, including but not limited to** ... the affected party shall give written notice to the other party of such Force Majeure within 48 hours after the arising of the Force Majeure conditions and **such affected party shall be relieved of liability and shall suffer no prejudice for failure to perform their obligations during such period. In the event that the said conditions of Force Majeure and the suspension of obligations shall continue in excess of 30 days, the contract may be cancelled at the option of either party."**

The contract contains an Indian arbitration clause, but no express choice of law clause. By contrast, with its terms, the USL claim document dated 25 June 2007 reads as follows (again with emphasis added):

"CHICK PEAS FREIGHT

| Description of Goods | Quantity | Rate | Per | Amount |
|---|---|---|---|---|
| Amount Debited to your A/c for loss of Revenue Due to Cancellation of Your Chick Peas Vessel MV Frederick Oldendorff **Due on 15.06.07 at Mumbai Port** | 44,000.000 mt | **270** | **MT** | 1,18,80,000.00 |

10. These documents entirely bear out the point I made in my earlier Declaration and in addition add further reinforcement. Everything I said at paragraph 18(ii) of my Declaration dated 2nd October 2007 remains entirely correct and I would add the following further comments:

    (a) The English arbitration tribunal determining the present charterparty dispute would hold that the USL contract was, as a matter of English

conflicts of laws principles, governed by Indian law because of the place of performance, the currency and the choice of arbitration forum, but, as a matter of English law (as the law of the forum in the charterparty arbitration, foreign law is presumed to be the same as English law and, in the absence of proof to the contrary, it would therefore determine (as between the Plaintiff and the Defendant) the true meaning and effect of the USL contract in accordance with English law: *Dicey Morris & Collins*[6] on *The Conflict of Laws 14th Ed* (Sweet & Maxwell 2006) Rule 18(1) and (2), Chapter 9. There is currently no suggestion that the principles of contractual construction of Indian law are materially different from those of English law and, indeed (if I may risk Mr. Blacker's wrath) it would be surprising if it were materially different since the Indian law of contract in the Indian Contract Act 1872, as amended, is "a code of English law"[7]. In their great work (op. cit.), Pollock & Mullah say at p.5 *"To interpret the Act, the aid of English law may be pressed into service."*[8] An English arbitral tribunal would therefore have little or no compunction about applying English law to determine the meaning and effect of the USL contract.

(b) The USL contract rate was expressed to be Rs.35 per metric ton, whereas the alleged claim invoice asserts a rate of Rs.270 per metric ton. An English arbitration tribunal would therefore have no doubt that the Plaintiff had and has no liability to USL for the amount asserted in the USL claim document. Furthermore, since the claim is at best one for damages and not for freight, since freight is due for the carriage and right and true delivery of goods and, by definition, there was none. Damages would have to take into account both the costs saved to USL by not having to perform the contract and the substitute earnings of the barge(s) in mitigation of their alleged loss. Not only is the rate of Rs270 per mt not

---

[6] The present editor of this seminal work is Sir Lawrence Collins, a Lord Justice of Appeal.
[7] The opening words of the preface to Pollock & Mullah's Indian Contract and Specific Reliefs Act 11th Ed.
[8] Referring to Superintendence Co. of India v Krishna Margin (1980) A.S.C 1717, 1721-1722 and Stayabrata Ghosh v Mugneeram (1954) A.S.C. 44.

supportable, not even the rate of Rs35 per mt is supportable since there must in law be such deductions.

(c) The USL contract does not contain a minimum contract quantity as such, although it may be said that it contemplates at least the pre-payment of Rs350,000 (10,000mts at Rs35 per mt) and a succeeding sum of the same amount upon completion of the discharge of 9,000mts. But the USL contract does not specify how much cargo on the vessel the Plaintiff wishes to discharge at Mumbai, nor does it impose an obligation on it to discharge 47,000 or 44,000 mts or indeed any quantity. If the Plaintiff wished to discharge a quantity at say, Kandla or Mundra, nothing in the USL contract expressly prevents it or compels the Plaintiff nonetheless to pay USL for a quantity not "…coming into Mumbai Port …". There could be no implied term to that effect, since it would not be necessary or indeed even reasonable: see the decisions of the House of Lords in <u>North West Metropolitan Regional Hospital Board v Trollope & Colls</u> [1973] 1 W.L.R. 601 and <u>Wickman Machine Tool Sales v Schuler</u> [1974] A.C. 235.

(c) Furthermore, if (as the Plaintiff alleges and I assume) it was compelled by the vessel's late arrival to discharge part of the cargo at Mundra, two consequences follow: it would be protected from liability to USL by the Force Majeure clause in the USL contract and, once the Mundra lightening had taken place, there was nothing preventing the Plaintiff from utilising the services of USL under the USL contract to discharge the balance of the cargo coming into Mumbai port, which in any event would seem from the USL claim document, to have been planned to start only on 15th June 2007. If the Plaintiff chose not to use the services of USL (or "cancelled" the USL contract, to use the term found in the USL claim document) for that part of the discharge which was effected into Mumbai port, that was unconnected in any causative way to the Defendant's assumed breach; it would have resulted from the Plaintiff's unencumbered choice. Any liability to USL for that failure by the Plaintiff cannot be recovered in damages from the Defendant therefore.

(d) In any event the Plaintiff is under a duty to mitigate his loss, as I noted in my earlier Declaration, and that will involve the duty to take reasonable steps to resist such a claim as made by USL. That will require reliance on the contract rate, the absence of a minimum contract quantity, the force majeure clause and the argument that USL was themselves under an obligation to find alternative employment in mitigation of their alleged loss. I am not aware of any evidence having been submitted by JKI on these points, and so I am unable to comment further. However, the principles of English law on this head of claim remains the same and my conclusion is unaltered.

(e) It is not said that the Plaintiff has paid the USL claim or any part of it. That being so, the Plaintiff has not yet suffered any loss at all. It is said that it has been exposed to a potential liability, and nothing more. That, however, is not a crystallised loss at all. No arbitral tribunal in England would award damages to the Plaintiff equal to the full amount of a claim merely as asserted by a third party; the ordinary remedy in a case where there has been no accrued loss by payment of a claim is an order that the respondent do indemnify the claimant, with suitable precautions to ensure the claimant acts reasonably in mitigation of his loss. No monetary award would or could be made by an English tribunal, and certainly not for the full amount claimed, least of all, when the claim appears to be unfounded and inflated in the respects I have noted.

In the light of these obvious points, which reinforce the point made in my earlier Declaration, I am entirely confident that no English arbitral tribunal could or would conceivably make a monetary award in the Plaintiff's favour for the amount asserted in the present proceedings by the Plaintiff.

11. Turning finally to item (iii), once more nothing in the new material presented by the Plaintiff affects my previously expressed opinion other than to reinforce it. I will consider the materials now presented. It is to be noted at the outset that the

Plaintiff has not provided any evidence of its alleged sales[9] to the receivers in respect of whose claims the Plaintiff is now seeking relief. The dates of the alleged contracts of sale may be highly material, given that this entire case is about timing. It would seem that the alleged contracts were made by JKI subsequent to the fixture of the vessel as evidenced by paragraph 9 of the Declaration of Mr. Mohan. However, in order to avoid the criticism of Mr. Blacker, I will assume that all of the sales to the third party claimants, whose claim documents appear in Exhibit 19 to the Declaration of Mr. Mohan (Shadiram & Sons, Sharp Menthol India Limited and Poona Dal and Oil Industries Ltd. as well as the "anticipated" claim of MMTC Ltd.) all predate the vessel's delays and are all subject to Indian law, as to which the same point arises as with item (ii). I will also assume that the proper currency of the claims is the US Dollar, although for an Indian sale referable to Indian market conditions, the proper currency of claim would be Rupees: <u>The Texaco Melbourne</u> [1994] 1 Lloyd's Rep. 473. That said, some observations need to be made:

(a) The Claim document of Shadiram & Sons dated 6th July 2007 refers to the sale contract under which they bought from the Plaintiff *"on terms of CIF Mundra Port, India."* (emphasis added). I cannot see how a sale on "cif Mundra" terms can possibly lead to a claim when the vessel actually proceeded to Mundra and discharged there at a time when the Plaintiff's case is that the vessel was never going to go to Mundra and was always going to go to Mumbai and only Mumbai. There is plainly no typographical error since the replacement bills of lading in Exhibit 13 to the Declaration of Mr. Mohan, names the discharge port for bills 2 and 11 as "Mundra". Also Mr. Mohan refers to the issue of two new bills of lading at paragraph 35 of his Declaration, but does not explain the circumstances of this new issue. This claim is manifestly unsustainable as an element of loss resulting form the alleged and assumed breach of

---

[9] Mr. Mohan says at paragraph 46 of his Declaration "The claims by the receivers are also subject to Indian law under the terms of the sales contracts" but does not exhibit any such contracts.

charter in failing to go to Mumbai, however, quite apart from the other points I mention.

(b) There is, however, a more general point, namely that all of the three claim documents refer to the sales as having been on c.i.f. (viz. cost, insurance and freight) terms, whether "c.i.f. Mundra" or "c.i.f. Mumbai". I begin by repeating all of the points I made above about the approach of English tribunals to the issue of the conflict of laws and by assuming that the contracts are as they are thus stated to be. The whole idea of a "c.i.f." contract is that it is a contract of sale performable by the transfer by the seller of documents: see *Benjamin's Sale of Goods 17th Ed (2 Sweet & Maxwell, 2007)* Chapter 19. The duty of a c.i.f. seller is (by himself or by his agent) to acquire the goods, secure a contract of carriage, ship the goods, obtain a bill of lading from the carrier and insure the goods against the voyage perils and then deliver to the buyer an invoice for the cost, the bills of lading and the insurance policy. The buyer then acquires rights against the underwriters and against the carrier in respect of the carriage and its risks. The seller has no obligations to the buyer in respect of those risks. Delay in delivery is entirely a matter between the buyer and the carrier under the bill of lading since the only material obligation of a c.i.f. seller with regard to the carriage of goods to their destination is to procure shipment and a reasonable contract of carriage (in accordance with s.32 of the Sale of Goods Act 1979); he is not responsible for the carrier's performance of that contract: see Manbre Saccharine v Corn Products [1919] 1 K.B. 198, esp. p.202, in which case, the seller was entitled to tender a bill of lading and recover the contract price even though, prior to that tender, the ship carrying the contract goods had sunk  This was precisely why I made the point I did in paragraph 18(iii) of my earlier Declaration about remoteness of damage; such a contract of sale under which the seller gives undertakings to the buyer about the carriage would require special knowledge to be conveyed to the carrier, in accordance with the principles of Hadley v Baxendale which I summarised. It is

therefore, not only unforeseeable, it is also inconceivable in law that the Plaintiff could ever have a liability to the buyers, who have asserted claims. An English arbitral tribunal would not hesitate so to conclude, since these points are really little more than a student of international trade law learns in his or her first week's studies.

(c) It will be seen that by far the largest element of the pertinent cargo receiver claims is a claim which has not yet even been made, namely the "anticipated" claim of MMTC Ltd (31,000 mts times US$38 per mt, ie US$1,197,000). If no claim has even been made, it is impossible to think that the Plaintiff has suffered any loss and damage. This seems to be implicitly asserted, or at least acknowledged, by Mr. Mohan himself in paragraph 49 of his Declaration. No claim for that "anticipated" claim can possibly have crystallized.

(d) The above points made about the absence of the Plaintiff's crystallised loss and the form of award being non-monetary and their attendant points, as explained, remain equally true of this head of claim.

Once more, not only was the point I made in paragraph 18(iii) of my earlier Declaration correct as a matter of English law, the further materials provided by the Plaintiff reinforce it so that it is inconceivable that an English arbitral tribunal could or would make a monetary award in the Plaintiff's favour for the amount asserted in the present proceedings by the Plaintiff. A rather telling illustration of this is the "anticipated" claim; no tribunal would award US$1,197,000 to the Plaintiff merely on an *anticipation*.

12. Even in the light of the points made by Mr. Blacker, therefore, I am in no doubt whatever that the three items of damage as asserted by the Plaintiff are irrecoverable in English law. It is pertinent, perhaps, to note that Mr. Blacker (who is critical of my assumptions) says that the issues of remoteness will depend upon the knowledge or intention (the true formulation in English law is "contemplation") of the parties at the time when they entered into the

charterparty, but there is in fact no suggestion of any evidence as to special knowledge being imparted by the Plaintiff to the Defendant at that time. Certainly I am not aware of any such evidence having been placed before this Honorable Court. On that basis, Mr. Blacker's comments are rather greater speculation than any of which he accuses me: I note for example his statement in paragraph 28 *"I should have thought that it is not beyond the bounds of probability that a carrier with their experience would be familiar with the operation of the port of Mumbai during the Monsoon season..."*. That said, it will be apparent, for the additional reasons I set out above, the simple issue of the parties' *hypothetical* contemplation does not render the Plaintiff's claims any the more sustainable in English law. They are simply not sustainable on the evidence adduced by the Plaintiff.

13. With this summary of my views on English law and the result of an English arbitration, let me now turn to the residue of Mr. Blacker's Declaration. I have no quibble with his general summary of the issues as they would be seen by an English arbitral tribunal as he sets them out in paragraph 5. Likewise I have no quibble with his general description of the areas of evidence that will doubtless be gathered. These are typical of a "high exhaust temperatures" case. I note that he takes issue with my description of the case as "run of the mill". Even on his own evidence, he is wrong to do so. I note that he says (in that same paragraph 7) *"My current estimate in line with other London arbitrations I have been involved in concerning **this type of casualty** is that the eventual oral hearing could last two full weeks..."* (emphasis added) and earlier (in paragraph 2) he says this *"Currently **I have at least 10 cases** which are subject to London arbitration proceedings and **where the disputes are very similar to that involving the vessel Frederike Oldendorff... in that they all concern allegations in relation to the fuel on board...**"* (emphasis added). He thus elegantly demonstrates my very point.

14. This leads me to a point which I have to say I approach with as much delicacy as I can muster. The traditional understanding is that claimants are always anxious to proceed with arbitrations as quickly as possible and to give the shortest possible time estimates in order to achieve the earliest possible hearing date and hence award. That traditional understanding has to be seen with one rather important caveat. Since the development of the Rule B Attachment procedure, the position has rather changed. It has been my own experience this year, acting for respondents whose money have been caught by a Rule B Attachment, that they are very keen to have hearings brought on quickly; I have taken part in two expedited hearings brought on at the behest of those respondents. Arbitrators who are members of the London Maritime Arbitrators Association, "the LMAA", are in my experience conscious of these trends and seek to do justice between the parties with them in mind. They are equally conscious that the cost of London arbitration is a serious issue which needs to be addressed.

15. With this in mind, I feel that I might usefully assist this Honorable Court with a brief exposition of how modern maritime arbitrations progress in England. After the exchange of pleadings/submissions (which must now, under the rules of the LMAA be accompanied by supporting documents) there is disclosure of documents, frequently limited to those documents which are directly germane to the dispute and which can be produced with reasonable effort and cost. This is not the old-fashioned wide-ranging discovery process which used to be encountered. That is followed by an exchange of witness statements and those witness statements stand as evidence-in-chief where the witnesses actually attend the hearing, thereby saving considerable amounts of time at the hearing; a great deal of witness evidence is simply taken in statement form without cross-examination. Then there is an exchange of experts' reports, followed by a meeting of experts for the discernment of where they agree and where they disagree; these meetings generate a Joint Memorandum of the experts setting out the areas of agreement and disagreement. Prior to the hearing the parties' counsel exchange Skeleton Arguments, which set out the parties' cases, the

material issues, the material evidence and the material pre-reading for tribunals. Thus, when hearings begin, the tribunals have already had the parties' cases in opening, the witnesses' evidence-in-chief and the experts' Joint Memorandum. Oral openings are, these days, usually fairly short and one goes pretty much straight into the witness evidence with cross-examination of the claimants' witnesses of fact, then cross-examination of the respondents' witnesses of fact, followed by the experts being cross-examined on the issues of their disagreement. Finally the parties' counsel make their closing submissions, which are frequently reduced to writing in advance. This procedure is very much more efficient and cost- and time-saving than used to be the case some years ago. Now, it will be instantly apparent that the major elements in the hearing are cross-examination and counsel's closing submissions. These are my particular areas of expertise, of course and therefore a topic on which I can express some relevant views.

16. I recently had a "high exhaust gas temperatures" case, which was materially more complex than the present and the cross-examination and evidence of the marine engineers was complete well within the space of one day. As an arbitrator, I conducted a fuel contamination case, and the entire case (with some very difficult questions of law, which do not arise in the present case) was completed within three days. I have every reason to think that the present case would not be significantly different. Most if not all London tribunals in such cases will have at least one Marine engineer on the panel, appointed as third arbitrator if not a party-appointee, and most if not all non-technical arbitrators still have considerable experience of this sort of case. The technical evidence would be unlikely to take much more than a day. That would leave the evidence of damages; the vouched element would be evident on the face of the documents and the only issues would be as to what would have happened if there had been no breach. Issues of that sort would be unlikely to fill more than two days. That would leave submissions and they would be relatively straightforward, based on the evidence. This is not a two week case; it would not take three years to reach a conclusion. It also raises only issues of fact (NB that issues of foreign law are

issues of fact for these purposes) and appeals are possible only on issues of English law pursuant to s.69 of the Arbitration Act 1996 and only with the permission of the court, determined on a "paper" application under which permission must be refused unless the tribunal has gone manifestly wrong on an issue of English law or, if the point of law is of general importance and there is a strong case that the tribunal has gone wrong as a matter of law. It is pretty hard to obtain permission to appeal.

17. Now, I of course, accept that Mr. Blacker says it is a two week case that will take three years to reach a conclusion and it would cost US$500,000 and I accept that his experience of the minutiae of costs is greater than mine, although my experience of cross-examination and submissions and thus the estimation of hearing lengths is however greater than his. I note that he agrees with me on the issue of interest awards. He does not mention, however, that interest is awarded only in respect of losses incurred and paid and, where a substantial part of the claim relates to third party liabilities, interest would run only from the date of payment of those liabilities.

18. There is therefore, I accept, some dispute about hearing length and cost, but I think it would be wrong to permit this court to think that it is common ground that this is a case of the procedural duration and cost indicated by Mr. Blacker. It is not. It is my view that this arbitration could and should be completed well within 18 months and for considerably less than the cost proposed by Mr. Blacker.

I declare under penalty of perjury and the laws of the United States of America that the foregoing is true and correct.

Executed at London on 12th December 2007.

_____
Timothy Young Q.C.